# EXHIBIT "1"

STEVEN J. ROTHANS-STATE BAR NO. 106579
SCOTT CARPENTER-STATE BAR NO. 253339
CARPENTER, ROTHANS & DUMONT LLP
500 South Grand Avenue, 19th Floor
Los Angeles, CA 90071
(213) 228-0400 / (213) 228-0401 (Fax)
srothans@crdlaw.com / scarpenter@crdlaw.com

Attorneys for Defendants, City of San Bernardino, a public entity, and Officers Jonathan Davalos and Andres Estrella

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENATO URENA, individually,<br><br>  Plaintiff,<br><br>  vs.<br><br>CITY OF SAN BERNARDINO, JONATHAN DAVALOS, ANDRES ESTRELLA and DOES 1-10, inclusive,<br><br>  Defendants. | Case No.: 5:24-cv-00341-JGB-SHK<br><br>**DECLARATION OF OFFICER JONATHAN DAVALOS** |

I, Officer Jonathan Davalos, declare that:

1. I am a sworn police officer employed by the City of San Bernardino Police Department ("SBPD"), in which capacity I have served for approximately seven years.

2. This declaration is made in connection with the defendants' Motion for Summary Judgment or, in the alternative, Partial Summary Judgment in the above-entitled matter.

3. The following facts are stated from my personal knowledge, except those facts stated on information and belief which I believe to be true, and if called as a witness I could and would so competently testify thereto under oath.

1

DECLARATION OF OFFICER JONATHAN DAVALOS

4. On February 10, 2023, I was on duty assigned as a district resource officer for the SBPD. My partner, Officer Andres Estrella and I had previously received a tip from members of the community about a Hispanic male in a silver Nissa Versa who was possibly armed with a gun around the area of 14th Street near Massachusetts or K Street.

5. On the morning of February 10, 2023, Officer Estrella and I were in a marked SBPD vehicle driving in that area of 14th Street looking for the suspect vehicle. Officer Estrella was driving our police vehicle, and I was seated in the front passenger seat. Officer Estrella and I were familiar with that area of the City, which was a known gang area with houses associated with criminal street gangs.

6. A little before 10:15 a.m. that morning, we observed a Nissan Versa matching the description of the suspect vehicle near the intersection of K Street and 14th Street. When I saw the suspect Nissan, I noticed that it had a cracked windshield – a possible violation of Vehicle Code section 26710. The Nissan turned westbound onto 14th Street and our vehicle followed. While driving westbound, we observed the Nissan go through a stop sign without stopping at the intersection of 14th Street and Garner – a violation of Vehicle Code section 22450.

7. Around this time, we determined to stop the Nissan, but because the area was a known gang area and because an elementary school was also in the vicinity, we waited to initiate the stop until nearing the intersection of 14th Street and Mount Vernon when we activated our vehicle's emergency lights.

8. Instead of pulling over, the Nissan continued driving westbound on 14th Street and I activated our vehicle's siren. We noticed a single male driving the Nissan, and Officer Estrella told me that he could see the driver was reaching around inside the vehicle, which raised suspicion that the driver (who had previously been reported as armed) was attempting to retrieve or conceal a firearm. After continuing westbound on 14th Street, the Nissan then turned northbound onto Mount Vernon while running the stop sign at the intersection of 14th Street

2

DECLARATION OF OFFICER JONATHAN DAVALOS

and Mount Vernon. The Nissan drove diagonally (northwest), crossing the southbound traffic lanes, and approached the west curb of Mount Vernon in front of a driveway leading to an abandoned lot between 14th Street and Magnolia, at which time the suspect driver of the Nissan (later identified as plaintiff Renato Urena) exited the driver's side of the Nissan while grabbing at his waistband with both hands. The suspect then began to flee on foot west through the abandoned lot. Officer Estrella and I exited our vehicle and pursued.

