# EXHIBIT "7"

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

RENATO URENA, individually,

    Plaintiff,

v.                            Case No.  5:24-cv-00341-JGB-SHK
CITY OF SAN BERNARDINO;
JONATHAN DAVALOS; ANDRES
ESTRELLA and DOES 1-10, inclusive,

    Defendants.
_____/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEO DEPOSITION OF JONATHAN DAVALOS

THURSDAY, JUNE 26, 2025

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No.  17495

---

Page 2

APPEARANCES (Remote)

FOR THE PLAINTIFFS:

        LAW OFFICES OF DALE K. GALIPO
        BY:  DALE K. GALIPO, ESQ.
             RENEE MASONGSONG, ESQ.
        21800 Burbank Boulevard, Suite 310
        Woodland Hills, California 91367
        818.347.3333
        dalekgalipo@yahoo.com
        rvalentine@galipolaw.com

FOR THE DEFENDANTS:

        CARPENTER, ROTHANS & DUMONT LLP
        BY:  SCOTT CARPENTER, ESQ.
        500 S. Grand Ave., 19th Floor
        Los Angeles, CA 90071
        scarpenter@crdlaw.com

ALSO PRESENT:  ANDRES ESTRELLA

--oOo--

---

Page 3

INDEX OF EXAMINATION

WITNESS:  JONATHAN DAVALOS

EXAMINATION BY                                PAGE

    MR. GALIPO.............................4

EXHIBITS FOR REFERENCE

EXHIBIT              DESCRIPTION              PAGE

1 - Officer Davalos's body-worn
    camera footage...........................85

2 - Officer Estrella's body-worn camera
    footage..................................93

--oOo--

---

Page 4

--oOo--

        BE IT REMEMBERED, that set on Thursday, the

26th day of June, 2025, commencing at the hour of

9:43 a.m., thereof, JONATHAN DAVALOS appeared remotely in

San Bernardino, California, before me, Kimberly E.

D'Urso, an RPR and Certified Shorthand Reporter of the

State of California, the following deposition was

stenographically reported by me:

        (Whereby the Certified Shorthand Reporter

        introduced herself on the record and

        administered the oath to the deponent.)

        THE VIDEOGRAPHER:  Good morning.  We are on

record at 9:43 a.m. Today's date is June 26, 2025.

This is the recorded remote deposition of Jonathan

Davalos, in the matter of Renato Urena versus City of

San Bernardino, Case Number 5:24-cv-00341 JGBSHK.

        This deposition is being held via web

conference.  My name is Said Hofiani.  I am the

videographer with Focus Litigation Solutions.  The court

reporter is Kimberly D'Urso.

        Counsel, please introduce yourselves and state

whom you represent, after which the court reporter will

state his or her CSR license number and swear in the

witness.

Page 5

MR. GALIPO:  Dale Galipo, on behalf of the
plaintiff.

MS. MASONGSONG:  Renee Masongsong, on behalf of
the plaintiff, as well.

MR. CARPENTER:  Scott Carpenter, on behalf of
the defendant, the City of San Bernardino, and Officers
Davalos and Estrella.  Both individuals are present in
this conference room today.

(Whereupon the Certified Shorthand Reporter
administered the oath to the deponent.)

THE WITNESS:  I do.

MR. GALIPO:  Okay.  Thank you.

EXAMINATION

BY MR. GALIPO:

Q.   Can you please state your name?

A.   Jonathan Davalos.

Q.   Have you ever had your deposition taken before?

A.   No, sir.

Q.   Have you testified in court before?

A.   Yes, sir.

Q.   How many times have you done that,
approximately?

A.   Over a hundred times, sir.

Q.   How long have you been a law enforcement
officer?

Page 6

A.   Approximately, seven years, sir.

Q.   Are you able to hear me okay so far?

A.   Yes, sir.

Q.   If you have any trouble hearing me at any time,
will you please let me know?

A.   Yes, sir.

Q.   I'm going to try to ask questions that you can
understand; but if for any reason you don't understand
one of my questions, you let me know, and I'll try to
re- ask it in a better way.

Does that sound good?

A.   Yes, sir.

Q.   Also, I usually go about an hour and then take
a break; but if you need to take a break at any time
before that, for any reason, just let me know and we'll
take a break at that time.

Does that sound okay?

A.   Yes, sir.

Q.   Have you reviewed any documents to help prepare
for the deposition?

A.   Yes, sir.

Q.   Can you please tell me what you have reviewed?

A.   My body camera and just a summary of the
incident.

Q.   And when you say a "summary of the incident," I

Page 7

know you gave an interview to Homicide at some point; is
that correct?

A.   Yes, sir.

Q.   Was that recorded, to your knowledge?

A.   Yes, sir.

Q.   Have you ever listened to the recording?

A.   No, sir.

Q.   Have you ever been provided with a transcript
of the interview?

A.   A summary of it, sir.

Q.   So the summary of the incident that you refer
to would be a summary of your interview?

A.   Yes, sir.

Q.   Anything else you can think of that you
reviewed?  Maybe radio dispatch?  CAD printout?
Policies?  Anything else?

A.   Policies, sir.

Q.   Which policy or policies did you review?

A.   The use of force policies, sir.

Q.   And did that include the use of deadly force?

A.   Yes, sir.

Q.   Your interview that you gave to Homicide, do
you recall if you gave it the same day as the shooting
or another day?

A.   It was the same day, sir.

Page 8

Q.   Were you given an opportunity to look at your
body-worn camera video before you gave the interview?

A.   Yes, sir.

Q.   And did you look at it before the interview?

A.   Yes, sir.

Q.   Did you have an attorney or some representative
there on your behalf?

A.   Yes, sir.

Q.   Do you recall the person's name?

A.   Yes, sir.

Q.   What is the person's name?

A.   It's on the tip of my tongue.  I apologize,
sir.

Q.   Okay.  Hold on.  Maybe I can help you.

A.   Sure.

Q.   Was it Castillo?

A.   Yes.

Q.   Okay.  Do you know if your partner that day
also gave a statement on the day of the incident?

A.   Yes, sir.

Q.   And did he have the same attorney, if you know?

A.   Yes, sir.

Q.   Can you give me an estimate as to how many
times you have reviewed a summary of your interview?

A.   Approximately, two to three times, sir.

Page 21

```
 1    A.   Yes, sir.
 2    Q.   Were you intentionally pressing the trigger
 3  each time, or do you think some of the shots were
 4  accidental?
 5    A.   I intentionally did it, sir.
 6    Q.   And when you were firing, were you aiming
 7  center mass at the person?
 8    A.   Yes, sir.
 9         MR. CARPENTER:  Objection.  Vague.  Overbroad.
10         But go ahead.
11  BY MR. GALIPO:
12    Q.   And what does "center mass" mean to you?
13    A.   The center of their body, sir.
14    Q.   When you work as a law enforcement officer, do
15  you wear a ballistic vest?
16    A.   Yes.
17    Q.   And is that to provide you at least some
18  protection in case someone tries to shoot at you?
19    A.   Yes, sir.
20    Q.   Were you trained that shooting someone center
21  mass could potentially cause serious injury or death?
22    A.   Yes, sir.
23    Q.   Before you fired your first shot, did you hear
24  any other shots being fired?
25    A.   No, sir.
```

Page 22

```
 1    Q.   And after you fired your last shot, did you
 2  hear any other shots being fired?
 3    A.   Yes, sir.
 4    Q.   How many shots did you hear being fired after
 5  you fired your last shot?
 6    A.   I -- I don't remember, sir.
 7    Q.   Do you have any estimate whether it was two to
 8  four, or whatever applies?
 9    A.   I -- approximately, three to four, sir.
10    Q.   And do you know who fires those three to four
11  shots after you stopped firing?
12    A.   My partner, sir.
13    Q.   And was your partner Officer Estrella?
14    A.   Yes, sir.
15    Q.   Were you partnered up with Officer Estrella on
16  the day of the incident?
17    A.   Yes, sir.
18    Q.   And did you have an understanding as to what
19  his assignment was?
20    A.   We both were district resource officers, sir.
21    Q.   And you talked about working with transients,
22  things of that nature in that position?
23    A.   Yes, sir.
24    Q.   Do you recall your shift hours at the time?
25    A.   Yes, sir.
```

Page 23

```
 1    Q.   What were they?
 2    A.   They were 7:00 to 5:00, sir.
 3    Q.   And would you two generally be, when you were
 4  out in your patrol vehicle, together during the shift?
 5    A.   Yes, sir.
 6    Q.   Do you recall who was driving that day?
 7    A.   Officer Estrella, sir.
 8    Q.   You would have been in the front seat
 9  passenger?
10    A.   Yes, sir.
11    Q.   Now, I have reviewed your statement, and it
12  appears you had some information about some car with
13  someone in it that possibly had a gun?
14    A.   Yes, sir.
15    Q.   What information did you have?
16    A.   We go to a lot of meetings, called -- at the
17  time, as district resource officers, as part of our
18  duties.  They're called "Coffee with a Cop."  As well as
19  we constantly communicate and engage with the community
20  on our assigned area, which was the west side at the
21  time, sir, the Adam beat.
22         And so we had heard complaints of somebody who
23  was driving around in that vehicle, that was possibly
24  armed, sir.
25    Q.   And when did you first receive this
```

Page 24

```
 1  information?  Was it on the day of the incident?
 2    A.   I couldn't quite -- it wasn't the day of the
 3  incident.  Like, I can't say if it was exactly then or a
 4  week before, a couple weeks.  It was around the time of
 5  the incident.
 6    Q.   Okay.  It wasn't the day of the incident.  It
 7  may have been a week or two before?
 8    A.   Or the day before.  I don't know the exact
 9  date.
10    Q.   Did you have a license plate of the car?
11    A.   No, sir.
12    Q.   Did you have the name of the person driving the
13  car that was suspected of having a firearm?
14    A.   No, sir.
15    Q.   Did you have -- for example, were you given any
16  specifics as to his age, height, weight?
17    A.   No, sir.
18    Q.   Were you told what his race was?
19    A.   I believe Hispanic, sir.
20    Q.   Do you think you were told that?
21    A.   I believe so, sir.  Yes.
22    Q.   Were you told what year the car was?
23    A.   No, sir.
24    Q.   Did you get this information from one person or
25  more than one person?
```

Page 25

1    A.   Just the community, sir.

2    Q.   And when you say "the community," are you

3    saying that you got it from more than one person?

