# EXHIBIT "8"

Page 1

1   UNITED STATES DISTRICT COURT

2   CENTRAL DISTRICT OF CALIFORNIA

3   --oOo--

4

5   RENATO URENA, individually,

6        Plaintiff,

7   v.                          Case No.  5:24-cv-00341-JGB-SHK
    CITY OF SAN BERNARDINO;
8   JONATHAN DAVALOS; ANDRES
    ESTRELLA and DOES 1-10, inclusive,

9        Defendants.

10   _____/

11

12

13

14

15        STENOGRAPHIC REPORTER'S TRANSCRIPT OF

16        REMOTE VIDEO DEPOSITION OF ANDRES ESTRELLA

17            THURSDAY, JUNE 26, 2025

18

19

20

21   Reported Stenographically by:

22   KIMBERLY D'URSO, CSR 11372, RPR

23   Job No.  17495

24

25

---

Page 2

APPEARANCES (Remote)

1

2

3   FOR THE PLAINTIFFS:

4        LAW OFFICES OF DALE K. GALIPO
         BY:  DALE K. GALIPO, ESQ.
5              RENEE MASONGSONG, ESQ.
         21800 Burbank Boulevard, Suite 310
6        Woodland Hills, California 91367
         818.347.3333
7        dalekgalipo@yahoo.com
8        rvalentine@galipolaw.com

9   FOR THE DEFENDANTS:

10       CARPENTER, ROTHANS & DUMONT LLP
         BY:  SCOTT CARPENTER, ESQ.
11       500 S. Grand Ave., 19th Floor
         Los Angeles, CA 90071
12       scarpenter@crdlaw.com

13

14   ALSO PRESENT:  JONATHAN DAVALOS

15            --oOo--

16

17

18

19

20

21

22

23

24

25

---

Page 3

INDEX OF EXAMINATION

1

2   WITNESS:  ANDRES ESTRELLA

3   EXAMINATION BY                              PAGE

4        MR. GALIPO..............................4

5

6        EXHIBITS FOR REFERENCE

7   EXHIBIT          DESCRIPTION              PAGE

8   2 - Officer Estrella's body-worn camera
         footage.....................................93

9            --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

Page 4

1            --oOo--

2        BE IT REMEMBERED, that set on Thursday, the

3   26th day of June, 2025, commencing at the hour of

4   2:05 p.m., thereof, ANDRES ESTRELLA appeared remotely in

5   San Bernardino, California, before me, Kimberly E.

6   D'Urso, an RPR and Certified Shorthand Reporter of the

7   State of California, the following deposition was

8   stenographically reported by me:

9        (Whereby the Certified Shorthand Reporter

10       introduced herself on the record and

11       administered the oath to the deponent.)

12

13       THE VIDEOGRAPHER:  Good afternoon.  We are on

14   the record at 2:05 p.m.  Today's date is June 26th,

15   2025.  This is the recorded remote deposition of

16   Andres Estrella in the matter of Renato Urena versus City

17   of San Bernardino, Case Number 5:24-cv-00341 JGBSHK.

18   This deposition is being held via web conference.  My

19   name is Said Hofiani.  I'm the videographer with Focus

20   Litigation Solutions.  The court reporter is Kimberly

21   D'Urso.

22       Counsel, please introduce yourselves and state

23   whom you represent, after which the court reporter will

24   state his or her CSR license number and swear in the

25   witness.

Page 5

1          MR. GALIPO:  Dale Galipo, with Renee Masongsong
2    from my office, on behalf of the plaintiff.
3          MR. CARPENTER:  Scott Carpenter, on behalf of
4    Defendants.
5          (Whereupon the Certified Shorthand Reporter
6          administered the oath to the deponent.)
7          THE WITNESS:  I do.
8          MR. GALIPO:  Okay.  Thank you.
9                    EXAMINATION
10   BY MR. GALIPO:
11         Q.   Can you please state your name?
12         A.   Yes, sir.  My name is Andres, and a last name
13   of Estrella.
14         Q.   And were you able to listen in to the prior
15   deposition we did this morning?
16         A.   Yes, sir.
17         Q.   How long have you been a police officer?
18         A.   Approximately six years now, sir.
19         Q.   Let's start with your educational background.
20   You graduated from high school in what year?
21         A.   Yes, sir.  That was in 2007.
22         Q.   Did you go to any college after high school?
23         A.   Yes, sir.
24         Q.   Did you study anything in particular?
25         A.   Yes, sir.

Page 6

1          Q.   What did you study?
2          A.   I have a bachelor's in exercise sports science.
3          Q.   What exactly is that?
4          A.   My -- I specifically got my degree aimed
5    towards working with kids with special needs,
6    specifically physical education, so adaptive PE.
7          Q.   And what year did you get your bachelor's in,
8    approximately?
9          A.   2013, sir.
10         Q.   When did you go to the academy -- police
11   academy?
12         A.   Police academy, it was 2018, I believe, like,
13   July 2018, actually.
14         Q.   Did you work for the Department of Corrections
15   before that?
16         A.   Yes, sir.
17         Q.   And what time frame did you work for the
18   Department of Corrections?
19         A.   I was there for approximately four years prior
20   to the police academy for San Bernardino.
21         Q.   When you graduated from the academy, what was
22   your initial assignment?
23         A.   For San Bernardino P.D.?
24         Q.   Yes.  Well, let me ask you this:  You graduated
25   from the academy approximately when?

Page 7

1          A.   December of 2018.
2          Q.   And where did you first go to work?
3          A.   Here in the City of San Bernardino.
4          Q.   You had a period of field training?
5          A.   Yes, sir.
6          Q.   Were you initially assigned to patrol?
7          A.   Yes, sir.
8          Q.   What was your assignment at the time of the
9    shooting incident with Mr. Urena?
10         A.   I was a district resource officer for the Adam
11   beat, which is the west side of the city of San
12   Bernardino.
13         Q.   How long had you had that assignment at the
14   time?
15         A.   I would say approximately six to seven months.
16         Q.   Did you have a collateral assignment at some
17   point with SWAT?
18         A.   Yes, sir.
19         Q.   And are you still assigned to the SWAT team?
20         A.   I am, sir.
21         Q.   And how long have you been assigned to the SWAT
22   team?
23         A.   Now, I think I've been on the SWAT team for
24   approximately just shy of three years.
25         Q.   Prior to the incident with Mr. Urena, had you

Page 8

1    ever seen a suspect with a gun in their hand before?
2          A.   Yes, sir.
3          Q.   On how many occasions, approximately?
4          A.   I would say anywhere from 15 to 20 times,
5    approximately.
6          Q.   Had you arrested people with guns on their
7    person before, such as pockets or waistband?
8          A.   Yes, sir.
9          Q.   Any estimate as to how many of those arrests?
10         A.   Yeah.  If you want to include other weapons,
11   other than firearms, such as knives, I would say
12   approximately 30 -- 20 to 30 times.
13         Q.   And what if we just included firearms?
14         A.   Firearms alone, I would say about 20 times.
15         Q.   You've been in foot pursuits before?
16         A.   Yes, sir.
17         Q.   Vehicle pursuits?
18         A.   Yes, sir.
19         Q.   You've had people run on you with guns before?
20         A.   Yes, sir.
21         Q.   You probably have had people try to discard
22   their guns when they're running away from you before?
23         A.   Yes, sir.
24         Q.   How old are you, currently?
25         A.   Currently, I'm 35, sir.

