LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq. (SBN 144074)
dalekgalipo@yahoo.com
Renee V. Masongsong, Esq. (SBN 281819)
rvalentine@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Tel:   (818) 347-3333
Fax:   (818) 347-4118

*Attorneys for Plaintiff*, RENATO URENA

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENATO URENA, individually,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF SAN BERNARDINO; JONATHAN DAVALOS; ANDRES ESTRELLA,<br><br>Defendants. | Case No. 5:24-cv-00341-JGB-SHK<br><br>*Assigned to*:<br>Hon. District Judge Jesus G. Bernal<br>Hon. Mag. Judge Shashi H. Kewalramani<br><br>**DECLARATION OF PLAINTIFF'S POLICE PRACTICES EXPERT RICHARD BRYCE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[*Filed concurrently with Plaintiff's Memorandum of Points and Authorities; Declaration of Renee V. Masongsong and Exhibits thereto; Plaintiff's Responsive Separate Statement*] |

-1-

DECLARATION OF RICHARD BRYCE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## <u>DECLARATION OF RICHARD BRYCE</u>

I, Richard Bryce, declare as follows:

1.      I am a police practices expert specializing in the procedures of police practices and proper police tactics, including the type and degree of force, if any, appropriate under different circumstances. I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so. My opinions are based in part on my training, professional experience and education. My qualifications to review this case are set forth in detail in my curriculum vitae, which is attached hereto as "Exhibit 1."

2.      Before reaching my opinions in this case, I reviewed the pertinent case materials, including but not limited to the following: (1) Investigation Reports; (2) Deposition of Defendant Andres Estrella; (3) Deposition of Defendant Jonathan Davalos; (4) Deposition of Plaintiff Renato Urena; (5) Deposition of defense expert Brady Held; (6) Interview of Andres Estrella; (7) Interview of Jonathan Davalos; (8) Estrella BWC Video and frame-by-frame of video; (9) Davalos BWC Video and frame-by-frame of video; (10) Brady Held Rule 26 Report; (11) photographs of the scene and the evidence; (12) scene walkthrough video; (13) Ring video and screenshots.

3.      Basic police training and Peace Officer Standards and Training ("POST") provides the following standards with respect to the use of deadly force.

a.  A peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary to defend against an imminent threat of death or serious bodily injury to the officer or to another person. *See California Penal Code Section 835a.*

b.  The training and standards with respect to the use if deadly force is that a threat of death or serious injury is imminent when, based upon the

DECLARATION OF RICHARD BRYCE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that from appearances, must be instantly confronted and addressed. *California Penal Code Section 835a(e)(2).*

    c.  Deadly force can only be used on the basis of an "objectively reasonable" belief that the suspect poses an immediate threat of death or serious bodily injury. Subjective fear alone does not justify the use of deadly force.

    d.  Basic police training teaches that that a suspect's failure to comply with officer commands or running away is an insufficient basis for the use of deadly force.

    e.  Police officers are trained that the decision to use deadly force must be guided by the reverence for human life.

    f.  Pursuant to basic police training and standards, police officers are responsible for justifying every shot they fire.

    g.  Basic police training teaches that an overreaction in using deadly force is excessive force.

    h.  Police officers are trained that deadly force should only be used when no reasonable alternative measures are available.

    i.  Police officers are trained to give a verbal warning before using deadly force, where feasible.

4.    Under the facts of this case and pursuant to police standards and training, it would have been inappropriate for the Officers to shoot at Mr. Urena for

-3-

fleeing or for running away, even with a gun in his hand. Both Officers Davalos and Estrella admitted at their depositions that based on their police training, it would be inappropriate to shoot Mr. Urena for running away with a gun.

5.      A reasonable police officer acting consistent with standard police practices and training would not have used lethal force in this situation and would not have considered Mr. Urena to be an immediate lethal threat in this set of facts. At the time that Officers Estrella and Davalos fired their shots at Mr. Urena, Mr. Urena did not pose an immediate threat of death or serious bodily injury to the officers or to any person. Therefore, all of the shots fired by the Officers were inappropriate and contrary to basic police training, POST Learning Domain 20, and California Penal Code Section 835a, particularly because Mr. Urena was unarmed and on the ground for at least 34 of the 36 shots.

