# EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

RENATO URENA, INDIVIDUALLY,      )
                                 )
          PLAINTIFF,             )
                                 )
     vs.                         )CASE NO. 5:24-cv-
                                 )     00341-JGB-SHK
CITY OF SAN BERNARDINO,          )
JONATHAN DAVALOS, ANDRES         )
ESTRELLA, AND DOES 1-10,         )
INCLUSIVE,                       )
                                 )
          DEFENDANT(S).          )
_____)

VIDEOTAPED REMOTE DEPOSITION OF

RENATO URENA

Wednesday, February 11, 2026

Reported by:
Christine C. Gordon
CSR No. 7709

Job No. 1009733

Page 1

Q    And am I correct that you pleaded guilty to possession of a firearm?    09:34:46 / 09:34:55

A    Yes, sir.    09:34:55

Q    In terms of preparing for this deposition, sir, have you reviewed any documents or materials?    09:34:56 / 09:35:11

A    No, sir.    09:35:16

Q    To prepare for the deposition have you read any Police Reports?    09:35:16 / 09:35:21

A    No, sir.    09:35:23

Q    Did you review any videotapes or body-worn camera footage related to the incident to prepare for this deposition?    09:35:25 / 09:35:31 / 09:35:35

A    No, sir.    09:35:35

Q    Have you reviewed any photographs or audio recordings to prepare for this deposition?    09:35:36 / 09:35:44

A    No, sir.    09:35:46

Q    And what about medical records?  Have you reviewed any of your medical records to prepare for this deposition?    09:35:47 / 09:35:50 / 09:35:53

A    No, sir.    09:35:54

Q    Have you ever reviewed any videotape related to the shooting at any point in time?    09:35:54 / 09:36:01

A    Yes, when it first occurred.    09:36:03

Q    And you said "when it first occurred"?    09:36:06

A    Yeah.  Well, when I first came to Sharon    09:36:11

RENATO URENA - February 11, 2026

A    Anna Lisa's.

Q    And what type of vehicle was it?

A    Nissan.

Q    And you didn't have a Driver's License at that time; correct?

A    Correct.

Q    Sorry.  I didn't hear you.  Did you say "no"?

A    No, sir.

Q    And you were on parole at that time?

A    Yes, sir.

Q    Okay.  And where were you driving to?

A    To see my kids.  Not all of them, but to see one of my kids.

Q    And which child were you going to go visit with?

A    My son.

Q    And what's their name?

A    Renato.

Q    And where were you going to go meet him?

A    I forgot what street it was.  It was at someone's house, and I was just supposed to pick him up.

Q    Did you have plans to do anything with him after you picked him up?

Page 35

RENATO URENA - February 11, 2026

A    No.

Q    And I believe you said you were just supposed to pick him up at someone's house, but you don't know whose house it was?

A    Yeah.  No, my son, he -- yeah.

Q    And you weren't working that day; is that correct?

A    No.

Q    Did Anna Lisa know you were using her car at that time?

A    Yes.

Q    And would she let you borrow that Nissan?

A    Yes.

Q    And do you know what she was doing that day?

A    She was working.

Q    And where did she work at that time?

A    An outpatient up there in Loma Linda.

Q    Sorry.  Could you repeat that?

A    Some outpatient hospital right there in Loma Linda that's connected to the Loma Linda Hospital.

Q    And what did she do for that outpatient hospital?

A    I'm not sure.  I forgot the name, what

Page 36

like her actual position is.

Q    Is she a nurse or a doctor or any type of medical provider to your knowledge?

A    She prepares the rooms and cleans up after surgeries.

Q    Prior to being contacted by the police officers in the morning of February 10, 2023, where had you been coming from?

A    (Inaudible.)

Q    Sorry, I didn't hear you.  Could you please repeat?

A    An associate of mine.  A friend, yeah.

Q    You were visiting with a friend?

A    Yes.

Q    Okay.  And do you recall their name?

A    Monica.

Q    Monica?

