# EXHIBIT B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

RENATO URENA, individually,

     Plaintiff,

v.                Case No.  5:24-cv-00341-JGB-SHK
CITY OF SAN BERNARDINO;
JONATHAN DAVALOS; ANDRES
ESTRELLA and DOES 1-10, inclusive,

     Defendants.
_____/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEO DEPOSITION OF BRADY HELD

MONDAY, MARCH 16, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No.  25061

relative to him entering the foliage.  Well, it's right when -- right when he's entering the foliage, but still standing.  So you can still see him in a standing position.  But --

Q.   Okay.

A.   -- but just upon entering the foliage.

Q.   So you have on page 5 of your report, an entry of 10:16:09.   Is that what you're referring to?

A.   On page 5 of my report?

Q.   I better --

A.   Oh, yes.

Q.   I think so.

A.   Sorry.   I was looking at the wrong page.   Yes, At 10:16:09.   That's correct.

Q.   And while we have this in front of us, can you tell what ground surface Mr. Urena is on at this point?

A.   I believe that he has just entered the foliage.

Now, I don't know specifically what the ground is right there.  I see some bushes that are encroaching upon the asphalt.  His feet could be on asphalt at that point.  They could be on soil.  I'm not sure exactly what his feet are on, but his body is within the foliage.

Q.   Okay.  And it looks like -- towards the bottom of this image, does that appear to be dirt?

A.    Towards the bottom of the image?

Q.    Well, the ground surface before the foliage.

A.    Yeah, it's some sort of vacant lot material. It could be asphalt.  It could be dusty as fault.

Q.    Okay.

A.    It seems to be about the same material as they're running through throughout that pursuit.

Q.    Okay.  So did you analyze both officers' body-worn camera footage during the pursuit?

A.    Yes.

Q.    And prior to this point, this 10:16:09, in analyzing it, whether it was zoom, stabilization, frame by frame, did you ever see in the video footage a gun in Mr. Urena's hand, before this point, 10:16:09?

A.    No, I did not.

Q.    It's probably going to be a pretty obvious question; but would you agree, prior to this point, you did not see Mr. Urena point a gun at the officers or turn towards the officers with a gun in his hand?  Would you at least agree with that?

A.    I did not see that.

Q.    And when you do a frame-by-frame analysis, am I understanding correctly that, given 30 frames per second, you would absolutely look at the 30 frames during a second time interval?

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 19

A.   That's correct.

Q.   And if you see something that might be noteworthy, is that when you consider whether you're going to enlarge or zoom?

A.   Yes.  As far as potentially an exhibit I might be creating, yes.  There's also -- just for sake of being thorough, there are times where I will enlarge and then go frame by frame, as opposed to go frame by frame and then enlarge, as you described it.

Q.   Sometimes you'll do the enlargement and then go frame by frame, so each frame is somewhat enlarged?

A.   Correct.

Q.   And in this image here that we see on page 5 of your report, do you know whose body-worn camera that came from?

A.    I believe it was Estrella's -- I'm sorry.  I'm sorry.  Davalos's.

Q.   Did you ever see, in any of the images from Estrella's body-worn camera, a gun in Mr. Urena's hand?

A.   I did not, no.

Q.   So the only one that you saw, it would be this time frame that we're looking at here, and that would be from Davalos's body-worn camera?

A.   Yes, that's correct.

Q.   And do you know which hand the gun was in at

on page 5, to the last image on page 7, would be 5/30ths of a second or one-sixth of a second?  Does that sound about right?

A.   That's right.

Kim.

Q.   And is that the time frame that you were able to see a dark object in Mr. Urena's hand before he went to the ground, approximately one-sixth of a second?

A.   Yes, from the body-worn camera, that's the time that I could see it.

Q.   And if we go to the top of page 8 of your report, am I understanding you correctly that, at this point, even looking at the top image on page 8, Mr. Urena would already be on the ground?

A.   I believe so, yes.

Q.   And were you able to determine from your work on this case whether any shots occurred before Mr. Urena went to the ground?

A.   Before he went to the ground?  I don't believe so.

Q.   So from your work on this case, part of your analysis is that all of the shots occurred after Mr. Urena went to the ground?

A.   That's correct.

Q.   You just don't recall how many shots?

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 25

A.    Right.

Q.    Would it be fair to say that you hear quite a few shots on the audio when you did the analysis?

A.    Yes, there were more than a few shots.  It was -- I don't know.  I'm not counting, but there was certainly more than, I would say, five shots.

