# EXHIBIT C

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

RENATO URENA, individually,

          Plaintiff,

v.                          Case No.  5:24-cv-00341-JGB-SHK
CITY OF SAN BERNARDINO;
JONATHAN DAVALOS; ANDRES
ESTRELLA and DOES 1-10, inclusive,

          Defendants.
_____/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEO DEPOSITION OF ANDRES ESTRELLA

THURSDAY, JUNE 26, 2025

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No.  17495

in relation to seeing the car, whether a week before; a month before?

A.    I don't recall specifically, but I would say it was within an approximate time of a week or two weeks.

Q.    Were you out specifically looking for that car that day?

A.    No, sir.

Q.    Was there any written report that you're aware of, documenting that that car -- be on the look out for that car, among San Bernardino police officers?

A.    No, sir.

Q.    When you saw the car, did you radio in, or did your partner radio in that you were going to stop a car that you believed may be associated with a gun?

A.    We did not.

Q.    The driver of the car, did you have any information as to the name of the driver?

A.    No, sir.

Q.    Any photo of the driver?

A.    No, sir.

Q.    Did you have a plate for the car?

A.    No, sir.

Q.    Did you know who the car was registered to?

A.    No, sir.

Q.    Do you know, on the date of the incident,

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 11

whether the person driving was even the registered owner of the car?

A.   No, sir.

Q.   And I think you were asked these questions in your interview, but you did not have any information that the person had a violent past or criminal history; is that correct?

A.   That is correct.  We had no knowledge of his prior criminal history.

Q.   To your knowledge, had you ever seen that person before?

A.   No, first time.

Q.   So do you recall the vehicle going through any stop signs?

A.   Yes, sir.

Q.   What do you recall in that regard?

A.   I remember the intersection of 14th Street and Massachusetts, in the city of San Bernardino, and the car traveling in a westbound direction, on 14th Street.

Q.   So did it just go through the stop sign completely, without slowing down, or did it slow down but not a complete stop?  What's your recollection?

A.   I recall it slowly rolling through the stop sign, but not making a complete stop.

Q.   Okay.  Did your vehicle -- was it equipped --

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 12

A.   Correct.  Yes, sir.

Q.   Which you thought might be a gun?

A.   Yes, sir.

Q.   When you started the foot pursuit, the initial portion of it, maybe the first 10 or 20 feet, did you see any object in the person's hand at that point?

A.   Initially, no.

Q.   At some point, did you see a cell phone fall out of his pocket?

A.   I did.

Q.   Did you recognize it as a cell phone at the time?

A.   Yes, sir.

Q.   Did you first observe what you believe to be a gun before or after the cell phone dropped out of his pocket?

A.   The first thing I observed was what I believe to be the back of an extended magazine on his right, before the cell phone came out of his back pocket and fell on the ground.

Q.   You would have made that observation before the cell phone fell?

A.   Yes, sir.

Q.   And did you yell out "Gun" or something like that to alert your partner that you believe you saw a

Andrew Estrella

gun?

A.    Not at that time.

Q.    Did you dispatch that you were chasing someone that you believed had a gun?

A.    No, sir.   I did not.

Q.    Were you trained that if you're in a foot pursuit, following someone with a gun, you should try to take cover, if you can?

A.    Yes, sir.   Depending on the circumstances, yes, sir.

Q.    And part of the circumstances would be whether there's cover available?

A.    That's correct.

Q.    And in foot pursuits, are you trained that if the person's trying to get away from you, one thing you can do is through radio communications, try to set up containment or a perimeter?

A.    That is an option.   Yes, sir.

Q.    And how is that done normally?   In other words, you would let fellow officers know when you were in a foot pursuit and which way the suspect was fleeing so that they could try to assist?

A.    Yes, that's one way.   Yes, sir.

Q.    Are there other ways to do it?

A.    Usually our primary option would be over radio

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 17

communication.  At the time, I know my partner put out during the radio, so I know that that was being broadcasted over the radio, so I didn't have to.

