# EXHIBIT D

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

RENATO URENA, individually,

     Plaintiff,

v.                         Case No.  5:24-cv-00341-JGB-SHK
CITY OF SAN BERNARDINO;
JONATHAN DAVALOS; ANDRES
ESTRELLA and DOES 1-10, inclusive,

     Defendants.
_____/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEO DEPOSITION OF JONATHAN DAVALOS

THURSDAY, JUNE 26, 2025

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No.  17495

Q.   Okay.  Now, were you trained that you could shoot someone merely because they had a firearm?

A.   No, sir.

Q.   Were you trained that you can shoot someone merely for seeing a gun in their hand, that fact alone?

A.   No, sir.

Q.   Were you trained that you could shoot someone for running away from you if they had a gun, just those facts?

A.   No, sir.

MR. CARPENTER:  Slow down a little bit.

BY MR. GALIPO:

Q.   Have you had situations before where you were in foot pursuit of a suspect that you believed had a gun or possibly had a gun, and the suspect tried to discard the gun during the foot pursuit?

A.   Yes, sir.

Q.   And how many times have you had that situation in your experience?

A.   I'd say approximately 15, sir.

Q.   Is that uncommon, based on your experience as a law enforcement officer, that someone running away from the police with a gun might try to get rid of it?

A.   Are you saying if it's uncommon for them to get rid of it, or is it common for them to get rid of it?

Jonathan Bustos

Q.   Is it uncommon, in your experience, for them to try to get rid of it, or is that something that's fairly common?

A.   I'd say it's a split 50/50.  Sometimes they do, sometimes they don't.

Q.   Were you trained as to why someone that has a gun may run from you or try to get rid of it?

A.   To get away from us, sir, and not go to jail.

Q.   And if you know, are there potential additional penalties for them being caught with a gun?

A.   Depending on their criminal history, sir.

Q.   I'm assuming you've probably also seen other suspects with weapons in their hands, whether they were knives or other items?

A.   Yes, sir.

Q.   Prior to the shooting that we're here to talk about, had you ever been involved in any other officer-involved shootings?

A.   No, sir.

Q.   Is that a "No"?

A.   No, sir.

Q.   Okay.  You cut out slightly, so thank you for that.

So all those other people that you saw that you talked about with guns in their hands or on their

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 19

person, you did not shoot any of those people; is that correct?

A.    Yes, sir.

Q.    And I think you already told me that, based on your training, seeing a gun in someone's hand, even if they're running away from you, is not enough to shoot them; is that fair?

A.    Yes, sir.

Q.    What type of gun did you have; was it a 9-millimeter or something else?

A.    9-millimeter.

Q.    And 17 rounds normally in the magazine, with one in the chamber, for a total of 18?

A.    Yes, sir.

Q.    And that's a semi-automatic weapon?

A.    Yes, sir.

Q.    Essentially, do you need to press the trigger for each shot?

A.    Yes, sir.

Q.    And in this case, how many times did you press the trigger?

A.    18, sir.

Q.    So you would have fired all the shots -- all the bullets, I guess, that you had loaded in the gun at that time?

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 20

Jonathan Bilos

A.   Yes, sir.

Q.   Were you intentionally pressing the trigger each time, or do you think some of the shots were accidental?

A.   I intentionally did it, sir.

Q.   And when you were firing, were you aiming center mass at the person?

A.   Yes, sir.

MR. CARPENTER:  Objection.  Vague.  Overbroad.

But go ahead.

BY MR. GALIPO:

Q.   And what does "center mass" mean to you?

A.   The center of their body, sir.

Q.   When you work as a law enforcement officer, do you wear a ballistic vest?

A.   Yes.

Q.   And is that to provide you at least some protection in case someone tries to shoot at you?

A.   Yes, sir.

Q.   Were you trained that shooting someone center mass could potentially cause serious injury or death?

A.   Yes, sir.

Q.   Before you fired your first shot, did you hear any other shots being fired?

A.   No, sir.

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 21

Jonathan Bacilos

that point?

A.   I could not, sir.

Q.   So based on your recollection, he would have been running an approximate -- another 60 feet, with the gun in his right hand, before he got to the brush?

A.   Yes.

Q.   During that 60 feet -- so I'm talking about before he got to the brush or the fence line.   I'm talking about the second part or the second half of that foot pursuit.

Are you with me?

