# EXHIBIT "16"

Richard S. Bryce

Criminal Justice Consulting

Date:  February 26, 2026

# Rule 26 Report
# Renato Urena v. City of San Bernardino
### Case No.: 5:24-cv-00341-JGB-SHK

The following report is respectfully submitted in compliance with Section (a)(2)(B) of Rule 26.  If called upon to testify as a witness in the above-entitled matter, I would offer the following opinions based on the information that was available to me at the time the report was prepared:

**ORIGIN OF ACTIVITY:**

I was retained by the law offices of Dale K. Galipo on 24 July 2025, to review the documents, videos and photographs provided and render my opinions as to the appropriateness of the shooting and arrest of Renato Urena by officers of the San Bernardino Police Department.

**DATA AND INFORMATION RELIED UPON:**

1. DIMS Photos 2023-00015413 Tag 23-1150.
2. Scene Walkthrough Video.
3. Ring Video & Screenshots.
4. Andres Estrella Deposition.
5. Jonathan Davalos Deposition.
6. CAD report.
7. Investigative Reports. SB 1-110.
8. Audio Officer A. Estrella Interview.
9. Audio Officer J Davalos Interview.
10. Photos SB 00154-01056.
11. Estrella BWC Video.
12. Davalos BWC Video.
13. Multicam BWC Davalos and Estrella.
14. SB 00125-00153 Body Videos.

15. Officer Estrella interview.
16. Officer Davalos interview.
17. UOF Policy.
18. POST Learning Domain 20.
19. California Penal Code Section 835a.
20. Renato Urena Deposition.

**Case Overview:**

On 10 February 2023, Officers J. Davalos and A. Estrella pursued a vehicle being driven by Renato Urena.  Mr. Urena fled from his vehicle and was pursued on foot and shot by the Officers.

**Opinions and Observations:**

1. **Officers Estrella and Davalos were not in compliance with POST Learning Domain 20, California Penal Code Section 835a(e)(1), and generally accepted police practices when they shot 36 times at Mr. Urena on February 10, 2023.**

   A reasonable police officer acting consistent with standard police practices would not have used lethal force in this situation.  A similarly trained police officer would not have considered Mr. Urena to be a lethal threat in this set of facts. At the time that Officers Estrella and Davalos fired their 36 shots at Mr. Urena, Mr. Urena did not pose an immediate threat of death or serious bodily injury to the officers or to any person.  Therefore, there was no reason to shoot, and all of the 36 shots fired by the Officers were inappropriate and contrary to basic police training, POST Learning Domain 20, and California Penal Code Section 835a.

   POST Learning Domain 20 quotes California Penal Code Section 835a:  "A peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary … to defend against an imminent threat of death or serious bodily injury to the officer or to another person."[1]

   "Imminent" means a threat of death or serious injury in "imminent" when, based upon the totality of the circumstance, a reasonable officer in the same

---

[1] POST Learning Domain 20.

2

situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed.[2]

Police officers are trained that deadly force can only be used on the basis of an "objectively reasonable" belief that the suspect poses an immediate threat of death or serious bodily injury. Police officers are also trained that subjective fear alone does not justify the use of deadly force.

In this case, Mr. Urena posed no immediate or imminent threat of death or serious bodily injury to any person at the time of any of Officers Estrella's and Davalos' shots, as follows:

1. <u>Mr. Urena was not in possession of a firearm or other weapon at the time officers Davalos and Estrella fired their 36 shots at Mr. Urena</u>.

Mr. Urena testified at his deposition that at the time of the shooting, he was not in possession of a firearm, and that he had discarded the firearm prior to the shots starting.[3] Mr. Urena testified, "When they are shooting me there is no gun nowhere. That gun's been gone. . . I have no gun. There's no reason. Why are they shooting me?" Mr. Urena also testified that prior to discarding the firearm, he never turned back towards the officers with the firearm and never pointed the firearm at the officers.[4] No firearm was found near Mr. Urena following the shooting. Photos taken at the scene show a firearm that was located on the opposite side of the fence and bushes some distance from where Officers Davalos and Estrella shot Mr. Urena. The firearm was holstered, completely covering the barrel, slide, and trigger of the weapon.[5]

Officer Estrella was able to see that Mr. Urena was not in possession of a firearm when Officer Estrella shot him. Officer Estrella was asked in his

---

[2] Penal Code Section 835a(e)(2).
[3] Renato Urena Deposition, pp. 54-55, 61062.
[4] Renato Urena Deposition, p. 57.
[5] Photos SB 00154-01056, 245-246; Estrella Deposition, p. 24.

interview with investigators, "Okay.  When you fired your weapon, was there any visual obstructions between you and your intended target?"  He responded, "No."  He was then asked, "And what was the distance between you and the suspect at the time you then fired?"  He responded, "Approximately 10 feet."  The investigator then asked him, "And do you remember there being anything between you and the suspect?"  He responded, "No."  Officer Estrella was then asked, "Okay.  And can you describe in as much detail as you can what you were looking at when you fired?"  He responded, "I was looking at the suspects hands."[6]

2. <u>A gun in the hand is not enough to justify using deadly force</u>.

