**STEVEN J. ROTHANS – State Bar No. 106579**
**SCOTT J. CARPENTER – State Bar No. 253339**
**CARPENTER, ROTHANS & DUMONT, LLP**
**500 S. Grand Avenue, 19th Floor**
**Los Angeles, CA  90071**
**(213) 228-0400 / (213) 228-0401 [Fax]**
**srothans@crdlaw.com / scarpenter@crdlaw.com**

Attorneys for Defendants, City of San Bernardino, a public entity, and Officers Jonathan Davalos and Andres Estrella, public employees

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENATO URENA, individually,<br><br>                         Plaintiff,<br><br>vs.<br><br>CITY OF SAN BERNARDINO, JONATHAN DAVALOS, ANDRES ESTRELLA and DOES 1-10, inclusive,<br><br>                         Defendants. | Case No. 5:24-cv-00341-JGB-ACCV<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION IN LIMINE NO. 3 TO LIMIT PLAINTIFF'S EXPERT RICHARD BRYCE'S OPINIONS AT TRIAL**<br><br>**[Motion in Limine #3]**<br><br><u>Final Pre-Trial Conference:</u><br>Date:   June 8, 2026<br>Time:   11:00 a.m.<br>Courtroom:  1 - Riverside<br><br>Trial:  June 23, 2026 |

PLEASE TAKE NOTICE THAT on June 8, 2026, at 11:00 a.m., or as soon thereafter as the matter may be called in Courtroom 1 of the above-entitled Court, located at 3470 Twelfth Street, Third Floor, Riverside, California 92501, Defendants City of San Bernardino, a public entity, and Officers Jonathan Davalos and Andres Estrella, public employees, will and hereby do move this Court for an order limiting plaintiff's designated police practices expert Richard Bryce ("Bryce") from offering any testimony or opinions on the following subjects and barring plaintiff's counsel from presenting any evidence or argument regarding:

- 1 -

1.      Opinions that were not contained in Mr. Bryce's Federal Rule of Civil Procedure 26 Report. Fed. R. Civ. Proc. 26(a)(2)(B)(i) & 37(c)(1); Fed. R. Evid. 403.

2.      Opinions regarding whether the officer defendants used unreasonable or excessive force because that constitutes an impermissible legal conclusion. United States v. Diaz, 876 F.3d 1194, 1197 (9th Cir. 2017); Fed. R. Evid. 403.

3.      Improper speculative opinions regarding the officers' conduct. Stephens v. Union Pac. R.R. Co., 935 F.3d 852, 856 (9th Cir. 2019); Nevada Power Co. v. Monsanto Co., 891 F. Supp. 1406, 1415 (D. Nev. 1995).

This motion is made following a pre-filing conference of counsel pursuant to Central District Local Rule 7-3 that took place in person on May 5, 2026. See Carpenter Decl. ¶ 3.

This motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, any matters of which the Court may take judicial notice, all pleadings and papers on file in this action, and upon such other matters as may be presented to the Court.

DATED: May 11, 2026                    CARPENTER, ROTHANS & DUMONT LLP

                                       /s/ Scott J. Carpenter
                          By:    _____
                                 STEVEN J. ROTHANS
                                 SCOTT J. CARPENTER
                                 Attorneys for Defendants, City of San
                                 Bernardino, a public entity, and Officers
                                 Jonathan Davalos and Andres Estrella,
                                 public employees

- 2 -

DEFENDANTS' MOTION IN LIMINE #3

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This civil case arises out of the non-fatal officer-involved shooting of Renato Alfonso Urena by City of San Bernardino Police Department ("SBPD") Officers Andres Estrella and Jonathan Davalos on February 10, 2023.

On February 10, 2023, SBPD Officers Andres Estrella and Jonathan Davalos were on patrol when they received a report of a male subject armed with a handgun driving a silver Nissan Versa nearby.  After locating the suspect Nissan, and observing various vehicle code violations, the officers attempted to conduct a traffic stop.  However, the driver (later identified as plaintiff Renato Urena) tried to evade officers, abandoned the Nissan, and fled on foot into a vacant lot.  Officers Estrella and Davalos pursued plaintiff on foot and observed plaintiff reaching for, and retrieving, a handgun.  After plaintiff went into tall, thick grass and shrubbery, and the officers observed plaintiff targeting with the gun, the officers fired in self-defense fearing that plaintiff was about to shoot them.

Plaintiff retained Richard Bryce ("Bryce") as a police practice's expert to provide opinions at trial. Mr. Bryce prepared a written report with a statement of his opinions, and the basis and reasons for the opinions, pursuant to Rule 26(a)(2). However, Mr. Bryce has given opinions: (i) in MSJ declaration and at deposition that were not contained within his Rule 26(a)(2) report; (ii) that addressed whether the shooting complied with legal standards of reasonableness; and (iii) that are improperly speculative.  Moreover, the prejudice of such testimony is substantially outweighed by its lack of probative value.  Thus, each of these categories of opinions are barred as improper opinion testimony and should be excluded at trial. Fed. R. Evid. 403.

## II.    ARGUMENT

**A.    Bryce's Testimony Must Be Limited To What Was Included in His Rule 26 Report.**

DEFENDANTS' MOTION IN LIMINE #3

Rule 26 requires expert reports to contain "a complete statement of all opinions the witness will express and the basis and reasons for them[.]" Fed. R. Civ. P. 26(a)(2)(B)(i). Rule 37(c)(1) generally forbids the use at trial of any information that is not properly disclosed, unless it is substantially justified or harmless. Fed. R. Civ. P. 37(c)(1); Goodman v. Staples The Office Superstore, LLC, 644 F.3d 817, 827 (9th Cir. 2011).

"[I]t is axiomatic that an expert may not present new opinions on topics not timely included or otherwise disclosed in the expert's report. This is blackletter law . . ." Garcia v. Cnty. of Riverside, 2019 WL 4282903, at *10 (C.D. Cal. June 7, 2019).

Defendants request the Court limit Mr. Bryce's testimony to what was specifically stated in his Rule 26 report, as it is anticipated by his subsequent declaration and deposition testimony that plaintiff will seek to elicit new opinions from him at trial. Mr. Bryce's new opinions not contained in his Rule 26 Report include the following:

- "Mr. Urena never pointed the gun at the officers and never turned toward the officers with the gun in his hand at any time." Bryce Decl. at ¶ 6.

- "It was inappropriate for the officers to believe that Mr. Urena went to the ground to gain a position of advantage. A reasonable interpretation of Urena going to the ground is that he went to the ground to surrender, particularly when viewed in conjunction with the fact that Urena tossed the gun over the fence. It was inappropriate for the officers to believe that Mr. Urena was in a shooting position when he was on the ground." Bryce Decl. at ¶ 9. He admitted in deposition that this opinion is not in his Rule 26 Report. See Ex. C. at 67:14-68:14.

- "All of the shots were fired when Mr. Urena was on the ground." Bryce Decl. at ¶ 8.

- It would be inappropriate for the officers to shoot Mr. Urena for tossing

DEFENDANTS' MOTION IN LIMINE #3

the gun." Bryce Decl. at ¶ 7.

- "Based on their experience as police officers, Davalos and Estrella knew that when a subject is running with a gun, the subject might try to toss the gun because they do not want to get caught with a gun." Bryce Decl. at ¶ 11.

- "Pursuant to police training on situational awareness, a reasonable officer in the position of Estrella and Davalos would have seen that Mr. Urena tossed the gun, when they had an unobstructed view a short distance behind Mr. Urena." Bryce Decl. at ¶ 11. He admitted in deposition that this opinion is not in his Rule 26 Report. See Ex. C. at 69:20-71:6.

- "The Officers may have engaged in "reactionary shooting" or "contagious fire," given number of shots that were fired (36), and particularly given the number of shots that were fired when Mr. Urena was unarmed and on the ground." Bryce Decl. at ¶ 15.

- Police officers are trained with respect to situational awareness. Based on police training on situational awareness, a reasonable police officer in the position of Officers Davalos and Estrella would have seen Mr. Urena toss the gun . . ." Bryce Decl. at ¶ 11. He admitted in deposition that this opinion is not in his Rule 26 Report. See Ex. C. at 69:20-71:6.