9. As the foot pursuit began, the suspect was still grabbing at his waistband as he fled while wearing baggy pants and a bulky hooded sweatshirt. Based on the prior report and his actions to that point, I believed that the suspect was attempting to retrieve a firearm from his waistband. Officer Estrella and I gave him multiple commands to show us his hands, which he refused to do. I then observed plaintiff retrieve a firearm from his waistband area, at which point Officer Estrella and I slowed down our pursuit and unholstered our firearms. I then gave plaintiff multiple commands to stop reaching, but plaintiff refused to comply and continued running through the abandoned lot where he turned southwest towards a chain-link fenced corner of a nearby residence. The south side of the fence line bordered an area of the abandoned lot that was overgrown with tall, waist-high grass and shrubbery. As the suspect approached that grassy field, I continued to give commands to stop and stop reaching and even warned the suspect that he would be shot.

10. As the suspect entered the grassy field, he turned counterclockwise towards Officer Estrella and myself with a dark-colored firearm in his right hand as if he were targeting us. The suspect then unexpectedly dove down into the thick grass and bushes, which made me believe he was attempting to ambush us from a shooting position under concealment. I yelled to my partner that the suspect had a gun as we approached the brush area. At that time, I could see the suspect laying on his side roughly five yards away facing me with his feet closer to me and his

3
DECLARATION OF OFFICER JONATHAN DAVALOS

arms outstretched towards my partner and I, and I saw the suspect turning towards us and bringing the gun up as if he intended to shoot at my partner and I. In fear of my life and the life of Officer Estrella, and due to the imminent threat of death that the suspect posed, I fired 18 rounds at the suspect. During the course of the shooting, I was continually reassessing the threat the suspect posed, but due his continued furtive movements and due to the limited ability to see his hands and parts of his body because of the thick brush, and because I had not seen the suspect discard his firearm, I fired each shot due to the continued imminent threat I believed the suspect posed. At no point during the incident did I ever see the suspect throw or toss his firearm. I would not have fired if I had seen that.

11. After the shooting, I radioed to dispatch that shots were fired. I ordered the suspect to stop reaching and to put his hands behind his head. After seeing that the suspect was no longer reaching around, Officer Estrella and I approached the suspect through the thick bushes, at which point Officer Estrella handcuffed the suspect and conducted a cursory pat down. I then radioed to dispatch that the suspect was in custody and I requested medical assistance. Dispatch responded that medical aid was in route. I then turned the suspect onto his side into a recovery position and began rendering checking the suspect for wounds and bleeding, while talking to the suspect to keep him alert. As I tended to the suspect, Officer Estrella searched through the brush for the suspect's firearm. Ultimately, paramedics arrived at the scene to treat the suspect and take him to the hospital.

12. A true and correct copy of my body-worn camera recording of the incident is attached hereto as Exhibit "4".

13. I later learned that a loaded handgun was found in the backyard of the residence adjacent to the scene of the shooting (1335 W. Magnolia Ave). I also later learned that DNA on the recovered handgun matched the suspect's. A true and correct copy of the DNA laboratory results of the recovered firearm is attached

hereto as Exhibit "6". In addition, I later learned that plaintiff's vehicle was searched and approximately 278 ammo cartridges of various caliber were located in a bag in the trunk of the vehicle along with a firearm magazine.

14. At no point during my encounter with decedent were my actions due to racial animus or discriminatory motive. At no point during my encounter with the suspect did I ever retaliate against him for any reason.

15. Furthermore, at no point during the subject incident did I act with malice, oppression or in reckless disregard of constitutional rights. At no point during my interaction with plaintiff did I use any force other than for the legitimate law enforcement purposes I believed were reasonably necessary under the circumstances and based on the safety risks known to me at the time.

16. There does not exist, nor did there exist at the time of the events underlying this action that gives rise to this litigation, within the SBPD, nor does the SBPD condone, a custom, practice or policy of permitting officers to falsely detain and/or arrest members of the public, target certain individuals, conduct unlawful searches or seizures, use excessive force, discriminate against members of the public, or retaliate against persons for exercising their rights.

17. Based on all of the information available to me at the time, as well as my own observations, I believe my actions and the actions of Officer Estrella were reasonable and justified under the circumstances.

* * * * *

5

DECLARATION OF OFFICER JONATHAN DAVALOS

\* \* \* \* \*

I declare under penalty of perjury that the foregoing is true and correct. Executed this __th day of March 2026 at San Bernardino, California.

_____
OFFICER JONATHAN DAVALOS - Declarant