4    That's what I'm trying to figure out.

5    A.   So, when I say "the community," sir, there's

6    times when we speak to groups of people.  So one person

7    will say something, and then other people will say, "Oh,

8    yes, I've seen that, as well," or "I've heard this as

9    well," et cetera.

10        So when I say "the community," it's more than

11   one person, sir.

12   Q.   And where were you when you received this

13   information?

14   A.   Like I said, sir, I'm not sure if it was with

15   the "Coffee with a Cop" or community engagements.  Just

16   speaking with people in the community.  I don't recall

17   that exactly, sir.

18   Q.   Okay.  For example, you don't recall if it was

19   in a park or where it was?

20   A.   No, sir.

21   Q.   And you don't recall the names of any of the

22   individuals?

23   A.   No, sir.

24   Q.   These were just normal people in the community?

25   A.   Yes, sir.

Page 26

1    Q.   Were you looking for this particular vehicle,

2    or did you just happened to see it?

3    A.   Just happened to see it, sir.  We were doing

4    extra patrol in the area.  So we're in the area, and if

5    we happen to see the vehicle, we happen to see it.

6    Q.   So it's not like you were specifically looking

7    for it that day; is that fair?

8    A.   No, sir.

9    Q.   I asked a bad question.

10        Were you specifically looking for that vehicle

11   that day?

12   A.   No, sir.

13   Q.   At some point, you see the vehicle that you

14   ended up pulling over, or your partner did; correct?

15   A.   Yes, sir.

16   Q.   And where was the vehicle when you first saw

17   it?

18   A.   It was driving westbound on 14th Street, from

19   Massachusetts, sir.

20   Q.   Did you see it committing any traffic

21   violations, initially?

22   A.   At the time of the traffic stop?

23   Q.   No; when you initially saw it?  In other words,

24   was it speeding or something when you first saw it?

25   A.   It proceeded through a stop sign, sir.

Page 27

1    Q.   When you first saw it, it was proceeding

2    through a stop sign.

3    A.   As we saw it, it proceeded through a stop sign,

4    sir.

5    Q.   When you say "proceeded through" --

6         (Simultaneous speakers.)

7    A.   I'm sorry.

8    Q.   -- can you help explain that?  Because

9    sometimes people totally blow a stop sign.  Sometimes

10   they do, like, a rolling stop.  What did you observe?

11   A.   Proceeding through the stop sign without

12   stopping, sir.

13   Q.   And what stop sign was that, if you recall?

14   A.   I do not recall, sir.

15   Q.   How was it going through the stop sign?

16   A.   I'd say -- I -- I don't recall, sir.  I just

17   know it did not stop.

18   Q.   Do you recall what street it was on, at least?

19   A.   I believe Mount Vernon, sir -- or there's a

20   street prior to Mount Vernon, actually.  I apologize.

21   Q.   Which direction was the vehicle going when it

22   went through the stop sign?

23   A.   Westbound, sir.

24   Q.   Did you see it go through any other stop signs?

25   A.   Yes, sir.

Page 28

1    Q.   What other stop signs?

2    A.   Mount Vernon, sir.

3    Q.   How fast was it going through that stop sign?

4    A.   I don't recall, sir.  At that point, we had

5    initiated the traffic stop.

6    Q.   You already had put the overhead lights on?

7    A.   Yes, sir.

8    Q.   When you first saw the vehicle, was it coming

9    in the opposite direction as you were, or perpendicular?

10   How would you describe that?

11   A.   It was driving westbound, as we were, sir, so

12   we were behind it.

13   Q.   Okay.  Could you see the driver, initially?

14   A.   No, sir.

15   Q.   At some point, the vehicle pulls over -- well,

16   strike that.

17        I guess, at some point, the driver got out

18   while the vehicle was still moving?

19   A.   Yes, sir.

20   Q.   Could you see the driver at all before he got

21   out, in terms of his face?

22   A.   No, sir.

23   Q.   Did you see what you believed to be a gun in

24   the vehicle before the driver got out?

25        MR. CARPENTER:  Objection.  Vague.

Page 29

1    Go ahead, if you understand.

2    THE WITNESS:  No, sir.

3 BY MR. GALIPO:

4    Q.    Did you, at some point, see the driver open the

5 door and exit the vehicle?

6    A.    Yes, sir.

7    Q.    And when the driver did that, could you see any

8 object in his hands when he first got out of the

9 vehicle?

10   A.    No, sir.

11   Q.    Was the driver faced in your direction for any

12 period of time, when initially getting out of the

13 vehicle?

14   A.    No, sir.

15   Q.    Did he pretty much turn away from you and start

16 to run?

17   A.    Yes, sir.

18   Q.    Could you see either one of his hands as he was

19 running?

20   A.    As soon as he got out of the vehicle, sir?

21   Q.    Yeah.  After he got out -- it sounds like he

22 got out and started running almost right away; is that

23 fair?

24   A.    Immediately after, yes, sir.

25   Q.    And when he was running away from you, which

Page 30

1 direction was he running?

2    A.    Westbound, sir.

3    Q.    And you would have got out of the patrol

4 vehicle on the passenger's side?

5    A.    Yes, sir.

6    Q.    And your partner would get out on the driver's

7 side?

8    A.    Yes, sir.

9    Q.    And then there was a foot pursuit?

10   A.    Yes, sir.

11   Q.    During the foot pursuit -- so I'm talking about

12 the beginning portion of the foot pursuit, before he got

13 to the brush area and that fence line and all that.  But

14 during the initial foot pursuit, could you see his

15 hands?

16   A.    Yes, sir.

17   Q.    And what, if anything, did you see his hands

18 doing?

19   A.    Holding his waistband, sir.

20   Q.    And did you see him holding his waistband with

21 one hand or both hands?

22   A.    I particularly noticed the right hand, sir.

23   Q.    And what part of the waistband did the right

24 hand appear to be holding?

25   A.    His right side, sir.

Page 31

1    Q.    What, if anything, was he doing with his left

2 hand at that point?

3    A.    Like, running.  When someone runs, moving in a

4 forward and backward motion, sir.

5    Q.    So the left hand was kind of swinging in a

6 normal running motion, but the right hand was holding

7 the right waistband?

8    A.    Yes, sir.

9    Q.    And did that make you think, based on your

10 experience, that he possibly had a firearm?

11   A.    Yes, sir.

12   Q.    How far do you think you were from him,

13 generally, when you were initially chasing him on foot?

14   A.    At what point, sir?  Would you -- I guess I

15 want to clarify; as far as the initial part, when I

16 first saw the firearm?  I just want to make sure I'm

17 answering correctly.

18   Q.    Yeah.  That's a fair clarification.  Let's just

19 break it down little by little.

20         Initially, when you first started chasing him,

21 after he got out of his car and you got out of yours,

22 what would you estimate the distance to be between you

23 and him?

24   A.    About 8 to 10 yards, sir.

25   Q.    Just to make sure we're on the same page -- I

Page 32

1 know football season is going to be starting in a month

2 or so, but is that like 24 to 30 feet?

3    A.    Yes, sir.

4    Q.    And do you know where your partner was

5 initially, in the pursuit, relative to you?

6    A.    He was on my left-hand side, sir.  He was

7 getting out of the driver's seat.

8    Q.    Were you initially closer to the suspect than

9 your partner was?

10   A.    I'd say we were about the same distance, sir.

11   Q.    Would your partner be generally to your left?

12   A.    Yes, sir.

13   Q.    And were you giving some commands at that

14 point?

15   A.    Are we still speaking initially getting out of

16 vehicle?

17   Q.    Yeah.  So let's just say -- let me break it

18 down.  Maybe we could do it this way.

19         I know eventually the person ran all the way to

20 that area where the brush was; is that correct?

21   A.    Yes, sir.

22   Q.    And you've seen probably photos or at least the

23 body-worn camera footage of the area?

24   A.    Yes, sir.

25   Q.    And it looks like to the right of the brush

Page 33

```
 1  there's some fence line there.  Do you recall that?
 2      A.   Yes, sir.
 3      Q.   Do you have an estimate as to how far that was
 4  from where he got out of his car to where that brush
 5  area begins or that fence line is?
 6      A.   I'd say approximately 40 yards, sir.
 7      Q.   40 yards.  So, again, I'm doing my simple math.
 8  That's about 120 feet?
 9      A.   Yes, sir.
10      Q.   Okay.  So just for discussion purposes, let's
11  take the first half of that, the first 20 yards, or the
12  first 60 feet of the foot pursuit.
13           Are you with me?
14      A.   Yes.
15      Q.   Okay.
16      A.   Yes, sir.
17      Q.   Well, were you giving him any commands in that
18  initial part of the foot pursuit?
19      A.   Yes, sir.
20      Q.   And what commands were you initially giving?
21      A.   "Stop reaching," sir.
22      Q.   Anything else that you can recall saying in the
23  initial 60 feet or so?
24      A.   "Stop reaching."  I said it multiple times.
25      Q.   Okay.  Multiple commands to "Stop reaching"?
```

Page 34

```
 1      A.   Yes, sir.
 2      Q.   And I guess what I'm wondering, in that first
 3  part of the foot pursuit, the first 60 feet or so, do
 4  you recall any giving any other commands, other than the
 5  multiple commands to "Stop reaching"?
 6      A.   No, sir.
 7      Q.   Do you recall if your partner gave any commands
 8  in that first approximate 60 feet?
 9      A.   I do not recall, sir.
10      Q.   Now, did you see a gun in his hand at any point
11  in time, an actual firearm, in that first 60 feet?
12      A.   I'd say at the end of the 60 feet, sir.
13      Q.   Okay.  And what did you see at the end of the
14  60 feet?
15      A.   The subject taking out a firearm from the right
16  side of his waistband area, sir.
17      Q.   Okay.  So you would have seen that, and he
18  still would have been 60 feet from the brush or the
19  fence line?
20      A.   The initial 60 feet we're talking about; right?
21      Q.   Right.  So here's what I'm imagining.  Just
22  correct me if I have it wrong.  If the total is about
23  120 feet or 40 yards --
24      A.   Okay.
25      Q.   -- about half of that would be 60 feet?
```