Page 9

1   Q.   How tall are you?

2   A.   5'10.

3   Q.   How much do you currently weigh?

4   A.   About 195.

5   Q.   Do you do anything to keep in shape or

6   exercise?

7   A.   Yes, sir.

8   Q.   What do you do?

9   A.   I try to work out as much as possible, such as

10  lifting weights or, you know, going for a run.

11  Q.   Did you play any sports in high school?

12  A.   Yes, sir.

13  Q.   What did you play?

14  A.   I played mainly soccer.  I played volleyball,

15  football.  That's about it.

16  Q.   All good sports, in my opinion.

17  A.   Yes, sir.

18  Q.   Okay.  Had you ever been present for an

19  officer-involved shooting before the day of the

20  incident?

21  A.   No, sir.

22  Q.   Is this the only time you've been involved in

23  an officer-involved shooting?

24  A.   Yes, sir.

25  Q.   So the information that you had regarding a

Page 10

1   gray car, or someone that might have a gun, where did

2   you get that information?

3   A.   We -- we would attend community meetings on the

4   west side of the city of San Bernardino, where community

5   members would bring up certain issues that they would

6   have.  I believe, at the time, we received information

7   from a community event of this information.

8   Q.   So I'm not too familiar with these meetings.

9   So there would be members of the community that would

10  come and voice concerns or issues that they had?

11  A.   Yes, sir.

12  Q.   And you would get some information that way?

13  A.   Correct.

14  Q.   And that's how you believe you got the

15  information regarding this -- a gray car, with someone

16  inside that might have a gun?

17  A.   Yes, sir.

18  Q.   And so this information, for example, did not

19  come from a confidential informant --

20  A.   No, sir.

21  Q.   -- is that correct?

22       It did not come from a confidential informant?

23  A.   Correct.  It did not come from a confidential

24  informant.

25  Q.   Do you know specifically when that meeting was,

Page 11

1   in relation to seeing the car, whether a week before; a

2   month before?

3   A.   I don't recall specifically, but I would say it

4   was within an approximate time of a week or two weeks.

5   Q.   Were you out specifically looking for that car

6   that day?

7   A.   No, sir.

8   Q.   Was there any written report that you're aware

9   of, documenting that that car -- be on the look out for

10  that car, among San Bernardino police officers?

11  A.   No, sir.

12  Q.   When you saw the car, did you radio in, or did

13  your partner radio in that you were going to stop a car

14  that you believed may be associated with a gun?

15  A.   We did not.

16  Q.   The driver of the car, did you have any

17  information as to the name of the driver?

18  A.   No, sir.

19  Q.   Any photo of the driver?

20  A.   No, sir.

21  Q.   Did you have a plate for the car?

22  A.   No, sir.

23  Q.   Did you know who the car was registered to?

24  A.   No, sir.

25  Q.   Do you know, on the date of the incident,

Page 12

1   whether the person driving was even the registered owner

2   of the car?

3   A.   No, sir.

4   Q.   And I think you were asked these questions in

5   your interview, but you did not have any information

6   that the person had a violent past or criminal history;

7   is that correct?

8   A.   That is correct.  We had no knowledge of his

9   prior criminal history.

10  Q.   To your knowledge, had you ever seen that

11  person before?

12  A.   No, first time.

13  Q.   So do you recall the vehicle going through any

14  stop signs?

15  A.   Yes, sir.

16  Q.   What do you recall in that regard?

17  A.   I remember the intersection of 14th Street and

18  Massachusetts, in the city of San Bernardino, and the

19  car traveling in a westbound direction, on 14th Street.

20  Q.   So did it just go through the stop sign

21  completely, without slowing down, or did it slow down

22  but not a complete stop?  What's your recollection?

23  A.   I recall it slowly rolling through the stop

24  sign, but not making a complete stop.

25  Q.   Okay.  Did your vehicle -- was it equipped --

Page 13

1 equipped with a dash cam?

2    A.   No, sir.

3    Q.   At some point, you turned your body-worn camera

4 on?

5    A.   Yes, sir.

6    Q.   When did you do that in the chronology?  Was

7 that close to the time you decided to pull the car over?

8    A.   Yes, sir.

9    Q.   And is there like a 30-second buffer or so

10 without sound?

11   A.   Yes, sir.

12   Q.   So when we hear the sound, that's actually the

13 time when you turned it on?

14   A.   Correct, sir.

15   Q.   And you probably reviewed a summary of your

16 statement in preparation for the deposition?

17   A.   I did, sir.

18   Q.   And you also looked at the body-worn camera

19 footage?

20   A.   Yes, sir.

21   Q.   Did you also see it in a slowed-down version at

22 times?

23   A.   Yes, sir.

24   Q.   And also some frame-to-frame analysis?

25   A.   Yes, sir.

Page 14

1    Q.   So at some point, you activated your overhead

2 lights to pull the vehicle over?

3    A.   Yes, sir.

4    Q.   I think we can hear on your body-worn camera,

5 you, for a short time, chirped the siren?

6    A.   Yes, sir.

7    Q.   How much time passed, in other words, from you

8 activating your overhead lights to the person getting

9 out of the car and starting to run?

10   A.   How much time had that been?  Is that what

11 you're asking?

12   Q.   Yeah.  In between putting on your lights,

13 because I really can't see them in your body-worn

14 camera.

15   A.   Right.

16   Q.   And then the person, like, starting to run out

17 of the car.

18   A.   I don't recall an exact time.  I would assume

19 anywhere from 15 to 30 seconds, approximately.