6.      Police officers are trained that seeing a gun in a suspect's hand is not a sufficient justification to use deadly force against that suspect. Based on my review of the BWC videos, Mr. Urena's deposition testimony, and Defendants' expert Brady Held's deposition testimony and Rule 26 report, Mr. Urena never pointed the gun at the officers and never turned toward the Officers with the gun in his hand coming in the direction of the Officers.

7.      According to Mr. Urena's deposition testimony, Mr. Urena discarded the gun before any shots were fired. It would be inappropriate for the Officers to shoot Mr. Urena for tossing the gun. According to Defendants' expert Brady Held, the gun is not visible in Officer Estrella's BWC video, the gun is visible in Officer Davalos' BWC video for only approximately 1/6 of one second, the first shot was fired approximately 1/15 of one second before Mr. Urena began to throw the gun over the fence, and the second shot was fired when the gun was leaving Mr. Urena's hand or in the air. Therefore, Mr. Urena was either unarmed at the time of all of the shots, or, alternatively, Mr. Urena was unarmed during 34 or 35 of the 36 shots.

-4-

DECLARATION OF RICHARD BRYCE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

8.      Based on my review of the BWC videos, Mr. Urena was down on the ground during all 36 of the shots.  Mr. Urena could not have been pointing the gun at the officers while he was on the ground, given that he tossed the gun and the Officers admitted that they did not see anything in Mr. Urena's hands after he went to the ground.

9.      It was inappropriate for the Officers to believe that Mr. Urena went to the ground to gain a position of advantage. A reasonable interpretation of Mr. Urena going to the ground is that he went to the ground to surrender, particularly when viewed in conjunction with the fact that Mr. Urena tossed the gun over the fence. It was also inappropriate for the Officers to believe that Mr. Urena was in a shooting position when he was down on the ground.

10.      The Officers' inconsistent statements regarding whether they actually observed a gun in Mr. Urena's hand when he was on the ground during the shooting places the Officers' credibility at issue, which must be determined by the Court or a jury. Officer Davalos stated in his initial interview: "He laid down himself on the ground . . . I saw him still with the gun and as I approached him, I saw him turn towards me, like looking at me with the gun in his right hand, at which point I opened fire." (Davalos Interview at 18:10-23). However, at his deposition, Officer Davalos admitted that he did not actually see a gun in Mr. Urena's hands when Mr. Urena was on the ground, and the video shows that Mr. Urena tossed the gun over the fence at the time of the first shot, assuming defense expert Mr. Held's analysis is correct.

11.      Police officers are trained to focus on the suspect's hands, particularly if the officer believes that the suspect is armed. Police officers are also trained with respect to situational awareness. Based on police training on situational awareness, a reasonable police officer in the position of Officers Davalos and Estrella would have seen Mr. Urena toss the gun, when they had an unobstructed view a short distance

-5-
DECLARATION OF RICHARD BRYCE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

behind Mr. Urena. Additionally, police officers are trained that when a subject is running with a gun, the subject might try to toss the gun so that they do not get caught with a gun.

12. Police officers are trained that they must re-assess when they are firing shots, and trained that they are responsible for justifying every shot they fire. Here, Officer Davalos and Officer Estrella fired 18 shots each. A reasonably well-trained police officer in the position of Officer Davalos and Officer Estrella would have reassessed multiple times during the shooting sequence and would have recognized that Mr. Urena was unarmed during at least 34 or 35 of the shots. Officer Estrella testified in his deposition that he never saw a gun pointed at him after Mr. Urena went to the ground and testified that when he paused to reassess during the shooting sequence, he was aware that Mr. Urena was on the ground.

13. After the shooting, the gun was located some distance from Mr. Urena, on the other side of the fence, in a holster. The fact that the gun was in a holster indicates that even when Mr. Urena did have the gun in his hand, he would not have been able to fire any shots from the gun.

14. The Officers failed to consider reasonable alternative measures to shooting. Less-lethal options were available, including taking cover and waiting for backup. Police officers are trained to take cover, create distance, and call for backup if they see a gun in a suspect's hand. A reasonable police officer in the position of Davalos and Estrella would not have pursued Mr. Urena on foot without cover if they thought he had a gun. Rather than pursuing Mr. Urena on foot, the Officers should have set up a perimeter and containment, which could have been done with the assistance of backup officers.

15. Basic police training teaches that an overreaction in using deadly force is excessive force. Here, the Officers overreacted when they fired 36 shots at Mr. Urena, including at least 34 to 35 shots fired when Mr. Urena was unarmed and 36

-6-

shots fired while Mr. Urena was on the ground. The Officers also may have engaged in "reactionary shooting" or "contagious fire," given number of shots that were fired (36), and particularly given the number of shots that were fired when Mr. Urena was unarmed and on the ground.