A    Yeah.

Q    And do you have a last name for Monica?

A    No.

Q    And where were you with Monica prior to driving to pick up your son?

A    On K.  On K Street.  K Street right there. It's like a -- it's like a little street off of 14th Street.

Page 37

Q     Okay.  So somewhere near 14th and K?

A     Yeah, somewhere like that.

Q     Would that have been a house or apartment?

A     A house.

Q     Is that Monica's house?

A     I couldn't even tell you.  She had just been -- I guess you could say she's fighting cancer, so like she's not doing too well.  I mean, I just went to see like -- yeah, she's doing bad, you know.  She's got cancer.

Q     Okay.  So she was sick, and you were just going to visit with her that morning?

A     Yeah, just encourage her.  She's sick. She's got cancer.

Q     Is Monica still alive currently?

A     That I am aware of, yes.

Q     And do you recall approximately what time you left that house on K Street prior to being contacted by the police officers?

A     It was early.  It was early in the morning, you know.  Before 12:00.  Before 10:00.

Q     Would you say you left that house just a few minutes before the police --

A     Yes, sir.

Q     -- contacted you?

Page 38

BAYSIDE REPORTING COMPANY   (888) 229-9897
www.baysidedepo.com

any plan of where you were running to?

A    Anywhere.  Anywhere away from the officers.

Q    Okay.  And other than the lights and siren, was there anything that you had observed that led to you running from the officers on February 10, 2023?

A    Not that I know of.

Q    Did you see the officers do anything before you started running away?

A    I don't know.  I was -- no, sir.

Q    Did the -- prior to the -- strike that.
Prior to you running did the officers make any statements to you like over a loud speaker or a bullhorn?

A    No.

Q    And so prior to you running they hadn't threatened to harm you; correct?

A    No, sir.

Q    Prior to you running they hadn't pointed any weapon at you; correct?

A    No, sir.

Q    And prior to you running they hadn't made any physical contact with you; correct?

A    No, sir.

Page 49

RENATO URENA - February 11, 2026

A    Yes, sir.

Q    Okay.  Could you give me an estimate as to how long in terms of time you were running through that lot?

A    No.  It's just -- it's just a matter of seconds.  A high octane moment, I guess you could say.  In time, no.  You know, it's all happening like fast.

Q    To your recollection, when you were running through that lot, how did you move your hands and arms when you were running from the police officers?

A    (Inaudible.)

Q    Just arms by your sides?

A    And I got to hold up my pants because they are -- I don't have -- I don't have like a big butt, so my pants fall off quite easily, so you got to hold your pants up at the same time.  Everything is jiggling.  You've got to hold your pants up. You've got to hold your pants up.

Q    So were you grabbing towards your waistband area in order to hold your pants up?

A    Like if I were to get up now, I would have to grab my pants because, once again, I don't have a backyard that will stop it.  I mean, it will slide down, you know, unless I have it real, real

Page 53

tight, but then I can't breathe.

Q    And while you were running through the lot, was the handgun in that front pouch of your sweatshirt?

A    Yes, sir.

Q    And while you were running through the lot, had you pulled it out of the pouch?

A    No.

Q    At any point in time while you were running through the lot had you retrieved the firearm?

A    No, thank God.  No, sir.

Q    Other than the firearm in your pouch, were you carrying any other items on you while you were running from the officers?

A    My cell phone, my wallet, some boxes from the casino, a little bottle of weed.  Like a medicine bottle of weed in my pocket.

Q    So at some point you're running through the lot, and then you get to this field where there's a lot of grass and bushes; right?

A    Yes, sir.

Q    What happened once you reached that grassy field?

A    The gun was gone, and I'm on the ground.

Q    Sorry.  Could you repeat that?

Page 54

A     The gun is gone, and I'm on the ground.

Q     Okay.  When you say "the gun is gone," what do you mean by that?

A     The gun is gone.  Like I'm running.  The gun is gone.  I mean, if I can get on that fence I'm gone.  That's all I'm thinking.  The gun is gone.  There's no gun, and if I can just reach the fence I can -- I know I can hop on over from the officers in my mind.  That's what I figured.

Q     So let me back up.

You're running through the vacant lot, and at some point you go to the ground in the grassy field; correct?

A     I'm shot.  I'm already shot.  That's why I went down.  I was already shot.

Q     You were already shot?

A     When I hit the ground I was already shot. I'm confused.  What am I doing here on the ground?

Q     Okay.  So had you been shot before you reached the grassy field?

A     No.  As soon as I reached it it was like -- you can see my eyeglass thing here; right? We're just saying that's the house, you know. That's a field.  There's a house with a fence around it.  I'm running.  If I can just get to that

Page 55

corner of this house where the fence is at I can get rid of that gun, and I can hit that fence, and I'll be gone.  That's all I'm thinking about is just getting away.

Q    Okay.  So as you're running, you're approaching the grassy field, and next to that field is a house with a chain link fence around it; correct?

A    Not a chain link, but it's like it's got those sleeves in it so you can't see inside, inside the people's yard and whatnot.  They are brown.

Q    So you approached that area where the fence meets the grass.  You're thinking to throw the gun over the fence?

A    Well, that's what I did.

Q    Okay.  Where were you standing or where were you positioned when you threw the gun over the fence?

A    I was barely coming to the grass.

Q    Had your feet touched the grassy field when you threw the gun?

A    Yeah, I was just -- I'm going up.  I'm throwing the gun, and for some reason I'm on the ground now, and like what am I doing here on the ground?

Page 56

Q    When did you pull out the firearm?

A    When I was getting straight to that -- I touched grass, and the gun is gone.  The gun is gone, and I'm on the ground.  What am I doing here on the ground?

Q    And were you in the process of running when you threw the gun?

A    I'm running.  I'm running.

Q    You were running?

A    Yeah, running away.

Q    So you were on your -- you were on your feet before --

A    Before I hit the grass I'm on my feet.

Q    When you threw the gun were you on your feet?

A    Yeah.

Q    Is that a yes?

A    Yes, sir.

Q    Had you ever pulled out the gun and turned back towards the officers while holding it?

A    No, sir.

Q    Did you ever point the firearm at the officers at any point?

A    No, sir.

Q    And so you say that you threw the gun

10:56:02
10:56:07
10:56:14
10:56:18
10:56:23
10:56:29
10:56:33
10:56:34
10:56:41
10:56:42
10:56:44
10:56:48
10:56:50
10:56:55
10:56:57
10:56:57
10:57:01
10:57:02
10:57:03
10:57:08
10:57:10
10:57:11
10:57:17
10:57:18
10:57:19

Page 57

before you fell into the grassy field?

10:57:24

A    Yeah.

10:57:28

Q    Is that a yes?

10:57:29

A    Yes, sir.

10:57:31

Q    And just so I'm clear, you believe you fell into the grassy field and hit the ground because you had been shot?

10:57:32

A    Yes, I know that happened.

10:57:46

I'm confused.  I'm on the ground.  Why? Why am I on the ground?  It hurts.

10:57:53

Q    And so just so I'm clear, you hadn't purposely -- you didn't purposely dive into the grass?

10:58:12

A    No.

10:58:27

Just some time like I'm running.  I know I'm not fast, you know, but it was weird.  I'm not fast, and I'm an older man now.  You know, like I'm running.  You hear these guys, these two officers. You hear their -- all this stuff that they got, their gear.  You hear all that so you know they are right on my bumper.  I hear them.  They are going to kill me.

10:58:32

"Stop.  I see a gun, a gun."

10:59:10

The officer is saying "gun, gun" the whole time, and I'm like I didn't understand that.  Like

10:59:12

Page 58

RENATO URENA - February 11, 2026

I started my confusion like why is he saying that? I'm not pointing a gun, but they know about the gun, so that's kind of weird, you know. Like I'm not brandishing no gun, but the whole time as soon as I got out of the car the officer is yelling, "There's a gun, a gun. Stop. We're going to kill you. Stop reaching."

And this is all happening in a matter of seconds. I mean, this is happening. And I'm lot of things, but I don't mess with cops like that, you know. I just want to get away.

Q    And when you say you don't mess with cops like that, you mean you didn't -- you had no intention to harm them or shoot at them or --

A    Hell no. My life is messed up enough. I don't need that. These are officers of the law. I just need to get away.

Q    Had you thought -- when you heard the commands to stop or that they were going to kill you, did you have a thought to comply and to surrender?

A    That's not going to happen. I'm running because if I am complying and all that, I would have already done that in the beginning.

Q    Can you describe specifically how you fell

Page 59

into the grassy field?  Like what part of your body first made contact with the ground or how your body was positioned when it hit the ground?

A    Well, picture myself falling forward. What am I doing?  Like --

Q    Let me -- I can help you out.

So did you fall face first?

A    Yes.

Q    And when you hit the ground were you laying on your stomach?

A    I'm on my side.

I would demonstrate to you how I am.  I'm like this, and one leg is like a number four almost.  My left leg is straight.  My right leg is bent at the knee, and I'm just like (indicating).

Q    Okay.  And so you're leaning a little bit on your left side?

A    I'm leaning forward, and my left arm is under me.  My right arm is like, and I'm like (indicating).  I'm like what am I doing here?  What am I doing on the ground?  Like I didn't -- what's going on?

Q    And when you fell onto the grass, I'm assuming your feet were closer to the officers than your head?

Page 60

A    Yes, sir.

Q    And when you hit the ground in the field did you move at all or did you just lay there?

A    Well, I'm sure I moved because I'm like my leg hurts bad.  My leg is burning, and you know when you're on the ground and you see all these little pieces of dirt coming up, and in my mind I'm like, oh, crap.  They are shooting.  They are shooting.  And I'm talking to myself, they are shooting you, Renato.  You're going to die right now.  How did you get to this point?  How did you get here, Renny?

Q    As they were shooting at you were you turning your body or crawling forward or anything?

A    I'm like this, and you're feeling things are hitting you.  Not only am I seeing dirt, now I'm feeling them, and in my mind, you're going to die right now, Renato.  You're going to die right now.  They are going to kill you.

Q    And the gun wasn't on you at any time when you were in the field?

A    When they are shooting me there is no gun nowhere.  That gun's been gone.  That gun has been gone.  Why are they shooting me?  I'm no angel, but why are they shooting me?  There is no gun.  I have

Page 61

RENATO URENA - February 11, 2026

no gun. There's no reason. Why are they shooting me?

Q    When the shots were being fired, did at any point you put your hands up above the grass and bushes?

A    The whole time I'm being shot when it's happening and I'm just like (indicating).

Q    Your hands were making contact with the ground?

A    Yeah. I'm on the ground. I'm on the ground.

And at first we seen the dust, you know. That means they are shooting still. The dust -- they are not coming up on their own. These are bullets that are happening. They are shooting still. They are shooting me, and my body is feeling them.

Q    Did you recall the officers saying anything to you while the shots were going on?

A    All the talk is over. Talking has been over.

Q    Did you say anything to them while the shots were being fired?

A    No. I was talking to God. I was asking God to forgive me. Like I know I'm going to die,

Page 62

Q    Were there any other charges that came about from that February 10, 2023, incident?

A    Just that.

Q    Going back to the shooting, just so I understand, I believe you said that before you made it to that grassy field and fell down onto the ground you had discarded the gun over the fence; is that correct?

A    Yes, sir.

Q    And as I understand, you say that you fell to the ground because you had been shot by that point?

A    Yes.  I didn't jump on the ground myself.

Q    And by being hit or being shot is what caused you to fall into the ground in the grassy field?

A    Yes, sir.

Q    Have you ever become aware that the San Bernardino County District Attorney's Office investigated the shooting?

MR. TERRELL:  Calls for speculation.

     Do you know that?

THE WITNESS:  No.

BY MR. CARPENTER:

Q    Have you -- you've never read any report by

Page 100

Q    And you were able to hear the officers shouting commands to you?

A    Yes, sir.

Q    And those were the commands that you heard when you were running away from them?

A    Yes, sir.

Q    And you heard them say to stop reaching?

A    Yes, sir.

Q    Okay.  And then you heard at the end of that portion of the video the officer say, "You're going to get shot"?

A    Yes, sir.

Q    And you had heard that at the time when you were running away from them?

A    Yes.

Q    Okay.  And from the screen here you can see there's -- in the center or towards the center of the screen is yourself; correct?

A    Yes, sir.

Q    As you're running through the lot and you're approaching that grassy field; correct?

A    Yes, sir.

Q    And then to your right is this fence line?

A    Yes, sir.

Q    Okay.  Do you think by this point in time

Page 104

when you were running through the lot you had thrown the gun?

A    That's right when it's happening.

Q    It's about right when it's happening?

And so when you threw the gun, did you retrieve it from your sweatshirt pouch with your right hand?

A    Yes, sir.

Q    Okay.  And in this image that you see on the screen here at 56 seconds into the video, do you see that -- your right arm towards the front, you know, center part of your body?

A    Yes, sir.

Q    And do you think you're reaching into the pouch at this point --

A    Yes, sir.

Q    -- to retrieve and throw the firearm?

A    Yes, sir.

Q    Okay.  I'm going to go back a little bit to 49 seconds and then start it again.

(Video played.)

BY MR. CARPENTER:

Q    I'm stopping at one minute into the video.

And, sir, when you saw that portion of the video, did you see yourself go into the grassy field

Page 105

and go down to the ground before the shots were fired?

A    I was already shot.

Q    So you say at that point you had been shot before going to the ground?

A    I had already been shot.

Q    Okay.  Did you hear any of the gun shots that caused you to fall to the ground on the video?

A    I heard it.

Q    All right.  I'm going to go back and start at 49 seconds again.

(Video played.)

BY MR. CARPENTER:

Q    So I'm stopping at 58 seconds into the video, sir, and it appears at this point you're now down on the ground in the grassy field; correct?

A    Yes, sir.

Q    Okay.  Had you heard any shots during that portion of the video that you say caused you to go to the ground?

A    I had already been shot.

Q    Okay.  So you're still -- your testimony is still that you had been shot by this point?

A    When I fell to the ground I was already shot.

Page 106

RENATO URENA - February 11, 2026

Q    Okay.  And in the video did you hear any gunshots prior to this point when you were on the ground?

A    You can hear the officer on the right clearly, but the officer on the left has his bodycam on mute, and you'll see him reach for it to unmute it.

Q    And you're saying the other officer had his bodycam on mute?

A    Yes, sir.

Q    Okay.  But just in this video did you hear any gunshots prior to you going to the ground?

A    In my mind, yes, sir.  I was already hit. That's the only reason I went to the ground.

Q    Okay.  Prior to getting into this grassy field area you had already thrown the gun over the fence?

A    Yes, sir.

Q    Had at any point in time you retrieved the gun and turned back towards the officers?

A    There's no way that's possible, no, sir.

Q    I want to show you another thing.

Can you see my screen now, sir?

A    Yes, sir.

Q    Okay.  This is a still image from the

Page 107

body-worn camera of Officer Davalos?

A    Uh-huh.

Q    And this looks like it depicts you as you're approaching the grassy field as you're just entering it.

Do you see that?

A    Yes, sir.

Q    And what appears to be a firearm in your hands -- do you see that?

A    No.

Q    Are you able to see that, sir?

A    No, sir, but --

MR. TERRELL:  Asked and answered.

MR. CARPENTER:  Okay.  I'll mark that still as Exhibit 2.

(Defendants' Exhibit 2 was marked for identification.)

BY MR. CARPENTER:

Q    This is the same image.  It's just zoomed in, sir.

A    Okay.

Q    And in this image it appears to depict you holding a firearm in your hands just before you go to the ground in the grassy field.

Do you see that?

Page 108

A    I see myself, yep.

Q    You see yourself, but you do not see yourself holding a firearm?

A    Okay.  It's being thrown.

Q    Are you able to see my curser here?

A    Yeah.  If you could blow that up that would be great.

Q    It's a little bit blurry, but are you able to see this portion of the --

A    No.

Q    -- image?

A    I see what you're talking about, but no. As to a firearm, no.

Q    Okay.  So you're saying that that's not the handgun that you're holding?

A    It's not part of that gun, yeah.

Q    Okay.  Sorry.  Just so I'm clear, as you look at that image, that's not you holding the firearm?

MR. TERRELL:  Go ahead and answer.

THE WITNESS:  I don't think it's the firearm. It's already been thrown.

MR. CARPENTER:  Okay.

THE WITNESS:  That firearm was thrown --

MR. TERRELL:  You've answered.

Page 109

MR. CARPENTER:  And I'll mark that as Exhibit 3.

(Defendants' Exhibit 3 was

marked for identification.)

BY MR. CARPENTER:

Q    And I'm going to show you another image.

Okay.  Can you see this image, sir?

A    Yes, sir.

Q    Okay.  This is another still image from Officer Davalos's body-worn camera.  Are you able to see up towards the top here?  And I'm going to try to zoom in.  Are you able to see what appears to be your hand sticking out in the grass?

A    Yes, sir.

Q    And do you see just above your hand there appears to be a firearm?

A    No, sir.

Q    Okay.  So that doesn't look to you like the firearm you were throwing?

A    No, sir.

MR. CARPENTER:  I'm going to show you another image.  Now I'll mark this one as Exhibit 4.  This is just the same image but zoomed in a little bit more.

(Defendants' Exhibit 4 was

marked for identification.)

Page 110

BAYSIDE REPORTING COMPANY   (888) 229-9897
www.baysidedepo.com

RENATO URENA - February 11, 2026

BY MR. CARPENTER:

Q    Do you see that red circle?

A    Yes, sir.

Q    And do you see your hand sort of at the bottom left edge of the circle?

A    Yes, sir.

Q    And do you see the dark object that's in the middle of the red circle?

A    I see that dark area, yes, sir.

Q    Okay.  And you're saying that that's not the firearm that you're in the process of throwing?

A    It was already.  No, sir.

Q    Okay.  You're saying it was already thrown?

A    Yes, sir.

Q    And you're aware that the 40-caliber firearm was found over the fence into the adjoining property; correct?

A    Yes, sir.

Q    And you're aware that that firearm had evidence of your DNA on it?

A    No, sir.

Q    Okay.  But the firearm that was found over the fence on the adjoining property, that was the firearm that you had possession of --

A    Yes.

Page 111

RENATO URENA - February 11, 2026

COUNTY OF LOS ANGELES,    )                                    10:08:54

STATE OF CALIFORNIA.      )

       I, CHRISTINE GORDON, Certified Shorthand Reporter,

licensed in the State of California, License No. 7709,

hereby certify that the deponent was first duly sworn

and the foregoing testimony was reported by me and was

thereafter transcribed with computer-aided

transcription; that the foregoing is a full, complete,

and true record of said proceeding.

       I further certify that I am not of counsel or

attorney for either or any of the parties in the

foregoing proceeding and caption named or in any way

interested in the outcome of the cause in said

caption.  The dismantling, unsealing, or unbinding of

the transcript will render the reporter's certificate

null and void.

       In witness whereof, I have hereunto set my hand

this day:  February 23, 2026.

       ____ Reading and signing was requested.

       ____ Reading and signing was waived.

       __X_ Reading and signing was not requested.

       _____

                CHRISTINE GORDON,  CSR NO. 7709

Page 126