Q.    Have you worked on any officer-involved shooting cases where you recall there was more than 30 shots?

A.    Yes.

Q.    Do you have an estimate as to how many other cases you worked on where there was more than 30 shots?

A.    At least two, maybe three.

Q.    Okay.  So just to go chronologically, to make sure I'm understanding your opinions in this case, during the approximate 15 second foot pursuit, before we get to the image on page 5 of your report, you don't see a gun in either one of Mr. Urena's hands; is that fair?  On the video footage?

A.    That's fair.

Q.    And then you do see a gun in the images that you captured on pages 5, 6, and 7, for approximately 1/6th of a second?

A.    That's correct.

Q.    And then at some point in between the image at

the bottom of page 7 and the top of page 8, Mr. Urena goes to the ground?

A.   Yes.

Q.   And you're estimating the time between the image at the bottom of page 7 and the top of page 8, is approximately two to three seconds, somewhere in that, generally?

A.   Yes, that's right.

Q.   And based on your analysis in this case, including the video and audio analysis, the shots didn't start until after Mr. Urena went to the ground?  Do I have that understanding; correct?

A.   That's correct.

Q.   Now, I still have page 8 in front of me, of your report.  Can you tell me what you were trying to show in these two images, please?

A.   So I drew a red circle around a hand that is arising out of the foliage and throwing the firearm.

Q.   Okay.  Could you tell -- were you able to actually distinguish it as a firearm as opposed to a dark object consistent with a firearm?

A.   Yeah, it is a dark object consistent with the shape of a firearm.

Q.   Okay.  And could you tell which hand he had it in at this point?

A.   No.

Q.   But you believe he was on the ground at this point?

A.   Yes.

Q.   And at least based on your video analysis, is this when you believed he started to make the motion, or at least it's when it's visible that he's making a motion to toss the gun?

A.   I'm sorry.  Can you ask that one more time?

Q.   Yeah.  That was a bad question.

Earlier we spoke about your understanding that there were scene photos where a gun was found, I think over a fence, in an area adjacent to where Mr. Urena was on the ground.  Do you remember talking about that?

A.   Yes.

Q.   So one of the issues that you looked at in this case, I take it, was when did he throw the gun or toss the gun over the fence?

A.   That's correct.

Q.   And you were looking to see when he tossed it -- and this is when you believe he started to toss the gun over the fence, these images on page 8?

A.   Yes.  Well, to narrow down when he began to toss, I wouldn't say it would be the first frame on page 8.  I would say that action as to be occurring before

the arm is outstretched over the foliage.  So the action is occurring at some point in time before that, because just knowing how a person throws an object, it doesn't just pop out of your hand.  There's an arm movement before that.  So this is the first time in the video that I can see the arm in action, throwing the firearm shaped object.  I don't know exactly when in time it begins.

Q.    Did you do something in your workup on the case to enumerate the frames of the videos, chronologically?

A.    Within the working file, I'd say, call it "frame count."  So within my working file that exists, there's a frame count that has each -- each frame has a number associated with it.

Q.    Okay.  Did you indicate those frame counts in your report, or was that just more or less part of your workup?

A.    Just part of my workup.  It's not indicated in the workup.

Q.    Okay.  Do you know or are you able to look at something that would -- you know, I'm just trying to compare the images on 5, 6, 7, and 8, where those would be in the frame count, versus the one starting on page 8, if you're able to tell me?

A.    Yes, I can certainly tell you that.  Bear with

me just a second here.

Q.   Yeah.   Take your time.

A.   So the image on page 5 has an associated frame number of 1820.

Q.   Okay.   How about the ones on page 6; would that be 1821 and 1822?

A.   Yes, that's correct.

Q.   And then on page 7, would that be 1823 and 1824?

A.   That's correct.

Q.   And then what would be the frame counts on the images on page 8?

A.   At the top of page 8, the first frame is 1884. So 1884.

Q.   Okay.   And then would the second one be 1885?

A.   That's correct.

Q.   And do you know at which frame count the first shot occurred?

A.   Yes.   The first shot occurs at about 1882.

Q.   So the first shot, if I'm doing my math right, occurred about 1/15th of a second prior to the image that we see at 1884?

A.   That's about right.

Q.   And so from 1824, which is the image at the bottom of page 7, to 1884, that would be about 60

frames?  Is that -- am I adding that right?

A.    That's right.  Sixty frames.

Q.    That would be about two seconds?

A.    Just about two seconds.

Q.    Okay.  And then so going to page 9, is that consecutive?  In other words, would that be frames 1886 and 1887?

A.    Yes, that's right.

Q.    And do you believe, from your analysis, this is the time frame that the gun is being tossed over the fence?

A.    Yes, I believe the gun is being tossed at this point in time.

Q.    And then going to page 10 of your report, are those also sequential?  So would that be 1888 and 1889?

A.    So page 10, so we have 1888.  So 1888 is the last frame where the firearm is visible that I have highlighted.  But in a second image on page 10, is an enlarged version of what we previously looked at.  So it's the same frame count that we just went through, I believe starting at page 1884, but just an enlarged version.

Q.    Okay.  So -- thank you for that.  So on page 10 at the top, that's 1888, which would be the last time the gun is visible, at least in the video image?

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 31

A.    Correct.

Q.    So from 1884 to 1888, again, about five frames or 1/6th of a second?

A.    That's correct.

Q.    And after that 1/6th of a second, the gun is no longer visible?

A.    From the body-worn camera, yes, it can't be seen.

Q.    Okay.  And then what you did, at the bottom of page 10, going to 11 and 12, the five images we just talked about, you simply enlarged and tried to circle the dark object that you believe is consistent with the gun?

A.    That's correct.

Q.    And do you know what frame count the second shot happened?

A.    The -- I'm sorry -- the second shot --

Q.    Yeah.  I think you told me the first shot happened at 1882?  Did I get that right?

A.    That's correct.

Q.    I was wondering what frame count the second shot happened?

A.    I don't know the exact time of that shot.  It's within -- let's see.  I'm looking at the audio right here.  It looks to be within three or four frames.  So a

tenth to about -- about a fifth to a tenth of a second between shot one and two.

Q.   Okay.   Do you know whether or not the second shot happened while the gun was in the air?

A.   It appears that way.

Q.   You believe it did, or no?

A.   It looks like the second shot -- I don't have an exact analysis on this.   It's not something I looked at in depth.   But it appears to be when the gun is just leaving his hand or still in the air.

Q.   And the third shot, do you know if the gun was in the air for that, or had the gun already gone out of view from the camera?

A.   I didn't explicitly analyze that, so I'm not entirely sure.

Q.   So at least based on your analysis, it sounds like all the shots happened after Mr. Urena went to the ground?   Am I understanding that part correctly?

A.   Yes.

Q.   And one shot occurred just about a 15th of a second before we see the one image with the gun starting to be tossed?

A.   I would just phrase it as the first shot occurs about two frames prior to the first time we see the hand exiting the foliage from the body-worn camera.

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 33

Q. Okay. Okay. Now -- and you believe there was another shot that may have happened while the gun was actually in the air?

A. Again, I didn't specifically analyze that second shot. It appears to be, perhaps, when he's still holding it. It's kind of towards the tail end of him holding it, maybe as it's in the air. I'm not sure exactly when that second shot occurs.

Q. And the third shot, you're not sure about that one either?

A. Right. In terms of proximity to where the gun is, no, I'm not entirely sure.

Q. But would it be fair to say, based on your analysis, the majority shots were fired after he tossed the gun?

A. Yes, that's correct.

Q. Whatever the total number is, less one or two?

A. Yes, the majority are after that point in time.

Q. Could you tell from your video analysis what body position Mr. Urena was in when he was on the ground, relative to the officers?

A. No. I could not tell exactly what position he was in.

Q. Like, for example, could you tell, you know, which way his head generally was and his feet generally

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 34

were?

A.    I couldn't tell when the shots were being fired, what position he was in, no.

Q.    Could you tell, for example, he was chest down, on his back, or on his side?

A.    I mean, I can infer that he likely wasn't chest down, just because -- I mean, unless he's extremely flexible, you can't lift your arm, you know, above foliage when laying on your chest.  At least I can't.  I don't know anyone who can.  So I would to assume he's at least on his side or back when that arm extended above the foliage.

Q.    At least at that point he'd have to be in some position to be able to toss the gun?

A.    Right.  Right.

Q.    And after that, it's unclear, at least from the video analysis, what his body position was?

A.    That's correct.

Q.    Do you -- as part of your work, do you ever deal with a concept of perception-reaction time?

A.    I'm not a human factors expert.  I'm very familiar with the concept, having worked with a lot of human factors and use of force experts.  So I'm aware of it.

Q.    Okay.  Would it be at least -- if we look at --

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 35

I guess it would be page 8 of your report.  I think that 1884 frame is when you could first see the gun extending beyond the foliage, I guess, so it's visible?

    A.    From the body-worn camera, yes.  The first image on page 8 is the first time the body-worn camera can -- can get a visual on the gun.

    Q.    And I think what you were trying to say or explain earlier is that that's not necessarily when he started to throw it, that's just when -- or toss it -- or made the initial movement.  That's just when it becomes visible?

    A.    Right.  I would say that's probably towards the end of the "throwing action," as I would label it.

    Q.    So in your opinion, he would have started the tossing motion before the frame we see in 1884?

    A.    That's correct.

    Q.    And then whatever this perception-reaction dynamic, he would have had to potentially think about tossing it before he started the movement?

    MR. CARPENTER:  Objection to the extent it calls for improper opinion, but you can go ahead.

    THE WITNESS:  Yes.  Generally, my understanding is one must think of doing something before doing it. Granted, there is this -- the idea of instinct and all that, but a little outside my scope.

is.  So I just wanted to clear that up, that I can't substantially or exactly say that it's left or right, but it appears to be more right than left.

Q.   Okay.  Are you saying it's difficult to tell from the video?

A.   Yeah.  It's hard to see which hand is holding it.  It appears that his left hand is down by his side just prior to that -- to that motion.  And it appears that you still can see some left hand at his side.  But you can't definitively say -- or I can't definitively say that it's -- that it's in he's right hand, although I would err more towards it being in his right hand than his left hand as he's turning.

Q.   Okay.  And image at the top of page 8, when it first becomes visible, are you able to say which hand it was in at that time?

A.   No, not at all.

Q.   I mean, do you ever, at any point either before he goes to the ground or when he's on the ground, see him pointing a weapon at the officers?

A.   No, I don't.

Q.   Was there any additional work you thought about doing in the case, but for whatever reason you weren't asked to do that?

A.   No, there wasn't.

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 38

A.    Yes, from the perspective of the camera, he would be throwing it to the right.

Q.    And were you literally able, when you went frame by frame -- able to see the gun traveling in the air and going over the fence?

A.    Well, I believe I've shown that in these still frames.

Q.    That's what I was trying to figure out.  Do you think, like, maybe we should look at your zoom-ins, because maybe that is better?  My eyes, I'll tell you, are not what they used to be.  So --

So the first zoom-in is at the bottom of page 10 of your report?

A.    That's correct.

Q.    And that's where it first becomes visible; is that correct?

A.    That's correct.

Q.    But you already told me it's obviously not pointed at the officers; is that correct?

A.    I don't know if it's obviously pointed or not pointed, but you can't tell from the video.

Q.    Okay.  And then in 1885, it's in the air --

A.    That's correct.

Q.    -- in the zoom.  I'm on page 11.  And we also see it in the air, if that's it, on 1886, the

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 40

enlargement?

A.    Yes.    You're saying the second image on page 11, yes.

Q.    And we see, does it appear like there's some arm extended, out, consistent with a tossing or throwing motion?

A.    Yes.

Q.    And then going to page 12, this would be at the top, the object in flight, going over the fence?

A.    That is correct.

Q.    And the bottom photo on page 12, are you still able to see it somewhat?

A.    Yes.    You can see what would just be the edge of it, just peeking out from behind the ivy or whatever foliage is on that fence right there.

Q.    Okay.    And then you believe that's consistent where it was found afterwards, on the other side of that fence?

A.    Yes.

Q.    And it sounds like you didn't do an exact analysis of all of the shots, the timing, what have you, but you're saying that -- do I have it correct that the gun would only have been in his hand at the time of the first shot?

A.    Again, I didn't do a specific analysis.    I can

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 41

clearly hear one shot when it's -- you know, before it exits the foliage. Now, granted, there could be two shots occurring at the same time that can't be discerned. I'm not entirely sure. But there's at least one shot prior to it exiting the foliage.

Q. Okay. And do you -- but you're not sure how many shots there are while it was actually in flight?

A. No, I'm not sure of that number.

Q. And the number of shots after it went over the fence, you're not sure of that as well?

A. That's correct.

MR. GALIPO: Okay. Scott, do you have any questions of Brady today?

MR. CARPENTER: No questions for me.

MR. GALIPO: All right. I'm not sure if we have a W9 from him.

But, Brady, if you just send it over to Scott, and he'll send it over to us, I'll see to it that you get your two-hour minimum for the deposition. And as much as I would love to spend another 40 minutes talking to you about stuff, I don't think it's necessary.

THE WITNESS: All right. Fair enough. I appreciate that.

MR. GALIPO: Okay. You're very welcome.

THE CERTIFIED STENOGRAPHER: Mr. Carpenter, are

STATE OF CALIFORNIA)
                   ) ss:
COUNTY OF BUTTE    )

          I, KIMBERLY E. D'URSO, do hereby certify:

          That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

          That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

          That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

          Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

          That I am a certified stenographic reporter and a disinterested person to the said action;

          IN WITNESS WHEREOF, I have hereunder subscribed my hand this 16th day of March, 2026.

_____

KIMBERLY D'URSO, CSR NO. 11372, RPR