Q.    You heard him at some point say "Foot pursuit"?

A.    Correct.

Q.    And based on your training, do officers normally, if they hear that and they're in the area, come to try to assist?

A.    They do.

Q.    And you do the same thing?  If you're out and about and you hear a fellow officer is in a foot pursuit, you try to learn where the foot pursuit is and see if you can come to help?

A.    Yeah.  That's if we're not on a critical call already, yes, we will try to assist.

Q.    Right.  Obviously, if you're on a critical call, that's going to take priority?

A.    Yes, sir.

Q.    So prior to the phone dropping -- did it appear to drop out of the back pocket, by the way?

A.    Yes, sir.  It did.

Q.    Prior to the phone dropping, did you ever see the individual turn towards you with the gun in his hand?

A.    No, sir.

Q.    Did you ever see the gun pointed at you prior to the phone dropping?

A.    Prior to the phone dropping, no.

Q.    Were you giving -- did you give any commands prior to the phone dropping?

A.    I believe I did.  I believe I stated multiple times to let me see his hands.

Q.    And why did you want to see his hands?

A.    Well, a couple reasons.  One thing that wasn't mentioned prior to him exiting the vehicle, was I could see movement in the vehicle.  He was also the single occupant.

Based on training and experience, people who are moving around their vehicle are usually intending to try to hide something or get rid of something.  So that was the first indicator for me.

And when he exited and started running, I saw what I believed to be and appeared to be an extended magazine.  And then, after that, I saw the cell phone fall out of his back pocket.

The other thing that was an indicator for me was -- being in so many foot pursuits in my career, the first thing -- the first thing -- the first thing that I look at is both hands and what they're doing.  And I could only see his left hand, and I couldn't see his

right hand.  I could only see his elbow.

Q.   Okay.  Let me ask you, those other foot pursuits, have you had foot pursuits of people with guns before?

A.   Yes, sir.

Q.   I think you told me earlier, sometimes they would try to toss the guns?

A.   Yes, sir.

Q.   And this is probably pretty obvious, maybe because I did some criminal defense law in my past life, but sometimes these suspects don't want to get caught with the guns; is that your experience?

A.   Yes, sir.  That's correct.

Q.   So the reason you were saying "Let me see your hands" is because you couldn't see the right hand.  Is that what you're saying?

A.   Yes, sir.

Q.   And was this object that you thought was possibly a gun in the right hand?

A.   Yes, sir.

Q.   I guess what I'm wondering, officers sometimes have training if they see what they believe to be a gun, to yell out "Gun."  Is that correct?

A.   Yes, sir.

Q.   And that's to alert your fellow officer as to

Andrew Padilla

A.   No, sir.

Q.   Are you aware that there was a gun found over the fence?

A.   After the fact, yes, sir.

Q.   Have you ever seen photos of that gun?

A.   Yes, sir.

Q.   Have you ever seen the gun either in the evidence room or otherwise, in person?

A.   No, sir.

Q.   Just the photographs?

A.   That's correct, sir.

Q.   Do you recall in the photographs whether the gun appeared to be in a holster?

A.   Yes, sir.

Q.   Did it appear to be in a holster?

A.   In the photos that were shown to me, yes, sir.

Q.   And when you saw the object on the day of the incident before the shooting or during the shooting, did it appear to be in a holster?

A.   No, sir.

Q.   The pictures of the gun you saw in the holster, do you believe that was the gun that you had seen in Mr. Urena's possession?

A.   Yes, sir.

Q.   Was it two-tone in color with the holster?

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 24

A.    The pictures I saw, yes, they were.

Q.    Do you recall seeing a two-tone object?

A.    No, sir.

Q.    At some point, did you hear your partner out, "Gun, gun, gun," or "He's got a gun," or word to that effect?

A.    Yes, sir.

Q.    And at that moment, could you see Mr. Urena?

A.    Yes, sir.

Q.    And up to that time, had any shots been fired yet?

A.    No, sir.

Q.    And prior to your partner saying "Gun, gun, gun" or words to that effect, did you see Mr. Urena point the firearm at you?

A.    Yes.

And if I can just clarify, before my partner yelled "Gun, gun, gun," I believe I shouted out, "He's got one," before he yelled "Gun, gun, gun."

Q.    Yeah.  I think we heard that when we listened this morning.

So let me break this down.  When you said, "He's got one," had he pointed the gun at you or your partner yet?

A.    Yes.  He had actually pointed the gun at me

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 25

A.   Can you repeat the question?

Q.   Sure.  You said he pulled it out of his right waistband -- I wrote down about 35 to 40 feet from the brush area?

A.   Correct.

Q.   And I asked how far he was when he pointed it, and you gave me about the same distance.  So I was asking did he immediately point it at you when he pulled it out?

A.   Yes.  As -- so he pulled it out, pointed it at me as he was running away from me, 35 feet from the brush.

Q.   Okay.  And did you have your gun out at that time?

A.   At that time, I did.

Q.   Did you shoot him at that time?

A.   No, sir.

Q.   Did you yell, "Drop it" at that time?

A.   No, sir.

Q.   And you didn't yell "Gun," but at some point you said, "He's got one"?

A.   Yes, sir.

Q.   How long after he pointed this gun at you did you say, "He's got one"?

A.   I'm going to say approximately, maybe, one to

So I didn't have -- I didn't feel comfortable shoot in that direction with his erratic movements at the time, and also, due to my backdrop and not knowing who was inside of those residence in cased I missed.

Q.   Was there a residence in the background at that point?

A.   Yes, sir.

Q.   Did he turn to his right or left when he pointed the gun at you?

A.   Not that I recall.

Q.   Did he have it in his right hand or left hand?

A.   Right hand, sir.

Q.   And where was it in relation to his body when it was pointed at you the first time?

A.   It was behind his -- behind his body, pointed in my direction.

Q.   Was it while he was in a running motion still?

A.   Yes, sir.

Q.   So you're saying his hand came back and at some point, with the hand coming back, it appeared to be pointed in your direction?

A.   That's correct.

Q.   Did you attempt to take cover after you saw that?

A.   No, sir.

before he went to the ground in the brush area?

A.   I don't recall how many.  I know I had a pause between my first volley and second volley, and my first volley had a lot more shots than my second one.

Q.   Now you're saying he pointed the gun at you again in the -- when he was in the brush area?

A.   Correct.  At me and my partner.

Q.   Was that before he went to the ground or after?

A.   He pointed it at us before he went to the ground.

Q.   Did you ever see a gun pointed at you after he went to the ground?

A.   No.

Q.   So when he pointed the gun at you in the brush area, before he went to the ground, did he turn that time towards you?

A.   I'm sorry, can you repeat the question?

Q.   Sure.  When he pointed the gun at you after getting into the brush area, before he went to the ground, did he turn towards you right or left at that time?

A.   Correct.  He did.

Q.   Which way did he turn?

A.   He turned to -- he turned in a -- he turned to the left, so his right hand came over and across his

was he still standing upright?

A.   Yes, sir.

Q.   And was he moving away from you?

A.   He was almost at a standstill position, kind of leaning back a little bit.

Q.   And you started shooting at about that time?

A.   Yes, sir.

Q.   So when you initially started shooting, he was upright?

A.   Correct.

Q.   And would it be at least fair to say you got at least several shots off while he was still upright?

A.   Yes, sir.

Q.   And where were you aiming at that time on his person?

A.   I was aiming at what we call his "center mass."

Q.   And what was center mass, from your perspective?

A.   Center mass is basically from the waistline up to the upper chest area.

Q.   Right.  I'm just wondering from your perspective, was center mass the stomach and chest?  Was it his left side?  Was it his back, or however you want to describe it?

A.   Stomach and chest area.

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 36

Andre Estrella

Q.   And is it correct that you did not give him a command to drop the weapon or a verbal warning you were going to shoot?

A.   Yeah.   I didn't -- I didn't give him any of those commands that you mentioned.   No, sir.

Q.   So do you believe you were the first one to fire between you and your partner?

A.   I do, sir.

Q.   And how soon after your partner said, "Gun, gun, he's got a gun," do you think you started firing?

A.   I don't recall the time.   I remember I took the first -- I remember shooting my first round as soon as the gun pointed in our direction.

Q.   Okay.

A.   It wasn't because my partner said, "Gun, gun, gun."

Q.   That did not play a part in your decision to shoot?

A.   No, sir.

Q.   It sounds like you already thought he had a gun before that.   Is that fair?

A.   That's correct.

Q.   And where would you wear your body-worn camera on your person?

A.   Right around the middle of my chest, kind of

Q.   Did you see his body reacting in any way to some of your initial shots?

A.   It's hard to recall, just because the incident occurred extremely quickly.  So if you're asking specific movements as to what he was doing after he was shot, I cannot recall or give you an answer.

Q.   But you do recall him going to the ground after some of your initial shots?

A.   Yes, sir.

Q.   And which way did he go to the ground, if you recall?

A.   He went down -- so if he was facing me, he went down basically to the ground while facing us and then started leaning back.

Q.   What compass direction were you from him?  Were you --

A.   I was --

Q.   Were you east of him or something else?

A.   So I was northeast of him, if you will.

Q.   So he would have been southwest of you?

A.   Correct.

Q.   And when he went to ground, was his head to the southwest and his feet to the northeast?

A.   Yes.

Q.   And could you tell what part of his body he

went to the ground on?

A.   Yes.   His -- his back area.

Q.   And you continued to fire shots after he went to the ground; correct?

A.   Yes, sir.

Q.   And you, in fact, had somewhat of a pause between your shots?

A.   Yes, sir.

Q.   So technically, you would have had two volleys of shots?

A.   Yes, sir.

Q.   And it sounds like, at least from the audio, there's about four shots in the second volley.   Would you agree?

A.   Approximately, yes.

Q.   And you fired 18 shots altogether?

A.   That's correct.

Q.   So just doing the math, would it be fair to say you fired approximately 14 shots in the first volley?

A.   Yes, sir.

Q.   And approximately four shots in the second volley?

A.   That's correct.

Q.   And was he upright for all 14 of your shots in the first volley, or were some of those shots fired as

he was going to the ground or on the ground?

A.   Yeah.   Some of those shots were fired as he was coming to the ground or falling to the ground.

Q.   Okay.   Did you fire any shots in your first volley as he was on the ground?

A.   Yes.

Q.   Do you have an estimate as to how many?

A.   I do not.

Q.   And did you come up on your sites when you were firing?

A.   No, sir.  I -- I pointed my gun in his direction.

Q.   Could you see a gun in his hand during all 14 of your initial shots?

A.   Not every single shot.  No, sir.

Q.   When he went to the ground, did you see a gun in his hand?

A.   No.   I believed he still had a firearm due to not seeing him toss the firearm and the amount of the brush in the general area.

Q.   If you would have seen him toss the firearm, based on your training, do you think it would have been appropriate to keep shooting?

A.   No.  If he would have -- if I would have seen him toss the firearm, at that point, I would have ceased

firing.

Q.   And so when he went to ground, if I understand what you're saying, you thought he still had a gun, but you just couldn't see it at that point because of the brush?

A.   Correct.   And also, due to not me seeing him toss the firearm at any point.

Q.   So would you at least --

MR. CARPENTER:   Sorry to interrupt.   When you have a moment and we can take ten, I could use the restroom.

MR. GALIPO:   We can do it now because we've been going about an hour.

Want to take a ten-minute break, everybody?

MR. CARPENTER:   That would be great.

MR. GALIPO:   Let videographer take us off and then we can take our break.

THE VIDEOGRAPHER:   Going off the record at 2:59 p.m.

(Break taken.)

THE VIDEOGRAPHER:   We're going back on the record at 3:17 p.m.

BY MR. GALIPO:

Q.   When you're saying he pointed the weapon at you the first time, would he have been running away from you

Andre Escella

at that point?

A.    Yes.   He was running away from me.

Q.    And was his back to you at that point?

A.    Yes, sir.

Q.    The second time, just so that I'm clear, was he in the brush when he pointed at you?

A.    Yes, sir.

Q.    And how far in the brush was he at that point?

A.    How far in or how low?

Q.    Yeah.  How far in?  Like, was he 2 feet in?  5 feet in?  10 feet?  Whatever is your best estimate.

A.    I'm going to say, maybe 5 feet into the brush from the -- from the asphalt.

Q.    Okay.

A.    Approximately.

Q.    And you're saying he was in this position of pointing at you for about two or three seconds?

A.    Total, approximately, two to three seconds, yes.

Q.    And during that two to three seconds, was he stationary or moving?

A.    Yeah, he was moving.

Q.    In which direction?

A.    He was -- like I said earlier, he was -- how he mentioned counter-clockwise, turning with the firearm

pointed in our direction, over and across, and as he's going into the brush.

Q.   Did you ever see him moving back in a counter-clockwise direction after you started shooting -- strike that -- in a clockwise?  I misspoke.

A.   Okay.

Q.   Did you ever see him turning back to his right in a clockwise direction after you started shooting?

A.   No, sir.

Q.   As he was going to the ground, did you see him toss a gun over the fence?

A.   No, sir.

Q.   After he went to the ground, did you see him tossing a gun over the fence?

A.   No, sir.

Q.   Do you think if he would have tossed a gun as he was going to the ground, you would have seen that?

A.   Yes, sir.

Q.   And do you think if he tossed the gun while he was on ground, you would have seen that?

A.   I believe I would have.  Yes, sir.

Q.   Did you have any estimate as to the age of the person you were chasing, before you fired your shots?

A.   No, sir.

Q.   Would you at least agree now that given where

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 46

the gun ended up, he must have tossed it there?

MR. CARPENTER:  Objection.  Lacks foundation.
Calls for speculation.

BY MR. GALIPO:

Q.    You may answer.

A.    Can you repeat the question, sir, please?

Q.    Sure.  Given what you know now about where the gun ended up, would you at least agree now he must have tossed it over the fence for it to get there?

MR. CARPENTER:   Same objections.

THE WITNESS:   Yes, sir.

BY MR. GALIPO:

Q.    In your interview, you reference at some point Mr. Urena turning the corner.  Do you remember saying that in your interview?

A.    Yes, sir.

Q.    Which corner were you referring to?

A.    I was referring to the fence line where the brush and the asphalt meet.

Q.    And in your interview, you reference as he was turning the corner, that's the time frame where you saw him pointing the firearm in your direction.  Do you recall that?

A.    Yes, sir.

Q.    You, in your initial interview, thought that

your shots after the pause was about two shots.  But
upon closer examination, you would agree it's more like
four?

A.   Yes, sir.

Q.   Did you look for the firearm at all, in the
immediate vicinity of Mr. Urena, after the shooting?

A.   Yes, sir.

Q.   And you're looking around a little bit in his
immediate area and around the brush?

A.   Yes, sir.

Q.   Would it be fair to say you did not see a
firearm at that point?

A.   That's correct.

Q.   Sergeant Campos showed up at some point and you
gave a public safety statement?

A.   I did, sir?

Q.   Did you tell him how many shots you fired?

A.   Yes, sir.

Q.   And what did you tell him?  18 shots?

A.   I did, yes, sir.

Q.   What part of Mr. Cerna were you aiming at that
when you were firing while he was on the ground?

MR. CARPENTER:  Mr. Urena?

THE WITNESS:  Mr. Urena?

BY MR. GALIPO:

Q.   Mr. Urena.  I'm so sorry.  I still have this other case on my mind.

Yeah.  Mr. Urena.  I apologize.

A.   Did you ask which part --

Q.   Let me start again with the right name this time.

What part of Mr. Urena's body were you firing at when he was on the grounds?

A.   His stomach/chest area.

Q.   Was his back ever exposed to you while you were firing, if you know?

A.   No.  No, sir.

Q.   Do you know if he had any bullet strikes to his back or buttocks or back of his legs?

A.   Actually, no, I don't.

Q.   Now, you listened to your -- the deposition this morning of Officer Davalos?

A.   Yes, sir.

Q.   And you heard Officer Davalos say that all of his shots were fired when Mr. Urena was on the ground. Do you recall hearing that this morning?

A.   Yes, sir.

Q.   Did you hear Officer Davalos firing shots while Mr. Urena was on the ground?

A.   I couldn't differentiate between -- we were

Andre Estrella

shooting at the same time, so I couldn't tell you if his third shot or fourth shot was when he was on the ground. I can only tell you that -- about the shots that I had fired and where I was. But he did shoot right around time I shot, as well.

Q.    Well, did you hear Officer Davalos firing any shots before Mr. Urena went to the ground?

A.    I don't recall.  No, sir.

Q.    And at some point, did you flare to your right during the foot pursuit to get try to get a better vantage point of the right arm and hand?

A.    Yes, sir.

Q.    You were hoping at some point that he would just stop; is that fair?

A.    Yes, sir.

Q.    During the time you were firing your shots, you were asked in your interview whether you had any visual obstructions, and you said no.  Do you recall that?

A.    That's correct.  No visual obstructions between the time we started the foot pursuit and prior to him going into the brush, correct.

Q.    Right.  But you were asked if you had any visual obstructions at the time you fired your shots, and you said no.  Do you recall that?

A.    Yes, sir.

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 50

Q.   In fact, you said you were looking at his hands during the time you were firing your shots.  Do you recall that, as well?

A.   Yes, sir.

Q.   And do you recall saying in your initial interview that your adrenalin was high at the time?

A.   Yes, sir.

Q.   And that when you heard "Gun, gun, gun," in your mind, you thought that Mr. Urena was going to shoot you and your partner?  Do you recall saying that in your interview?

A.   I don't recall saying that I shot because Davalos said, "Gun, gun, gun."  I do recall saying that I believed he was going to shoot my partner and myself.

Q.   I believe the detective had asked you, "What did you think when you heard your partner say, 'Gun, gun, gun?'"

And you said that, "He was going to shoot both of us."  Do you recall that or not?

A.   Oh, yes.  I do recall that.  Yes, sir.

Q.   And when you approached Mr. Urena after the shooting, he was in a chest down or stomach down position; is that correct?

A.   Yes, sir.

Q.   And you referred to it as a prone position?

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 51

Andre Estrella

A.   Yes, sir.

Q.   I think you said his stomach and pelvis area was on the ground?

A.   Yes, sir.

Q.   And we could see in the video that's his position when you approached him; would you agree?

A.   Yes, sir.  I agree.

Q.   Did you at any time see the firearm over Mr. Urena's right shoulder?

A.   No, sir.

Q.   At any time, did you hear anyone tell him to drop the gun or drop the firearm?

A.   Those exact words, no, sir.

Q.   Any words like, "Drop it," or any words to that effect?

A.   No, sir.

Q.   And you heard some moaning and groaning coming from Mr. Urena after the shots?

A.   Yes, sir.

Q.   How long were you on scene, approximately, after the shooting?

A.   I couldn't give you an exact time.  I'm going to guesstimate here and say I was there approximately, maybe, ten minutes after the shooting, seven to ten minutes.

him when you're firing your weapon?  Do you know if it's because he was already in the brush or some other reason?

MR. CARPENTER:  Objection.  Calls for speculation.

If you know.

THE WITNESS:  I'm going to say due to the position of the body-worn camera and the angle.

BY MR. GALIPO:

Q.   Okay.  And I think you told me this before, but you would agree in your body-worn camera footage, we don't see him turned to the left, pointing the weapon at you; is that fair?

A.   Yeah.  I don't believe -- I don't recall if it shows it or not on mine.

Q.   Well, let's go back again and we'll look at it.

MR. GALIPO:  So let's go back about 10, 15 seconds and we'll play it.  We stopped it at 51 seconds.

You can go ahead.

(Video being played.)

MR. GALIPO:  Okay.  We can stop.

BY MR. GALIPO:

Q.   Did you have a chance to view that again?

A.   Yes, sir.

Q.   And would you agree on your body-worn camera

footage, we do not see him turn towards you with a gun pointed at you?

A.    On the body-worn camera, that's correct.  We don't see him do that.

Q.    And would you agree, at least on your body-worn camera footage, when you're firing your shots, we cannot see Mr. Urena on your body-worn camera footage?

A.    That's correct.

Q.    And when you paused to re-assess, you were aware at least at that point that Mr. Urena was on the ground?

A.    Yes, sir.

Q.    And then you fired, I think, four additional shots?

A.    Yes, sir.

MR. GALIPO:  Okay.  That's fine.  Thank you, Renee.

BY MR. GALIPO:

Q.    In terms of your training on deadly force -- I went over some of this with Officer Davalos.  But are you familiar with the policy and the language from the Learning Domain and Penal Code that for imminent threat death or serious bodily injury, the person must have the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury?

Andre Estrella

A.    Yes, sir.

Q.    I take it, you would agree with your partner officer at the time, that someone having a gun or having a gun in their hands or running away, those facts alone are not enough to use deadly force?    Would you agree with that?

A.    That's correct.

Q.    And so, hypothetically, based on your training, if Mr. Urena had not turned and pointed a gun at you, you would agree, based on your training, at least, it would be inappropriate to shoot?

        MR. CARPENTER:    Objection.    Calls for speculation.    Incomplete hypothetical.

        But go ahead.

        THE WITNESS:    That's correct, sir.

BY MR. GALIPO:

Q.    And I think you told me earlier, but you had no information that Mr. Urena had injured anyone or committed any violent crime prior to that day; is that true?

A.    That's true, sir.

Q.    And you didn't get any call regarding him on that day, did you, that he was threatening people or anything like that?

A.    No, sir.

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 63

Andrea Escala

Q.   Were you trained as part of your training with deadly force that you should only use deadly force when there are no other reasonable options?

A.   Yes, sir.

Q.   Were you trained that you should give a verbal warning before using deadly force, when feasible?

A.   When feasible, yes, sir.

Q.   Were you trained that you should consider your backdrop in using deadly force?

A.   Yes, sir.

Q.   And were you trained that you're responsible to justify each shot when use deadly force?

A.   Yes, sir.

MR. GALIPO:  Okay.  Let's take our last break. I think we can just do five minutes because I think I'm just about done.  But I just want to double-check with Renee to see if I need to ask a few follow-ups.

We're almost done, and we'll come back in five, if that's okay?

MR. CARPENTER:  Sounds good.

THE VIDEOGRAPHER:  Should I go off the record?

MR. GALIPO:  Yes.  Thank you.

THE VIDEOGRAPHER:  We are going off the record at 3:47 p.m.

(Break taken.)

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 64

Andre Escalla

THE VIDEOGRAPHER:  We are back on record at 35:4 p.m.

BY MR. GALIPO:

Q.   I think you told me earlier that you recall him going towards the ground during some of your first volley of shots.

A.   Yes, sir.

Q.   Do you know if he was on the ground during some of your first volley?

A.   I believe he was.  Yes, sir.

Q.   You never saw him pointing a gun at you when he was on the ground, did you?

A.   I saw him pointing the -- what I believed to be a firearm at the time, in our direction.

Q.   Did you see an object in his hands when he was on the ground?

A.   I believed that I did see an object during the entire time, which is why I kept shooting.  And also, I never saw him toss the firearm.

Q.   Right.  So I guess I had this issue with Officer Davalos.  I'm trying not to get what you thought or believed.  I get it.  You believed he still had the firearm.  I'm asking a slightly different question.

Did you actually see it when he was on the ground, in his hands?

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 65

Andre Ramula

A.   No, sir.

Q.   And I'm going to show you -- we did a few still photos from your body-worn camera, and they have numbers on them in the bottom right, which corresponds to slide numbers.  But I'm going to make the slide numbers exhibits, so the next one will be Exhibit 3.

(Reporter clarification.)

MR. GALIPO:  I'll go with Exhibit 3 for slide 239.

(Exhibit Number 3 was marked.)

MS. MASONGSONG:  Sorry.  Let me --

MR. GALIPO:  And there it went.

MS. MASONGSONG:  Sorry.

MR. GALIPO:  Can we make it a little bigger?

MS. MASONGSONG:  Yes.

MR. GALIPO:  Or is that it --

BY MR. GALIPO:

Q.   Okay.  Are you able to see that on your screen?

A.   Yes, sir.

Q.   And does there appear to be from your body-worn camera footage?

A.   Yes, sir.

Q.   I -- I can tell your arm has a few less tattoos than Officer Davalos.

A.   Yeah.  I don't have any tattoos.

Q.   Okay.  Me neither.  So tattoos are fine.  It's different strokes for different folks.

But in any event, can you see in this image, Exhibit 3, slide 239, Mr. Urena?

A.   Yes, sir.

Q.   And does he appear to be turned toward you, pointing a weapon, in this image?

A.   No, sir.

MR. GALIPO:  Okay.  Let's go to image 240.  And this will be Exhibit 4.

(Exhibit Number 4 was marked.)

BY MR. GALIPO:

Q.   Again, we see Mr. Urena approaching or starting to enter the brush area here?

A.   Yes, sir.

Q.   Do you see him turn and pointing a weapon in this image?

A.   No, sir.

MR. GALIPO:  Let's go to 241, and we'll mark that as Exhibit 5.

(Exhibit Number 5 was marked.)

BY MR. GALIPO:

Q.   Do you see Mr. Urena turn towards you, pointing a weapon, in this image?

MR. CARPENTER:  Can you see clearly enough?

Andre Estrella

THE WITNESS:  No, can you make it bigger.  I'm sorry.  It's hard to see.

MR. GALIPO:  Sure.

MS. MASONGSONG:  Sure.  Let me try.

Does that help?

THE WITNESS:  A little bit.  But, yeah, he's still not turning our direction, no.

MR. GALIPO:  Okay.  Let's try the next slide, Exhibit 6.

(Exhibit Number 6 was marked.)

MR. GALIPO:  Am I up to -- which number is this, Renee?

MS. MASONGSONG:  This is 242.

MR. GALIPO:  242.  Okay.  Thank you.

BY MR. GALIPO:

Q.   Do you see him turn in your direction, pointing a weapon in this slide?

A.   No, sir.

MR. GALIPO:  And let's just do a few more, 243.  I think that will be Exhibit 6 [sic].

BY MR. GALIPO:

Q.   Do you see him turn towards you, pointing a weapon, in this slide?

A.   No, sir.

(Reporter clarification.)

(Exhibit Number 7 was marked.)

MR. GALIPO:    And then 244.

(Exhibit Number 8 was marked.)

BY MR. GALIPO:

Q.    Do you see him turn towards you, pointing a weapon, in this image?

A.    No, sir.

MR. GALIPO:    245.

(Exhibit Number 9 was marked.)

BY MR. GALIPO:

Q.    Do you see him turn towards you, pointing a weapon, in this image?

A.    No, sir.

MR. GALIPO:    246.

(Exhibit Number 10 was marked.)

BY MR. GALIPO:

Q.    Do you see him turning towards you, pointing a weapon, in this image?

A.    No, sir.

MR. GALIPO:    And one more, 247.

(Exhibit Number 11 was marked.)

BY MR. GALIPO:

Q.    Do you see him turn towards you, pointing a weapon, in this image?

A.    No, sir.

STATE OF CALIFORNIA)
                   ) ss:
COUNTY OF BUTTE    )

          I, KIMBERLY E. D'URSO, do hereby certify:

          That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

          That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

          That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

          Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

          That I am a certified stenographic reporter and a disinterested person to the said action;

          IN WITNESS WHEREOF, I have hereunder subscribed my hand this 13th day of July, 2025.

_____

KIMBERLY D'URSO, CSR NO. 11372, RPR