A.   Yes, sir.

Q.   Did he ever point the gun at you?

A.   No, sir.

Q.   Did he ever turn towards you with the gun?

A.   We're speaking before the brush; correct?

Q.   Before the brush.

A.   No, sir.

Q.   Based on your training, seeing him running with a gun in his hand, before he got to the brush, did you think it would have been appropriate to shoot him?

A.   Prior to him pointing it at me?

Q.   Prior to him pointing it at you.

A.   No, sir.

Q.   In other words, as we talked earlier, based on

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 36

Jonathan Davalos

your training, just because someone has a gun in their hand or is running with a gun in their hand, that alone would not justify shooting them; is that fair?

A.   Yes, sir.

Q.   But if they're pointing the gun at you, that's different, based on your training, because then that poses an immediate or imminent threat of death or serious body injury to you?

A.   Yes, sir.

Q.   Or to others, like your partner?

A.   Yes, sir.

Q.   So if I'm understanding your testimony, although you saw a gun in his right hand for the last 60 feet, before he got to the brush, you're saying he never pointed it at you at that time or turned towards you and, therefore, you did not shoot him at that point?

Am I understanding your testimony correctly?

A.   His head turned towards us to look back, sir. But if you're asking as if his whole body did, no, sir.

Q.   He might have just looked over his shoulder a few times as he was running?

A.   Yes, sir.

Q.   Now, did you ever get a look at his face before he got to the brush?

A.   No, sir.

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 37

Q.   Did you have any -- strike that.

Did you know, for example, his name or anything like that?

A.   No, sir.

Q.   Did you know if he had any criminal history, for example?

A.   No, sir.

Q.   Any information he was on probation or parole?

A.   No, sir.

Q.   Any information that he'd ever been violent with anyone in the past?

A.   No, sir.

Q.   Any information that he had ever injured anyone in his whole life?

A.   No, sir.

Q.   And you certainly, obviously, didn't have any specific information that he was affiliated with any gang.  Would you agree with that?

A.   Yes, sir.  I would agree with that.

Q.   So you told me about the commands you initially gave him in the first part of the foot pursuit.  Did you give additional commands in the second part of the foot pursuit, before he got to the brush?

A.   Yes, sir.

Q.   And what additional commands did you give?

Jonathan Bañuelos

A.    I told him to stop running or I was going to shoot him.

Q.    Okay.  Anything else you recall?

A.    No, sir.

Q.    So initially, it was multiple commands to "Stop reaching."  And then at some point, you told him stop running or you're going to shoot him?

A.    Yes, sir.

Q.    And when you told him stop running or you're going to shoot him, this was still in the -- I guess, the second half of the foot pursuit?

A.    Yes, sir.

Q.    You were getting closer to the brush at this point?

A.    Yes, sir.

Q.    You were telling him that, I take it, in hope that he would stop running?

A.    Yes, sir.

Q.    Based on your training, you weren't really going to shoot him just for running at that point, were you?

A.    No, sir.

Q.    At some point, when he got to the brush, did you see him go to the ground in the brush?

MR. CARPENTER:  Objection.  Vague.

Go ahead.

THE WITNESS:  I guess if I can ask for clarification.  Gets to the brush, goes to the ground. Are you asking me to skip over the part where he turned around towards us with his firearm?  You're just asking, in general, if he laid down in the brush?

BY MR. GALIPO:

Q.  Yeah.  I'm going to go through each part.  I realize I'm skipping a little bit here.

I just wanted to know, at some point, when he got in the brush, did he go -- end up going to the ground?

A.  Yes, sir.

Q.  And do you have an estimate as to how much time passed from him getting to the brush, actually physically getting to the brush and going to the ground?

A.  I'd say approximately two seconds, sir.

Q.  And were any shots fired before he went to the ground?

A.  No, sir.

Q.  So all of your shots, all 18 shots, would have been fired after he went to the ground?

A.  Yes, sir.

Q.  And you believe the shots fired by your partner were also all fired after the person went to the ground?

A.   Yes, sir.

Q.   When he went to the ground, in the brush, approximately how far into the brush was he?

A.   As far as his distance from mine, or the start of the brush line?

Q.   Let's do both.  How far was he, approximately, from the start of the brush line?

A.   I'd say approximately 8 to 10 yards, sir.

Q.   So, again, I'm doing my simple math, but 24 to 30 feet?

A.   Yes, sir.

Q.   And where were you positioned in relation to the start of the brush when he went to the ground?

A.   I was approximately, I'd say, about a foot away from the brush, sir.

Q.   Did you hear your partner saying anything before Mr. Urena got to the brush?

A.   I know he gave commands.  I just don't remember exactly the commands, sir.

MR. GALIPO:  Okay.  We've been going about an hour, I think.  Is this a good time for, like, a ten-minute break for everyone?

MR. CARPENTER:  Yes.

MR. GALIPO:  Okay.  We'll have our videographer take us off the record.

Jonathan Davalos

shoulder to you?

A.   The left shoulder would have been turned, as well.  I'd say, like, the side of his left shoulder, not back of it, but side of it, facing towards us, as well.

Q.   Okay.  And you're saying that the gun was in his right hand and pointed in your direction at that time?

A.   Yes, sir.

Q.   How long did you see the gun pointed at you?  Was it a split-second or something else?

A.   I'd say about a second, sir.

Q.   And you're saying that happened right as he was just before or getting to the brush line?

A.   Right around the brush line; yes, sir.

Q.   So let me just follow up on a few questions.

When you saw the gun about halfway in the foot pursuit, as you described, there was still about 60 feet to go to the brush line?  Is that generally correct?

A.   Approximately, yes, sir.

Q.   And you said it would be about four to five seconds to travel that distance?

A.   Yes, sir.

Q.   Did you yell out "Gun" as you are trained to do, upon seeing the gun when you were halfway in the pursuit?

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 47

A.    I don't recall if it was right at halfway.   I do know that once we got to the brush line, I yelled, "He has a gun.   He has a gun."

Q.    Right.   I'm just wondering if you yelled it as soon as you saw it, to alert your partner?

A.    I -- I don't believe so, sir.

Q.    So do you believe you yelled, "Gun, gun," or words to that effect, after he got to the brush line or before?

A.    When -- when -- around the time that he was at the brush line, sir.

Q.    Did you ever give him a command to drop the gun?

A.    I told him that he was going to get shot because of the firearm, as far as if he didn't drop it or if he kept running with it, like you said -- like we had mentioned earlier, to dissuade him from running with the firearm.

Q.    Okay.   But it sounds like when you initially saw the firearm, halfway through the foot pursuit, you did not yell out "Gun" at that time; is that correct?

A.    I don't think so, sir.

Q.    And you did not yell "Drop it" at that time; is that also correct?

A.    I don't recall that.

Jonathan Davalos

Q.   And I think you told me you said something like, you know, "Stop running or you're going to get shot"?

A.   Yes, sir.

Q.   But that -- it sounds like you said that before you yelled "Gun" or referred to the gun.  Is that also fair?

A.   That was once he pulled the firearm out, I told him that.  So I had drawn my firearm at that point.  So this is at the halfway point.

Q.   And I think you told me earlier that, although you told him that, based on your training, you were aware that it would be inappropriate to shoot him just for running with the gun?

A.   Yes, sir, which is why I didn't.

Q.   Did you have your -- when you told him to stop running or you're going to shoot him, or words to that effect, did you have your gun pointed at him?

A.   Yes, sir.

Q.   And so when he got in the brush and turned to his left, as you described, with the gun in his right hand, did you say "Drop it" at that point?

A.   I yelled "He has a" -- once he's in the brush; is what you're saying?

Q.   Well, no.  At the time -- I'm trying to focus

Jonathan Bazalos

going on, because it's during school time hours.

So his backdrop would have been a school, kids in recess, or whatever is going on, as well as mine, as well. So I'm thinking of everything at that time when he took it out.

Q. And it sounds like you didn't say "Gun" until after he was in the brush, on the ground. That's when you yelled out "Gun, gun. He's got a gun," or something like that?

A. Yes, sir.

Q. So when he's on the ground in the position you described in the brush, can you actually see a gun in his hand at that point?

A. At the -- parts of him were obscured, sir. But I did see him -- the last thing I saw was him pointing the gun at me and going right into the brush. And then in a -- I would call it like a "shooter's position," like laying down on his side with his arms pointed out towards me.

Q. What I'm asking, and maybe you answered it already, when he was in the -- laying on his right side, in the brush, did you see a gun in his hand at that point?

A. No, sir. I didn't see one, like, directly at me at that point.

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 62

Q.   Did you -- okay.   Let me just break it down.
Did you see him pointing a gun at you at that point?

A.   I saw him facing me with his arms extended out, pointing in my direction.   But like I said, there's a lot of brush, so I can't say I saw the exact firearm.   I just saw, if I can demonstrate, his arms, like, pointed in my direction with him facing me.

Q.   Both arms pointed in your direction?

A.   I don't remember if it was both or one, but I remember seeing his body and his arms pointed out towards my direction.

Q.   Could you see his hands?

A.   Parts of it.   But I couldn't see -- like I said, the brush was covering a lot of it -- or not a lot of it, part of it.

Q.   What part of his hands was the brush covering?

A.   Like I said, parts of it were higher than others.   So his arm -- like, part of his arm and part of the torso, I can't remember exactly now, what -- like, if a finger was showing, not shown, you know, a thumb. I don't want to inappropriately or -- say the wrong thing.

Q.   So were part of his arms and hands covered by the brush?

Jonathan Davalos

A.   Certain parts.  Not everything, but certain parts.  Enough to where I could still see him, his direction, and the direction his arms were pointing.

Q.   What percentage of his hands do you think you could see?  Was it half of his hands?  10 percent?  What percentage would you give?

A.   When you say "hands," are you including also the arms with it, or just the hands itself?

Q.   Just the hands.

A.   I'd say about 60 to 80 percent of his hand.

Q.   And in looking at his hands, did you see any dark object in his hands at that point?

A.   I -- I don't remember, sir, if I -- like, right at that moment because it's-- like I'm saying, it's hard to describe it without you seeing it.  The brush, like, I could see -- like, let's say 60 to 80 is about this, right, or this part of it.

But a firearm, if someone has it, is going to be part of it here, they can have part of it towards the front.  So it just depends at that point, especially because he went to the ground, how he's holding the firearm.

Q.   Right.  I'm just wondering if you saw any part of the firearm when he was on the ground, in the brush, before you fired your first shot?

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 64

Jonathan Bacalos

A.    When he's on the ground, in the brush, before I fired my first shot, no.

Q.    And how about during your shots?   I realize you fired 18 shots.   At any point during the shooting sequence, did you see a firearm or object in his hands?

A.    No, sir.

Q.    Were you trying to assess as you were shooting?

A.    Yes, sir.

Q.    Are you taught to assess after every shot, if you can?

A.    Yes, sir.

Q.    And prior to shooting the second shot, for example, did you see an object in his hands?

A.    No, sir.   At that point, I still saw him facing my direction, with his arms extended.

Q.    Okay.   If I went through every one of the 18 shots, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, and asked you, prior to shooting that shot did you see a gun or any object in his hand, your answer would be no?

A.    Yes, sir.

Q.    So the last time you saw the object or the gun would have been before he went to the ground, just as he was getting to the brush?

A.    When it was pointed at me.

Jonathan Bazalos

Q.   And you say you saw that for about a second?

A.   About a -- yes, sir, about a second.

And when I say a "second" it's like:  "One Mississippi," so an actual second.  I understand people can have different perceptions of a second.

Q.   Right.  And you told me you did not shoot at that time; correct?

A.   No, sir.

Q.   That is correct?

A.   That is correct, sir.

Q.   I asked it in a bad way.

Do you know if your partner shot at that time when you say he had the gun turned towards you?

A.   No, sir.  He did not.

Q.   To your knowledge, all the shots were fired -- all 36 shots, while Mr. Urena was on the ground?

A.   Yes, sir.

Q.   And during all of those shots, you're saying that you did not see a gun or object in his hands; is that correct?

A.   Yes, sir.

Q.   After the shots -- I think you said you heard some additional shots after your last shot?  Maybe two to four?  Something like that?

A.   Yes, sir.

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 66

was approximately two to three seconds.

Q.   And you are saying you were assessing for each shot?

A.   Yes, sir.

Q.   Did you give any commands during the shooting sequence?

A.   No, sir.

Q.   Did you give any commands after the shooting, but before you approached him?

A.   Yes, sir.

(Reporter clarification.)

BY MR. GALIPO:

Q.   What commands did you give?

A.   "Let me see your hands."  Something to the effect of "Let me see your hands" or "Put your hands up."

Q.   Could you see his hands at that point?

A.   He lifted them up briefly.

Q.   Could you see them before you gave the command?

A.   After the shooting?

Q.   Yeah.  After the shooting, when you said, "Let me see your hands" or "Put your hands up," at the moment you gave the command, could you see his hands?

A.   No, sir.

Q.   Do you know what was blocking your view of his

A.   Briefly, sir.

Q.   To give a public safety statement?

A.   Yes, sir.

Q.   Did you tell anybody at the scene that he had pointed a gun at you?

A.   Not that I recall, sir.

Q.   Did you tell the sergeant how many shots you fired?

A.   Yes, sir.

Q.   And in which direction you were firing the shots?

A.   Yes, sir.

Q.   What did you tell the sergeant as opposed to how many shots?

A.   18.

(Reporter clarification.)

BY MR. GALIPO:

Q.   You were aware of that at the time?

A.   Yes, sir.

Q.   At some point, you did a tactical reload?

A.   Yes, sir.

Q.   And in terms of the direction, what direction did you tell the sergeant you were firing?

A.   Southwest direction, sir.

Q.   Did you mention to the sergeant that you fired

Renato Urena v. City of San Bernardino, et al.
Focus Litigation Solutions

Page: 73

A.    Yes, sir.

Q.    So after you approached him, weren't you expecting to find a gun?

A.    Yes, sir.  But because of the shooting, it could have been -- I didn't go through all the brush looking for it.  We were more focused on securing the scene and administering whatever med aid we could, and calling in for med aid, so I didn't go looking for it.

It could have been moved, however, as we approached it or right prior to.  I -- I didn't check.

Q.    So you thought maybe it might be somewhere in the brush?

A.    Like I said, I didn't do an extensive check.  I just walked up, didn't see it on his person or immediately, like, right next to him -- right next to him and he -- the impression he had made.  I apologize.  So at that point, I just administered the medical aid and secured --

Q.    Did you see him toss any gun anywhere after you shot him?

A.    No, sir.

Q.    When he was on the ground, but before you shot him, did you see him tossing any gun anywhere?

A.    No, sir.

Q.    I take it if you would have seen him tossing a

gun over the fence before he went to the ground, based

on your training, you wouldn't have shot him.  Is that a

fair statement?

A.   I would have not shot him, sir, if I saw him

throw it.

Q.   At some point, did you become aware that a gun

was located over the fence?

A.   Later on, sir.

Q.   When did you learn that?

A.   I don't remember if it was 30 minutes, an hour,

two hours after the fact.  I just know it was a little

bit after.

Q.   It was before you gave your interview, though;

correct?

A.   Yes, sir.

Q.   Was there any conversation you had with your

partner after the shooting about Mr. Urena pointing a

gun at you?

A.   No, sir.

Q.   Any conversation you had with your partner

after the shooting as to where the gun was?

A.   No, sir.

Q.   How long did you keep your body-worn camera on

after the shooting?

A.   That, I don't remember, sir.  Actually, I want

Jonathan Davalos

to say it was on up until right before we got transported.

Q.   I'm going to ask you a few questions about your interview.  Some of this I already covered, so just bear with me.  I'm going to put my glasses on so I can read.

A.   Yes, sir.

Q.   Were you afraid that this person, when they got out of the car, was going to get out of the car and start shooting?

A.   I didn't know if he had a firearm, but I believed he did.  So that's something that's always on my mind, sir, yes, when anybody jumps out of a vehicle.

Q.   Did he -- when he got out of the car, would you at least agree he did not start shooting?

A.   No, sir, he didn't.

Q.   And you're saying he was grabbing his waistband with his right hand; correct?

A.   Yes, sir.

Q.   So you didn't see him, for example, grabbing his waistband with both hands; is that correct?

A.   Not that I recall right now, sir, no.

Q.   And did you dispatch that the individual was running westbound?

A.   Yes, sir.

Q.   Did you dispatch that you thought he had a gun?

A.    No, sir.

Q.    Did you dispatch that he was reaching in his waistband?

A.    No, sir.

Q.    Prior to pulling the car over, did you tell any supervisors or dispatch that you were pulling a car over that you thought the occupant might have a gun?

A.    No, sir.

Q.    Did you request another unit as backup before trying to pull this car over, having information that this person might be possibly armed?

A.    No, sir.

Q.    And you're saying that at some point, you saw this gun over his right shoulder as he's running?

A.    Yes, sir.

Q.    Was it pointed at you when it was over his right shoulder?

A.    No, sir.

Q.    And in your interview, you indicated that you gave him multiple commands to "Drop the firearm."  Do you remember saying that in your interview?

A.    No, sir.  Like I -- like, I don't remember my whole interview right now, I guess.  Sorry.

Q.    But from what I'm understanding your testimony today, you're saying you did not give him any specific

Renato Urena v. City of San Bernardino, et al.                    Page: 78

Focus Litigation Solutions

time?

Q.   The initial.

A.   No -- Well, sideways, like, sideways facing towards me.  Prone is on chest-facing.

Q.   Did you say in your initial statement, when he went and laid down on the ground, he was prone on the ground?

A.   It's still a prone position.  It's just a sideways prone.

Q.   And did you say in your initial statement that when he was prone on the ground, he turned towards you with a gun in his hand?

A.   If I said that, sir, yes, that's what I believed.

Q.   But I think you told me today you never saw a gun in his hand when he was on the ground in the brush; is that correct?

A.   Yes.  But I believed he had a gun, because the last thing I saw was him having one.

Q.   Did you say in your statement that the gun was pointed right at you when he was on the ground?

A.   In my direction, yes, sir, because that's --again, that's what I saw, is the position of it.

Q.   After the shooting, do you recall saying in

Jonathan Davalos

Q.   And up to this point in time, he had not pointed the gun at you; would you agree?

A.   Yes, sir.

Q.   Now, we can see -- is that the fence you were referring to earlier, that we were talking about?

A.   Yes, sir.

Q.   And it's your understanding now, at least, that the gun -- a gun was found inside or over that fence?

A.   Yes, sir.

MR. GALIPO:   Okay.   Let's back up just a little bit, Renee, and then -- okay.   That's fine.   And then I'll tell you when to stop it again.

(Video being played.)

MR. GALIPO:   All right.   Stop.

Okay.   So now we stopped it at 58 seconds.

BY MR. GALIPO:

Q.   And that's your voice saying, "You're going to get effing shot"?

A.   Yes, sir.

Q.   Up to this point in time, do you hear yourself at all saying, "Drop the gun"?

A.   No, sir.

Q.   Now, up to this point in time, had he turned towards you and pointed the gun yet?

A.   Yes, sir.   Right before he went into the brush.

Exhibit 2.

THE CERTIFIED STENOGRAPHER:  Exhibit 2, got it.

(Video is being played.)

MR. GALIPO:  Okay.  We can stop it.

BY MR. GALIPO:

Q.    Would you at least agree, now that we've listened to the body-worn cameras, that nobody tells him to drop the gun at any time?

A.    Not that I heard right now, sir.

Q.    And the one reference to him having a gun, that's your voice?

A.    My partner also says, "He has one," which I knew he was referencing a gun.

Q.    And when did you hear your partner saying that?

A.    If you play it back a little bit, I'd say 10 seconds is enough would cover it.

Q.    Okay.

MR. GALIPO:  Let's try that, Renee.

THE WITNESS:  Okay.  Maybe 10 more.

MS. MASONGSONG:  Starting at 1:07?

MR. GALIPO:  Just go back to, like -- I don't know.  Yeah.

THE WITNESS:  Right there.

MR. GALIPO:  That's good.

(Video being played.)

Jonathan Davalos

MR. GALIPO:  We're starting at 0:57.

(Video being played.)

MR. GALIPO:  Okay.  Stop, please.

BY MR. GALIPO:

Q.   So you hear him say, "He's got one."  Is that what you're referring to?

A.   Yes, sir.

Q.   Would you agree that nowhere on any of the body-worn cameras does either you or your partner say he pointed a gun?

A.   Yes, sir.

MR. GALIPO:  Okay.  Thank you for that, Renee.

BY MR. GALIPO:

Q.   We also could hear a little bit of a pause before the last three or four shots; correct?

A.   Yes, sir.

Q.   And I think you told me those last three or four shots were your partner?

A.   Yes, sir.

Q.   Were you still looking at Mr. Urena during those last three or four shots?

A.   Yes, sir.

Q.   Did you see any gun on him at that time?

A.   I don't remember, sir, if he had one.  Like if I -- I still saw him pointing in my direction.

Q.    Well, it sounds like, from your testimony today, that after he went to the ground, you never specifically saw a gun; is that correct?

A.    No, sir.    So I saw him point the gun at me right before he went down -- he went down to the ground.

(Reporter clarification.)

THE WITNESS:    And I saw him pointing at me, what I believed to be the firearm.    Now, when I gave my statement that day, obviously, it's a lot more fresh, that moment, than it is right now.

BY MR. GALIPO:

Q.    Okay.    What I'm saying, a gun obviously has various parts to it, right:    a barrel, a trigger, a trigger guard, magazine, slide, things like that?

A.    Yes, sir.

Q.    Right now I'm not asking you what you thought. I'm asking you if you specifically saw a gun in his hands after he went to the ground?

A.    I don't remember, sir.    I saw him pointing at me, what I believed to be a firearm.

Q.    Would you agree, based on your training, that if he was not pointing what you believed to be a firearm at you when he was on the ground, it would be inappropriate to shoot him?

MR. CARPENTER:    Objection.    Vague.    Calls for

speculation.  Incomplete hypothetical.

But go ahead, if you understand.

THE WITNESS:  If I saw somebody not pointing at me or hands up, or if he would have thrown the gun and I knew a hundred percent certain he did not have a gun, then, no, I would not have shot.

BY MR. GALIPO:

Q.   Right.  But you would also agree that even if he had a gun and was on the ground, if he wasn't pointing it at you, it would be inappropriate to shoot him, based on your training?

A.    If he just went down to the ground and proned himself out -- and since we're going off of that, let's say when we were chasing him, if he laid down, kept the gun in his hand but just proned himself out on the ground, no, I wouldn't have shot.

Q.   And that gets back to our discussion we had earlier.  You can't shoot someone just for seeing a gun in their hand; correct?

A.   Yes, sir.

Q.   Now, the last thing I want ask you about, your training on deadly force, obviously you had training on deadly force, both at the academy and with the department; correct?

A.   Yes, sir.

Jonathan Davalos

Q.   And you're familiar with the department policy on deadly force?

A.   Yes, sir.

Q.   And you're familiar that deadly force can only be used if there's an imminent threat of death or serious bodily injury to the officer or others?

A.   Yes, sir.

Q.   And then, your policy goes on to define imminent threat of death or serious bodily injury as: "Someone with the present ability, opportunity, and apparent intent to immediately cause death or serious body injury."

Are you familiar with that part of the policy?

A.   Yes, sir.

Q.   And is it your understanding that actually comes from revised Penal Code Section 835(a)?

A.   Yes.

Q.   And it is also part of the POST Learning Domain now?

A.   Yes, sir.

Q.   So when we talk about the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury, that would be, for example, when someone's pointing a gun at you?

A.   Yes, sir.

Q.    And someone has a gun in their hand, but they're not pointing it at you or turned towards you, that might be a potential threat; but at least based on your training, it doesn't meet the present ability, opportunity, and apparent intent to immediately cause death.  Would you agree?

A.    I'm sorry, sir.  I guess what I understand from the jargon is if he's running and he has a gun back towards me, am I going to shoot him in the back for just having a gun?  No.  If that's what you were trying to get at?

Q.    What I'm trying to say -- and I think we've talked about this -- a gun in someone's hand is not enough.  It has to be coming in your direction or pointed in your direction for there to be the present ability, opportunity, and apparent intent to immediately cause death?

A.    Yes, sir.

Q.    And that's part of the training and the policy; correct?

A.    Yes, sir.

Q.    Have you given any statement yet to -- an administrative statement regarding this case, or you've only given your statement to Homicide?

A.    No.  We did our -- we gave our statement the

Jonathan Davalos

STATE OF CALIFORNIA)
                                    ) ss:
COUNTY OF BUTTE        )


           I, KIMBERLY E. D'URSO, do hereby certify:


           That the witness named in the foregoing

deposition was present remotely and duly sworn to testify

to the truth in the within-entitled action on the day and

date and at the time and place therein specified;

           That the testimony of said witness was reported

by me in shorthand and was thereafter transcribed through

computer-aided transcription;

           That the foregoing constitutes a full, true and

correct transcript of said deposition and of the

proceedings which took place;

           Further, that if the foregoing pertains to the

original transcript of a deposition in a federal case,

before completion of the proceedings, review of the

transcript [ ] was [ ] was not requested.

           That I am a certified stenographic reporter and

a disinterested person to the said action;

           IN WITNESS WHEREOF, I have hereunder subscribed

my hand this 13th day of July, 2025.

_____

KIMBERLY D'URSO, CSR NO. 11372, RPR