Officer Estrella's and Officer Davalos's BWC videos do not show Mr. Urena pointing a firearm towards either officer or any other person at any time. Even if the Officers believed that Mr. Urena had a firearm at the time of the shooting (which Mr. Urena did not), police officers are trained that seeing a gun in the person's hand is not enough to justify the use of deadly force. According to my review of Mr. Urena's deposition, the scene photographs, and the BWC videos, Mr. Urena did not point the firearm at either Officer at any time, and he was unarmed at the time of the shooting.

3. <u>Mr. Urena was on the ground when Officers Davalos and Estrella fired upon him</u>.

BWC videos from both Officers Estrella and Davalos show that both Officers fired shots at Mr. Urena when Mr. Urena was on the ground.[7] Mr. Urena testified at his deposition that he was struck by shots while he was on the ground.[8] From my review of the evidence, it does not appear that Mr. Urena was ever facing the officers in an upright position during any of the shots.

---

[6] Estrella Interview, p. 35, lines 22-25, p. 36, lines 1-6, 18-22.

[7] *Id.* p. 32, lines 9-12

[8] Renato Urena Deposition, p. 60.

4. <u>Officers are trained to re-assess while shooting and trained that officers are responsible for justifying every shot fired</u>.

Police officers are trained that they must re-assess when they are firing shots. Officers are also trained that they are responsible for justifying every shot they fire. Here, each officer fired 18 gunshots at Mr. Urena[9], and each of the 36 total shots were unjustified. Officer Estrella was asked in his deposition, "Did you ever see a gun pointed at you after he went to the ground?" He responded, "No."[10] He was also asked, "And when you paused to re-assess, you were aware at least at that point that Mr. Urena was on the ground?" He responded, "Yes, sir." In this case, a reasonably well-trained officer would have reassessed multiple times during the shooting sequence and would have recognized that Mr. Urena was unarmed prior to any shots being fired, and, with respect to at least some of the shots, was on the ground and had been struck by shots. Despite this, the Officers continued to shoot at Mr. Urena while he was unarmed and on the ground.

5. <u>The Officers were not responding to a serious or violent crime</u>.

At the time of the shooting, the Officers had no information that Mr. Urena had injured anyone or committed any violent crime, and no information that Mr. Urena was threatening people.[11] Additionally, there were no civilians in the immediate vicinity.[12]

6. <u>Mr. Urena made no verbal threats</u>.

Mr. Urena made no verbal threats to harm the Officers or any other person.[13]

7. <u>The Officers had other reasonable alternative measures available</u>.

Police Officers are trained that deadly force should only be used when no reasonable alternative measures are available. The Officers failed to consider reasonable alternative measures to shooting. Less-lethal options were available, including taking cover and waiting for backup. Here, where the

---

[9] Estrella Interview, p. 10; Davalos Interview, p. 10.

[10] Estrella Deposition p. 62, lines 11-13.

[11] Estrella Deposition at p. 63; Davalos Deposition at p. 38; Estrella Interview at p. 24, lines 1-14.

[12] BWC videos; Estrella Interview at p. 28, lines 20-25.

[13] BWC videos.

5

Officers had initial information that Mr. Urena possibly had a gun, then they should have taken cover and requested backup officers and an air unit to assist. The Officers should have set up a perimeter and containment, which could have been done with the assistance of backup officers. Rather than taking cover and calling for backup, the Officers pursued Mr. Urena on foot. The Officers also had less lethal tools available, including a police baton and pepper spray.

8.  <u>An overreaction in using deadly force is excessive force</u>.

Basic police training teaches that an overreaction in using deadly force is excessive force. Here, the Officers overreacted when they fired 36 shots at Mr. Urena when Mr. Urena was unarmed, including shots fired while Mr. Urena was on the ground. The Officers also may have engaged in "reactionary shooting" or "contagious fire."

## 2.  The Officers cannot justify shooting at Mr. Urena for fleeing or running away.

Under the facts of this case and pursuant to police standards and training, it would have been inappropriate for the Officers to shoot at Mr. Urena for fleeing or attempting to flee.  Police officers are trained that they can only shoot a fleeing felon where all of the following factors are present: (1) the person threatens the officer with a weapon or the officer has information that the person has committed a felony involving the infliction of serious bodily harm or death, (2) the officer has probable cause to believe that that the person will cause death or serious bodily injury to another person unless immediately apprehended, (3) the officer has probable cause to believe that the use of deadly force is reasonably necessary, and (4) the officer gives some warning that deadly force may be used, where feasible.[14]

These four factors were not met in this case.  Mr. Urena did not inflict or threaten to inflict death or serious bodily injury against anyone at any point relative to this incident, Mr. Urena did not have a firearm at the time of the shooting, and Mr. Urena posed no immediate threat of death or serious bodily injury necessitating deadly force. To justify the use of deadly force, "a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death

---

[14] POST LD 20.

or serious bodily injury to the peace officer or another person."[15] None of those factors were present here, where Mr. Urena was unarmed during all of the shots and on the ground at the time of at least some of the shots.

Further, both Officers admitted in their depositions that based on their police training, it would be inappropriate to shoot Mr. Urena for running away with a gun.[16]

### 3. Officers Estrella and Davalos engaged in negligent pre-shooting tactics.

Officers Estrella and Davalos engaged in negligent pre-shooting tactics, as follows:

1. <u>The Officers failed to give Mr. Urena sufficient commands and time to comply with commands</u>.

Police officers are trained to give sufficient commands and time to comply with those commands. Other than "let me see your hands," Officer Estrella did not give Mr. Urena any commands before he got to the brush area.[17] Neither officer gave Mr. Urena a command to "drop it at any point."[18] Officer Estrella did not give Mr. Urena a verbal warning before shooting.[19] Officer Davalos did not yell out "gun" when he initially saw the firearm, halfway through the foot pursuit.[20]

2. <u>The Officers failed to utilize time, cover, and distance</u>.

If Mr. Urena had a firearm in his position when the Officers began shooting him, which evidence shows he did not, then the Officers failed to position themselves a safe distance from Mr. Urena. The Officers had time, distance, and cover available to them. The Officers were not responding to a crime in progress, and there was no rush. The Officers could have taken cover and continued to give Mr. Urena commands and time to comply with the

---

[15] Cal. Penal Code 835a(e)(2).

[16] Davalos Deposition, pp. 39, 49; Estrella Deposition, p. 63, lines 2-7.

[17] Estrella Deposition, p. 23, lines 13-16.

[18] Davalos Deposition, p. 48, p. 94, lines 6-19; Estrella Deposition, p. 37, p. 52, lines 11-16.

[19] Estrella Deposition, p. 37, lines 1-5.

[20] Davalos Deposition, p. 48.

commands. The Officers made a poor tactical decision when they pursued Mr. Urena on foot when they had information that he may possibly be armed.

3.  The Officers failed to set up a perimeter and containment.

A reasonably well trained officer under this set of facts would have called for backup and worked with backup officers to set up a perimeter and containment rather than shooting.

**QUALIFICATIONS:**

I am qualified and competent to render my opinions in the case before this Court due to my education, experience, training and professional activities in criminal justice.

I am currently self-employed as a criminal justice consultant and enter private engagements with criminal justice agencies to perform a wide range of services, including audits and inspections, review of policy and procedure, administrative investigations, audits of practices and processes, development and delivery of training courses, original research, surveys, draft policies and procedures, staff development, meeting and conference facilitation, and expert testimony in court and before governing bodies.

I have over 33 years of continuous and escalating experience in law enforcement. My initial experience was as a patrol deputy with the Ventura County Sheriff's Department assigned to the contract city of Camarillo.  I performed routine patrol, traffic investigation and criminal investigation.  I was later assigned to a special enforcement patrol unit in the unincorporated area of Ventura County.  I performed surveillance of known criminals, gang activity, and special events along with assisting routine patrol deputies with their responsibilities.

In October of 1968, I was promoted to Senior Deputy and assigned as a training officer at the Ventura County Sheriff's Academy.

From April 1972, until December 1976, I was assigned to the Criminal Investigation Division.  During that period of time I worked burglary investigation, undercover fencing and property crime investigation, undercover vice investigation, undercover narcotics investigation and undercover criminal intelligence investigation.

8

In December of 1976, I was promoted to sergeant and assigned to the Custody Division. I began my custody experience as a shift sergeant assigned to the Branch Jail Honor Farm and was later assigned as the administrative sergeant of that facility. I was responsible for budget, scheduling of personnel and development of operational policy.

In May of 1978, I was transferred to the Court Services Division. I was the supervisor of all bailiff's and court security deputies servicing the Ventura County Superior Court.

In January of 1979, I was promoted to Lieutenant and assigned to the Custody Division as the Facility Manager of the Oxnard Branch Jail. I also had collateral management responsibilities for the Sheriff's Inmate Transportation Unit and the Court Holding Facilities.

In November of 1979, I was transferred to the Support Services Division as the Court Services Bureau Commander. I was responsible for the management of all court services and civil process service. I was also given the responsibility of justification, preparation, presentation and implementation of a merger of the Ventura County Marshall's Department into the Sheriff's Court Services Division.

In December of 1980, I was transferred to the Special Services Division as the Special Investigations Bureau Commander. I was responsible for the management and operation of the Sheriff's Narcotics, Vice, and Criminal Intelligence Units.

In October of 1982, I was promoted to Commander and assigned as the Commander of the Special Services Division. I was responsible for the overall operation and administration of the Special Services Division, which included; major criminal investigation, narcotics investigation, vice and intelligence investigation, criminalistics laboratory, Sheriff's Air Unit and other special investigation functions.

In February of 1983, I was assigned as the Commander of the Custody Division. My responsibilities in that assignment included the operation and administration of 5 custodial facilities, 339 employees and the supervision of over 1500 inmates.

In March of 1986, I was appointed Assistant Sheriff. I was responsible for the administration and direction of 4 of the 8 major divisions within the Sheriff's Department. My primary responsibilities included; providing administrative direction to the Custody Division and its 5 facilities, giving administrative

9

oversight to the Project Development Division with the design, development and construction of a new 2000 bed jail, providing administrative control over the entire Department's operational budget, giving primary approval for most disciplinary actions within the Department, presenting budget requests and other Department related matter to the Board of Supervisors, and representing the Sheriff in public forums.

In June of 1993, I was appointed Undersheriff and served in that position until my retirement in August of 1999. As Undersheriff, I was responsible for the administration of the entire Sheriff's Department under the direction of the Sheriff. At the time of my appointment the Sheriff's Department was reorganized into 4 major divisions each headed by a Chief Deputy. Each Chief Deputy reported directly to me. The 4 divisions of the Sheriff's Department were comprised of the Detention Services Division, East Valley Police Services Division, West County Police Services Division, and Support Services Division. The police services divisions included police service for the 5 contract cities of Thousand Oaks, Camarillo, Moorpark, Ojai and Fillmore. The Sheriff's Department employed 1355 individuals with an operational budget in excess of $140,000,000.00.

FORMAL EDUCATION:

1985            Master of Public Administration
                University of La Verne

1982            Bachelor of Science: Criminal Justice
                University of La Verne

PROFESSIONAL CERTIFICATES:

P.O.S.T.  Management Certificate

P.O.S.T.  Supervisory Certificate

P.O.S.T.  Advanced Certificate

P.O.S.T.  Intermediate Certificate

P.O.S.T.  Basic Certificate

California Community College Teaching Credential (life)

PROFESSIONAL MEMBERSHIPS Past and Present:

American Correctional Association

American Jail Association

California State Sheriff's Association

California Peace Officer's Association

California Narcotic Officer's Association

National Sheriff's Association

Southern California Jail Manager's Association

Ventura County Deputy Sheriff's Association

**PREVIOUS CASES:**

Mesa Arizona
    Spencer v. City of Mesa – Feb 25 P

Santa Clara County, California
    Leal v. Officer Siegal et al. – Sep 06 D
    Garcia et al. v. County of Santa Clara – Dec 06 D
    Richard Carrasco v. County of Santa Clara – Jan 07 D
    Marino v. County of Santa Clara – Mar 07 D

Fresno, California
    Eliseo Renteria v. Tulare County – Sep 03 P
    Cindy Staunton v. City of Clovis – Jun 01 P
    Brock v. County of Fresno – Jul 21 P
    Flores v. County of Fresno – Jan 22 P

City of Houston, Texas
    Claudia Navarro Pineda, et al. v. City of Houston – Dec 00 D

Riverside County, California
    Zaragoza v. Riverside County – Mar 22 P

11

City of Bakersfield, California
>    Perry v. City of Bakersfield – Sep 20 P

Pasadena, Texas
>    Moises Delao v. The City of Pasadena, Texas – Dec 96 D

Calaveras County, California
>    Payne v. Calaveras County – Jan 20 P

Palm Springs, California
>    Sandra Lee Denham v. City of Palm Springs – Nov 99 P

San Joaquin County, California
>    Friends v. San Joaquin County – Mar 19 P

Harris County, Texas
>    Alberti, v. Harris County – Apr 92 D
>    Laura Sherrard v. Harris County – Nov 93 D
>    Robert Earl McMullen III v. Harris County – Sep 94 D
>    Jason Aguillard v. Joseph McGowen – Feb 96 D
>    Alphonso Robinson v. Constable A. B. Chambers – May 98 D
>    Brad Allen Mathes v. Harris County – Jun 99 D

Liberty County, Texas
>    Womack v. Liberty County – Nov 93 D

Orleans Parish, Louisiana
>    Hamilton v. Morial – Jun 93 D

Warren, Michigan
>    Sondey v. Woloweic et al – Feb 16 P

Yuba County, California
>    Court Appointed Monitor -- Present

Cass County, Michigan
>    Nash v. Sheriff Underwood, Jr., et al. – Feb 16 P

Bexar County, Texas, Texas Attorney General

DeVonish v. Lopez – Oct 93 D

Mendocino County, California
Neuroth, et al. v. Mendocino County, et al. – Oct 17 D

San Bernardino County, California
Mendoza v. San Bernardino County – Feb 21 P
Person-Lynn v. San Bernardino County – Apr 22 P
Renato Urena v. City of San Bernardino – Jul 25 P

Kern County, California
McClure v. PTS – Dec 19 D

Monterey County, California
Thomas Dewey v. Monterey County, et al. – June 15 D
Claypole v. County of Monterey, et al. – Sep 15 D
Villerreal v. County of Monterey – May 17 D
Hernandez v. County of Monterey Court appointed monitor Present

Chino, California
Brown v. City of Chino – July 21 P

San Mateo County, California
Doe v. San Mateo County, et al. – Sep 17 P

Mesa Arizona
Spencer v. City of Mesa – Mar 25 P

Los Angeles County, California
Dion Starr v. County of Los Angeles et al. --  09 D
William Russell v. County of Los Angeles et al. – Jul 09 D
Justin Henderson, et al. v. County of Los Angeles – Sep 10 D
Ronald Johnson v. County of Los Angeles – Nov 10 D
Kevin King v. County of Los Angeles – May 11 D
Mariano Duvall v. Richard Torres et al. – Aug 12 D
XYZ Distributors Inc. v. County of Los Angeles – Oct 12 D
Christopher Brown v. County of Los Angeles – Jan 13 D
Timothy Smith v. County of Los Angeles – May 13 D
Mancilla v. County of Los Angeles – May 13 D
Tyler Willis v. County of Los Angeles – Jun 13 D

13

Frank Martinez v. County of Los Angeles – Jan 15 D
Jaime A. Moreno v. County of Los Angeles – Aug 15 D
Cory Crittenden v. County of Los Angeles – Aug 25 P

City of Santa Monica, California
Gonzales v. City of Santa Monica – Sep 21P

City of Huntington Beach, California
Shay v. City of Huntington Beach – 18 P

City of Long Beach, California
Pream v. City of Long Beach – May 18 P
Eugene Martindale v. City of Long Beach – June 2022 P

City of Los Angeles, California
Kathleen Washington v. City of Los Angeles – Apr 12 D
Murillo v. City of Los Angeles – Jul 22 P
Peralta v. City of Los Angeles – Mar 25 P
Ashley v. City of Los Angeles – Sep 25 P

United States Department of Justice
Doe v. Johnson – Jan 16 D
Lion v. ICE – Feb 16 D

**FEE SCHEDULE:**

Initial Case Review $2000.00

This is a one-time fee for an initial review and assessment of the case and includes a preliminary written or oral report to client.

Consultation on Management and Operations ($250.00 per hour)

This hourly fee includes all labor associated with the study of jail or law enforcement management and operations, including preparation of reports and travel to and from site.

Case Review and Preparation ($250.00 per hour)

14

This hourly fee includes review of documents, interviews, site inspection, preparation of expert report and affidavit; and any other associated labor performed as directed.

Travel - $100.00 per/hr.

Formal Presentations ($2500.00per day or $1500.00 per half day)

This fee applies to Court appearances, depositions and hearings.

Expenses (actual)

Travel related expenses, including transportation, on site lodging and meals; will be billed at actual cost.  Other expenses associated with the provision of consultation or expert testimony may include postage, vehicle rental, parking, ground and air transportation, telephone and photography, all of which will be billed at actual cost.

Respectfully submitted,

*/s/ Richard Bryce*

Richard S. Bryce