Mr. Bryce did not provide any opinions in his Rule 26 report on the above subjects, and thus he should be barred from providing any such opinions at trial, in addition to any other opinions he attempts to provide at trial that were not contained in his Rule 26 report.

**B.** **Bryce Should Not Be Allowed To Testify As To Whether The Officers Used Unreasonable Or Excessive Force, An Issue Of Law For The Jury**.

Ninth Circuit courts have "repeatedly affirmed that 'an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law.'" United States v. Diaz, 876 F.3d 1194, 1197 (9th Cir. 2017) (quoting

DEFENDANTS' MOTION IN LIMINE #3

Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1016 (9th Cir. 2004) (emphasis in Hangarter).  That is, expert testimony which advises the jury to find that the subject conduct violates the law should be excluded, as "[s]uch testimony would, in effect, instruct the jury regarding how it should decide the key question whether [the defendant] violated a statute and thus acted improperly." Diamond v. City of Sandy, 2025 U.S. Dist. LEXIS 23292, *18 (D. Or. Feb. 10, 2025), citing to Nationwide Transp. Fin. v. Cass Info. Sys., Inc., 523 F.3d 1051, 1059 (9th Cir. 2008).

"[The] prohibition of opinion testimony on an ultimate issue of law recognizes that, "[w]hen an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." Diaz, 876 F.3d at 1197 (citing to United States v. Duncan, 42 F.3d 97, 101 (2nd Cir. 1994)). While Federal Rule of Evidence 704(a) provides that expert testimony that "[a]n opinion is not objectionable just because it embraces an ultimate issue", this does not allow for an expert opinion as to a legal conclusion.  Valtierra v. City of L.A., 99 F.Supp.3d 1190, 1198 (C.D. Cal. Apr. 13, 2015).

Mr. Bryce has repeatedly proffered that the deadly force by Officers Davalos and Estrella was unreasonable.  Such improper legal conclusions which advise the jury to find that the officers' conduct violated the law and must be excluded.  Examples of Mr. Bryce's improper opinions include:

"At the time that Officers Estrella and Davalos fired their 36 shots at Mr. Urena, Mr. Urena did not pose an immediate threat of death or serious bodily injury to the officers or to any person."  Bryce Report at 2.

"[T]he Officers overreacted when they fired 36 shots" and "an overreaction in using deadly force is excessive force."  Bryce Report at 6.

"A reasonable police officer . . . would not have used lethal force in this situation and would not have considered Mr. Urena to be an imminent threat in this

- 6 -

set of facts.  At the time that Officers Estrella and Davalos fired their shots at Mr. Urena, Mr. Urena did not pose an immediate threat of death or serious bodily injury to the officers or to any person.  Therefore, all of the shots fired by the Officers were inappropriate . . ."  Bryce Decl. at ¶ 5.

Thus, Mr. Bryce should be barred from providing legal conclusions that the officer defendants engaged in an unreasonable use of force or excessive force.

C.    **Speculative Opinions About Reactionary Or Contagious Shooting Are Improper**.

Under Rule 702, a witness may be qualified as an expert if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of facts to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

Expert opinions are excludible as unhelpful if based on speculative assumptions.  In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988, 37 F.3d 804, 824 (2nd Cir. 1994) (overruled on other grounds by Zicherman v. Korean Air Lines Co., Ltd., 516 U.S. 217 (1996)); Guidroz-Brault v. Missouri Pac. R. Co., 254 F.3d 825, 829 (9th Cir. 2001) ("Rule 702 requires that expert testimony relate to scientific, technical, or other specialized knowledge, which does not include unsupported speculation and subjective beliefs.").  Expert evidence is admissible only "if the principles and methodology used by the expert proffering it are grounded in the methods of science." Domingo ex rel. Domingo v. T.K., 289 F.3d 600, 605 (9th Cir. 2002).  As such, expert testimony is only reliable if it "signif[ies] something beyond 'subjective belief or unsupported speculation.'" Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc., 87 F. Supp. 928, 939 (N.D. Cal. 2015) (quoting Daubert, 509 U.S. at 590).

Here, Mr. Bryce intends to offer opinions that are based purely on

- 7 -

DEFENDANTS' MOTION IN LIMINE #3

speculation and conjecture about the officers' conduct.  In particular, Mr. Bryce's Rule 26 Report raises the mere possibility that the officers "may have engaged in 'reactionary shooting' or 'contagious fire.'"  Bryce Report at 6.  However, such possibility is purely speculative and improper for expert testimony.  Stephens v. Union Pac. R.R. Co., 935 F.3d 852, 856 (9th Cir. 2019) ("[An] expert's opinion must rest on 'facts or data in the case that the expert has been made aware of or personally observed,' not merely assumptions and speculation."); see Nevada Power Co. v. Monsanto Co., 891 F. Supp. 1406, 1415 (D. Nev. 1995). ("[S]peculative testimony about how another might have acted without personal knowledge is not admissible as evidence").  Thus, such anticipated argument or testimony should be excluded at trial.

> **D.      The Evidence Is Substantially More Prejudicial Than Probative.**

Federal Rule of Evidence 403 authorizes the exclusion of relevant evidence when its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."   In addition to being improper expert opinion testimony, any purported probative value of permitting Mr. Bryce to testify outside the parameters outlined above would be substantially outweighed by the danger of unfair prejudice, confusing the issues and misleading the jury. Fed. R. Evid. 403.  In Liew v. Official Receiver and Liquidator, 685 F.2d 1192 (9th Cir. 1982), the Ninth Circuit held that trial courts have "very broad discretion in applying Rule 403 and absent excuse, the exercise of its discretion will not be disturbed on appeal."

Citing to Ballou v. Henri Studios, 656 F.2d 1147 (5th Cir. 1981), the Advisory Committee note to Rule 403 noted that "[u]nfair prejudice is that which could lead the jury to make an emotional or irrational decision, or to use the evidence in a manner not permitted by the rules of evidence . . . 'unfair prejudice as used in Rule 403 is not to be equated with testimony simply adverse to the

- 8 -

DEFENDANTS' MOTION IN LIMINE #3

opposing party. Virtually all evidence is prejudice or isn't material. Unfair prejudice within the context of Rule 403 means an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one.' " Fed. R. Evid. 403 Adv. Comm. Note, citing <u>Ballou</u>, 656 F.2d at 1147.

Here, as explained above, the jury would be unduly prejudiced if it is permitted to receive testimony from Mr. Bryce, a law enforcement specialist, regarding his opinions (i) that were not contained within his Rule 26(a)(2) report, (ii) that addressed whether the shooting was an unreasonable or excessive use of force; and (iii) that are speculative. Admitting this evidence or argument to a jury would create juror confusion, in that the jury may give more credence to Mr. Bryce's testimony than is lawfully warranted. In other words, based on Mr. Bryce's law enforcement background, the jury could realistically make an inference that the officer defendants acted unreasonably in this case without properly weighing the evidence.

For these additional reasons, Defendants seek an order precluding Mr. Bryce from offering any testimony that goes beyond his Rule 26 report, constitutes an impermissible legal conclusion, and constitutes improper speculative opinion.

## VI. CONCLUSION

For all the foregoing reasons, Defendants respectfully request that this Motion in Limine No. 3 be granted.

DATED: May 11, 2026                    CARPENTER, ROTHANS & DUMONT LLP

                                       */s/ Scott J. Carpenter*

By: _____
                                       STEVEN J. ROTHANS
                                       SCOTT J. CARPENTER
                                       Attorneys for Defendants, City of San Bernardino, a public entity, and Officers Jonathan Davalos and Andres Estrella, public employees

- 9 -
DEFENDANTS' MOTION IN LIMINE #3

## DECLARATION OF SCOTT J. CARPENTER

I, Scott J. Carpenter, declare that:

1.    I am an attorney, duly licensed to practice law before all of the courts in the State of California, and an attorney at the law firm of Carpenter, Rothans & Dumont, attorneys of record for defendants City of San Bernardino and Officer Davalos and Estrella in this matter.

2.    This declaration is made in support of the defendants Motion in Limine #3 - to limit testimony at trial of plaintiff's expert Richard Bryce - in the civil action entitled Renato Urena v. City of San Bernardino, et al., bearing case number 5:24-cv-00341-JGB-ACCV.

3.    On May 5, 2026, counsel for the parties met and conferred via Zoom, to discuss trial documents, including the parties' respective motions in limine. The parties discussed this motion but were not able to come to a resolution.

4.    Attached hereto as Exhibit "A" is a true and correct copy of the Rule 26 Report of Richard Bryce.

5.    Attached hereto as Exhibit "B" is a true and correct copy of the Declaration of Richard Bryce in Opposition to Defendants' Motion for Summary Judgment.

6.    Attached hereto as Exhibit "C" is a true and correct copy of the relevant portions of the deposition of Richard Bryce taken on April 23, 2026.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 11th day of May 2026, at Los Angeles, California.

/s/ Scott J. Carpenter

_____

Scott J. Carpenter – Declarant

- 10 -

# EXHIBIT "A"

Richard S. Bryce

Criminal Justice Consulting

Date: February 26, 2026

# Rule 26 Report
# Renato Urena v. City of San Bernardino
### Case No.: 5:24-cv-00341-JGB-SHK

The following report is respectfully submitted in compliance with Section (a)(2)(B) of Rule 26. If called upon to testify as a witness in the above-entitled matter, I would offer the following opinions based on the information that was available to me at the time the report was prepared:

**ORIGIN OF ACTIVITY:**

I was retained by the law offices of Dale K. Galipo on 24 July 2025, to review the documents, videos and photographs provided and render my opinions as to the appropriateness of the shooting and arrest of Renato Urena by officers of the San Bernardino Police Department.

**DATA AND INFORMATION RELIED UPON:**

1. DIMS Photos 2023-00015413 Tag 23-1150.
2. Scene Walkthrough Video.
3. Ring Video & Screenshots.
4. Andres Estrella Deposition.
5. Jonathan Davalos Deposition.
6. CAD report.
7. Investigative Reports. SB 1-110.
8. Audio Officer A. Estrella Interview.
9. Audio Officer J Davalos Interview.
10. Photos SB 00154-01056.
11. Estrella BWC Video.
12. Davalos BWC Video.
13. Multicam BWC Davalos and Estrella.
14. SB 00125-00153 Body Videos.

15. Officer Estrella interview.
16. Officer Davalos interview.
17. UOF Policy.
18. POST Learning Domain 20.
19. California Penal Code Section 835a.
20. Renato Urena Deposition.

**Case Overview:**

On 10 February 2023, Officers J. Davalos and A. Estrella pursued a vehicle being driven by Renato Urena. Mr. Urena fled from his vehicle and was pursued on foot and shot by the Officers.

**Opinions and Observations:**

1. **Officers Estrella and Davalos were not in compliance with POST Learning Domain 20, California Penal Code Section 835a(e)(1), and generally accepted police practices when they shot 36 times at Mr. Urena on February 10, 2023.**

   A reasonable police officer acting consistent with standard police practices would not have used lethal force in this situation. A similarly trained police officer would not have considered Mr. Urena to be a lethal threat in this set of facts. At the time that Officers Estrella and Davalos fired their 36 shots at Mr. Urena, Mr. Urena did not pose an immediate threat of death or serious bodily injury to the officers or to any person. Therefore, there was no reason to shoot, and all of the 36 shots fired by the Officers were inappropriate and contrary to basic police training, POST Learning Domain 20, and California Penal Code Section 835a.

   POST Learning Domain 20 quotes California Penal Code Section 835a: "A peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary … to defend against an imminent threat of death or serious bodily injury to the officer or to another person."[1]

   "Imminent" means a threat of death or serious injury in "imminent" when, based upon the totality of the circumstance, a reasonable officer in the same

   ---
   [1] POST Learning Domain 20.

2

situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed.[2]

Police officers are trained that deadly force can only be used on the basis of an "objectively reasonable" belief that the suspect poses an immediate threat of death or serious bodily injury. Police officers are also trained that subjective fear alone does not justify the use of deadly force.

In this case, Mr. Urena posed no immediate or imminent threat of death or serious bodily injury to any person at the time of any of Officers Estrella's and Davalos' shots, as follows:

1. <u>Mr. Urena was not in possession of a firearm or other weapon at the time officers Davalos and Estrella fired their 36 shots at Mr. Urena.</u>

Mr. Urena testified at his deposition that at the time of the shooting, he was not in possession of a firearm, and that he had discarded the firearm prior to the shots starting.[3] Mr. Urena testified, "When they are shooting me there is no gun nowhere. That gun's been gone. . . I have no gun. There's no reason. Why are they shooting me?" Mr. Urena also testified that prior to discarding the firearm, he never turned back towards the officers with the firearm and never pointed the firearm at the officers.[4] No firearm was found near Mr. Urena following the shooting. Photos taken at the scene show a firearm that was located on the opposite side of the fence and bushes some distance from where Officers Davalos and Estrella shot Mr. Urena. The firearm was holstered, completely covering the barrel, slide, and trigger of the weapon.[5]

Officer Estrella was able to see that Mr. Urena was not in possession of a firearm when Officer Estrella shot him. Officer Estrella was asked in his

---

[2] Penal Code Section 835a(e)(2).
[3] Renato Urena Deposition, pp. 54-55, 61062.
[4] Renato Urena Deposition, p. 57.
[5] Photos SB 00154-01056, 245-246; Estrella Deposition, p. 24.

3

interview with investigators, "Okay.  When you fired your weapon, was there any visual obstructions between you and your intended target?"  He responded, "No."  He was then asked, "And what was the distance between you and the suspect at the time you then fired?"  He responded, "Approximately 10 feet."  The investigator then asked him, "And do you remember there being anything between you and the suspect?"  He responded, "No."  Officer Estrella was then asked, "Okay.  And can you describe in as much detail as you can what you were looking at when you fired?"  He responded, "I was looking at the suspects hands."[6]

2.  <u>A gun in the hand is not enough to justify using deadly force</u>.

Officer Estrella's and Officer Davalos's BWC videos do not show Mr. Urena pointing a firearm towards either officer or any other person at any time. Even if the Officers believed that Mr. Urena had a firearm at the time of the shooting (which Mr. Urena did not), police officers are trained that seeing a gun in the person's hand is not enough to justify the use of deadly force. According to my review of Mr. Urena's deposition, the scene photographs, and the BWC videos, Mr. Urena did not point the firearm at either Officer at any time, and he was unarmed at the time of the shooting.

3.  <u>Mr. Urena was on the ground when Officers Davalos and Estrella fired upon him</u>.

BWC videos from both Officers Estrella and Davalos show that both Officers fired shots at Mr. Urena when Mr. Urena was on the ground.[7] Mr. Urena testified at his deposition that he was struck by shots while he was on the ground.[8] From my review of the evidence, it does not appear that Mr. Urena was ever facing the officers in an upright position during any of the shots.

---

[6] Estrella Interview, p. 35, lines 22-25, p. 36, lines 1-6, 18-22.

[7] *Id.* p. 32, lines 9-12

[8] Renato Urena Deposition, p. 60.

4. <u>Officers are trained to re-assess while shooting and trained that officers are responsible for justifying every shot fired</u>.

Police officers are trained that they must re-assess when they are firing shots. Officers are also trained that they are responsible for justifying every shot they fire. Here, each officer fired 18 gunshots at Mr. Urena[9], and each of the 36 total shots were unjustified. Officer Estrella was asked in his deposition, "Did you ever see a gun pointed at you after he went to the ground?" He responded, "No."[10] He was also asked, "And when you paused to re-assess, you were aware at least at that point that Mr. Urena was on the ground?" He responded, "Yes, sir." In this case, a reasonably well-trained officer would have reassessed multiple times during the shooting sequence and would have recognized that Mr. Urena was unarmed prior to any shots being fired, and, with respect to at least some of the shots, was on the ground and had been struck by shots. Despite this, the Officers continued to shoot at Mr. Urena while he was unarmed and on the ground.

5. <u>The Officers were not responding to a serious or violent crime</u>.

At the time of the shooting, the Officers had no information that Mr. Urena had injured anyone or committed any violent crime, and no information that Mr. Urena was threatening people.[11] Additionally, there were no civilians in the immediate vicinity.[12]

6. <u>Mr. Urena made no verbal threats</u>.

Mr. Urena made no verbal threats to harm the Officers or any other person.[13]

7. <u>The Officers had other reasonable alternative measures available</u>.

Police Officers are trained that deadly force should only be used when no reasonable alternative measures are available. The Officers failed to consider reasonable alternative measures to shooting. Less-lethal options were available, including taking cover and waiting for backup. Here, where the

---

[9] Estrella Interview, p. 10; Davalos Interview, p. 10.

[10] Estrella Deposition p. 62, lines 11-13.

[11] Estrella Deposition at p. 63; Davalos Deposition at p. 38; Estrella Interview at p. 24, lines 1-14.

[12] BWC videos; Estrella Interview at p. 28, lines 20-25.

[13] BWC videos.

Officers had initial information that Mr. Urena possibly had a gun, then they should have taken cover and requested backup officers and an air unit to assist. The Officers should have set up a perimeter and containment, which could have been done with the assistance of backup officers. Rather than taking cover and calling for backup, the Officers pursued Mr. Urena on foot. The Officers also had less lethal tools available, including a police baton and pepper spray.

    8.  <u>An overreaction in using deadly force is excessive force</u>.

Basic police training teaches that an overreaction in using deadly force is excessive force. Here, the Officers overreacted when they fired 36 shots at Mr. Urena when Mr. Urena was unarmed, including shots fired while Mr. Urena was on the ground. The Officers also may have engaged in "reactionary shooting" or "contagious fire."

**2.    The Officers cannot justify shooting at Mr. Urena for fleeing or running away.**

Under the facts of this case and pursuant to police standards and training, it would have been inappropriate for the Officers to shoot at Mr. Urena for fleeing or attempting to flee.  Police officers are trained that they can only shoot a fleeing felon where all of the following factors are present: (1) the person threatens the officer with a weapon or the officer has information that the person has committed a felony involving the infliction of serious bodily harm or death, (2) the officer has probable cause to believe that that the person will cause death or serious bodily injury to another person unless immediately apprehended, (3) the officer has probable cause to believe that the use of deadly force is reasonably necessary, and (4) the officer gives some warning that deadly force may be used, where feasible.[14]

These four factors were not met in this case.  Mr. Urena did not inflict or threaten to inflict death or serious bodily injury against anyone at any point relative to this incident, Mr. Urena did not have a firearm at the time of the shooting, and Mr. Urena posed no immediate threat of death or serious bodily injury necessitating deadly force. To justify the use of deadly force, "a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death

---

[14] POST LD 20.

6

or serious bodily injury to the peace officer or another person."[15] None of those factors were present here, where Mr. Urena was unarmed during all of the shots and on the ground at the time of at least some of the shots.

Further, both Officers admitted in their depositions that based on their police training, it would be inappropriate to shoot Mr. Urena for running away with a gun.[16]

**3.    Officers Estrella and Davalos engaged in negligent pre-shooting tactics.**

Officers Estrella and Davalos engaged in negligent pre-shooting tactics, as follows:

1.  <u>The Officers failed to give Mr. Urena sufficient commands and time to comply with commands</u>.

Police officers are trained to give sufficient commands and time to comply with those commands. Other than "let me see your hands," Officer Estrella did not give Mr. Urena any commands before he got to the brush area.[17] Neither officer gave Mr. Urena a command to "drop it at any point."[18] Officer Estrella did not give Mr. Urena a verbal warning before shooting.[19] Officer Davalos did not yell out "gun" when he initially saw the firearm, halfway through the foot pursuit.[20]

2.  <u>The Officers failed to utilize time, cover, and distance</u>.

If Mr. Urena had a firearm in his position when the Officers began shooting him, which evidence shows he did not, then the Officers failed to position themselves a safe distance from Mr. Urena. The Officers had time, distance, and cover available to them. The Officers were not responding to a crime in progress, and there was no rush. The Officers could have taken cover and continued to give Mr. Urena commands and time to comply with the

---

[15] Cal. Penal Code 835a(e)(2).

[16] Davalos Deposition, pp. 39, 49; Estrella Deposition, p. 63, lines 2-7.

[17] Estrella Deposition, p. 23, lines 13-16.

[18] Davalos Deposition, p. 48, p. 94, lines 6-19; Estrella Deposition, p. 37, p. 52, lines 11-16.

[19] Estrella Deposition, p. 37, lines 1-5.

[20] Davalos Deposition, p. 48.

commands. The Officers made a poor tactical decision when they pursued Mr. Urena on foot when they had information that he may possibly be armed.

3. The Officers failed to set up a perimeter and containment.

A reasonably well trained officer under this set of facts would have called for backup and worked with backup officers to set up a perimeter and containment rather than shooting.

**QUALIFICATIONS:**

I am qualified and competent to render my opinions in the case before this Court due to my education, experience, training and professional activities in criminal justice.

I am currently self-employed as a criminal justice consultant and enter private engagements with criminal justice agencies to perform a wide range of services, including audits and inspections, review of policy and procedure, administrative investigations, audits of practices and processes, development and delivery of training courses, original research, surveys, draft policies and procedures, staff development, meeting and conference facilitation, and expert testimony in court and before governing bodies.

I have over 33 years of continuous and escalating experience in law enforcement. My initial experience was as a patrol deputy with the Ventura County Sheriff's Department assigned to the contract city of Camarillo. I performed routine patrol, traffic investigation and criminal investigation. I was later assigned to a special enforcement patrol unit in the unincorporated area of Ventura County. I performed surveillance of known criminals, gang activity, and special events along with assisting routine patrol deputies with their responsibilities.

In October of 1968, I was promoted to Senior Deputy and assigned as a training officer at the Ventura County Sheriff's Academy.

From April 1972, until December 1976, I was assigned to the Criminal Investigation Division. During that period of time I worked burglary investigation, undercover fencing and property crime investigation, undercover vice investigation, undercover narcotics investigation and undercover criminal intelligence investigation.

8

In December of 1976, I was promoted to sergeant and assigned to the Custody Division. I began my custody experience as a shift sergeant assigned to the Branch Jail Honor Farm and was later assigned as the administrative sergeant of that facility. I was responsible for budget, scheduling of personnel and development of operational policy.

In May of 1978, I was transferred to the Court Services Division. I was the supervisor of all bailiff's and court security deputies servicing the Ventura County Superior Court.

In January of 1979, I was promoted to Lieutenant and assigned to the Custody Division as the Facility Manager of the Oxnard Branch Jail. I also had collateral management responsibilities for the Sheriff's Inmate Transportation Unit and the Court Holding Facilities.

In November of 1979, I was transferred to the Support Services Division as the Court Services Bureau Commander. I was responsible for the management of all court services and civil process service. I was also given the responsibility of justification, preparation, presentation and implementation of a merger of the Ventura County Marshall's Department into the Sheriff's Court Services Division.

In December of 1980, I was transferred to the Special Services Division as the Special Investigations Bureau Commander. I was responsible for the management and operation of the Sheriff's Narcotics, Vice, and Criminal Intelligence Units.

In October of 1982, I was promoted to Commander and assigned as the Commander of the Special Services Division. I was responsible for the overall operation and administration of the Special Services Division, which included; major criminal investigation, narcotics investigation, vice and intelligence investigation, criminalistics laboratory, Sheriff's Air Unit and other special investigation functions.

In February of 1983, I was assigned as the Commander of the Custody Division. My responsibilities in that assignment included the operation and administration of 5 custodial facilities, 339 employees and the supervision of over 1500 inmates.

In March of 1986, I was appointed Assistant Sheriff. I was responsible for the administration and direction of 4 of the 8 major divisions within the Sheriff's Department. My primary responsibilities included; providing administrative direction to the Custody Division and its 5 facilities, giving administrative

9

oversight to the Project Development Division with the design, development and construction of a new 2000 bed jail, providing administrative control over the entire Department's operational budget, giving primary approval for most disciplinary actions within the Department, presenting budget requests and other Department related matter to the Board of Supervisors, and representing the Sheriff in public forums.

In June of 1993, I was appointed Undersheriff and served in that position until my retirement in August of 1999.  As Undersheriff, I was responsible for the administration of the entire Sheriff's Department under the direction of the Sheriff.  At the time of my appointment the Sheriff's Department was reorganized into 4 major divisions each headed by a Chief Deputy.  Each Chief Deputy reported directly to me.  The 4 divisions of the Sheriff's Department were comprised of the Detention Services Division, East Valley Police Services Division, West County Police Services Division, and Support Services Division.  The police services divisions included police service for the 5 contract cities of Thousand Oaks, Camarillo, Moorpark, Ojai and Fillmore.  The Sheriff's Department employed 1355 individuals with an operational budget in excess of $140,000,000.00.

FORMAL EDUCATION:

1985        Master of Public Administration
            University of La Verne

1982        Bachelor of Science: Criminal Justice
            University of La Verne

PROFESSIONAL CERTIFICATES:

P.O.S.T.  Management Certificate

P.O.S.T.  Supervisory Certificate

P.O.S.T.  Advanced Certificate

P.O.S.T.  Intermediate Certificate

P.O.S.T.  Basic Certificate

California Community College Teaching Credential (life)

10

PROFESSIONAL MEMBERSHIPS Past and Present:

American Correctional Association

American Jail Association

California State Sheriff's Association

California Peace Officer's Association

California Narcotic Officer's Association

National Sheriff's Association

Southern California Jail Manager's Association

Ventura County Deputy Sheriff's Association

**PREVIOUS CASES:**

Mesa Arizona
Spencer v. City of Mesa – Feb 25 P

Santa Clara County, California
Leal v. Officer Siegal et al. – Sep 06 D
Garcia et al. v. County of Santa Clara – Dec 06 D
Richard Carrasco v. County of Santa Clara – Jan 07 D
Marino v. County of Santa Clara – Mar 07 D

Fresno, California
Eliseo Renteria v. Tulare County – Sep 03 P
Cindy Staunton v. City of Clovis – Jun 01 P
Brock v. County of Fresno – Jul 21 P
Flores v. County of Fresno – Jan 22 P

City of Houston, Texas
Claudia Navarro Pineda, et al. v. City of Houston – Dec 00 D

Riverside County, California
Zaragoza v. Riverside County – Mar 22 P

11

City of Bakersfield, California
>    Perry v. City of Bakersfield – Sep 20 P

Pasadena, Texas
>    Moises Delao v. The City of Pasadena, Texas – Dec 96 D

Calaveras County, California
>    Payne v. Calaveras County – Jan 20 P

Palm Springs, California
>    Sandra Lee Denham v. City of Palm Springs – Nov 99 P

San Joaquin County, California
>    Friends v. San Joaquin County – Mar 19 P

Harris County, Texas
>    Alberti, v. Harris County – Apr 92 D
>    Laura Sherrard v. Harris County – Nov 93 D
>    Robert Earl McMullen III v. Harris County – Sep 94 D
>    Jason Aguillard v. Joseph McGowen – Feb 96 D
>    Alphonso Robinson v. Constable A. B. Chambers – May 98 D
>    Brad Allen Mathes v. Harris County – Jun 99 D

Liberty County, Texas
>    Womack v. Liberty County – Nov 93 D

Orleans Parish, Louisiana
>    Hamilton v. Morial – Jun 93 D

Warren, Michigan
>    Sondey v. Woloweic et al – Feb 16 P

Yuba County, California
>    Court Appointed Monitor -- Present

Cass County, Michigan
>    Nash v. Sheriff Underwood, Jr., et al. – Feb 16 P

Bexar County, Texas, Texas Attorney General

12

DeVonish v. Lopez – Oct 93 D

Mendocino County, California
Neuroth, et al. v. Mendocino County, et al. – Oct 17 D

San Bernardino County, California
Mendoza v. San Bernardino County – Feb 21 P
Person-Lynn v. San Bernardino County – Apr 22 P
Renato Urena v. City of San Bernardino – Jul 25 P

Kern County, California
McClure v. PTS – Dec 19 D

Monterey County, California
Thomas Dewey v. Monterey County, et al. – June 15 D
Claypole v. County of Monterey, et al. – Sep 15 D
Villerreal v. County of Monterey – May 17 D
Hernandez v. County of Monterey Court appointed monitor Present

Chino, California
Brown v. City of Chino – July 21 P

San Mateo County, California
Doe v. San Mateo County, et al. – Sep 17 P

Mesa Arizona
Spencer v. City of Mesa – Mar 25 P

Los Angeles County, California
Dion Starr v. County of Los Angeles et al. --  09 D
William Russell v. County of Los Angeles et al. – Jul 09 D
Justin Henderson, et al. v. County of Los Angeles – Sep 10 D
Ronald Johnson v. County of Los Angeles – Nov 10 D
Kevin King v. County of Los Angeles – May 11 D
Mariano Duvall v. Richard Torres et al. – Aug 12 D
XYZ Distributors Inc. v. County of Los Angeles – Oct 12 D
Christopher Brown v. County of Los Angeles – Jan 13 D
Timothy Smith v. County of Los Angeles – May 13 D
Mancilla v. County of Los Angeles – May 13 D
Tyler Willis v. County of Los Angeles – Jun 13 D

13

Frank Martinez v. County of Los Angeles – Jan 15 D
Jaime A. Moreno v. County of Los Angeles – Aug 15 D
Cory Crittenden v. County of Los Angeles – Aug 25 P

City of Santa Monica, California
Gonzales v. City of Santa Monica – Sep 21P

City of Huntington Beach, California
Shay v. City of Huntington Beach – 18 P

City of Long Beach, California
Pream v. City of Long Beach – May 18 P
Eugene Martindale v. City of Long Beach – June 2022 P

City of Los Angeles, California
Kathleen Washington v. City of Los Angeles – Apr 12 D
Murillo v. City of Los Angeles – Jul 22 P
Peralta v. City of Los Angeles – Mar 25 P
Ashley v. City of Los Angeles – Sep 25 P

United States Department of Justice
Doe v. Johnson – Jan 16 D
Lion v. ICE – Feb 16 D

**FEE SCHEDULE:**

Initial Case Review $2000.00

This is a one-time fee for an initial review and assessment of the case and includes a preliminary written or oral report to client.

Consultation on Management and Operations ($250.00 per hour)

This hourly fee includes all labor associated with the study of jail or law enforcement management and operations, including preparation of reports and travel to and from site.

Case Review and Preparation ($250.00 per hour)

14

This hourly fee includes review of documents, interviews, site inspection, preparation of expert report and affidavit; and any other associated labor performed as directed.

Travel - $100.00 per/hr.

Formal Presentations ($2500.00per day or $1500.00 per half day)

This fee applies to Court appearances, depositions and hearings.

Expenses (actual)

Travel related expenses, including transportation, on site lodging and meals; will be billed at actual cost.  Other expenses associated with the provision of consultation or expert testimony may include postage, vehicle rental, parking, ground and air transportation, telephone and photography, all of which will be billed at actual cost.

Respectfully submitted,

/s/ Richard Bryce

Richard S. Bryce

# EXHIBIT "B"

LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq. (SBN 144074)
dalekgalipo@yahoo.com
Renee V. Masongsong, Esq. (SBN 281819)
rvalentine@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Tel:   (818) 347-3333
Fax:   (818) 347-4118

*Attorneys for Plaintiff*, RENATO URENA

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENATO URENA, individually,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF SAN BERNARDINO; JONATHAN DAVALOS; ANDRES ESTRELLA,<br><br>Defendants. | Case No. 5:24-cv-00341-JGB-SHK<br><br>*Assigned to*:<br>Hon. District Judge Jesus G. Bernal<br>Hon. Mag. Judge Shashi H. Kewalramani<br><br>**DECLARATION OF PLAINTIFF'S POLICE PRACTICES EXPERT RICHARD BRYCE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[*Filed concurrently with Plaintiff's Memorandum of Points and Authorities; Declaration of Renee V. Masongsong and Exhibits thereto; Plaintiff's Responsive Separate Statement*] |

-1-

DECLARATION OF RICHARD BRYCE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## <u>DECLARATION OF RICHARD BRYCE</u>

I, Richard Bryce, declare as follows:

1.      I am a police practices expert specializing in the procedures of police practices and proper police tactics, including the type and degree of force, if any, appropriate under different circumstances. I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so. My opinions are based in part on my training, professional experience and education. My qualifications to review this case are set forth in detail in my curriculum vitae, which is attached hereto as "Exhibit 1."

2.      Before reaching my opinions in this case, I reviewed the pertinent case materials, including but not limited to the following: (1) Investigation Reports; (2) Deposition of Defendant Andres Estrella; (3) Deposition of Defendant Jonathan Davalos; (4) Deposition of Plaintiff Renato Urena; (5) Deposition of defense expert Brady Held; (6) Interview of Andres Estrella; (7) Interview of Jonathan Davalos; (8) Estrella BWC Video and frame-by-frame of video; (9) Davalos BWC Video and frame-by-frame of video; (10) Brady Held Rule 26 Report; (11) photographs of the scene and the evidence; (12) scene walkthrough video; (13) Ring video and screenshots.

3.      Basic police training and Peace Officer Standards and Training ("POST") provides the following standards with respect to the use of deadly force.

a. A peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary to defend against an imminent threat of death or serious bodily injury to the officer or to another person. *See California Penal Code Section 835a.*

b. The training and standards with respect to the use if deadly force is that a threat of death or serious injury is imminent when, based upon the

-2-
DECLARATION OF RICHARD BRYCE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that from appearances, must be instantly confronted and addressed. *California Penal Code Section 835a(e)(2).*

    c.  Deadly force can only be used on the basis of an "objectively reasonable" belief that the suspect poses an immediate threat of death or serious bodily injury. Subjective fear alone does not justify the use of deadly force.

    d.  Basic police training teaches that that a suspect's failure to comply with officer commands or running away is an insufficient basis for the use of deadly force.

    e.  Police officers are trained that the decision to use deadly force must be guided by the reverence for human life.

    f.  Pursuant to basic police training and standards, police officers are responsible for justifying every shot they fire.

    g.  Basic police training teaches that an overreaction in using deadly force is excessive force.

    h.  Police officers are trained that deadly force should only be used when no reasonable alternative measures are available.

    i.  Police officers are trained to give a verbal warning before using deadly force, where feasible.

4.    Under the facts of this case and pursuant to police standards and training, it would have been inappropriate for the Officers to shoot at Mr. Urena for

-3-

DECLARATION OF RICHARD BRYCE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

fleeing or for running away, even with a gun in his hand. Both Officers Davalos and Estrella admitted at their depositions that based on their police training, it would be inappropriate to shoot Mr. Urena for running away with a gun.

5.      A reasonable police officer acting consistent with standard police practices and training would not have used lethal force in this situation and would not have considered Mr. Urena to be an immediate lethal threat in this set of facts. At the time that Officers Estrella and Davalos fired their shots at Mr. Urena, Mr. Urena did not pose an immediate threat of death or serious bodily injury to the officers or to any person. Therefore, all of the shots fired by the Officers were inappropriate and contrary to basic police training, POST Learning Domain 20, and California Penal Code Section 835a, particularly because Mr. Urena was unarmed and on the ground for at least 34 of the 36 shots.

6.      Police officers are trained that seeing a gun in a suspect's hand is not a sufficient justification to use deadly force against that suspect. Based on my review of the BWC videos, Mr. Urena's deposition testimony, and Defendants' expert Brady Held's deposition testimony and Rule 26 report, Mr. Urena never pointed the gun at the officers and never turned toward the Officers with the gun in his hand coming in the direction of the Officers.

7.      According to Mr. Urena's deposition testimony, Mr. Urena discarded the gun before any shots were fired. It would be inappropriate for the Officers to shoot Mr. Urena for tossing the gun. According to Defendants' expert Brady Held, the gun is not visible in Officer Estrella's BWC video, the gun is visible in Officer Davalos' BWC video for only approximately 1/6 of one second, the first shot was fired approximately 1/15 of one second before Mr. Urena began to throw the gun over the fence, and the second shot was fired when the gun was leaving Mr. Urena's hand or in the air. Therefore, Mr. Urena was either unarmed at the time of all of the shots, or, alternatively, Mr. Urena was unarmed during 34 or 35 of the 36 shots.

-4-

DECLARATION OF RICHARD BRYCE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

8.      Based on my review of the BWC videos, Mr. Urena was down on the ground during all 36 of the shots.  Mr. Urena could not have been pointing the gun at the officers while he was on the ground, given that he tossed the gun and the Officers admitted that they did not see anything in Mr. Urena's hands after he went to the ground.

9.      It was inappropriate for the Officers to believe that Mr. Urena went to the ground to gain a position of advantage. A reasonable interpretation of Mr. Urena going to the ground is that he went to the ground to surrender, particularly when viewed in conjunction with the fact that Mr. Urena tossed the gun over the fence. It was also inappropriate for the Officers to believe that Mr. Urena was in a shooting position when he was down on the ground.

10.     The Officers' inconsistent statements regarding whether they actually observed a gun in Mr. Urena's hand when he was on the ground during the shooting places the Officers' credibility at issue, which must be determined by the Court or a jury. Officer Davalos stated in his initial interview: "He laid down himself on the ground . . . I saw him still with the gun and as I approached him, I saw him turn towards me, like looking at me with the gun in his right hand, at which point I opened fire." (Davalos Interview at 18:10-23). However, at his deposition, Officer Davalos admitted that he did not actually see a gun in Mr. Urena's hands when Mr. Urena was on the ground, and the video shows that Mr. Urena tossed the gun over the fence at the time of the first shot, assuming defense expert Mr. Held's analysis is correct.

11.     Police officers are trained to focus on the suspect's hands, particularly if the officer believes that the suspect is armed. Police officers are also trained with respect to situational awareness. Based on police training on situational awareness, a reasonable police officer in the position of Officers Davalos and Estrella would have seen Mr. Urena toss the gun, when they had an unobstructed view a short distance

-5-

DECLARATION OF RICHARD BRYCE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

behind Mr. Urena. Additionally, police officers are trained that when a subject is running with a gun, the subject might try to toss the gun so that they do not get caught with a gun.

12.    Police officers are trained that they must re-assess when they are firing shots, and trained that they are responsible for justifying every shot they fire. Here, Officer Davalos and Officer Estrella fired 18 shots each. A reasonably well-trained police officer in the position of Officer Davalos and Officer Estrella would have reassessed multiple times during the shooting sequence and would have recognized that Mr. Urena was unarmed during at least 34 or 35 of the shots. Officer Estrella testified in his deposition that he never saw a gun pointed at him after Mr. Urena went to the ground and testified that when he paused to reassess during the shooting sequence, he was aware that Mr. Urena was on the ground.

13.    After the shooting, the gun was located some distance from Mr. Urena, on the other side of the fence, in a holster. The fact that the gun was in a holster indicates that even when Mr. Urena did have the gun in his hand, he would not have been able to fire any shots from the gun.

14.    The Officers failed to consider reasonable alternative measures to shooting. Less-lethal options were available, including taking cover and waiting for backup. Police officers are trained to take cover, create distance, and call for backup if they see a gun in a suspect's hand. A reasonable police officer in the position of Davalos and Estrella would not have pursued Mr. Urena on foot without cover if they thought he had a gun. Rather than pursuing Mr. Urena on foot, the Officers should have set up a perimeter and containment, which could have been done with the assistance of backup officers.

15.    Basic police training teaches that an overreaction in using deadly force is excessive force. Here, the Officers overreacted when they fired 36 shots at Mr. Urena, including at least 34 to 35 shots fired when Mr. Urena was unarmed and 36

-6-

DECLARATION OF RICHARD BRYCE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

shots fired while Mr. Urena was on the ground. The Officers also may have engaged in "reactionary shooting" or "contagious fire," given number of shots that were fired (36), and particularly given the number of shots that were fired when Mr. Urena was unarmed and on the ground.

16.    Officers Estrella and Davalos engaged in substandard pre-shooting tactics. This includes that the Officers made poor tactical decisions when they pursued Mr. Urena on foot without cover when they had information that he may be armed. The Officers also failed to give Mr. Urena sufficient commands and time to comply with those commands. Other than "let me see your hands," Officer Estrella did not give Mr. Urena any commands before Mr. Urena got to the brush area. Neither officer gave Mr. Urena a command to "drop it at any point." Officer Estrella did not give Mr. Urena a verbal warning before shooting. Officer Davalos did not yell out "gun" when he claims initially saw the gun, halfway through the foot pursuit, even though police officers are trained to yell out "gun" when they see a gun. Additionally, the Officers failed to utilize time, cover, and distance, which they had available to them. The Officers also failed to properly assess during the shooting sequence.

17.    From the standpoint of police practices, including basic police training, POST standards, both Officer Estrella's and Officer Davalos' uses of deadly force were improper, inappropriate, and contrary to POST standards and basic police training, including for the following reasons:

a. No "Immediate Defense of Life" situation.  Police officers are trained that they can only use deadly force in an Immediate Defense of Life Situation, in other words, when they have an objectively reasonable belief that the suspect poses an immediate or imminent threat of death or serious bodily injury. A fear of future harm is not enough. There was no immediate defense of life situation when Officers Estrella and

-7-

Davalos fired their shots at Mr. Urena when he was unarmed and on the ground.

b. <u>Subjective fear is insufficient to justify a use of deadly force</u>.  Basic police training requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger."

c. <u>Unarmed during at least the majority of the shots</u>.  According to Mr. Urena, he discarded the firearm prior to any shots being fired. According to Defendants' expert Mr. Held, Mr. Urena was unarmed during 34 or 35 of the 36 shots.

d. <u>Shots fired when Mr. Urena was on the ground</u>. Based on my review of the BWC videos, Mr. Urena was on the ground during all of the shots. At no point was Mr. Urena ever standing upright and facing the Officers with the gun in his hand.

e. <u>Gun in hand not enough</u>. Basic police training teaches that police officers cannot shoot a subject merely for seeing a gun in the subject's hand—there must be additional factors to justify the use of deadly force. Here, according to the BWC videos and Mr. Urena, Mr. Urena never pointed the gun at either Officer and never turned toward either Officer with the gun. Even if Mr. Urena did have the gun in his hand during one or two of the shots, the gun was in a holster, such that Mr. Urena would not have immediately been able to fire it.

f. <u>Cannot shoot for fleeing</u>. Based on basic police training, Officers could not justify shooting Mr. Urena for fleeing or for running away with the gun in his hand. The Officers admitted that at their depositions that they had no information that Mr. Urena committed an act involving the infliction of serious injury or death.

-8-
DECLARATION OF RICHARD BRYCE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

g. <u>No crime involving the infliction of serious injury or death.</u>  The Officers were not responding to a crime involving the infliction of death or serious bodily injury.

h. <u>No verbal threats</u>.  Mr. Urena never verbally threatened to harm any of the officers.

i. <u>Reasonable alternative measures available</u>.  Officers are trained that they can only use deadly force in a "last resort" situation when there are no other reasonable options.  The Officers had other reasonable measures available, including taking cover, waiting for backup, giving further commands and time to comply with commands, employing time and distance, and setting up a perimeter for later apprehension.

j. <u>No reverence for human life</u>.  Police officers are trained that they must show a reverence for human life. When the Officers fired a total of 36 shots at Mr. Urena, including shots fired when Mr. Urena was unarmed and shots fired when he was on the ground, they showed no reverence for human life.

k. <u>Police officers are responsible for justifying every shot</u>.  Police officers are trained that they must justify every shot they fire. None of the shots are justified, and certainly not the 34 or 35 shots fired while Urena was unarmed and on the ground.

l. <u>Contagious fire</u>. Given the number of shots that were fired (36), and given the number of shots that were fired when Mr. Urena was unarmed and on the ground, this appears to be a case of contagious fire or reactionary shooting.

-9-

DECLARATION OF RICHARD BRYCE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I declare under penalty of perjury that the foregoing is true and correct, and that this was executed this 23rd day of March 2026 at Mapleton, Utah.

_____

Richard Bryce

-10-

# EXHIBIT "C"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

RENATO URENA, individually, )
                            )
              Plaintiff,    )
                            )
     vs.                    ) Case No.
                            ) 5:24-cv-00341-JGB-SHK
                            )
CITY OF SAN BERNARDINO,      )
JONATHAN DAVALOS, ANDRES     )
ESTRELLA, and DOES 1-10,     )
inclusive,                   )
                            )
              Defendants.   )
_____)

DEPOSITION OF EXPERT WITNESS

RICHARD SCOTT BRYCE

Thursday, April 23, 2026

Reported by:
Annette Shaver
CSR No. 6169

Page 1

RICHARD SCOTT BRYCE - April 23, 2026

Deposition of EXPERT WITNESS, RICHARD SCOTT BRYCE, taken remotely via Zoom Meetings, on behalf of Defendants, beginning at 10:01 a.m., on Thursday, April 23, 2026, before Annette Shaver, CSR No. 6169.

APPEARANCES:

For Plaintiff:

LAW OFFICES OF DALE K GALIPO
BY:  RENEE V. MASONGSONG, ESQ.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
(310) 698-0990
rvalentine@galipolaw.com

and

LAW OFFICE OF JAMES TERRELL
BY:  JAMES S. TERRELL, ESQ.
15411 Anacapa Road
Victorville, California 92392
(760) 951-5850
jim@talktoterrell.com

and

LAW OFFICE OF SHARON J. BRUNNER
BY:  SHARON J. BRUNNER, ESQ.
14393 Park Avenue, Suite 100
Victorville, California 92392
(760) 243-9997   (Not present)
sharonjbrunner@yahoo.com

For Defendants:

CARPENTER, ROTHANS & DUMONT, LLP
BY:  SCOTT J. CARPENTER, ESQ.
500 South Grand Avenue, 19the Floor
Los Angeles, California 90071
(213) 228-0400
scarpenter@crdlaw.com

Page 2

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| RICHARD BRYCE | BY MR. CARPENTER | 4 |

EXHIBITS

(None offered)

Page 3

THURSDAY, APRIL 23, 2026
10:01 A.M.
-- o0o --

RICHARD SCOTT BRYCE, called as a witness, having been first duly sworn in remotely, was examined and testified remotely via Zoom Meetings as follows:

EXAMINATION

BY MR. CARPENTER:

Q.  Good morning, sir.  Could you please state and spell your full name for the record.

A.  Richard Scott Bryce, R-i-c-h-a-r-d, S-c-o-t-t, B-r-y-c-e.

Q.  Thank you.  My name is Scott Carpenter, I represent the City of San Bernardino and Officers Davalos and Estrella in this matter, sir.  I assume you've had your deposition taken in civil matters before?

A.  Yes.

Q.  A number of times?

A.  Yes.

Q.  And you've testified in court as an expert witness in civil matters on a number of times?

Page 4

A.  Yes.

Q.  About how many times have you testified in court on civil matters as an expert witness?

A.  I don't know, I would have to look through all the cases, somewhere between 30 and 40, I would estimate.

Q.  So fair to say we can dispense with the usual deposition admonitions?

A.  Yes.

Q.  Okay.

MS. MASONGSONG:  I am sorry to interrupt, I just wanted to state for our court reporter, my name is Renee Masongsong, I am an attorney to the plaintiff, and I apologize that I was just joining a couple minutes late, and good morning to everyone, Mr Carpenter, Mr. Bryce.

(Discussion held off the record.)

MS. MASONGSONG:  Law offices of Dale K. Galipo.

BY MR. CARPENTER:

Q.  Okay.  So sir, I just want to, before we start diving into this case, ask you some questions about your background.  Just looking at your qualifications, it looks like you spent your law enforcement career with Ventura County Sheriff's Department, is that correct?

Page 5

RICHARD SCOTT BRYCE - April 23, 2026

wasn't that long ago, but let's see, it is saying this was the 23rd of March, so it would have been somewhere after the 1st of March.

Q. Obviously after you had drafted your Rule 26 Report?

A. Yes.

Q. And when you were asked to prepare this Declaration, what was discussed about your assignment?

A. To cover the pertinent issues that they needed to be addressed.

Q. Were you provided any materials in connection with the request to prepare this Declaration?

A. Yes, I'm sure I was.

Q. Do you recall what those materials were?

A. Again, the pertinent areas that needed to be addressed.

Q. Do you recall specifically receiving any documents or materials in connection with preparing this Declaration?

A. Specific documents I don't recall.

Q. Do you recall being provided with Defendant's Motion for Summary Judgment in connection with preparing this Declaration?

Page 66

A. Yes, I believe I was.

Q. Were you provided with the exhibits attached thereto such as deposition transcripts, Declarations?

A. I'm sorry, what was that?

Q. Did you receive any of the exhibits attached to Defendant's Motion such as deposition transcripts or officer Declarations?

A. Well, I have had the -- yes, I've got some of those, yes.

Q. And did you review all of those materials?

A. I reviewed all of the material that was provided to me, yes.

Q. Just looking at some of the statements made in your Declaration, I am going to turn to page 5, paragraph 9 of your Declaration, it says "It was inappropriate for the officers to believe that Mr. Urena went to the ground to gain a position of vantage," do you see that, sir?

A. Yes.

Q. Is that opinion anywhere in your Rule 26 Report?

A. I don't recall that being in there specifically.

Q. And it goes on the next sentence, "A

Page 67

reasonable interpretation of Mr. Urena going to the ground is that he went to the ground to surrender particularly when viewed in conjunction with the fact that Mr. Urena tossed the gun over the fence," do you see that?

A. Yes.

Q. Is that opinion in your report?

A. Well, part of it is, yes, that he tossed the gun.

Q. Is the part about the reasonable interpretation of Mr. Urena going to the ground is that he surrendered or went to the ground to surrender, is that part in your Rule 26 Report?

A. I don't believe that's listed in there.

Q. In terms of that opinion, what facts support the interpretation that Mr. Urena went to the ground to surrender?

A. Well, he tossed the firearm, he was unarmed, and he was being chased by the officers; so it's reasonable to assume that he fell down or dove down onto the ground to avoid being shot or harmed by the officers, that he was essentially giving up.

Q. So that opinion that he went to the ground to surrender is in part based off of Mr. Urena

Page 68

tossing the gun prior to going to the ground?

A. Yes, and I believe he made a comment of something to that effect.

Q. You would agree that Mr. Urena never said anything indicating that he was surrendering before the shooting?

A. Not surrendering, no.

Q. You would agree that he did not put up both of his hands and surrender before the shooting?

A. No.

Q. And then aside from the account that Mr. Urena threw the gun prior to going to the ground, wouldn't you agree there was no other indication given to the officers that he was going to surrender?

A. Other than that?

Q. Yes, other than that.

A. No.

Q. Going down, still on page 5, to paragraph 11.

A. Okay.

Q. The second sentence says "Police officers are also trained with respect to situational awareness," do you see that, sir?

Page 69

RICHARD SCOTT BRYCE - April 23, 2026

A. Yes.

Q. Is this discussion of situational awareness anywhere in your Rule 26 Report?

A. I don't recall stating that, no.

Q. And what is the situational awareness training that officers receive that you are referring to here in paragraph 11?

A. To assess what's going on and the potential risk involved, and how best to handle it.

Q. Is there any specific training in the area of situational awareness?

A. Oh, yes, officers are put through extensive training on how to deal with situations and act out situations so they will know best how to handle them.

Q. And when you use the word or the term "situational awareness," based off of your training and experience, what does that entail?

A. Assessing the situation of the surroundings, what's happening, what's available to them, what's the best tactic to take to overcome the resistance or lack of cooperation, all of those things come in.

Q. Moving along, the next sentence says "Based on police training on situational awareness,

Page 70

a reasonable police officer in the position of Officers Davalos and Estrella would have seen Mr. Urena toss the gun," do you see that, sir?

A. Yes.

Q. Is that opinion in your Rule 26 Report?

A. No.

Q. In reading this statement, is it your opinion that the officers actually saw Mr. Urena toss the gun?

A. No.

Q. Is it your opinion that the officers did not, in fact, see Mr. Urena toss the gun at any point in time?

A. No, that isn't my opinion, my opinion is they should have, they might have, they said they didn't, but when they were chasing him at that close of a distance, which they described at 10 to 15 feet, and they were watching his hands, they should have seen him toss the gun, and I think they -- well, that would be up to the jury to decide, but I think they did.

Q. Did you see at any point during any of your reviews of the body-worn camera footage any portion indicating Mr. Urena tossing the gun?

A. I saw evidence that he tossed the gun

Page 71

because it was found on the other side of the fence; I'm sure it didn't walk over by itself, someone tossed it, and the only people involved were Mr. Urena and the two officers.

Q. But in your review of the body-worn camera footage and the 15 or so times, and when you slow-mo'ed in slow motion frame-by-frame did you ever see a specific instance where Mr. Urena tossed the firearm?

A. No, I didn't see it.

Q. And as you sit here today, you still don't know necessarily a specific time when Mr. Urena tossed the firearm?

A. Not other than based on his testimony.

MR. CARPENTER: Let's take another five or ten and then I think we can finish up.

MS. MASONGSONG: Okay, sounds good.

(Recess.)

BY MR. CARPENTER:

Q. Just a few more questions and then we'll wrap up. So we've gone over your Rule 26 Report and the Declaration that you drafted, do you have any plans to prepare any other reports or updated reports?

A. Not unless I am requested to do so.

Page 72

Q. Does the Rule 26 Report and your Declaration contain all of the opinions you intend to offer at trial in this case?

A. Well, it depends somewhat on again the questions that I'm asked. I indicated in there that brought up my opinions about the shooting not being justified based on the circumstances.

Q. But as you sit here today, are there any opinions you intend to offer at trial in this matter that are not contained in either your Rule 26 Report or your Declaration?

A. No, again, not unless I am asked some specific questions.

Q. After this deposition do you have any plans to review more materials or gather more information, do anything else to support your opinions?

A. Well, I'm sure I'll go over all of the documents that I have again before trial, but if I'm provided with any additional information, I'd be happy to review that.

Q. Then other than potentially testifying at trial, have you completed your assignment for Mr. Urena's attorneys for your work on this case so far?

Page 73

RICHARD SCOTT BRYCE - April 23, 2026

A. That would be up to them, I don't know.

Q. No other specific assignments that are pending or open in terms of your work on this matter?

A. No.

MR. CARPENTER: All right. That's all I have for now. Thank you.

MS. MASONGSONG: No questions from me.

THE REPORTER: Miss Masongsong, do you need a copy of this deposition?

MS. MASONGSONG: Probably at some point, so I am going to make sure I take your e-mail down, but at this point I am not going to order a copy, and maybe you could just put your e-mail in the Chat, unless there's another way I can find it quickly.

(Discussion held off the record.)

(Whereupon, at the hour of 12:40 p.m.

the deposition was concluded.)

-- o0o --

I declare under penalty of perjury that I

Page 74

have read the foregoing transcript of my deposition testimony, taken on Thursday, April 23, 2026, via Zoom Internet Conference, and that, with the following exceptions which I have hand-marked on the transcript, the same is a true record of the testimony given by me at that deposition:

Page/Line      Should read           Reason for change:
_____    _____     _____
_____    _____     _____
_____    _____     _____
_____    _____     _____
_____    _____     _____
_____    _____     _____
_____    _____     _____
_____    _____     _____
_____    _____     _____
_____    _____     _____
_____    _____     _____

_____          _____
DATE                              RICHARD SCOTT BRYCE

Page 75

COUNTY OF LOS ANGELES,  )

STATE OF CALIFORNIA,     )

I, Annette Shaver, Certified Shorthand Reporter licences in the State of California, License No 6169, hereby certify that the deponent was by me first duly sworn and the foregoing testimony was reported by me and was thereafter transcribed with Computer-Aided Transcription; that the foregoing is a full, complete, and true record of said proceeding.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceeding and caption named or in any way interested in the outcome of the cause in said caption. The dismantling, unsealing, or unbinding of the transcript will render the reporter's certificates null and void.

In witness whereof, I have hereunto set my hand this day: 8th of May, 2026.

_____ Reading and Signing was requested.

_____ Reading and Signing was waived.

__X__ Reading and Signing was not requested.

_____
ANNETTE SHAVER, CSR NO. 6169

Page 76