Page 35

```
 1      A.   Yes, sir.
 2      Q.   So I'm imagining, based on what you're telling
 3  me, that he was about half the distance between his car
 4  and the brush when you saw him pull the gun out.
 5      A.   Yes, sir.
 6      Q.   Am I getting that correct?
 7      A.   Yes, sir.
 8      Q.   Okay.  And what, if anything, did he do with
 9  the gun at that point?
10      A.   I saw him pull it out and lift it up initially,
11  sir, as he was running, like, in a running motion.  So
12  take it out and point it up.
13      Q.   Okay.  And you're demonstrating, like, over his
14  right shoulder?
15      A.   As in initially taking it out, sir, and then
16  continuing, like, a running motion, with it afterwards.
17      Q.   Okay.  So when he initially took it out, you
18  saw him raise it above his right shoulder?  And then
19  after that, it was like a running motion?  Is that what
20  you're saying?
21      A.   Yes, sir.
22      Q.   Could you tell at that point if the gun was one
23  color or more than one color?
24      A.   I could not, sir.  I just saw a black object.
25      Q.   Could you see if it was in a holster or not at
```

Page 36

```
 1  that point?
 2      A.   I could not, sir.
 3      Q.   So based on your recollection, he would have
 4  been running an approximate -- another 60 feet, with the
 5  gun in his right hand, before he got to the brush?
 6      A.   Yes.
 7      Q.   During that 60 feet -- so I'm talking about
 8  before he got to the brush or the fence line.  I'm
 9  talking about the second part or the second half of that
10  foot pursuit.
11           Are you with me?
12      A.   Yes, sir.
13      Q.   Did he ever point the gun at you?
14      A.   No, sir.
15      Q.   Did he ever turn towards you with the gun?
16      A.   We're speaking before the brush; correct?
17      Q.   Before the brush.
18      A.   No, sir.
19      Q.   Based on your training, seeing him running with
20  a gun in his hand, before he got to the brush, did you
21  think it would have been appropriate to shoot him?
22      A.   Prior to him pointing it at me?
23      Q.   Prior to him pointing it at you.
24      A.   No, sir.
25      Q.   In other words, as we talked earlier, based on
```

Page 37

1  your training, just because someone has a gun in their
2  hand or is running with a gun in their hand, that alone
3  would not justify shooting them; is that fair?
4      A.  Yes, sir.
5      Q.  But if they're pointing the gun at you, that's
6  different, based on your training, because then that
7  poses an immediate or imminent threat of death or
8  serious body injury to you?
9      A.  Yes, sir.
10     Q.  Or to others, like your partner?
11     A.  Yes, sir.
12     Q.  So if I'm understanding your testimony,
13  although you saw a gun in his right hand for the last 60
14  feet, before he got to the brush, you're saying he never
15  pointed it at you at that time or turned towards you
16  and, therefore, you did not shoot him at that point?
17         Am I understanding your testimony correctly?
18     A.  His head turned towards us to look back, sir.
19  But if you're asking as if his whole body did, no, sir.
20     Q.  He might have just looked over his shoulder a
21  few times as he was running?
22     A.  Yes, sir.
23     Q.  Now, did you ever get a look at his face before
24  he got to the brush?
25     A.  No, sir.

Page 38

1      Q.  Did you have any -- strike that.
2          Did you know, for example, his name or anything
3  like that?
4      A.  No, sir.
5      Q.  Did you know if he had any criminal history,
6  for example?
7      A.  No, sir.
8      Q.  Any information he was on probation or parole?
9      A.  No, sir.
10     Q.  Any information that he'd ever been violent
11  with anyone in the past?
12     A.  No, sir.
13     Q.  Any information that he had ever injured anyone
14  in his whole life?
15     A.  No, sir.
16     Q.  And you certainly, obviously, didn't have any
17  specific information that he was affiliated with any
18  gang.  Would you agree with that?
19     A.  Yes, sir.  I would agree with that.
20     Q.  So you told me about the commands you initially
21  gave him in the first part of the foot pursuit.  Did you
22  give additional commands in the second part of the foot
23  pursuit, before he got to the brush?
24     A.  Yes, sir.
25     Q.  And what additional commands did you give?

Page 39

1      A.  I told him to stop running or I was going to
2  shoot him.
3      Q.  Okay.  Anything else you recall?
4      A.  No, sir.
5      Q.  So initially, it was multiple commands to "Stop
6  reaching."  And then at some point, you told him stop
7  running or you're going to shoot him?
8      A.  Yes, sir.
9      Q.  And when you told him stop running or you're
10  going to shoot him, this was still in the -- I guess,
11  the second half of the foot pursuit?
12     A.  Yes, sir.
13     Q.  You were getting closer to the brush at this
14  point?
15     A.  Yes, sir.
16     Q.  You were telling him that, I take it, in hope
17  that he would stop running?
18     A.  Yes, sir.
19     Q.  Based on your training, you weren't really
20  going to shoot him just for running at that point, were
21  you?
22     A.  No, sir.
23     Q.  At some point, when he got to the brush, did
24  you see him go to the ground in the brush?
25         MR. CARPENTER:  Objection.  Vague.

Page 40

1          Go ahead.
2          THE WITNESS:  I guess if I can ask for
3  clarification.  Gets to the brush, goes to the ground.
4  Are you asking me to skip over the part where he turned
5  around towards us with his firearm?  You're just asking,
6  in general, if he laid down in the brush?
7  BY MR. GALIPO:
8      Q.  Yeah.  I'm going to go through each part.  I
9  realize I'm skipping a little bit here.
10         I just wanted to know, at some point, when he
11  got in the brush, did he go -- end up going to the
12  ground?
13     A.  Yes, sir.
14     Q.  And do you have an estimate as to how much time
15  passed from him getting to the brush, actually
16  physically getting to the brush and going to the ground?
17     A.  I'd say approximately two seconds, sir.
18     Q.  And were any shots fired before he went to the
19  ground?
20     A.  No, sir.
21     Q.  So all of your shots, all 18 shots, would have
22  been fired after he went to the ground?
23     A.  Yes, sir.
24     Q.  And you believe the shots fired by your partner
25  were also all fired after the person went to the ground?

Page 41

1    A.   Yes, sir.

2    Q.   When he went to the ground, in the brush,

3  approximately how far into the brush was he?

4    A.   As far as his distance from mine, or the start

5  of the brush line?

6    Q.   Let's do both.  How far was he, approximately,

7  from the start of the brush line?

8    A.   I'd say approximately 8 to 10 yards, sir.

9    Q.   So, again, I'm doing my simple math, but 24 to

10  30 feet?

11    A.   Yes, sir.

12    Q.   And where were you positioned in relation to

13  the start of the brush when he went to the ground?

14    A.   I was approximately, I'd say, about a foot away

15  from the brush, sir.

16    Q.   Did you hear your partner saying anything

17  before Mr. Urena got to the brush?

18    A.   I know he gave commands.  I just don't remember

19  exactly the commands, sir.

20    MR. GALIPO:  Okay.  We've been going about an

21  hour, I think.  Is this a good time for, like, a

22  ten-minute break for everyone?

23    MR. CARPENTER:  Yes.

24    MR. GALIPO:  Okay.  We'll have our videographer

25  take us off the record.

Page 42

1    THE VIDEOGRAPHER:  Going off record at 10:35

2  a.m.

3    (Break taken.)

4    THE VIDEOGRAPHER:  We are back on record at

5  10:48 a.m.

6  BY MR. GALIPO:

7    Q.   So you told me the distance you were at,

8  approximately, during the first part of the pursuit,

9  from Mr. Urena.  Did that change in the second part?  In

10  other words, that last 60 feet before the brush, did

11  that change your distance from him?  Did you try to slow

12  down a little bit to create distance?

13    A.   Yes, sir.

14    Q.   And can you explain that to me?  What was your

15  initial distance?  And then after slowing down, what

16  distance did you create?

17    A.   We slowed down once the firearm came out, sir.

18  So once I saw the firearm, my partner and I slowed down,

19  and at that point, we drew our firearms.

20    And this is the second part of it from the

21  initial 60 feet to the brush.  That's when we slowed

22  down and gave -- drew our firearms and gave the

23  commands.  And then at that point, we still ran after

24  him, but just at a more slower pace, to kind of give a

25  distance.

Page 43

1    Q.   Okay.  And then what would you say your

2  distance was during the last part of the foot pursuit,

3  from Mr. Urena?

4    A.   I'd say about 10 to 15 yards, sir.

5    Q.   So you pulled out your firearm about midway in

6  the foot pursuit.  Is that what you're saying?

7    A.   Once I saw him pull his out, yes, sir.

8    Q.   When he was initially running and you saw his

9  hand on his waistband, it sounds like you thought he

10  might have a gun at that point; correct?

11    A.   Yes, sir.

12    Q.   Plus, I think you told me before that you had

13  information that a person driving a car like that might

14  possibly have a gun?

15    A.   Once -- we -- yes.  Yes, sir.

16    Q.   So those two points together and then the

17  person's running holding their waistband, you thought he

18  probably had a gun at that point; is that fair?

19    A.   Yes, sir.

20    Q.   But you did not pull out your gun yet?

21    A.   No, sir.

22    Q.   You're saying you didn't pull out your gun

23  until you saw a gun in his hand?

24    A.   Yes, sir.

25    Q.   And you believe your partner pulled out his gun

Page 44

1  at about the same time as you did?

2    A.   Yes, sir.

3    Q.   Is that something you were aware of at the

4  time, or something more you noticed when watching the

5  video recently?

6    A.   When watching the video, sir.  But at the time,

7  I did notice we both were at the same distance, I guess,

8  so to speak, once we saw the firearm out.

9    Q.   And how long do you think it took to run that

10  last 60 feet, the last 60 feet before the brush?

11    A.   Four seconds, five seconds, sir.

12    Q.   How would you describe the gait?  Was it, you

13  know, a jog?  A run?  A sprint?  Anyway you want to

14  describe it.

15    A.   The gate?  Like, not the fence line, like --

16    Q.   I used a bad word.  When I said "gait," I

17  didn't mean the "gate," like G-A-T-E.  I was meaning the

18  "gait," like G-A-I-T.

19    A.   Okay.

20    Q.   In other words, how fast were you moving, I

21  guess, is what I want to know?

22    A.   I would call it a jog, sir.

23    Q.   And if I'm understanding what you told me

24  before we took our break, prior to Mr. Urena getting to

25  the brush, he did not point the gun at you; is that

Page 45

1  correct?
2      A.  I just want to clarify, once he got around the
3  area of the brush, he did.  So I don't want it to show
4  that he pointed it only at the brush.  Before he went
5  into the brush, he did right before he did.  So I just
6  want to make that clear.
7          So I want to make it clear that it was during
8  the run, the initial 60 feet -- no -- toward at the end
9  of the 60 feet, yes.
10     Q.  Okay.  Well, that's helpful.  So let me just
11 follow-up on that.
12         Are you saying he pointed a gun at you just
13 before he got to the brush?
14     A.  Yes.
15     Q.  And how far would you estimate he was from the
16 brush when he pointed the gun at you?
17     A.  Right at the brush line, so a couple inches, I
18 would assume.  Like I said, I wasn't right on him, but
19 he was at the brush line.  It could have been a couple
20 inches before or a couple inches into, but it was right
21 at the brush line.  And he was standing up still at that
22 point.
23     Q.  And what hand did he have the gun in at that
24 point?
25     A.  His right, sir.

Page 46

1      Q.  And did he turn to face you at that point?
2      A.  Yes, sir.  I would like to demonstrate how, if
3  that's possible.  It wasn't like a full turn towards me.
4  It was like a partial turn, if I can demonstrate?
5      Q.  Yeah.  If you want to demonstrate, that's okay.
6      A.  Okay.  Would you like me to stand up to do it?
7      Q.  Well, the only problem is if you stand up, we
8  probably can't see you because --
9          MR. CARPENTER:  Yeah --
10         (Simultaneous speakers.)
11         MR. CARPENTER:  -- describe it.
12 BY MR. GALIPO:
13     Q.  Can you show the upper body, as you're sitting?
14     A.  So he was running back towards me.  Once we
15 approached the brush line, he turned his upper torso.
16 So let's say the wall is -- where we are,
17 behind me, he turned his upper torso, also, towards me,
18 with his right hand still having the firearm, and
19 pointed it in our direction --
20     Q.  Okay.
21     A.  -- if that makes sense.
22     Q.  Okay.  You have him turning to his left; is
23 that correct?
24     A.  Yes, sir.
25     Q.  Kind of like a quarter turn, with his left

Page 47

1  shoulder to you?
2      A.  The left shoulder would have been turned, as
3  well.  I'd say, like, the side of his left shoulder, not
4  back of it, but side of it, facing towards us, as well.
5      Q.  Okay.  And you're saying that the gun was in
6  his right hand and pointed in your direction at that
7  time?
8      A.  Yes, sir.
9      Q.  How long did you see the gun pointed at you?
10 Was it a split-second or something else?
11     A.  I'd say about a second, sir.
12     Q.  And you're saying that happened right as he was
13 just before or getting to the brush line?
14     A.  Right around the brush line; yes, sir.
15     Q.  So let me just follow up on a few questions.
16         When you saw the gun about halfway in the foot
17 pursuit, as you described, there was still about 60 feet
18 to go to the brush line?  Is that generally correct?
19     A.  Approximately, yes, sir.
20     Q.  And you said it would be about four to five
21 seconds to travel that distance?
22     A.  Yes, sir.
23     Q.  Did you yell out "Gun" as you are trained to
24 do, upon seeing the gun when you were halfway in the
25 pursuit?

Page 48

1      A.  I don't recall if it was right at halfway.  I
2  do know that once we got to the brush line, I yelled,
3  "He has a gun.  He has a gun."
4      Q.  Right.  I'm just wondering if you yelled it as
5  soon as you saw it, to alert your partner?
6      A.  I -- I don't believe so, sir.
7      Q.  So do you believe you yelled, "Gun, gun," or
8  words to that effect, after he got to the brush line or
9  before?
10     A.  When -- when -- around the time that he was at
11 the brush line, sir.
12     Q.  Did you ever give him a command to drop the
13 gun?
14     A.  I told him that he was going to get shot
15 because of the firearm, as far as if he didn't drop it
16 or if he kept running with it, like you said -- like we
17 had mentioned earlier, to dissuade him from running with
18 the firearm.
19     Q.  Okay.  But it sounds like when you initially
20 saw the firearm, halfway through the foot pursuit, you
21 did not yell out "Gun" at that time; is that correct?
22     A.  I don't think so, sir.
23     Q.  And you did not yell "Drop it" at that time; is
24 that also correct?
25     A.  I don't recall that.

Page 49

1  Q.  And I think you told me you said something
2  like, you know, "Stop running or you're going to get
3  shot"?
4  A.  Yes, sir.
5  Q.  But that -- it sounds like you said that before
6  you yelled "Gun" or referred to the gun.  Is that also
7  fair?
8  A.  That was once he pulled the firearm out, I told
9  him that.  So I had drawn my firearm at that point.  So
10  this is at the halfway point.
11  Q.  And I think you told me earlier that, although
12  you told him that, based on your training, you were
13  aware that it would be inappropriate to shoot him just
14  for running with the gun?
15  A.  Yes, sir, which is why I didn't.
16  Q.  Did you have your -- when you told him to stop
17  running or you're going to shoot him, or words to that
18  effect, did you have your gun pointed at him?
19  A.  Yes, sir.
20  Q.  And so when he got in the brush and turned to
21  his left, as you described, with the gun in his right
22  hand, did you say "Drop it" at that point?
23  A.  I yelled "He has a" -- once he's in the brush;
24  is what you're saying?
25  Q.  Well, no.  At the time -- I'm trying to focus

Page 50

1  on this time where you demonstrate him turning to his
2  left with the gun in his right hand, pointed to -- in
3  your direction, did you say anything to him at that
4  moment?
5  A.  No, sir.  Right after that, he went straight
6  into the brush.  That was the last thing I saw, was him
7  pointing the gun at me; and then he went into the brush.
8  Q.  Is there a reason why you didn't fire at him
9  when he was pointing the gun at you?
10  A.  Like I said, sir, it was a quick second.  So by
11  the time I see the gun pointed at me, process it,
12  everything, there's also -- there's a backdrop.
13      There's a lot of things that we're thinking at
14  the time.  So he's -- he points it as me, and then he
15  goes behind the brush.  And so by the time I process it,
16  see that and everything and close the distance, and
17  that's when the incident happened.
18  Q.  Okay.  So you're -- are you saying that you
19  didn't fire at that time because you were still
20  processing it?
21  A.  I had just seen it.  And like I said, sir, it
22  was a matter of a second.  He turned around, pointed the
23  firearm at us, and then he was in the brush.
24  Q.  But would you agree you did not fire any shots
25  at that time?

Page 51

1  A.  No, sir.  I didn't.
2  Q.  You would agree with that?
3  A.  Yes, sir.
4  Q.  I guess --
5  A.  While he was standing.
6  Q.  I was wondering -- and in a little bit, we'll
7  watch the body-worn camera together; but my
8  recollection, and yours is different.  I heard you
9  yelling "Gun, gun," or words to that effect right, at
10  the end when he got to the brush, but not before --
11      (Simultaneous speakers.)
12  A.  Yes.
13  Q.  -- that.
14      Do you agree that when you said it, he was
15  already either at the brush or almost at the brush?
16  A.  Yes, sir, because he had a distance on us.  So
17  he turned around, pointed the gun at us.  We're still
18  running towards him.  At which point, he goes into the
19  brush.  We closed the distance of about four steps, and
20  then I yell, "He has a gun.  He has a gun."
21  Q.  Okay.  So you yelled "Gun -- he's got a gun"
22  after he was in the brush, and after he went to the
23  ground?
24  A.  Yes, sir.
25  Q.  So he gets to the brush.  He does this turn to

Page 52

1  the left, you describe, with the gun in his right hand.
2  He then goes into the brush.  And then after he goes
3  into the brush, you yell, "Gun, gun"; "He's got a gun,"
4  or words to that effect?
5  A.  Yes, sir.
6  Q.  And when he went into the brush, did he go down
7  towards the ground?  What was your impression?
8  A.  So the brush was about, I'd say, a couple feet
9  off the ground.  He went into the brush, and I saw him
10  laying down on his right side, pointing -- like arms
11  extended towards our direction, as we were running.
12  Q.  How many steps did you see him take into the
13  brush before going to the ground?
14  A.  Approximately, two.
15  Q.  And when he went to the ground, did it look
16  like he went forward or in some other direction?
17  A.  I -- I couldn't tell you, sir.  I just saw him
18  go to the ground.
19  Q.  Are you saying that once he was on the ground,
20  you could see him on his right side?
21  A.  I could see him facing me; yes, sir.
22  Q.  So this is where I'm going to just need a
23  little clarification.  I remember you saying the initial
24  part of the foot pursuit was west, going west?
25  A.  Yes, sir.

Page 53

```
 1      Q.  But once you got to the brush, that fence line
 2  and the brush line, as he was going into the brush a
 3  couple steps, which direction was he going?
 4      A.  That would have been a southwest direction.
 5  Because there was a wall and a fence line, he could have
 6  went north, south, or west over the fence line to keep
 7  running.
 8          And so he went -- if this is the fence
 9  (indicating), he went in a southwest direction.  At that
10  point, if he did jump the wall, he would have to either
11  go north or south.
12      Q.  It was the wall, a north and south wall?
13      A.  It was -- it was a -- the front was like a
14  wall, and the back was like a fence, with like plastic
15  and chain link.
16      Q.  Okay.  The wall, let's just talk about the wall
17  for a moment.  Was that a north and south wall, that
18  front wall?
19      A.  Yes, sir.
20      Q.  So if someone went over that wall, they would
21  be going west?
22      A.  Yes, sir.
23      Q.  So the north would be to the right, and the
24  south would be to the left?
25      A.  Yes, sir.
```

Page 54

```
 1      Q.  Okay.  Then perpendicular to that wall is like
 2  a chain-link fence?
 3      A.  Yes, sir.
 4      Q.  And that fence would run east/west?
 5      A.  No, I'm not sorry.  Not perpendicular.  Just
 6  south of the wall.  So it was like a cement wall or a
 7  brick wall on the north side of it, and then on the
 8  south side of the wall, attached to the same residence
 9  was like a chain link fence with plastic, like a privacy
10  fence.
11      Q.  Okay.  So when he went into the brush, and you
12  saw him on his right side, which way would his head be
13  and which way would his feet be directionally?
14      A.  So his feet would be northeast.  His -- the top
15  of his head would have been facing southwest, and his
16  face would have been facing east, towards me.
17      Q.  His feet were northeast, and his face or head
18  was southwest?  He was on his right side, but he was
19  looking towards you?
20      A.  In my direction yes, sir.  So the front torso
21  portion of his body was facing east, towards me.
22      Q.  I'm a little directionally challenged.  Was his
23  head closer to you, or his feet?
24      A.  His feet were closer to me.
25      Q.  Okay.  I think I understand.
```

Page 55

```
 1      Q.  And how far would you say he was from you?
 2      A.  Probably about 5 feet.
 3      Q.  Were you in the brush line or just at the
 4  beginning of it?
 5      A.  Just at the beginning of it.  There's cement,
 6  and then the brush line and the dirt continues.  So I
 7  was right in front of it.
 8      Q.  So you believe he was only 5 feet from you at
 9  that point?
10      A.  I apologize; 5 yards.
11      Q.  Oh, 5 yards?
12      A.  I apologize.
13      Q.  It's okay.
14          Now, was the brush covering some portions of
15  his body?
16      A.  Yes, sir.
17      Q.  What portions of his body was the brush
18  covering from your perspective?
19      A.  Part of his legs and part of his -- I'd said
20  part of his legs and part of his torso portion.
21      Q.  So you could see some parts of his body, but
22  not others?
23      A.  I could see his body facing towards me, but
24  parts of the brush were higher than others.  Parts of
25  the brush was more separated and spaced out than others,
```

Page 56

```
 1  as well as he made -- there was already an indentation,
 2  it looks like.  And he made an indentation when he went
 3  in there, so I was able to see it.
 4      Q.  And you're saying that you started firing when
 5  he was in this position that you described, about 15
 6  feet from you or 5 yards on his right side, facing -- at
 7  least his chest and face in your direction?
 8      A.  Yes, sir.
 9      Q.  Now, we talked earlier about situations where
10  you've been in, I think, quite a few, when a person was
11  running with a gun and tried to toss the gun at some
12  point.
13          Do you remember us talking about that early on?
14      A.  Yes, sir.
15      Q.  Was one of the things you were thinking of as a
16  possibility in this scenario, that this person is going
17  to try to toss the gun if he can?
18      A.  At which portion of the foot pursuit?
19      Q.  When you were running, before you got to the
20  brush?
21      A.  Possibly.
22      Q.  And when that fence was coming up, were you
23  thinking maybe he's going to try to toss it over the
24  fence, for example?
25      A.  Once he continued -- so when he -- the first
```

Page 57

```
 1   portion -- because we have it broken down in two -- when
 2   he was running and he was grabbing his waistband --
 3            (Reporter clarification.)
 4        THE WITNESS:  When he was running and grabbing
 5   his waistband, that lead me to believe that he, you
 6   know, possibly had a firearm at that point.  So I didn't
 7   shoot at that point because I -- you know, I hadn't seen
 8   a firearm at that point.
 9        Sorry, sir.  Can you ask the question again?
10   BY MR. GALIPO:
11        Q.  I don't even remember what it was, but I'll try
12   to ask a new one.
13        Yeah, because it sounds like the last 60 feet,
14   according to your testimony, you did see a firearm in
15   his right hand as he was running, but you didn't shoot
16   at that point because it wasn't pointed at you.  Is that
17   correct?
18        A.  Yes, sir.  We're talking about discarding it.
19   I apologize.  I remember.
20        So I didn't shoot the first 60 feet because,
21   although I believe he may have a firearm, I didn't see
22   him pull one out.  The last 60 feet, once he took it
23   out, we were giving him, like, the commands as well, as
24   well as advising him, "Hey," you know, the escalation
25   and totality of everything going on, he needs to stop.
```

Page 58

```
 1        If he would have discarded it at that point, he
 2   had the last 60 feet to discard it.  Your question was
 3   something about once he approached the fence line, well,
 4   at that point, because of the totality of everything
 5   with running, taking out the firearm, still hadn't
 6   discarded it, once he approached the fence line, at that
 7   point, I was believing more and more he was either going
 8   to jump into a residence, if he would have jumped the
 9   fence line with a firearm, or take a position of
10   advantage.
11        At that point, the times of me thinking he's
12   going to throw it are diminishing, because he had a
13   distance to throw it.
14        THE WITNESS:  I'm sorry, ma'am.  I'm trying to
15   slow it down.
16   BY MR. GALIPO:
17        Q.  You did better.  Young people tend to talk
18   faster, but we've got to slow it down for a little bit
19   for today.
20        But he didn't jump over the fence line, did he?
21        A.  No, sir.
22        Q.  He didn't enter a home, did he?
23        A.  No, sir.
24        Q.  I mean, the nearest home was some distance
25   away, wasn't it?
```

Page 59

```
 1        A.  No.  It was where that fence line and that wall
 2   was that he approached, where the brush was.
 3        Q.  Okay.
 4        A.  It was there.
 5        Q.  I guess what I was -- I mean, maybe I'm wrong
 6   and maybe I think too simplistically.  But if someone is
 7   running from the police and doesn't want them to know he
 8   has a gun, then they would try to toss it where the
 9   police can't see it so obviously.  Because if he tossed
10   the gun during the pursuit in the open, then obviously,
11   you would see it.
12        I would think that sometimes they might try to
13   get to a spot where they could toss it when you were out
14   of their view for a second, hoping you didn't see it.
15   But maybe I have that wrong.
16        What's your experience?
17        MR. CARPENTER:  Just objection.  Vague.
18   Overbroad.  Calls for speculation.
19        MR. GALIPO:  It's probably --
20        (Simultaneous speakers.)
21        MR. CARPENTER:  If he understands.
22   BY MR. GALIPO:
23        Q.  But, yes.  Go ahead, if you understand.
24        A.  So your question, sir, is he's looking for
25   somewhere to throw it?  My thoughts -- sorry.  Go ahead.
```

Page 60

```
 1        Q.  No, yeah, that's pretty much it.  I agree with
 2   Scott.  It was a crazy, compound, vague question.
 3        But I guess what I'm really getting at, I was
 4   thinking if they were trying to get rid of it so you
 5   didn't see it, they may try to do it over a fence or
 6   when they're momentarily out of your view, as opposed to
 7   right in the open with you.
 8        A.  So that -- for that answer, sir, the totality
 9   of it, right?  So from my training and experience, when
10   people do want to get rid of firearms, he had the
11   opportunity to leave it in the car.
12        He had the opportunity if -- which has
13   happened, go on a vehicle pursuit and throw it out
14   during the vehicle pursuit.  Those are the times that
15   are kind of harder to find it.
16        And if it's running at that point -- like I
17   said, we weren't a hundred percent sure he had the
18   firearm.  So at that point, he could have kept running
19   and waited until he got out of distance, out of view,
20   maybe went around the brush and then took it to out to
21   get rid of it.
22        But he pulled it out, like you said, in
23   broad -- it was a parking lot, so to speak, I guess, an
24   abandoned parking lot, in broad -- in open.  So he
25   pulled it out at that point.  So the opportunities he
```

Page 61

1  had to get rid of it were diminishing as each time.

2      Like I said, the vehicle -- a vehicle

3  pursuit -- and he's the one that pulled it out,

4  therefore causing me to think -- and he didn't pull it

5  out when he was hiding, which has happened.

6      Because at that point, before he pulled it out,

7  there was no firearm seen, just our belief that he had

8  one. So it was still concealed.

9      Once he took it out, then at that point, he

10 exposed it, and that's when we knew he had a firearm.

11 He could have waited until he was in the brush, or any

12 other opportunity, based on my training and experience,

13 to get rid of it.

14 Q.   I guess what I'm wondering, and maybe you've

15 already answered this, if you saw the gun in his hand

16 four or five seconds before he got to the brush, and 60

17 feet before he got to the brush, why didn't you yell out

18 "Gun" at that time?

19 A.   So I saw him pull it out, and that's when I

20 gave him the command that he's going to get shot. I --

21 like, it's a very fast evolving situation.

22      So I see the gun. He's still running. He

23 has -- I slow down. And I'm still thinking of drawing

24 my gun. We're thinking of -- I'm trying to see, is he

25 pointing it at me? There's a school behind us that's

Page 62

1  going on, because it's during school time hours.

2      So his backdrop would have been a school, kids

3  in recess, or whatever is going on, as well as mine, as

4  well. So I'm thinking of everything at that time when

5  he took it out.

6  Q.   And it sounds like you didn't say "Gun" until

7  after he was in the brush, on the ground. That's when

8  you yelled out "Gun, gun. He's got a gun," or something

9  like that?

10 A.   Yes, sir.

11 Q.   So when he's on the ground in the position you

12 described in the brush, can you actually see a gun in

13 his hand at that point?

14 A.   At the -- parts of him were obscured, sir. But

15 I did see him -- the last thing I saw was him pointing

16 the gun at me and going right into the brush. And then

17 in a -- I would call it like a "shooter's position,"

18 like laying down on his side with his arms pointed out

19 towards me.

20 Q.   What I'm asking, and maybe you answered it

21 already, when he was in the -- laying on his right side,

22 in the brush, did you see a gun in his hand at that

23 point?

24 A.   No, sir. I didn't see one, like, directly at

25 me at that point.

Page 63

1  Q.   Did you -- okay. Let me just break it down.

2      Did you see him pointing a gun at you at that

3  point?

4  A.   I saw him facing me with his arms extended out,

5  pointing in my direction. But like I said, there's a

6  lot of brush, so I can't say I saw the exact firearm. I

7  just saw, if I can demonstrate, his arms, like, pointed

8  in my direction with him facing me.

9  Q.   Both arms pointed in your direction?

10 A.   I don't remember if it was both or one, but I

11 remember seeing his body and his arms pointed out

12 towards my direction.

13 Q.   Could you see his hands?

14 A.   Parts of it. But I couldn't see -- like I

15 said, the brush was covering a lot of it -- or not a lot

16 of it, part of it.

17 Q.   What part of his hands was the brush covering?

18 A.   Like I said, parts of it were higher than

19 others. So his arm -- like, part of his arm and part of

20 the torso, I can't remember exactly now, what -- like,

21 if a finger was showing, not shown, you know, a thumb.

22 I don't want to inappropriately or -- say the wrong

23 thing.

24 Q.   So were part of his arms and hands covered by

25 the brush?

Page 64

1  A.   Certain parts. Not everything, but certain

2  parts. Enough to where I could still see him, his

3  direction, and the direction his arms were pointing.

4  Q.   What percentage of his hands do you think you

5  could see? Was it half of his hands? 10 percent? What

6  percentage would you give?

7  A.   When you say "hands," are you including also

8  the arms with it, or just the hands itself?

9  Q.   Just the hands.

10 A.   I'd say about 60 to 80 percent of his hand.

11 Q.   And in looking at his hands, did you see any

12 dark object in his hands at that point?

13 A.   I -- I don't remember, sir, if I -- like, right

14 at that moment because it's-- like I'm saying, it's hard

15 to describe it without you seeing it. The brush, like,

16 I could see -- like, let's say 60 to 80 is about this,

17 right, or this part of it.

18      But a firearm, if someone has it, is going to

19 be part of it here, they can have part of it towards the

20 front. So it just depends at that point, especially

21 because he went to the ground, how he's holding the

22 firearm.

23 Q.   Right. I'm just wondering if you saw any part

24 of the firearm when he was on the ground, in the brush,

25 before you fired your first shot?

Page 65

1    A.    When he's on the ground, in the brush, before I
2  fired my first shot, no.
3    Q.    And how about during your shots?  I realize you
4  fired 18 shots.  At any point during the shooting
5  sequence, did you see a firearm or object in his hands?
6    A.    No, sir.
7    Q.    Were you trying to assess as you were shooting?
8    A.    Yes, sir.
9    Q.    Are you taught to assess after every shot, if
10  you can?
11    A.    Yes, sir.
12    Q.    And prior to shooting the second shot, for
13  example, did you see an object in his hands?
14    A.    No, sir.  At that point, I still saw him facing
15  my direction, with his arms extended.
16    Q.    Okay.  If I went through every one of the 18
17  shots, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16,
18  17, 18, and asked you, prior to shooting that shot did
19  you see a gun or any object in his hand, your answer
20  would be no?
21    A.    Yes, sir.
22    Q.    So the last time you saw the object or the gun
23  would have been before he went to the ground, just as he
24  was getting to the brush?
25    A.    When it was pointed at me.

Page 66

1    Q.    And you say you saw that for about a second?
2    A.    About a -- yes, sir, about a second.
3          And when I say a "second" it's like:  "One
4  Mississippi," so an actual second.  I understand people
5  can have different perceptions of a second.
6    Q.    Right.  And you told me you did not shoot at
7  that time; correct?
8    A.    No, sir.
9    Q.    That is correct?
10    A.    That is correct, sir.
11    Q.    I asked it in a bad way.
12          Do you know if your partner shot at that time
13  when you say he had the gun turned towards you?
14    A.    No, sir.  He did not.
15    Q.    To your knowledge, all the shots were fired --
16  all 36 shots, while Mr. Urena was on the ground?
17    A.    Yes, sir.
18    Q.    And during all of those shots, you're saying
19  that you did not see a gun or object in his hands; is
20  that correct?
21    A.    Yes, sir.
22    Q.    After the shots -- I think you said you heard
23  some additional shots after your last shot?  Maybe two
24  to four?  Something like that?
25    A.    Yes, sir.

Page 67

1    Q.    How long was the pause, if you recall?
2    A.    I don't, sir.
3    Q.    At some point, did you approach Mr. Urena after
4  the shooting?
5    A.    Yes, sir.
6    Q.    And what position was he in when you approached
7  him on the ground?
8    A.    Facing our direction -- well, he was partially
9  facing our direction and kind of hunched over, sir.
10    Q.    Was he chest down or in some other position?
11    A.    I guess it's like chest down, sir, huddled.
12    Q.    Chest down, so that his chest would be towards
13  the ground?
14    A.    Yes, sir.
15    Q.    And which way was his head, directionally, at
16  that time?
17    A.    Facing kind of the floor, sir.
18    Q.    What compass direction were his head and feet?
19  I understand he was chest down.  You talked about
20  southwest and northeast before.  I don't know if that's
21  still the compass direction, or it was different when
22  you approached him after the shooting?
23    A.    No.  It was pretty much the same, sir.
24    Q.    So he would have been chest down, I think his
25  head more southwest, his feet more northeast?

Page 68

1    A.    Yes, sir.
2    Q.    And how much time -- sure.
3          THE WITNESS:  Can I use the bathroom real
4  quick, sir?
5          MR. GALIPO:  Sure.  Let's go off the record.
6  We can take a break right now.  Just let our
7  videographer go off the record.
8          THE WITNESS:  Okay.
9          THE VIDEOGRAPHER:  Going off the record at
10  11:25 a.m.
11          (Break taken.)
12          THE VIDEOGRAPHER:  We're back on record at
13  11:30 a.m.
14  BY MR. GALIPO:
15    Q.    Okay.  Did you approach Mr. Cernas in the brush
16  at some point after the shooting?
17    A.    Yes, sir.
18    Q.    And how much time would you say passed from the
19  time of the last shot to the time you approached him?
20    A.    I would say approximately 40 seconds to a
21  minute.
22    Q.    How much time would you say passed from the
23  first shot to the last shot, including your shots and
24  your partner's shots?
25    A.    I can't speak on my partner's, but on mine, it

Page 69

1  was approximately two to three seconds.

2      Q.   And you are saying you were assessing for each

3  shot?

4      A.   Yes, sir.

5      Q.   Did you give any commands during the shooting

6  sequence?

7      A.   No, sir.

8      Q.   Did you give any commands after the shooting,

9  but before you approached him?

10     A.   Yes, sir.

11          (Reporter clarification.)

12  BY MR. GALIPO:

13     Q.   What commands did you give?

14     A.   "Let me see your hands."  Something to the

15  effect of "Let me see your hands" or "Put your hands

16  up."

17     Q.   Could you see his hands at that point?

18     A.   He lifted them up briefly.

19     Q.   Could you see them before you gave the command?

20     A.   After the shooting?

21     Q.   Yeah.  After the shooting, when you said, "Let

22  me see your hands" or "Put your hands up," at the moment

23  you gave the command, could you see his hands?

24     A.   No, sir.

25     Q.   Do you know what was blocking your view of his

Page 70

1  hands at that time?

2      A.   The brush.

3      Q.   And when you told him, "Let me see your hands"

4  or put his hands up, did he briefly?

5      A.   Yes, sir.

6      Q.   Any other commands you recall giving him after

7  the shooting, but before you approached?

8      A.   Just "Hands."

9      Q.   Did you tell him what to do with his hands at

10  any point, other than to put them up?

11     A.   I don't recall, sir.

12     Q.   At some point, did you approach him in the

13  brush, though, with your partner?

14     A.   Yes, sir.

15     Q.   Did you have the impression as to whether he

16  had been struck by any of the shots?

17     A.   Once we approached him and he was -- he told

18  us.

19     Q.   Did you hear him moaning at various times after

20  the shooting?

21     A.   As we approached, yes, sir.

22     Q.   And he told you he had been shot, or words to

23  that effect?

24     A.   No.  Not words to that effect, that I recall.

25  It was more when we asked him where's he hurt at and he

Page 71

1  told us where.

2      Q.   Do you recall what he told you?

3      A.   His stomach.

4      Q.   Anything else?

5      A.   Just that.  And then we started securing the

6  scene and focusing on him.

7      Q.   Was he handcuffed at some point?

8      A.   Yes, sir.

9      Q.   Who handcuffed him?

10     A.   My partner and I.

11     Q.   When you approached him, did you see a gun in

12  his hand?

13     A.   No, sir.

14     Q.   Did you see a gun near his hand?

15     A.   No, sir.

16     Q.   Did you see a gun anywhere around his body

17  where he was at?

18     A.   Not in the -- around his body, no, sir.

19     Q.   Did you look around the immediate area of his

20  body for a gun?

21     A.   My -- my partner and I did, real quick, sir.

22  Yes.

23     Q.   Did you pat him down to see if he had any gun

24  on him?

25     A.   Yes, sir.

Page 72

1      Q.   And did he?

2      A.   No, sir.

3      Q.   How long were you at the scene before you left?

4      A.   Are you saying from the traffic stop to when I

5  left the initiation --

6      Q.   Like -- I'm sorry.  That's a good

7  clarification.  I mean, from the time of the shooting,

8  how long after the shooting did you stay on the scene?

9      A.   Approximately, I'd say about, like, three

10  minutes, three to five minutes, maybe.

11     Q.   And did other officers show up during that

12  time?

13     A.   Yes.

14     Q.   Do you recall how many, approximately?

15     A.   No, sir.

16     Q.   Was there a shots fired, a 998 broadcast, after

17  the shots were fired?  Did someone broadcast "Shots

18  fired"?

19     A.   Yes, sir.

20     Q.   I don't know if you use 998.  That might be

21  other agencies.  I take it you don't use 998?

22     A.   No, sir.  We just say "Shots fired."

23     Q.   Okay.  Sorry for confusing you with that one.

24          So did you talk to a sergeant or someone before

25  you left the scene?

Page 73

1    A.   Briefly, sir.

2    Q.   To give a public safety statement?

3    A.   Yes, sir.

4    Q.   Did you tell anybody at the scene that he had

5  pointed a gun at you?

6    A.   Not that I recall, sir.

7    Q.   Did you tell the sergeant how many shots you

8  fired?

9    A.   Yes, sir.

10    Q.   And in which direction you were firing the

11  shots?

12    A.   Yes, sir.

13    Q.   What did you tell the sergeant as opposed to

14  how many shots?

15    A.   18.

16        (Reporter clarification.)

17  BY MR. GALIPO:

18    Q.   You were aware of that at the time?

19    A.   Yes, sir.

20    Q.   At some point, you did a tactical reload?

21    A.   Yes, sir.

22    Q.   And in terms of the direction, what direction

23  did you tell the sergeant you were firing?

24    A.   Southwest direction, sir.

25    Q.   Did you mention to the sergeant that you fired

Page 74

1  all your shots while the individual was on the ground?

2    A.   I just told him that's the direction I shot.

3  Yes, sir.

4    Q.   Other than the direction, did you mention the

5  person was on the ground when you shot him?

6    A.   No, sir.

7    Q.   Now, before you left the scene, did you have

8  any information that a gun had been located?

9    A.   No, sir.

10        (Reporter clarification.)

11  BY MR. GALIPO:

12    Q.   So were you wondering what happened to the gun,

13  given that you shot him and you couldn't see it

14  afterwards?

15    A.   No, sir.  We -- after the incident happened, we

16  approached him.  And because we give him med aid, there

17  was a lot of going on, and we gave our safety statement

18  and we were out of there pretty quickly.  There was a

19  lot going on at the time.

20        I can't say I remember where it is or what's

21  going or on any of that.

22    Q.   Right.  But it sounds like you shot him because

23  he had pointed a gun at you?

24    A.   Yes, sir.

25    Q.   And that was before he went to the ground?

Page 75

1    A.   Yes, sir.

2    Q.   So after you approached him, weren't you

3  expecting to find a gun?

4    A.   Yes, sir.  But because of the shooting, it

5  could have been -- I didn't go through all the brush

6  looking for it.  We were more focused on securing the

7  scene and administering whatever med aid we could, and

8  calling in for med aid, so I didn't go looking for it.

9        It could have been moved, however, as we

10  approached it or right prior to.  I -- I didn't check.

11    Q.   So you thought maybe it might be somewhere in

12  the brush?

13    A.   Like I said, I didn't do an extensive check.  I

14  just walked up, didn't see it on his person or

15  immediately, like, right next to him -- right next to

16  him and he -- the impression he had made.  I apologize.

17  So at that point, I just administered the medical aid

18  and secured --

19    Q.   Did you see him toss any gun anywhere after you

20  shot him?

21    A.   No, sir.

22    Q.   When he was on the ground, but before you shot

23  him, did you see him tossing any gun anywhere?

24    A.   No, sir.

25    Q.   I take it if you would have seen him tossing a

Page 76

1  gun over the fence before he went to the ground, based

2  on your training, you wouldn't have shot him.  Is that a

3  fair statement?

4    A.   I would have not shot him, sir, if I saw him

5  throw it.

6    Q.   At some point, did you become aware that a gun

7  was located over the fence?

8    A.   Later on, sir.

9    Q.   When did you learn that?

10    A.   I don't remember if it was 30 minutes, an hour,

11  two hours after the fact.  I just know it was a little

12  bit after.

13    Q.   It was before you gave your interview, though;

14  correct?

15    A.   Yes, sir.

16    Q.   Was there any conversation you had with your

17  partner after the shooting about Mr. Urena pointing a

18  gun at you?

19    A.   No, sir.

20    Q.   Any conversation you had with your partner

21  after the shooting as to where the gun was?

22    A.   No, sir.

23    Q.   How long did you keep your body-worn camera on

24  after the shooting?

25    A.   That, I don't remember, sir.  Actually, I want

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 19 (73 - 76)

Page 77

1  to say it was on up until right before we got

2  transported.

3      Q.  I'm going to ask you a few questions about your

4  interview.  Some of this I already covered, so just bear

5  with me.  I'm going to put my glasses on so I can read.

6      A.  Yes, sir.

7      Q.  Were you afraid that this person, when they got

8  out of the car, was going to get out of the car and

9  start shooting?

10      A.  I didn't know if he had a firearm, but I

11  believed he did.  So that's something that's always on

12  my mind, sir, yes, when anybody jumps out of a vehicle.

13      Q.  Did he -- when he got out of the car, would you

14  at least agree he did not start shooting?

15      A.  No, sir, he didn't.

16      Q.  And you're saying he was grabbing his waistband

17  with his right hand; correct?

18      A.  Yes, sir.

19      Q.  So you didn't see him, for example, grabbing

20  his waistband with both hands; is that correct?

21      A.  Not that I recall right now, sir, no.

22      Q.  And did you dispatch that the individual was

23  running westbound?

24      A.  Yes, sir.

25      Q.  Did you dispatch that you thought he had a gun?

Page 78

1      A.  No, sir.

2      Q.  Did you dispatch that he was reaching in his

3  waistband?

4      A.  No, sir.

5      Q.  Prior to pulling the car over, did you tell any

6  supervisors or dispatch that you were pulling a car over

7  that you thought the occupant might have a gun?

8      A.  No, sir.

9      Q.  Did you request another unit as backup before

10  trying to pull this car over, having information that

11  this person might be possibly armed?

12      A.  No, sir.

13      Q.  And you're saying that at some point, you saw

14  this gun over his right shoulder as he's running?

15      A.  Yes, sir.

16      Q.  Was it pointed at you when it was over his

17  right shoulder?

18      A.  No, sir.

19      Q.  And in your interview, you indicated that you

20  gave him multiple commands to "Drop the firearm."  Do

21  you remember saying that in your interview?

22      A.  No, sir.  Like I -- like, I don't remember my

23  whole interview right now, I guess.  Sorry.

24      Q.  But from what I'm understanding your testimony

25  today, you're saying you did not give him any specific

Page 79

1  commands to drop the firearm; is that fair?

2      A.  I'd have to see my body camera to see -- like,

3  again, right now, to see if I said -- if there's a point

4  that I'm missing or not remembering right now.

5      Q.  Do you have that summary handy that you

6  reviewed, that narrative summary of your interview?

7      A.  Not on me, on my person right now, sir.

8      Q.  Okay.  So if I asked you did you say in your

9  interview you gave multiple commands to drop the

10  firearm, what would your response be?

11      A.  Then -- if I said it then, especially because

12  it was fresher and had just happened, then I would say

13  my summary is more accurate.

14      Q.  Okay.  Do you recall saying in your initial

15  interview that you wanted to let him know, if he doesn't

16  drop the firearm, you're going to shoot him?

17      A.  No, sir.

18      Q.  Did you, in your mind, "draw a line in the

19  sand," so to speak?  In other words, if he got to the

20  that brush line or that fence line, in your mind, that

21  was a line in the sand where you were going to shoot

22  him?

23      A.  Once he -- my line in the sand was when he

24  pointed the firearm at me, and then he took the position

25  of advantage, at which point, I took it that he was

Page 80

1  going to try to ambush us.

2      Q.  Do you -- did you say in your initial statement

3  that your line in the sand was the southeast corner of

4  the fence line?

5      A.  Yes, sir.  Which is where the brush began and

6  he would have taken the position of advantage.

7      Q.  How many times did you tell him you were going

8  to shoot him?

9      A.  I remember telling him he was going to get

10  shot, and I want to say I told him I'm going to shoot

11  him.  So I'd say about two.

12      Q.  Okay.  And did you tell him that you were going

13  to shoot him before he got to this line in the sand?

14      A.  In the second -- once he pulled the gun out,

15  yes.

16      Q.  So when you told him you were going to shoot

17  him, it would be before he got to that brush area or

18  southeast corner?

19      A.  Yes, sir.  Like we had said, it was the -- more

20  of to convince him to drop the firearm.

21      Q.  Which is why you were telling him to drop it?

22      A.  Yes, sir.

23      Q.  When he laid down on the ground, was he prone

24  or chest down?

25      A.  The -- when I approached him, or the initial

Page 81

1  time?

2      Q.   The initial.

3      A.   No -- Well, sideways, like, sideways facing

4  towards me.  Prone is on chest-facing.

5      Q.   Did you say in your initial statement, when he

6  went and laid down on the ground, he was prone on the

7  ground?

8      A.   It's still a prone position.  It's just a

9  sideways prone.

10     Q.   And did you say in your initial statement that

11 when he was prone on the ground, he turned towards you

12 with a gun in his hand?

13     A.   If I said that, sir, yes, that's what I

14 believed.

15     Q.   But I think you told me today you never saw a

16 gun in his hand when he was on the ground in the brush;

17 is that correct?

18     A.   Yes.  But I believed he had a gun, because the

19 last thing I saw was him having one.

20     Q.   Did you say in your statement that the gun was

21 pointed right at you when he was on the ground?

22     A.   In my direction, yes, sir, because

23 that's --again, that's what I saw, is the position of

24 it.

25     Q.   After the shooting, do you recall saying in

Page 82

1  your statement that he was still reaching around?

2      A.   Yes, sir.

3      Q.   And do you recall saying in your statement that

4  you thought maybe he was going to grab the gun again?

5      A.   Yes, sir.

6      Q.   Do you recall that he complied by putting his

7  hands behind his head?

8      A.   I told him to put his hands behind his head and

9  up, and I saw him put his hands up.

10     Q.   Do you recall at some point after the shooting,

11 when you approached and he was chest down, that he was

12 placed on his right side, in a recovery position?

13     A.   Yes, sir.  "Right side" as far as right arm

14 facing ground?

15     Q.   Yes.

16     A.   Yes, sir.

17     Q.   And again, I think you answered this; but do

18 you recall saying in your initial statement that you saw

19 the gun pointed at you when he was on the ground, in the

20 brush?

21     A.   Yes, sir; because that's what I -- I believed

22 at the time based off his positioning and everything.

23     Q.   You believed that, but you would agree you

24 didn't actually see that?

25     A.   I saw him pointing in my direction.  And the

Page 83

1  last thing I saw was him pointing the gun at me before

2  he went down, sir.

3      Q.   Right.  But I think we've already agreed you

4  did not actually see the gun once he went down in the

5  brush; is that fair?

6      A.   I saw him pointing at me.  I can't say -- if

7  that's what I gave at the time, then that's what I

8  initially saw.  But as of right now -- because, like I

9  said, that summary would be more accurate.  It was right

10 at the time, right after.

11          But me, right now, I'm trying to remember back

12 to it, and I remember seeing him pointing towards me.

13     Q.   It sounds like the last time you saw the gun

14 was in that one second when he turned to his left; is

15 that right?

16     A.   Right now, yes, sir.

17     Q.   And your vision, being young, at least at the

18 time of your statement, was 20/20?

19     A.   Yes, sir.

20     Q.   You can see mine's not anymore.

21          Did you ever see a cell phone in his hand or a

22 cell phone drop from his pocket?

23     A.   One fell out of his pocket, yes.

24     Q.   You recognized it was a cell phone?

25     A.   Yes, sir.  I believe -- I'm not a hundred

Page 84

1  percent sure if it came out of his back pocket, but I

2  did see a cell phone fall out.

3      Q.   At some point, before he went to the ground,

4  meaning Mr. Urena, did he turn the corner?  I guess what

5  I'm asking, I don't know if he just ran straight into

6  the brush.  I know you said he made this turn to his

7  left that you described and demonstrated.  But did he

8  have to turn the corner, so to speak, to get to the

9  brush, or it was just kind of a straight line?

10     A.   So when we're initially running, it was a

11 straight shot westbound.  Once he took out the firearm,

12 he made a southwest turn into the brush.  But it

13 wasn't -- as far as like the fence line, if it's here,

14 he didn't go around the fence line.

15     Q.   Okay.

16     A.   If that's what you're asking.

17     Q.   Did you ever see what appeared to be the bottom

18 of a magazine at all?

19     A.   Yes.

20     Q.   When did you see that?

21     A.   When he was running.

22     Q.   When you were firing at him, was there any

23 visual obstructions that you had?

24     A.   In totality, the brush.

25     Q.   And you were attempting to look at his hands

Page 85

1  when you fired?

2  A.  Yes, sir.  His whole body positioning.

3  Q.  Including his hands?

4  A.  Yes, sir.

5  Q.  And I think you told us you could see a portion

6  of his hands?

7  A.  Yes, sir.

8  MR. GALIPO:  Okay.  We're going to just -- I

9  think Renee's going to help me.  We're going to play a

10  portion of the two body-worn camera videos, and I may

11  have a few questions for you.

12  So maybe, Renee, we could play it once through,

13  and then we'll stop it.  And then we can play it again,

14  and I might have you stop it.

15  Can we play Officer Davalos's body-worn camera

16  first?  And if we could identify it as Exhibit 1, and

17  we'll send it to Kimberly.

18  I'm pretty sure Scott has it, but we can send

19  him another copy if he wants.  He's probably seen it

20  enough.

21  (Exhibit Number 1 was marked.)

22  MS. MASONGSONG:  Sounds good.  I'll start at

23  the very beginning.

24  MR. GALIPO:  Okay.  We'll play it through the

25  first time.

Page 86

1  (Video being played.)

2  MR. GALIPO:  We can stop it right now, please.

3  So we stopped it at about 3:31.  Let's play it

4  from the beginning, again, and then I'm going to ask you

5  to stop it a few times, Renee, and I'll ask the officer a

6  few questions.

7  (Video being played.)

8  MR. GALIPO:  Okay.  Stop it, please.

9  Okay.  We stopped at 47 seconds in.

10  BY MR. GALIPO:

11  Q.  So we can see Mr. Urena running in this image;

12  correct?

13  A.  Yes, sir.

14  Q.  And is the officer closest to him, is that

15  Estrella?

16  A.  Yes, sir.  It's Officer Estrella.

17  Q.  And it looks like Officer Estrella has his gun

18  -- his gun out, doesn't it?

19  A.  Yes, sir.

20  Q.  Up to this point in time, did you see a gun in

21  the hand of Mr. Urena?

22  A.  Yes, sir.  We had seen it.  I pull it out right

23  after this.

24  Q.  No.  I'm asking if up to this point in time,

25  you're saying you could see a gun in his hand?

Page 87

1  A.  I believe he had he taken it out already; yes,

2  sir.

3  Q.  And then, at some point, you see it go over his

4  right shoulder?

5  A.  As he's running; yes, sir.

6  MR. GALIPO:  Okay.  All right.  Let's play a

7  little further, please.

8  (Video being played.)

9  MR. GALIPO:  Stop it again.

10  So we're at 0:55.

11  BY MR. GALIPO:

12  Q.  Who's saying, "Stop reaching.  Stop reaching."

13  A.  I am, sir.

14  Q.  Okay.  And then this is where you're starting

15  to say, "You're going to get effing shot"; is that

16  right?

17  A.  Yes, sir.

18  Q.  And you said that before he turned towards you;

19  correct?

20  A.  Yes, sir.

21  Q.  Because we can see in this image, at 55 seconds

22  in, he's not yet to the brush.  Would you agree?

23  A.  He's right before it; but, yes, sir.

24  Q.  Right before the brush?

25  A.  Yes, sir.

Page 88

1  Q.  And up to this point in time, he had not

2  pointed the gun at you; would you agree?

3  A.  Yes, sir.

4  Q.  Now, we can see -- is that the fence you were

5  referring to earlier, that we were talking about?

6  A.  Yes, sir.

7  Q.  And it's your understanding now, at least, that

8  the gun -- a gun was found inside or over that fence?

9  A.  Yes, sir.

10  MR. GALIPO:  Okay.  Let's back up just a little

11  bit, Renee, and then -- okay.  That's fine.  And then

12  I'll tell you when to stop it again.

13  (Video being played.)

14  MR. GALIPO:  All right.  Stop.

15  Okay.  So now we stopped it at 58 seconds.

16  BY MR. GALIPO:

17  Q.  And that's your voice saying, "You're going to

18  get effing shot"?

19  A.  Yes, sir.

20  Q.  Up to this point in time, do you hear yourself

21  at all saying, "Drop the gun"?

22  A.  No, sir.

23  Q.  Now, up to this point in time, had he turned

24  towards you and pointed the gun yet?

25  A.  Yes, sir.  Right before he went into the brush.

Page 101

1  other questions of anybody?
2          (Pause.)
3          THE CERTIFIED STENOGRAPHER:  Mr. Carpenter, are
4  you ordering copy?
5          MR. CARPENTER:  Yes, and we're going to request
6  read and sign.
7                  FURTHER EXAMINATION
8  BY MR. GALIPO:
9      Q.   Okay.  I just thought of one more question I
10  had.
11         You mentioned that during your partner's last
12  group of shots, you still saw what appeared to be the
13  hands pointed in your direction.  Do you recall saying
14  that?
15     A.   Yes, sir.
16     Q.   Do you recall saying that?
17     A.   Yes, sir.
18     Q.   So why didn't you shoot at that point in time?
19     A.   I was doing the reload.
20         MR. GALIPO:  Okay.  I think that's all I have.
21  We'll let our videographer to sign us off.
22         THE VIDEOGRAPHER:  Okay.  Going off the record
23  at 2:28 p.m. -- sorry -- 12:28 p.m.
24         (12:28 p.m., deposition concluded.)
25                  --oOo--

Page 102

1  STATE OF CALIFORNIA)
                      ) ss:
2  COUNTY OF BUTTE    )
3
4          I, KIMBERLY E. D'URSO, do hereby certify:
5          That the witness named in the foregoing
6  deposition was present remotely and duly sworn to testify
7  to the truth in the within-entitled action on the day and
8  date and at the time and place therein specified;
9          That the testimony of said witness was reported
10  by me in shorthand and was thereafter transcribed through
11  computer-aided transcription;
12         That the foregoing constitutes a full, true and
13  correct transcript of said deposition and of the
14  proceedings which took place;
15         Further, that if the foregoing pertains to the
16  original transcript of a deposition in a federal case,
17  before completion of the proceedings, review of the
18  transcript [ ] was [ ] was not requested.
19         That I am a certified stenographic reporter and
20  a disinterested person to the said action;
21         IN WITNESS WHEREOF, I have hereunder subscribed
22  my hand this 13th day of July, 2025.
23  _____
24  KIMBERLY D'URSO, CSR NO. 11372, RPR
25

Page 103

1                  ERRATA SHEET
2  PAGE/LINE        CHANGE              REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 104

1               DECLARATION OF DEPONENT
2
3          I, _____, say I have read the
4  foregoing deposition and declare under penalty of perjury
5  under the laws of the State of California and all federal
6  laws that my answers as indicated are true and correct.
7
8          Dated this _____ day of _____, 2025, at
9  _____, California.
10
11
12         _____
12         JONATHAN DAVALOS
13
14
15
16
17
18
19
20
21
22
23
24
25