20   Q.   And it sounded like it was a relatively short

21 period from chirping your siren to the person getting

22 out and running?

23   A.   Yes, sir.

24   Q.   When the person first got out the of the car,

25 were you able to see their face, or did they turn away

Page 15

1 from you from the beginning?

2    A.   No.  I was only able to see a side profile,

3 based on the way the car was positioned and how he

4 exited the vehicle.

5    Q.   By the way, did you have any information as to

6 the age, height, or weight of this person that might

7 have a gun, in a gray car?

8    A.   No, sir.

9    Q.   And was it pretty clear to you when you saw the

10 door open and the cars starting to move that the person

11 was going to try to foot bail?

12   A.   Yes, sir.

13   Q.   You probably have seen that before in your

14 career?

15   A.   I have, sir.

16   Q.   And I think you mentioned in your interview

17 that your experiences when people jump out of a moving

18 vehicle, they're either trying to get away or hide

19 something from the police.  Has that been your general

20 experience?

21   A.   Yes, sir.

22   Q.   And was that your initial impression, that this

23 person was trying to get away from you?

24   A.   Yes, sir.

25   Q.   And maybe trying to hide something?

Page 16

1    A.   Correct.  Yes, sir.

2    Q.   Which you thought might be a gun?

3    A.   Yes, sir.

4    Q.   When you started the foot pursuit, the initial

5 portion of it, maybe the first 10 or 20 feet, did you

6 see any object in the person's hand at that point?

7    A.   Initially, no.

8    Q.   At some point, did you see a cell phone fall

9 out of his pocket?

10   A.   I did.

11   Q.   Did you recognize it as a cell phone at the

12 time?

13   A.   Yes, sir.

14   Q.   Did you first observe what you believe to be a

15 gun before or after the cell phone dropped out of his

16 pocket?

17   A.   The first thing I observed was what I believe

18 to be the back of an extended magazine on his right,

19 before the cell phone came out of his back pocket and

20 fell on the ground.

21   Q.   You would have made that observation before the

22 cell phone fell?

23   A.   Yes, sir.

24   Q.   And did you yell out "Gun" or something like

25 that to alert your partner that you believe you saw a

Page 17

1  gun?

2      A.   Not at that time.

3      Q.   Did you dispatch that you were chasing someone

4  that you believed had a gun?

5      A.   No, sir.  I did not.

6      Q.   Were you trained that if you're in a foot

7  pursuit, following someone with a gun, you should try to

8  take cover, if you can?

9      A.   Yes, sir.  Depending on the circumstances, yes,

10  sir.

11      Q.   And part of the circumstances would be whether

12  there's cover available?

13      A.   That's correct.

14      Q.   And in foot pursuits, are you trained that if

15  the person's trying to get away from you, one thing you

16  can do is through radio communications, try to set up

17  containment or a perimeter?

18      A.   That is an option.  Yes, sir.

19      Q.   And how is that done normally?  In other words,

20  you would let fellow officers know when you were in a

21  foot pursuit and which way the suspect was fleeing so

22  that they could try to assist?

23      A.   Yes, that's one way.  Yes, sir.

24      Q.   Are there other ways to do it?

25      A.   Usually our primary option would be over radio

Page 18

1  communication.  At the time, I know my partner put out

2  during the radio, so I know that that was being

3  broadcasted over the radio, so I didn't have to.

4      Q.   You heard him at some point say "Foot pursuit"?

5      A.   Correct.

6      Q.   And based on your training, do officers

7  normally, if they hear that and they're in the area,

8  come to try to assist?

9      A.   They do.

10      Q.   And you do the same thing?  If you're out and

11  about and you hear a fellow officer is in a foot

12  pursuit, you try to learn where the foot pursuit is and

13  see if you can come to help?

14      A.   Yeah.  That's if we're not on a critical call

15  already, yes, we will try to assist.

16      Q.   Right.  Obviously, if you're on a critical

17  call, that's going to take priority?

18      A.   Yes, sir.

19      Q.   So prior to the phone dropping -- did it appear

20  to drop out of the back pocket, by the way?

21      A.   Yes, sir.  It did.

22      Q.   Prior to the phone dropping, did you ever see

23  the individual turn towards you with the gun in his

24  hand?

25      A.   No, sir.

Page 19

1      Q.   Did you ever see the gun pointed at you prior

2  to the phone dropping?

3      A.   Prior to the phone dropping, no.

4      Q.   Were you giving -- did you give any commands

5  prior to the phone dropping?

6      A.   I believe I did.  I believe I stated multiple

7  times to let me see his hands.

8      Q.   And why did you want to see his hands?

9      A.   Well, a couple reasons.  One thing that wasn't

10  mentioned prior to him exiting the vehicle, was I could

11  see movement in the vehicle.  He was also the single

12  occupant.

13           Based on training and experience, people who

14  are moving around their vehicle are usually intending to

15  try to hide something or get rid of something.  So that

16  was the first indicator for me.

17           And when he exited and started running, I saw

18  what I believed to be and appeared to be an extended

19  magazine.  And then, after that, I saw the cell phone

20  fall out of his back pocket.

21           The other thing that was an indicator for me

22  was -- being in so many foot pursuits in my career, the

23  first thing -- the first thing -- the first thing that I

24  look at is both hands and what they're doing.  And I

25  could only see his left hand, and I couldn't see his

Page 20

1  right hand.  I could only see his elbow.

2      Q.   Okay.  Let me ask you, those other foot

3  pursuits, have you had foot pursuits of people with guns

4  before?

5      A.   Yes, sir.

6      Q.   I think you told me earlier, sometimes they

7  would try to toss the guns?

8      A.   Yes, sir.

9      Q.   And this is probably pretty obvious, maybe

10  because I did some criminal defense law in my past life,

11  but sometimes these suspects don't want to get caught

12  with the guns; is that your experience?

13      A.   Yes, sir.  That's correct.

14      Q.   So the reason you were saying "Let me see your

15  hands" is because you couldn't see the right hand.  Is

16  that what you're saying?

17      A.   Yes, sir.

18      Q.   And was this object that you thought was

19  possibly a gun in the right hand?

20      A.   Yes, sir.

21      Q.   I guess what I'm wondering, officers sometimes

22  have training if they see what they believe to be a gun,

23  to yell out "Gun."  Is that correct?

24      A.   Yes, sir.

25      Q.   And that's to alert your fellow officer as to

**Page 25**

1  A.  The pictures I saw, yes, they were.

2  Q.  Do you recall seeing a two-tone object?

3  A.  No, sir.

4  Q.  At some point, did you hear your partner out,

5  "Gun, gun, gun," or "He's got a gun," or word to that

6  effect?

7  A.  Yes, sir.

8  Q.  And at that moment, could you see Mr. Urena?

9  A.  Yes, sir.

10  Q.  And up to that time, had any shots been fired

11  yet?

12  A.  No, sir.

13  Q.  And prior to your partner saying "Gun, gun,

14  gun" or words to that effect, did you see Mr. Urena

15  point the firearm at you?

16  A.  Yes.

17      And if I can just clarify, before my partner

18  yelled "Gun, gun, gun," I believe I shouted out, "He's

19  got one," before he yelled "Gun, gun, gun."

20  Q.  Yeah.  I think we heard that when we listened

21  this morning.

22      So let me break this down.  When you said,

23  "He's got one," had he pointed the gun at you or your

24  partner yet?

25  A.  Yes.  He had actually pointed the gun at me

**Page 26**

1  prior to even me yelling, "He's got one."  And that was

2  during the initial foot pursuit.

3  Q.  Well, where was he in relation to this brush

4  field when he pointed the gun at you?

5  A.  If, if you -- if we watch the video, he's

6  running directly in a westbound direction.  Prior to him

7  going in a southwest direction, he's actually able to

8  pull out the entire firearm.

9      This is after I observed the extended mag.

10  This is after the cell phone fell out of his back

11  pocket.  He's actually able to retrieve the firearm from

12  his right side, and, you know, running motion, the gun

13  pointed back towards my direction.

14  Q.  Okay.  Let me break that down a little bit.

15      When you say he's finally able to retrieve it,

16  where did he retrieve it from?

17  A.  From his right side.  His front right side

18  area, waistband.

19  Q.  So how -- and when I say the "brush area," I'm

20  talking about where it starts.  How far was he from the

21  brush area when you saw him pull out the firearm from

22  his right waistband?

23  A.  I want to say approximately 40, 35, 45 feet.

24  Q.  Okay.  And he's still running at that point?

25  A.  Yes, sir.

**Page 27**

1  Q.  And which direction is he running in?

2  A.  At that point, he's now running in a southwest

3  direction.

4  Q.  Okay.  So he still would have 35 or 40 feet to

5  go to get to the brush area?

6  A.  Yes, sir.

7  Q.  And are you saying -- strike that.

8      How far was he from the brush area when you say

9  he pointed the gun at you?

10  A.  Are you saying while -- are you saying -- can

11  you just clarify?

12  Q.  Sure.

13  A.  Because he pointed the gun at me twice.  One

14  was when I was chasing after him on the -- on the

15  asphalt, and then the second time was when he was in the

16  brush.

17  Q.  Okay.  Let's take it one at a time.

18      The first time when he pointed the gun at you,

19  he was on the asphalt?

20  A.  Yes, sir.

21  Q.  And how far would you estimate he was from the

22  brush area at that time?

23  A.  About, like I said, 35, 45 feet.

24  Q.  Okay.  So the same approximate distance that he

25  pulled it out was about the same time he pointed it?

**Page 28**

1  A.  Can you repeat the question?

2  Q.  Sure.  You said he pulled it out of his right

3  waistband -- I wrote down about 35 to 40 feet from the

4  brush area?

5  A.  Correct.

6  Q.  And I asked how far he was when pointed it,

7  and you gave me about the same distance.  So I was

8  asking did he immediately point it at you when he pulled

9  it out?

10  A.  Yes.  As -- so he pulled it out, pointed it at

11  me as he was running away from me, 35 feet from the

12  brush.

13  Q.  Okay.  And did you have your gun out at that

14  time?

15  A.  At that time, I did.

16  Q.  Did you shoot him at that time?

17  A.  No, sir.

18  Q.  Did you yell, "Drop it" at that time?

19  A.  No, sir.

20  Q.  And you didn't yell "Gun," but at some point

21  you said, "He's got one"?

22  A.  Yes, sir.

23  Q.  How long after he pointed this gun at you did

24  you say, "He's got one"?

25  A.  I'm going to say approximately, maybe, one to

Page 29

1   two seconds.

2       Q.   And when he pointed the gun at you, where were

3   you in relation to him?  In other words, were you behind

4   him to his left, behind him to his right, or straight

5   behind him, or any way you want to describe it?

6       A.   I was directly behind him, closer -- closer to

7   his right side.  So not far right, but to his right,

8   directly behind him.

9       Q.   So you were -- he was ahead of you slightly to

10  your left, maybe?

11      A.   Correct.

12      Q.   And your partner was to your left?

13      A.   Yeah.  He was to my left, behind me.

14      Q.   And is there a reason why you didn't yell,

15  "Drop it" at that point?

16      A.   No.

17      Q.   Is there a reason why you didn't shoot him at

18  that point?

19      A.   Yes, sir.

20      Q.   What's the reason?

21      A.   One of the reasons was he was running in a

22  direction of a residential area.  It was a vacant field,

23  but behind -- or directly in front of him, there was a

24  chain-link fence and a very small concrete wall, I'm

25  going to say about 3 feet high.

Page 30

1            So I didn't have -- I didn't feel comfortable

2   shoot in that direction with his erratic movements at

3   the time, and also, due to my backdrop and not knowing

4   who was inside of those residence in cased I missed.

5       Q.   Was there a residence in the background at that

6   point?

7       A.   Yes, sir.

8       Q.   Did he turn to his right or left when he

9   pointed the gun at you?

10      A.   Not that I recall.

11      Q.   Did he have it in his right hand or left hand?

12      A.   Right hand, sir.

13      Q.   And where was it in relation to his body when

14  it was pointed at you the first time?

15      A.   It was behind his -- behind his body, pointed

16  in my direction.

17      Q.   Was it while he was in a running motion still?

18      A.   Yes, sir.

19      Q.   So you're saying his hand came back and at some

20  point, with the hand coming back, it appeared to be

21  pointed in your direction?

22      A.   That's correct.

23      Q.   Did you attempt to take cover after you saw

24  that?

25      A.   No, sir.

Page 31

1       Q.   Did you consider using that fence as cover at

2   any point?

3       A.   I couldn't take cover with the fence that

4   you're speaking of, because the fence was in front of

5   him.  So I had nothing behind him to take cover or

6   concealment.

7       Q.   At some point, did he enter this bush -- brush

8   area?

9       A.   Yes.

10      Q.   And when he entered the brush area, how far

11  were you from him, approximately?

12      A.   I believe I was approximately, like, 10 to 15

13  feet from him.

14      Q.   And when he pointed this gun at you with his

15  back towards you as he's returning away, how far were

16  you from him at that point?

17      A.   I was approximately anywhere from 8 to 10 feet

18  from him.

19      Q.   And did you see him go to the ground at some

20  point in the brush area?

21      A.   Yes, sir.

22      Q.   And did you fire your first shot before or

23  after he went to the ground in the brush area?

24      A.   Before.

25      Q.   And how many shots do you think you got off

Page 32

1   before he went to the ground in the brush area?

2       A.   I don't recall how many.  I know I had a pause

3   between my first volley and second volley, and my first

4   volley had a lot more shots than my second one.

5       Q.   Now you're saying he pointed the gun at you

6   again in the -- when he was in the brush area?

7       A.   Correct.  At me and my partner.

8       Q.   Was that before he went to the ground or after?

9       A.   He pointed it at us before he went to the

10  ground.

11      Q.   Did you ever see a gun pointed at you after he

12  went to the ground?

13      A.   No.

14      Q.   So when he pointed the gun at you in the brush

15  area, before he went to the ground, did he turn that

16  time towards you?

17      A.   I'm sorry, can you repeat the question?

18      Q.   Sure.  When he pointed the gun at you after

19  getting into the brush area, before he went to the

20  ground, did he turn towards you right or left at that

21  time?

22      A.   Correct.  He did.

23      Q.   Which way did he turn?

24      A.   He turned to -- he turned in a -- he turned to

25  the left, so his right hand came over and across his

Page 33

1  body towards us.

2  Q.   Were you trying to see whether he was going to
3  try to toss the gun or not?

4  A.   I didn't know what he was trying to do at the
5  time.  I just knew that when he turned, the gun was
6  pointed at my partner and myself's direction.  I never
7  saw him toss the gun.

8  Q.   I understand that.  I'm just wondering as you
9  were chasing him, were you looking to see what he's
10  going to do with the gun?  Whether he's going to toss it
11  or do something else with it?

12  A.   No.  I strongly believed he had plenty of
13  options to get rid of the gun before he got into the
14  brush.

15  Q.   So once he got in the brush, you were not
16  looking anymore to see whether he was going to toss it?

17      MR. CARPENTER:  Objection.  Misstates
18  testimony.

19      But go ahead.

20  BY MR. GALIPO:

21  Q.   Let me ask you:  Were you still looking to see
22  whether he was going toss the gun once he got to the
23  brush?

24  A.   I wasn't anticipating that he would toss the
25  gun in the brush.  I actually believed he was going to

Page 34

1  discharge his firearm at that point.

2  Q.   I get that part.  I guess what I'm asking is
3  whether you were looking for it, not whether you
4  anticipated or expected it.  Because I take it, given
5  situational awareness, you're not sure what someone's
6  going to do and you have to try to observe the best you
7  can.  Is that fair?

8  A.   Correct.

9  Q.   And when he pointed the gun the second time --
10  you might have answered this -- how far was he from you
11  at that point?

12  A.   He was approximately 10 feet away from me.

13  Q.   And are you saying he did a counter-clockwise
14  turn to his left?

15  A.   Yes.

16  Q.   And I don't know -- I'm sure you're familiar
17  with the hands of a clock, but, like, if someone is
18  facing 12:00 o'clock, so the top of the clock, and if I
19  turn like a quarter turn, I would be at 9:00 o'clock.

20      Are you with me?

21  A.   Yes, sir.

22  Q.   How much of a turn did he do?  Did he get to
23  6:00 o'clock or 9:00 o'clock, or however you want to
24  describe it?

25  A.   Yeah, he was more like a 6:00, 7:00, 6:00

Page 35

1  o'clock.

2  Q.   And was the gun also pointed towards 6:00 or
3  7:00 o'clock?

4  A.   Yes.

5  Q.   And how long did you see the gun pointed in
6  that direction for?

7  A.   I don't recall an exact time, but it was, I
8  believe, approximately two seconds, two to three
9  seconds.

10  Q.   Two to three seconds.

11      And the first time that it was pointed at you
12  when you were running away, do you see that on your
13  body-worn camera, the gun pointed at you?

14  A.   On the body camera?

15  Q.   Yes.

16  A.   I don't remember seeing it on the body camera.
17  It's kind of hard to pause it in certain spaces.  But I
18  do remember the gun being pointed at me at that time.

19  Q.   How about the second time when it was pointed
20  at you for two to three seconds while he was in the
21  brush area?  Do you see that on either one of the
22  body-worn cameras?

23  A.   I don't believe so.

24  Q.   And when he was pointing the gun at you for
25  approximately two to three seconds in the brush area,

Page 36

1  was he still standing upright?

2  A.   Yes, sir.

3  Q.   And was he moving away from you?

4  A.   He was almost at a standstill position, kind of
5  leaning back a little bit.

6  Q.   And you started shooting at about that time?

7  A.   Yes, sir.

8  Q.   So when you initially started shooting, he was
9  upright?

10  A.   Correct.

11  Q.   And would it be at least fair to say you got at
12  least several shots off while he was still upright?

13  A.   Yes, sir.

14  Q.   And where were you aiming at that time on his
15  person?

16  A.   I was aiming at what we call his "center mass."

17  Q.   And what was center mass, from your
18  perspective?

19  A.   Center mass is basically from the waistline up
20  to the upper chest area.

21  Q.   Right.  I'm just wondering from your
22  perspective, was center mass the stomach and chest?  Was
23  it his left side?  Was it his back, or however you want
24  to describe it?

25  A.   Stomach and chest area.

Page 37

1    Q.   And is it correct that you did not give him a
2    command to drop the weapon or a verbal warning you were
3    going to shoot?
4    A.   Yeah.  I didn't -- I didn't give him any of
5    those commands that you mentioned.  No, sir.
6    Q.   So do you believe you were the first one to
7    fire between you and your partner?
8    A.   I do, sir.
9    Q.   And how soon after your partner said, "Gun,
10   gun, he's got a gun," do you think you started firing?
11   A.   I don't recall the time.  I remember I took the
12   first -- I remember shooting my first round as soon as
13   the gun pointed in our direction.
14   Q.   Okay.
15   A.   It wasn't because my partner said, "Gun, gun,
16   gun."
17   Q.   That did not play a part in your decision to
18   shoot?
19   A.   No, sir.
20   Q.   It sounds like you already thought he had a gun
21   before that.  Is that fair?
22   A.   That's correct.
23   Q.   And where would you wear your body-worn camera
24   on your person?
25   A.   Right around the middle of my chest, kind of

Page 38

1    right below the -- in between the nipple line area.
2    Q.   Did you have a chance to look at your body-worn
3    camera footage before you gave your interview?
4    A.   Yes, sir.
5    Q.   Were you aware, at the time you gave your
6    interview, that the body-worn camera footage did not Mr.
7    Urena pointing his gun at you?
8    A.   Yes, sir.
9    Q.   You had Attorney Castillo also for your
10   interview; is that correct?
11   A.   Yes, sir.
12   Q.   Were you aware that it was being recorded?
13   A.   Yes, sir.
14   Q.   Have you read a transcription or summary?
15   A.   Yes, sir.
16   Q.   Was it a summary or a word-to-word
17   transcription, if you recall?
18   A.   No, it was a summary.
19   Q.   Were there any breaks during the statement?  In
20   other words, were there times when you took a break?
21   A.   Yes, sir.
22        (Reporter clarification.)
23   BY MR. GALIPO:
24   Q.   And were you able to at least consult with your
25   attorney during the breaks?

Page 39

1    A.   Yes, sir.
2    Q.   And I'm assuming -- I don't want to get into
3    what was spoken about -- but you were permitted to
4    consult with your attorney prior to the interview, as
5    well; is that fair?
6    A.   Yes, sir.
7    Q.   How did you learn that the gun was found over
8    the fence in the adjacent property?
9        MR. CARPENTER:  I'm just going to objection to
10   the extent it calls for attorney-client privilege.
11        But if you learned about it outside of any
12   attorneys, you can go ahead and answer.
13        THE WITNESS:  So when I learned about --
14   BY MR. GALIPO:
15   Q.   Go ahead.  Sorry --
16   A.   Yeah.  Yeah.  I actually learned that the
17   firearm was recovered at the scene, before we were
18   transported from the scene to the station, over our
19   dispatch radio.
20   Q.   And how did you learn that -- oh, over the
21   radio?
22   A.   Yes, sir.
23   Q.   Did you at least go and see where it was?
24   A.   No, sir.
25   Q.   Did you know where it was recovered from,

Page 40

1    generally?
2    A.   Generally, yes.  It was broadcast over the
3    dispatch radio.
4    Q.   At some point, did you see Mr. Urena go to the
5    ground?
6    A.   Yes, sir.
7    Q.   And that was after you started shooting?
8    A.   Yes, sir.
9    Q.   And you were shooting from about -- was it
10   about 10 feet away?
11   A.   Approximately.
12   Q.   Aiming at his chest/stomach area?
13   A.   Correct.
14   Q.   Do you consider yourself to be a pretty good
15   shop?
16   A.   Decent, yes, sir.
17   Q.   I assume as part of your SWAT responsibilities,
18   there's some additional training you have to go through?
19   A.   Yes, sir.
20   Q.   And did you have the impression from 10 feet
21   away that some of your initial shots struck him?
22   A.   Yes, sir.
23   Q.   And is that in part because of your abilities,
24   the distance, and seeing him going to the ground?
25   A.   Yes, sir.

Page 41

1    Q.   Did you see his body reacting in any way to
2  some of your initial shots?
3    A.   It's hard to recall, just because the incident
4  occurred extremely quickly.  So if you're asking
5  specific movements as to what he was doing after he was
6  shot, I cannot recall or give you an answer.
7    Q.   But you do recall him going to the ground after
8  some of your initial shots?
9    A.   Yes, sir.
10   Q.   And which way did he go to the ground, if you
11 recall?
12   A.   He went down -- so if he was facing me, he went
13 down basically to the ground while facing us and then
14 started leaning back.
15   Q.   What compass direction were you from him?  Were
16 you --
17   A.   I was --
18   Q.   Were you east of him or something else?
19   A.   So I was northeast of him, if you will.
20   Q.   So he would have been southwest of you?
21   A.   Correct.
22   Q.   And when he went to ground, was his head to the
23 southwest and his feet to the northeast?
24   A.   Yes.
25   Q.   And could you tell what part of his body he

Page 42

1  went to the ground on?
2    A.   Yes.  His -- his back area.
3    Q.   And you continued to fire shots after he went
4  to the ground; correct?
5    A.   Yes, sir.
6    Q.   And you, in fact, had somewhat of a pause
7  between your shots?
8    A.   Yes, sir.
9    Q.   So technically, you would have had two volleys
10 of shots?
11   A.   Yes, sir.
12   Q.   And it sounds like, at least from the audio,
13 there's about four shots in the second volley.  Would
14 you agree?
15   A.   Approximately, yes.
16   Q.   And you fired 18 shots altogether?
17   A.   That's correct.
18   Q.   So just doing the math, would it be fair to say
19 you fired approximately 14 shots in the first volley?
20   A.   Yes, sir.
21   Q.   And approximately four shots in the second
22 volley?
23   A.   That's correct.
24   Q.   And was he upright for all 14 of your shots in
25 the first volley, or were some of those shots fired as

Page 43

1  he was going to the ground or on the ground?
2    A.   Yeah.  Some of those shots were fired as he was
3  coming to the ground or falling to the ground.
4    Q.   Okay.  Did you fire any shots in your first
5  volley as he was on the ground?
6    A.   Yes.
7    Q.   Do you have an estimate as to how many?
8    A.   I do not.
9    Q.   And did you come up on your sites when you were
10 firing?
11   A.   No, sir.  I -- I pointed my gun in his
12 direction.
13   Q.   Could you see a gun in his hand during all 14
14 of your initial shots?
15   A.   Not every single shot.  No, sir.
16   Q.   When he went to the ground, did you see a gun
17 in his hand?
18   A.   No.  I believed he still had a firearm due to
19 not seeing him toss the firearm and the amount of the
20 brush in the general area.
21   Q.   If you would have seen him toss the firearm,
22 based on your training, do you think it would have been
23 appropriate to keep shooting?
24   A.   No.  If he would have -- if I would have seen
25 him toss the firearm, at that point, I would have ceased

Page 44

1  firing.
2    Q.   And so when he went to ground, if I understand
3  what you're saying, you thought he still had a gun, but
4  you just couldn't see it at that point because of the
5  brush?
6    A.   Correct.  And also, due to not me seeing him
7  toss the firearm at any point.
8    Q.   So would you at least --
9         MR. CARPENTER:  Sorry to interrupt.  When you
10 have a moment and we can take ten, I could use the
11 restroom.
12        MR. GALIPO:  We can do it now because we've
13 been going about an hour.
14        Want to take a ten-minute break, everybody?
15        MR. CARPENTER:  That would be great.
16        MR. GALIPO:  Let videographer take us off and
17 then we can take our break.
18        THE VIDEOGRAPHER:  Going off the record at 2:59
19 p.m.
20        (Break taken.)
21        THE VIDEOGRAPHER:  We're going back on the
22 record at 3:17 p.m.
23 BY MR. GALIPO:
24   Q.   When you're saying he pointed the weapon at you
25 the first time, would he have been running away from you

Page 45

1  at that point?
2      A.   Yes.  He was running away from me.
3      Q.   And was his back to you at that point?
4      A.   Yes, sir.
5      Q.   The second time, just so that I'm clear, was he
6  in the brush when he pointed at you?
7      A.   Yes, sir.
8      Q.   And how far in the brush was he at that point?
9      A.   How far in or how low?
10     Q.   Yeah.  How far in?  Like, was he 2 feet in?  5
11 feet in?  10 feet?  Whatever is your best estimate.
12     A.   I'm going to say, maybe 5 feet into the brush
13 from the -- from the asphalt.
14     Q.   Okay.
15     A.   Approximately.
16     Q.   And you're saying he was in this position of
17 pointing at you for about two or three seconds?
18     A.   Total, approximately, two to three seconds,
19 yes.
20     Q.   And during that two to three seconds, was he
21 stationary or moving?
22     A.   Yeah, he was moving.
23     Q.   In which direction?
24     A.   He was -- like I said earlier, he was -- how he
25 mentioned counter-clockwise, turning with the firearm

Page 46

1  pointed in our direction, over and across, and as he's
2  going into the brush.
3      Q.   Did you ever see him moving back in a
4  counter-clockwise direction after you started
5  shooting -- strike that -- in a clockwise?  I misspoke.
6      A.   Okay.
7      Q.   Did you ever see him turning back to his right
8  in a clockwise direction after you started shooting?
9      A.   No, sir.
10     Q.   As he was going to the ground, did you see him
11 toss a gun over the fence?
12     A.   No, sir.
13     Q.   After he went to the ground, did you see him
14 tossing a gun over the fence?
15     A.   No, sir.
16     Q.   Do you think if he would have tossed a gun as
17 he was going to the ground, you would have seen that?
18     A.   Yes, sir.
19     Q.   And do you think if he tossed the gun while he
20 was on ground, you would have seen that?
21     A.   I believe I would have.  Yes, sir.
22     Q.   Did you have any estimate as to the age of the
23 person you were chasing, before you fired your shots?
24     A.   No, sir.
25     Q.   Would you at least agree now that given where

Page 47

1  the gun ended up, he must have tossed it there?
2          MR. CARPENTER:  Objection.  Lacks foundation.
3  Calls for speculation.
4  BY MR. GALIPO:
5      Q.   You may answer.
6      A.   Can you repeat the question, sir, please?
7      Q.   Sure.  Given what you know now about where the
8  gun ended up, would you at least agree now he must have
9  tossed it over the fence for it to get there?
10         MR. CARPENTER:  Same objections.
11         THE WITNESS:  Yes, sir.
12 BY MR. GALIPO:
13     Q.   In your interview, you reference at some point
14 Mr. Urena turning the corner.  Do you remember saying
15 that in your interview?
16     A.   Yes, sir.
17     Q.   Which corner were you referring to?
18     A.   I was referring to the fence line where the
19 brush and the asphalt meet.
20     Q.   And in your interview, you reference as he was
21 turning the corner, that's the time frame where you saw
22 him pointing the firearm in your direction.  Do you
23 recall that?
24     A.   Yes, sir.
25     Q.   You, in your initial interview, thought that

Page 48

1  your shots after the pause was about two shots.  But
2  upon closer examination, you would agree it's more like
3  four?
4      A.   Yes, sir.
5      Q.   Did you look for the firearm at all, in the
6  immediate vicinity of Mr. Urena, after the shooting?
7      A.   Yes, sir.
8      Q.   And you're looking around a little bit in his
9  immediate area and around the brush?
10     A.   Yes, sir.
11     Q.   Would it be fair to say you did not see a
12 firearm at that point?
13     A.   That's correct.
14     Q.   Sergeant Campos showed up at some point and you
15 gave a public safety statement?
16     A.   I did, sir.
17     Q.   Did you tell him how many shots you fired?
18     A.   Yes, sir.
19     Q.   And what did you tell him?  18 shots?
20     A.   I did, yes, sir.
21     Q.   What part of Mr. Cerna were you aiming at that
22 when you were firing while he was on the ground?
23         MR. CARPENTER:  Mr. Urena?
24         THE WITNESS:  Mr. Urena?
25 BY MR. GALIPO:

Page 65

1      THE VIDEOGRAPHER:  We are back on record at
2  35:4 p.m.
3  BY MR. GALIPO:
4      Q.  I think you told me earlier that you recall him
5  going towards the ground during some of your first
6  volley of shots.
7      A.  Yes, sir.
8      Q.  Do you know if he was on the ground during some
9  of your first volley?
10     A.  I believe he was.  Yes, sir.
11     Q.  You never saw him pointing a gun at you when he
12  was on the ground, did you?
13     A.  I saw him pointing the -- what I believed to be
14  a firearm at the time, in our direction.
15     Q.  Did you see an object in his hands when he was
16  on the ground?
17     A.  I believed that I did see an object during the
18  entire time, which is why I kept shooting.  And also, I
19  never saw him toss the firearm.
20     Q.  Right.  So I guess I had this issue with
21  Officer Davalos.  I'm trying not to get what you thought
22  or believed.  I get it.  You believed he still had the
23  firearm.  I'm asking a slightly different question.
24     Did you actually see it when he was on the
25  ground, in his hands?

Page 66

1      A.  No, sir.
2      Q.  And I'm going to show you -- we did a few still
3  photos from your body-worn camera, and they have numbers
4  on them in the bottom right, which corresponds to slide
5  numbers.  But I'm going to make the slide numbers
6  exhibits, so the next one will be Exhibit 3.
7      (Reporter clarification.)
8      MR. GALIPO:  I'll go with Exhibit 3 for slide
9  239.
10     (Exhibit Number 3 was marked.)
11     MS. MASONGSONG:  Sorry.  Let me --
12     MR. GALIPO:  And there it went.
13     MS. MASONGSONG:  Sorry.
14     MR. GALIPO:  Can we make it a little bigger?
15     MS. MASONGSONG:  Yes.
16     MR. GALIPO:  Or is that it --
17  BY MR. GALIPO:
18     Q.  Okay.  Are you able to see that on your screen?
19     A.  Yes, sir.
20     Q.  And does there appear to be from your body-worn
21  camera footage?
22     A.  Yes, sir.
23     Q.  I -- I can tell your arm has a few less tattoos
24  than Officer Davalos.
25     A.  Yeah.  I don't have any tattoos.

Page 67

1      Q.  Okay.  Me neither.  So tattoos are fine.  It's
2  different strokes for different folks.
3      But in any event, can you see in this image,
4  Exhibit 3, slide 239, Mr. Urena?
5      A.  Yes, sir.
6      Q.  And does he appear to be turned toward you,
7  pointing a weapon, in this image?
8      A.  No, sir.
9      Q.  Okay.  Let's go to image 240.  And
10  this will be Exhibit 4.
11     (Exhibit Number 4 was marked.)
12  BY MR. GALIPO:
13     Q.  Again, we see Mr. Urena approaching or starting
14  to enter the brush area here?
15     A.  Yes, sir.
16     Q.  Do you see him turn and pointing a weapon in
17  this image?
18     A.  No, sir.
19     MR. GALIPO:  Let's go to 241, and we'll mark
20  that as Exhibit 5.
21     (Exhibit Number 5 was marked.)
22  BY MR. GALIPO:
23     Q.  Do you see Mr. Urena turn towards you, pointing
24  a weapon, in this image?
25     MR. CARPENTER:  Can you see clearly enough?

Page 68

1      THE WITNESS:  No, can you make it bigger.  I'm
2  sorry.  It's hard to see.
3      MR. GALIPO:  Sure.
4      MS. MASONGSONG:  Sure.  Let me try.
5      Does that help?
6      THE WITNESS:  A little bit.  But, yeah, he's
7  still not turning our direction, no.
8      MR. GALIPO:  Okay.  Let's try the next slide,
9  Exhibit 6.
10     (Exhibit Number 6 was marked.)
11     MR. GALIPO:  Am I up to -- which number is
12  this, Renee?
13     MS. MASONGSONG:  This is 242.
14     MR. GALIPO:  242.  Okay.  Thank you.
15  BY MR. GALIPO:
16     Q.  Do you see him turn in your direction, pointing
17  a weapon in this slide?
18     A.  No, sir.
19     MR. GALIPO:  And let's just do a few more, 243.
20  I think that will be Exhibit 6 [sic].
21  BY MR. GALIPO:
22     Q.  Do you see him turn towards you, pointing a
23  weapon, in this slide?
24     A.  No, sir.
25     (Reporter clarification.)

Page 69

```
 1              (Exhibit Number 7 was marked.)
 2         MR. GALIPO:  And then 244.
 3              (Exhibit Number 8 was marked.)
 4  BY MR. GALIPO:
 5    Q.   Do you see him turn towards you, pointing a
 6  weapon, in this image?
 7    A.   No, sir.
 8         MR. GALIPO:  245.
 9              (Exhibit Number 9 was marked.)
10  BY MR. GALIPO:
11    Q.   Do you see him turn towards you, pointing a
12  weapon, in this image?
13    A.   No, sir.
14         MR. GALIPO:  246.
15              (Exhibit Number 10 was marked.)
16  BY MR. GALIPO:
17    Q.   Do you see him turning towards you, pointing a
18  weapon, in this image?
19    A.   No, sir.
20         MR. GALIPO:  And one more, 247.
21              (Exhibit Number 11 was marked.)
22  BY MR. GALIPO:
23    Q.   Do you see him turn towards you, pointing a
24  weapon, in this image?
25    A.   No, sir.
```

Page 70

```
 1    Q.   Okay.  Thank you.
 2         MR. GALIPO:  That's all the questions I have.
 3    Scott, do you have any questions for your
 4  client today?
 5         MR. CARPENTER:  No, I have no questions.
 6         MR. GALIPO:  Okay.  Kimberly, do you have any
 7  questions or spelling questions for us?
 8         THE CERTIFIED STENOGRAPHER:  Mr. Carpenter,
 9  you're ordering copy of this on as well, and read and
10  sign?
11         MR. CARPENTER:  Yes, and read and sign.
12         THE CERTIFIED STENOGRAPHER:  Okay.  Thank you
13  very much.
14         MR. GALIPO:  Okay.  Mr. Videographer, you can
15  just take us off now, please.
16         THE VIDEOGRAPHER:  Okay.  Going off the record
17  at 4:01 p.m.
18         MR. GALIPO:  Thank you.
19              (4:02 p.m., deposition concluded.)
20                   --oOo--
21
22
23
24
25
```

Page 71

```
 1  STATE OF CALIFORNIA)
 2                     ) ss:
    COUNTY OF BUTTE    )
 3
 4         I, KIMBERLY E. D'URSO, do hereby certify:
 5         That the witness named in the foregoing
 6  deposition was present remotely and duly sworn to testify
 7  to the truth in the within-entitled action on the day and
 8  date and at the time and place therein specified;
 9         That the testimony of said witness was reported
10  by me in shorthand and was thereafter transcribed through
11  computer-aided transcription;
12         That the foregoing constitutes a full, true and
13  correct transcript of said deposition and of the
14  proceedings which took place;
15         Further, that if the foregoing pertains to the
16  original transcript of a deposition in a federal case,
17  before completion of the proceedings, review of the
18  transcript [ ] was [ ] was not requested.
19         That I am a certified stenographic reporter and
20  a disinterested person to the said action;
21         IN WITNESS WHEREOF, I have hereunder subscribed
22  my hand this 13th day of July, 2025.
23         _____
24  KIMBERLY D'URSO, CSR NO. 11372, RPR
25
```

Page 72

```
 1              ERRATA SHEET
 2  PAGE/LINE          CHANGE          REASON
 3  _____
 4  _____
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

Page 73

1          DECLARATION OF DEPONENT

2

3          I, _____, say I have read the

4   foregoing deposition and declare under penalty of perjury

5   under the laws of the State of California and all federal

6   laws that my answers as indicated are true and correct.

7

8          Dated this _____ day of _____, 2025, at

9   _____, California.

10

11                    _____

12                    ANDRES ESTRELLA

13

14

15

16

17

18

19

20

21

22

23

24

25