16. Officers Estrella and Davalos engaged in substandard pre-shooting tactics. This includes that the Officers made poor tactical decisions when they pursued Mr. Urena on foot without cover when they had information that he may be armed. The Officers also failed to give Mr. Urena sufficient commands and time to comply with those commands. Other than "let me see your hands," Officer Estrella did not give Mr. Urena any commands before Mr. Urena got to the brush area. Neither officer gave Mr. Urena a command to "drop it at any point." Officer Estrella did not give Mr. Urena a verbal warning before shooting. Officer Davalos did not yell out "gun" when he claims initially saw the gun, halfway through the foot pursuit, even though police officers are trained to yell out "gun" when they see a gun. Additionally, the Officers failed to utilize time, cover, and distance, which they had available to them. The Officers also failed to properly assess during the shooting sequence.

17. From the standpoint of police practices, including basic police training, POST standards, both Officer Estrella's and Officer Davalos' uses of deadly force were improper, inappropriate, and contrary to POST standards and basic police training, including for the following reasons:

      a. No "Immediate Defense of Life" situation. Police officers are trained that they can only use deadly force in an Immediate Defense of Life Situation, in other words, when they have an objectively reasonable belief that the suspect poses an immediate or imminent threat of death or serious bodily injury. A fear of future harm is not enough. There was no immediate defense of life situation when Officers Estrella and

DECLARATION OF RICHARD BRYCE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Davalos fired their shots at Mr. Urena when he was unarmed and on the ground.

b. <u>Subjective fear is insufficient to justify a use of deadly force</u>. Basic police training requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger."

c. <u>Unarmed during at least the majority of the shots</u>. According to Mr. Urena, he discarded the firearm prior to any shots being fired. According to Defendants' expert Mr. Held, Mr. Urena was unarmed during 34 or 35 of the 36 shots.

d. <u>Shots fired when Mr. Urena was on the ground</u>. Based on my review of the BWC videos, Mr. Urena was on the ground during all of the shots. At no point was Mr. Urena ever standing upright and facing the Officers with the gun in his hand.

e. <u>Gun in hand not enough</u>. Basic police training teaches that police officers cannot shoot a subject merely for seeing a gun in the subject's hand—there must be additional factors to justify the use of deadly force. Here, according to the BWC videos and Mr. Urena, Mr. Urena never pointed the gun at either Officer and never turned toward either Officer with the gun. Even if Mr. Urena did have the gun in his hand during one or two of the shots, the gun was in a holster, such that Mr. Urena would not have immediately been able to fire it.

f. <u>Cannot shoot for fleeing</u>. Based on basic police training, Officers could not justify shooting Mr. Urena for fleeing or for running away with the gun in his hand. The Officers admitted that at their depositions that they had no information that Mr. Urena committed an act involving the infliction of serious injury or death.

-8-

g. No crime involving the infliction of serious injury or death. The Officers were not responding to a crime involving the infliction of death or serious bodily injury.

h. No verbal threats. Mr. Urena never verbally threatened to harm any of the officers.

i. Reasonable alternative measures available. Officers are trained that they can only use deadly force in a "last resort" situation when there are no other reasonable options. The Officers had other reasonable measures available, including taking cover, waiting for backup, giving further commands and time to comply with commands, employing time and distance, and setting up a perimeter for later apprehension.

j. No reverence for human life. Police officers are trained that they must show a reverence for human life. When the Officers fired a total of 36 shots at Mr. Urena, including shots fired when Mr. Urena was unarmed and shots fired when he was on the ground, they showed no reverence for human life.

k. Police officers are responsible for justifying every shot. Police officers are trained that they must justify every shot they fire. None of the shots are justified, and certainly not the 34 or 35 shots fired while Urena was unarmed and on the ground.

l. Contagious fire. Given the number of shots that were fired (36), and given the number of shots that were fired when Mr. Urena was unarmed and on the ground, this appears to be a case of contagious fire or reactionary shooting.

-9-

DECLARATION OF RICHARD BRYCE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I declare under penalty of perjury that the foregoing is true and correct, and that this was executed this 23rd day of March 2026 at Mapleton, Utah.

_____

Richard Bryce

DECLARATION OF RICHARD BRYCE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT