**STEVEN J. ROTHANS – State Bar No. 106579**
**SCOTT J. CARPENTER – State Bar No. 253339**
**CARPENTER, ROTHANS & DUMONT, LLP**
**500 S. Grand Avenue, 19th Floor**
**Los Angeles, CA  90071**
**(213) 228-0400 / (213) 228-0401 [Fax]**
**srothans@crdlaw.com / scarpenter@crdlaw.com**

Attorneys for Defendants, City of San Bernardino, a public entity, and Officers Jonathan Davalos and Andres Estrella, public employees

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENATO URENA, individually,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF SAN BERNARDINO, JONATHAN DAVALOS, ANDRES ESTRELLA and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 5:24-cv-00341-JGB-ACCV<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION IN LIMINE NO. 4 TO LIMIT PLAINTIFF'S EXPERT DR. BENNET OMALU'S OPINIONS AT TRIAL**<br><br>**[Motion in Limine #4]**<br><br>Final Pre-Trial Conference:<br>Date:  June 8, 2026<br>Time:  11:00 a.m.<br>Courtroom:  1 - Riverside<br><br>Trial:  June 23, 2026 |

PLEASE TAKE NOTICE THAT on June 8, 2026, at 11:00 a.m., or as soon thereafter as the matter may be called in Courtroom 1 of the above-entitled Court, located at 3470 Twelfth Street, Third Floor, Riverside, California 92501, Defendants City of San Bernardino, a public entity, and Officers Jonathan Davalos and Andres Estrella, public employees, will and hereby do move this Court for an order limiting plaintiff's designated expert Dr. Bennet Omalu ("Omalu") from offering any testimony or opinions on the following subjects and barring plaintiff's counsel from presenting any evidence or argument regarding:

- 1 -
DEFENDANTS' MOTION IN LIMINE #4

1.    Any evidence, mention, opinion, or argument regarding the trajectories of the bullets inside the body that are unreliable, lack foundation, and are speculative.

2.    Any evidence, mention or argument concerning the shooting as being "overkill" since such opinion is unreliable, invades the province of the jury, draws legal conclusions, is speculative, lacks foundation, is conclusory, that are nothing more than credibility determinations, that concern a party or witness' subjective knowledge and that are more prejudicial than probative. United States v. Diaz, 876 F.3d 1194, 1197 (9th Cir. 2017); Fed. R. Evid. 403.

3.    Any evidence, mention, opinion, or argument that the plaintiff suffered pain, including while unconscious and in a coma.

This motion is made following a pre-filing conference of counsel pursuant to Central District Local Rule 7-3 that took place in person on May 5, 2026.  See Carpenter Decl. ¶ 3.

This motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, any matters of which the Court may take judicial notice, all pleadings and papers on file in this action, and upon such other matters as may be presented to the Court.

DATED: May 11, 2026          CARPENTER, ROTHANS & DUMONT LLP

/s/ Scott J. Carpenter

By: _____
STEVEN J. ROTHANS
SCOTT J. CARPENTER
Attorneys for Defendants, City of San Bernardino, a public entity, and Officers Jonathan Davalos and Andres Estrella, public employees

- 2 -
DEFENDANTS' MOTION IN LIMINE #4

### MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

This civil case arises out of the non-fatal officer-involved shooting of Renato Alfonso Urena by City of San Bernardino Police Department ("SBPD") Officers Andres Estrella and Jonathan Davalos on February 10, 2023.

On February 10, 2023, SBPD Officers Andres Estrella and Jonathan Davalos were on patrol when they received a report of a male subject armed with a handgun driving a silver Nissan Versa nearby.  After locating the suspect Nissan, and observing various vehicle code violations, the officers attempted to conduct a traffic stop.  However, the driver (later identified as plaintiff Renato Urena) tried to evade officers, abandoned the Nissan, and fled on foot into a vacant lot.  Officers Estrella and Davalos pursued plaintiff on foot and observed plaintiff reaching for, and retrieving, a handgun.  After plaintiff went into tall, thick grass and shrubbery, and the officers observed plaintiff targeting with the gun, the officers fired in self-defense fearing that plaintiff was about to shoot them.

Plaintiff retained Dr. Bennett Omalu ("Omalu"), a forensic pathologist, to provide opinions at trial.  Defendants seek to exclude from Dr. Omalu's testimony any and all opinions that are speculative, conclusory, contain principles not grounded in law or scientific methodology, and do not assist the trier of fact. These opinions are as follows:

- Opinions regarding the trajectory of bullets inside the body that are unreliable, lack foundation, are speculative and not supported by the evidence.

- Opinions that the shooting was "overkill", which invade the province of the jury, contain legal conclusions, and are conclusory.

- Opinions that the plaintiff suffered pain, including while unconscious and in a coma, as not being helpful to the jury.  The experience of pain and suffering by the plaintiff is not disputed.

Moreover, the prejudice of such testimony is substantially outweighed by its

- 3 -

DEFENDANTS' MOTION IN LIMINE #4

lack of probative value.  Thus, each of these categories of opinions are barred as improper opinion testimony and should be excluded at trial. Fed. R. Evid. 403.

## II.    <u>ARGUMENT</u>

Federal Rules of Evidence 702 states:  "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

<u>Daubert</u> and its progeny have set forth the four elements that must be met before a proposed expert's testimony will be allowed.  The courts should only allow a proposed expert's testimony if it will 1) assist the trier of fact in determining or understanding the facts in issue because the facts are beyond the common knowledge of the average lay person, 2) the proposed expert testimony is relevant, 3) if the proposed expert witness is sufficiently qualified and 4) if there is a reliable basis for expert's opinions and testimony.  <u>Id.</u> 702; <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579 (1993); <u>see</u> <u>also</u> <u>United States v. Finley</u>, 301 F.3d 1000, 1007 (9th Cir. 2002).  Because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it," a court has more control over experts than lay witnesses under Rule 403.  <u>Daubert</u>, 509 U.S. at 595 (1993). In addition, the party offering an expert witness bears the burden of showing that (1) the expert is qualified to render the opinion; and (2) the opinion offered has adequate factual and scientific support for that opinion.  <u>Daubert</u>, 509 U.S. at 592-93; <u>see</u> <u>Cholakyan v. Mercedes-Benz, USA, LLC</u>, 281 F.R.D. 534, 542–43 (C.D. Cal. 2012).

///

- 4 -

DEFENDANTS' MOTION IN LIMINE #4

## A.    Dr. Omalu's Opinions Regarding Bullet Trajectory Are Unreliable And Unsupported By The Evidence.

"Rule 702 requires that expert testimony relate to scientific, technical, or other specialized knowledge, which does not include unsupported speculation and subjective beliefs." Guidroz-Brault v. Missouri Pacific R.R. Co., 254 F.3d 825, 829 (9th Cir. 2001); see Daubert, 509 U.S. at 590. Further, Rule 702 provides that "expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." See Fed. R. Evid. 702, Advisory Committee Notes, 2023 Amendments.

Here, in his Rule 26 Report, Dr. Omalu opines that "the trajectories of the bullets inside the body were forward and upward." Dr. Omalu **attempted to** clarify at deposition that this opinion is that the bullets travelled from back to front – meaning plaintiff was shot in the back. See Ex. B at 58:11-59:8. Dr. Omalu's opinions about bullet trajectory are not reliable because they are not supported by the evidence and are not grounded in any scientific methodology. The objective evidence indicates that the majority of shots struck plaintiff's front side including his chest. This evidence can be gleaned from the body-worn camera footage and from the records of the paramedics that treated plaintiff at the scene. In particular, the paramedics noted gunshot wounds to the chest and torso, not the back. See Exhibits C & D. During deposition, out of roughly twenty gunshot wounds noted from the medical records, Dr. Omalu could not identify more than four of them that he believed stuck plaintiff in the back. See Ex. B at 70:4-72:9.

Additionally, Dr. Omalu did not apply any specialized training or expertise in reaching his opinions about the bullet trajectories. For starters, Dr. Omalu's Rule 26 Report does not indicate how Dr. Omalu reached his conclusions about bullet trajectory. But in deposition, Dr. Omalu testified that he based these opinions mainly on his review of the body-worn camera footage, rather than the

- 5 -

medical evidence.  See Ex. B at 59:9-60:4, 68:25-69:22.  Specifically, as to the bullets supposedly having travelled back to front, Dr. Omalu relied on the video footage and did not base such opinions on the "anatomic pathways" of the bullets through the body or internal damage to the body.  However, as noted above, the video evidence does not support Dr. Omalu's conclusions.  Dr. Omalu also clarified at deposition that only a "preponderance" of bullet trajectories, not all, were back to front.  See Ex. B at 67:4-68:2, 73:14-74:3.  In all, Dr. Omalu's opinions about the bullet trajectories being back to front lack sufficient evidentiary support, are unreliable, and, as such, are inadmissible under Daubert.

**B. Dr. Omalu Should Be Precluded From Describing The Shooting As "Overkill".**

Dr. Omalu offered opinions in his Rule 26 Report and at his deposition that the shooting was "overkill" and that plaintiff was "an overpowered and subdued victim of a gunshot assault."

Ninth Circuit courts have "repeatedly affirmed that 'an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law.'"  United States v. Diaz, 876 F.3d 1194, 1197 (9th Cir. 2017) (quoting Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1016 (9th Cir. 2004) (emphasis in Hangarter).  That is, expert testimony which advises the jury to find that the subject conduct violates the law should be excluded, as "[s]uch testimony would, in effect, instruct the jury regarding how it should decide the key question whether [the defendant] violated a statute and thus acted improperly."  Diamond v. City of Sandy, 2025 U.S. Dist. LEXIS 23292, *18 (D. Or. Feb. 10, 2025), citing to Nationwide Transp. Fin. v. Cass Info. Sys., Inc., 523 F.3d 1051, 1059 (9th Cir. 2008).

"[The] prohibition of opinion testimony on an ultimate issue of law recognizes that, "[w]hen an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the

- 6 -

DEFENDANTS' MOTION IN LIMINE #4

expert's judgment for the jury's." Diaz, 876 F.3d at 1197 (citing to United States v. Duncan, 42 F.3d 97, 101 (2nd Cir. 1994)). While Federal Rule of Evidence 704(a) provides that expert testimony that "[a]n opinion is not objectionable just because it embraces an ultimate issue", this does not allow for an expert opinion as to a legal conclusion. Valtierra v. City of L.A., 99 F.Supp.3d 1190, 1198 (C.D. Cal. Apr. 13, 2015).

Whether the gunshot wounds were excessive or unreasonable is a factual determination for the jury to make in this case, not Dr. Omalu. As set forth above, courts bar expert witnesses from telling or insinuating to the jury how the jury should find on any of the issues. Allowing him to do so, impermissibly invades the province of the jury. As such, Dr. Omalu should be prohibited from offering any such testimony at trial.

Moreover, Dr. Omalu's Rule 26 Report does not properly establish his opinions about overkill with scientific methodology. The endnotes he cited in his Rule 26 were not correct and did not support his opinion. See Ex. A at 16 n.2-12. The fact that he issued an untimely corrected report at deposition does not make such opinions permissible now. Rule 26 requires expert reports to contain "a complete statement of all opinions the witness will express and the basis and reasons for them[.]" Fed. R. Civ. P. 26(a)(2)(B)(i). Dr. Omalu failed to do so in his Rule 26 with respect to the "overkill" opinion.

**C.** **Dr. Omalu's Opinions About Plaintiff's Pain And Suffering Are Not Helpful To A Jury.**

The only evidence that is admissible at trial is evidence which proves or disproves a disputed fact of consequence. Fed. R. of Evid. 402, states in relevant part that, ". . . Evidence which is not relevant is not admissible." "Relevant evidence" is "any evidence having any tendency to make the existence of any fact that is of consequence of the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

- 7 -

"Encompassed in the determination of whether expert testimony is relevant is whether it is helpful to the jury, which is the 'central concern' of Rule 702." Mukhtar v. Cal. State Univ., Hayward, 299 F.3d 1053, 1066 n.7 (9th Cir. 2002); see also United States v. Gwaltney, 790 F.2d 1378, 1381 (9th Cir. 1986) ("The general test regarding the admissibility of expert testimony is whether the jury can receive 'appreciable help' from such testimony."). "Expert testimony is not helpful to the jury—and therefore inadmissible—if it simply tells the jury what result it should reach." Moore v. Deer Valley Trucking, Inc., 2014 WL 4956241, at *2 (D. Idaho Oct. 2, 2014).

Dr. Omalu opines in his Rule 26 Report that plaintiff "experienced pain and suffering beginning from the time he was shot, and will continue to experience pain and suffering for the rest of his life." Ex. A at 10. The concept that plaintiff experienced pain after multiple gunshot wounds does not "**assist the trier of fact in determining or understanding the facts in issue because the facts are beyond the common knowledge of the average lay person**." It is well-withing a jury's understanding that getting shot would cause pain, and plaintiff is more than capable of testifying as to his own pain and suffering. As acknowledged in deposition, Dr. Omalu did not conduct an assessment of how much pain plaintiff ever experienced, nor did he employ any scientifically accepted pain severity evaluation tools or scales.

### D. The Evidence Is Substantially More Prejudicial Than Probative.

Federal Rule of Evidence 403 authorizes the exclusion of relevant evidence when its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." In addition to being improper expert opinion testimony, any purported probative value of permitting Dr. Omalu to testify outside the parameters outlined above would be substantially outweighed by the danger of unfair prejudice, confusing the issues

- 8 -

DEFENDANTS' MOTION IN LIMINE #4

and misleading the jury. Fed.R.Evid. 403. In <u>Liew v. Official Receiver and Liquidator</u>, 685 F.2d 1192 (9th Cir. 1982), the Ninth Circuit held that trial courts have "very broad discretion in applying Rule 403 and absent excuse, the exercise of its discretion will not be disturbed on appeal."

Citing to <u>Ballou v. Henri Studios</u>, 656 F.2d 1147 (5th Cir. 1981), the Advisory Committee note to Rule 403 noted that "[u]nfair prejudice is that which could lead the jury to make an emotional or irrational decision, or to use the evidence in a manner not permitted by the rules of evidence . . . 'unfair prejudice as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudice or isn't material. Unfair prejudice within the context of Rule 403 means an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one.'" Fed. R. Evid. 403 Adv. Comm. Note, citing <u>Ballou</u>, 656 F.2d at 1147.

Here, as explained above, the jury would be unduly prejudiced if it is permitted to receive testimony from Dr. Omalu regarding unreliable opinions about the bullet trajectories, about the shooting being overkill and an assault, as well as unhelpful opinions that plaintiff experienced pain and suffering as a result of the shooting. Admitting this evidence or argument to a jury would not only create juror confusion, it would inflame the passions of the jury in a way that is substantially outweighed by the minimal probative value of Dr. Omalu's testimony. Moreover, based on Dr. Omalu's medical background, the jury could realistically make an inference that the officer defendants acted unreasonably in this case without properly weighing the trial evidence. For these additional reasons, Defendants seek an order precluding Dr. Omalu from offering any such improper and inflammatory testimony.

## VI.  **CONCLUSION**

For all the foregoing reasons, Defendants respectfully request that this Motion in Limine No. 4 be granted.

- 9 -

DATED: May 11, 2026                  CARPENTER, ROTHANS & DUMONT LLP

*/s/ Scott J. Carpenter*

By: _____

STEVEN J. ROTHANS
SCOTT J. CARPENTER
Attorneys for Defendants

DEFENDANTS' MOTION IN LIMINE #4

**<u>DECLARATION OF SCOTT J. CARPENTER</u>**

I, Scott J. Carpenter, declare that:

1. I am an attorney, duly licensed to practice law before all of the courts in the State of California, and an attorney at the law firm of Carpenter, Rothans & Dumont, attorneys of record for defendants City of San Bernardino and Officer Davalos and Estrella in this matter.

2. This declaration is made in support of the defendants Motion in Limine #4 - to limit testimony at trial of plaintiff's expert Bennett Omalu - in the civil action entitled <u>Renato Urena v. City of San Bernardino, et al.</u>, bearing case number 5:24-cv-00341-JGB-ACCV.

3. On May 5, 2026, counsel for the parties met and conferred via Zoom, to discuss trial documents, including the parties' respective motions in limine. The parties discussed this motion but were not able to come to a resolution.

4. Attached hereto as Exhibit "A" is a true and correct copy of the Rule 26 Report of Dr. Bennet Omalu.

5. Attached hereto as Exhibit "B" is a true and correct copy of the relevant portions of the deposition of Dr. Bennet Omalu taken on April 24, 2026.

6. Attached hereto as Exhibit "C" is a true and correct copy of AMR records related to the February 10, 2023 medical treatment provided to plaintiff at the scene of the shooting.

7. Attached hereto as Exhibit "D" is a true and correct copy of San Bernardino Fire Department records related to the February 10, 2023 medical treatment provided to plaintiff at the scene of the shooting.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

///

///

///

DEFENDANTS' MOTION IN LIMINE #4

Executed this 11th day of May 2026, at Los Angeles, California.

*/s/ Scott J. Carpenter*

_____

Scott J. Carpenter – Declarant

DEFENDANTS' MOTION IN LIMINE #4

# EXHIBIT "A"



**Phone: 279-345-1300**
**Fax: 866-402-6875**
**bennetomalu@bennetomalu.com**

**Autopsy and Anatomic Pathology**
**Clinical Pathology and Toxicology**
**Forensic Pathology**

**Neuropathology**
**Epidemiology**
**Medico-Legal Consultations**

Dale Galipo, Esq.                                          February 26, 2026
The Law Offices of Dale K. Galipo
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367

Dear Mr. Galipo,

**Re:     Renato Alfonso Urena**
**        Medico-Legal Report**

**Summary of Education, Training, and Experience**

I completed medical school in 1990 at the University of Nigeria, Enugu, Nigeria. Upon graduating from medical school, I completed a one-year clinical housemanship at the University of Nigeria Teaching Hospital in the fields of Pediatrics, Internal Medicine, General Surgery, Obstetrics, and Gynecology. After housemanship, I worked as an emergency room physician at a university hospital in Nigeria for approximately three years. I sat for and passed my United States Medical Licensing Examinations [USMLE] while I worked as an emergency room physician. I came to the United States in 1994 through a World Health Organization scholarship to become a visiting research scholar for eight months at the Department of Epidemiology, Graduate School of Public Health, University of Washington, Seattle, Washington.

In 1995, I proceeded to the College of Physicians and Surgeons of Columbia University, New York, at Harlem Hospital Center, to complete residency training in Anatomic Pathology and Clinical Pathology. In 1999, I proceeded to the University of Pittsburgh in Pittsburgh, Pennsylvania, to complete fellowship training in Forensic Pathology and Neuropathology. I hold four board certifications in Anatomic Pathology, Clinical Pathology, Forensic Pathology and Neuropathology. I also hold a Masters in Public Health [MPH] in Epidemiology from the Graduate School of Public Health at the University of Pittsburgh in Pittsburgh, Pennsylvania. I also hold a Masters in Business Administration [MBA] degree from the Tepper School of Business at Carnegie Mellon University in Pittsburgh, Pennsylvania, one of the leading business schools in the world. I am a Certified Physician Executive and an Honorary Fellow of the American Association of Physician Leadership [AAPL]. I also hold a fifth board certification in Medical Management from the AAPL. I am currently licensed to practice Medicine and Surgery in the State of California.

I am currently the President and Medical Director of Bennet Omalu Pathology [BOP], a California medico-legal consulting firm, and a Clinical Professor at the Department of Medical Pathology and Laboratory Medicine, University of California, Davis. In my capacity as the Medical Director of BOP, I am a consulting Forensic Pathologist and Neuropathologist to many

**1621 Executive Court**
**Sacramento, CA 95864**

hospitals in central California and to several counties in northern California. There are less than a few dozen practicing Forensic Pathologists-Neuropathologists in the United States who are board-certified in both Forensic Pathology and Neuropathology.

For over 25 years, I have been involved in over 15,000 death and injury investigations in my career as a Forensic Pathologist and Neuropathologist, which began in 1999. I have personally conducted and performed over 13,000 autopsies and death investigations and examined over 15,000 brain tissue specimens. I also perform trauma pattern analysis in both living patients and deceased patients to determine causes and mechanisms of sustenance of injuries and death. I am also involved in the evaluation of living victims of all types of injuries and trauma, including, but not limited to, victims of assault, traumatic falls, industrial and accidental injuries, medical complications and misadventures, rape, child abuse, and sports-related injuries.

I have performed autopsies and examined the medical records, occupational histories, exposure histories, autopsy tissues, and biopsy tissues of hundreds of living and deceased patients who had been occupationally exposed to asbestos, solvents, and other types of toxic agents. I have performed differential diagnosis, made disease diagnosis, and determined medical causation of diseases involving all types of occupational exposures, including asbestos-related diseases and malignancies like malignant mesothelioma.

I have been consulted and retained as an expert witness in 2,000-3,000 cases involving all types of medico-legal cases across all jurisdictions in the United States, including federal, state, county, and municipal courts and arbitration panels, in both civil and criminal cases, for the plaintiff, defense, district attorneys, and public defenders. I have been involved as an expert witness in complex class action and industrial lawsuits involving thousands of individuals and major corporations.

My areas of interest and focus include brain pathophysiology, brain injuries, and brain trauma, in both living and deceased patients. I identified Chronic Traumatic Encephalopathy [CTE] in a retired football player when I performed an autopsy and examined the brain of Mike Webster in 2002. Subsequently, I identified CTE in other high-impact, high-contact sports athletes and in military veterans suffering from Post-Traumatic Stress Disorder [PTSD]. Since 2002, CTE has received international attention from the sports industry, sports medicine, and neuroscience. My work has been featured extensively in all media platforms across the world. My work and life were featured in a major Hollywood film, *Concussion*, released in December 2015 by Sony Motion Pictures, in which the renowned actor, Will Smith, played me as Dr. Omalu. Several New York Times best-selling books have also been published on my life and work, including *The League of Denial* and *Concussion*. I have published several books including my memoir, *Truth Doesn't Have a Side*, which was published in August 2017. My latest book, *Brain Damage in Contact Sports,* was published in February 2018. I have published extensively in the medical and scientific literature, authoring many scientific papers and book chapters.

I have received three honorary PhD degrees from two universities in the United States and from the Royal College of Surgeons of Ireland in recognition of my work and expertise. I have also received numerous awards from across the world in recognition of my work and expertise in both living and deceased patients. I have received the "Distinguished Service Award" from the American Medical Association [AMA], which is the most prestigious award of the AMA. I have been honored by the United States Congress, and I have appeared on multiple occasions before committees of the United States Congress and committees of State Legislatures across the



Unites States, advising them on matters relating to trauma. In 2019 and 2020, I was appointed to the Traumatic Brain Injury Board of the State of California to advise the state on matters relating to traumatic brain injuries.

Since 1999, I have testified as an expert witness in matters relating to all types of injuries and deaths in over 800 court proceedings across the United States. I have attached a copy of my curriculum vitae, which enumerates my body of work and experience in greater detail. The cases I have testified in, beginning in 2009, are enumerated at the end of my curriculum vitae.

Pursuant upon your request, I have reviewed the following materials sent to me on the case of Renato Urena:

1.  State of California – Department of Corrections and Rehabilitation - Procedures for a legal visit
2.  Letter of sponsorship for Dr. Bennet Omalu & Court-Ordered Mental/Physical Examination Renato Alfonso Urena from the Law Offices of James S. Terrell to the Litigation Coordinator Wasco State Prison
3.  Gate clearances for Notary Service/Legal Interview/Court-Ordered Visit Memorandum from California Department of Corrections and Rehabilitation
4.  Axon body-worn camera X60A7459X (A. Estrella)
5.  Axon body-worn camera X60A7252T (J. Davalos)
6.  Axon body-worn camera X60A7322X
7.  Axon body-worn camera X60A6143U
8.  Axon body-worn camera X60A89170
9.  Axon body-worn camera X60A7113Z
10. Axon body-worn camera X60A89170
11. Axon body-worn camera X60A4550P
12. Axon body-worn camera X60A6143U
13. Axon body-worn camera X60A7932R
14. Axon body-worn camera X60A7232X
15. Axon body-worn camera X60A89170
16. Axon body-worn camera X60A7113Z
17. Axon body-worn camera X60A7321S
18. Axon body-worn camera X60A7063W
19. Axon body-worn camera X6039B684
20. Scene and evidence photos
21. Scene video 9N9A6564
22. Ring camera pictures and videos
23. Audio interview of Officer Andres Estrella
24. Audio interview of Officer Jonathan Davalos
25. Deposition transcripts of:
    a. Officer Andres Estrella
    b. Officer Jonathan Davalos
    c. Renato Urena
26. San Bernardino City Police Department – Call for Service Detail Report –CFS 36
27. San Bernardino City Police Department investigative reports
28. Transcription of tape-recorded interview of Officer A. Estrella
29. Transcription of tape-recorded interview of Officer J. Davalos
30. San Bernardino Police Department Use of Force Policy Manual
31. Medical records of Renato Urena from ARMC Main Hospital



Renato Urena
Medico-Legal Report

Page 4 of 20

In order to perform and apply a valid differential diagnosis method, including, but not limited to, causation criteria analysis[1], central limit theorem analysis, and clinicopathologic correlation analysis, on this case, I had to review, document, and analyze the materials sent to me in considerable depth and detail. As part of the differential diagnosis method, I also visited Renato Urena to spend time with him, speak to him, interact with him, and evaluate him in order to perform a clinicopathologic correlation analysis and confirm his medical history. Such differential diagnosis and review would form the foundation for my case-specific and general causation opinions in this case.

**Brief Summary of Prevailing Forensic Scenario[1,2]**
At the time he was seen by Dr. Brandon Woodward at the General Surgery Clinic of Arrowhead Regional Medical Center (ARMC) on May 27, 2025, Renato Urena was a 52-year-old male, born on May 24, 1973. He was being followed-up for a large, symptomatic ventral abdominal hernia. This was a complication from multiple abdominal surgeries he had had following multiple gunshot wounds he sustained during an officer-involved shooting on February 10, 2023.

**Emergency Medical Services[3] (Video record)**
A body-worn camera from a San Bernardino Police Department (SBPD) officer showed firefighters from the San Bernardino Fire Department arriving on the scene of the incident at 10:23 a.m. on February 10, 2023. Upon arrival, officers had already moved the victim, who identified himself as Renato Urena, into an open area. The firefighters immediately exposed him by cutting off his clothing with scissors to determine the extent of his injuries. He was subsequently placed on a stretcher at 10:28 a.m. and moved into an American Medical Response (AMR) ambulance at 10:29 a.m. Renato Urena arrived at the emergency department (ED) at 10:37 a.m., and his care was transferred to the ED team at 10:41 a.m.

The body camera video clips show that, beginning from the time he was shot until he was moved into the ambulance, Renato Urena continued to groan and moan in pain, making excruciating agonal noises and sounds and asking for water and help. The video clips at the emergency room also show him continuing to make these noises when he moved to a hospital bed in the emergency room.

**Medical Records from Arrowhead Regional Medical Center**
Trauma activation was called from the field, so the entire ED and trauma teams were present for Renato Urena's arrival at the ED of Arrowhead Regional Medical Center at 10:37 a.m. on February 10, 2023. He was admitted by Dr. Edwin Kim.

According to the emergency medical services report, Renato Urena was a 49-year-old male who presented with multiple gunshot wounds sustained from an officer-involved shooting. His initial Glasgow Coma Scale (GCS) was 15/15. He had no significant past medical history, and his vital signs were stable. His pulse oximetry was 100% on room air.

His physical exam revealed sternal tenderness with no crepitus and an absent rectal tone. There were no step-offs or deformities and no midline tenderness over the cervical, thoracic, and lumbar spine. There were penetrating wounds to the top and bottom of the left foot (through and through), left posterior calf, right posterior thigh, left sternal chest wall, right groin, left

---

[1] This section of the report should not be used to establish the facts in this case and is not intended to be used to establish the facts in this case.

[2] There are body camera-worn video clips, which in part documented the shooting of Renato Urena.

[3] The emergency medical services (EMS) report was not available for this review.


Bennet Omalu
PATHOLOGY

lateral calf, left lateral chest (with venous bleeding), and right thoracic area. He was alert and oriented to time, place, and person, with a GCS of 14/15.

A diagnosis of assault with gunshot wounds was made, with a differential diagnosis of internal bleeding, fractures, and contusions. A bedside chest X-ray, blood tests, and other imaging studies were initiated. A Focused Assessment with Sonography for Trauma (FAST) performed at 10:41 a.m. was negative.

A chest X-ray showed no evidence of pneumothorax or obvious mediastinal injury. A computed tomography (CT) scan of the pelvis, legs, and feet, without contrast, showed gunshot wounds with fractures involving the right sacrum, right iliac, left proximal tibia, and tarsal bones. A CT scan of the cervical spine with contrast showed no evidence of acute cervical spine injury. An abdominal and chest CT with intravenous contrast showed multiple areas of gunshot wounds. Free intraperitoneal air with grossly intact large bowels was seen, but small bowel injury could not be excluded. There were bilateral rib fractures without evidence of pneumothorax and a pulmonary contusion in the left lower lobe. There were also right pelvic fractures with subcutaneous hematoma and active bleeding in the right groin. The thoracic and lumbar spines were intact. A head CT scan showed no acute intracranial abnormalities. A neck CT angiography showed no evidence of acute vascular abnormality in the neck. A CT aorta and femoral runoff angiogram with intravenous contrast showed no evidence of vascular injury in either lower extremity.

At 10:50 a.m., Dr. Ashley Stading's review found Renato Urena disoriented, moaning, and appearing uncomfortable. His vital signs were blood pressure 81/48 mmHg (and he needed fluids and resuscitation to keep the systolic blood pressure above 100 mmHg), pulse 130 bpm, and respiration 36 cycles per minute, though his oxygen saturation was 98% on room air. In the emergency department, he received two units of uncross-matched packed red blood cells. Dr. Stading admitted him to the surgical intensive care unit (SICU), where he was placed on ventilation support, per protocol, with an exploratory laparotomy scheduled in the operating room.

At 4:14 p.m. on February 10, 2023, Dr. Payam Falatoonzadeh, a surgical critical care fellow, noted that Renato Urena had undergone an exploratory laparotomy. The intraoperative findings included multiple enterotomies of the proximal jejunum, requiring a 35-cm resection, and an ileocecectomy. His right psoas muscle was packed with Surgical due to a retroperitoneal injury, and a testicular vessel was ligated after a groin exploration.

At the SICU, he was given fentanyl and Versed for pain and sedation and was placed on hourly neurovascular and vital sign monitoring. He was also started on Levophed and vasopressin to maintain his mean arterial pressure (MAP) above 65 mmHg. Due to acute respiratory failure from bilateral rib fractures, he remained on ventilator support and had bilateral chest tubes in place. Dr. Falatoonzadeh recommended an orthopedic review and physiotherapy/occupational therapy as soon as it was appropriate.

On February 10, 2023, at 11:41 p.m., Renato Urena was evaluated for polytrauma by Dr. Joseph Elsissy and physician assistant (PA) Alexander Hammonds. PA Hammonds performed a bedside washout of the left lower extremity wound and sutured the lacerations on the legs and foot. The wound was then dressed with dry gauze and a compression dressing after irrigation. His left lower extremity was placed in a knee immobilizer and a cam boot.



Over the following few days, Renato Urena underwent several additional procedures:
- February 12, 2023: A second exploratory laparotomy
- February 13, 2023: Orthopedic surgery for metallic fragment retrieval
- February 14, 2023: A third exploratory laparotomy, a washout, and a closure
- February 16, 2023: A paracentesis along with orthopedic surgery for a tibial intramedullary nail (IMN)

Renato Urena's chest tubes were removed on February 17, 2023. Due to a severe inflammatory response, Renato Urena developed decompensated cirrhosis, which led to jaundice and elevated bilirubin levels.

He was transferred out of the SICU on February 26, 2023. He was seen by nephrology for persistent hyponatremia, even with fluid restriction and sodium chloride supplementation. Nephrology recommended adding urea packets and continuing to restrict his fluids. By March 7, 2023, his sodium level was 133 mmol/L and remained stable over the following days.

Renato Urena was evaluated by a physiotherapist who recommended home physiotherapy after his discharge. Orthopedic surgery determined his left lower extremity injury was nonoperative and would be followed up on an outpatient basis. Trauma surgery also stated that his abdominal wound care could be done as an outpatient.

He complained of a "feeling of something" under the skin of his posterior shoulder, and an X-ray showed an embedded bullet with no fracture or signs of infection. His vital signs were stable. He was taking acetaminophen-codeine, bisacodyl, calcium (oyster shell)-vitamin D3, docusate sodium, enoxaparin, gabapentin, lactulose, melatonin, methocarbamol, sennosides, sodium chloride, and urea powder.

He had poor dentition, no respiratory distress in room air, and normal heart sounds. The abdominal incision was healing with no signs of infection. He had a fistula with a pouch in the suprapubic area with small drainage. The right groin incision and multiple gunshot wounds on his chest and legs were also healing without signs of infection.

At the time of the physical exam, Renato Urena had an active peripheral intravenous cannula on his right antecubital fossa, an open drain on his ventral thigh, a male external urinary catheter, and a midline single-lumen right basilic vein catheter in place.

Renato Urena was cleared for discharge with a mobility score of 3/5 by physical therapy (PT) and 3/6 by occupational therapy (OT). All recommended equipment from both therapies was available at the West Valley Detention Center, where he was discharged on March 22, 2023. At the facility, he was to continue his wound care and PT/OT for mobility. He was instructed to have repeat X-rays of his left tibia/fibula in six weeks and again in 12 weeks. He was also started on aspirin 325 mg for a period of six weeks.

**Outpatient Follow-up**
On May 27, 2025, Renato Urena presented to the general surgery clinic to be seen by Dr. Brandon Woodward for a ventral abdominal hernia that had developed since his surgeries in February 2023. He reported the hernia had been getting worse, causing constant pain rated 6/10 in his epigastric and periumbilical regions. He was unable to reduce the hernia, as it kept



returning and worsened with exercise. He had no complaints of fever, chills, nausea, vomiting, or changes in appetite or weight. His daily bowel movements were normal.

His vital signs were blood pressure 136/88 mmHg, pulse 99 bpm, respiration 18 cpm, and a temperature of 37.5°C. His physical examination showed a non-distended abdomen with no rebound tenderness or guarding. He had a well-healed midline abdominal surgical scar with a large, partially reducible ventral hernia in the superior aspect of the midline, as well as an infraumbilical scar. The area was mildly tender to the touch, with no skin changes.

Dr. Woodward's assessment was a symptomatic large multiple ventral hernia. For operative planning, he ordered a contrast CT scan of the abdomen and pelvis and recommended an abdominal binder for comfort. He also scheduled a return visit for Renato Urena in two to four weeks, counseled him on emergency department precautions, and advised him to avoid lifting objects greater than 10 pounds.

**Clinical Descriptions of Renato Urena's Trauma Derived from the Medical Records**
1. Gunshot wound of chest cavity, left
2. Gunshot wound of groin
3. Gunshot wound of left foot
4. Gunshot wound of left lower leg
5. Gunshot wound of left thigh
6. Gunshot wound of right thigh
7. 6x gunshot wounds: upper left breast, left lower breast, x2 in each leg, and x2 in each foot
8. Penetrating wounds to: top and bottom of left foot through and through, left posterior calf, right posterior thigh, left sternal chest wall, right groin, left lateral calf, left lateral chest with venous bleeding, and right thoracic
9. Gunshot wounds with fractures involving the right sacrum, right iliac, and left proximal tibia
10. Free intraperitoneal air with grossly intact large bowel, small bowel injury cannot be excluded
11. Bilateral rib fractures without evidence of pneumothorax, pulmonary contusion in the left lower lobe
12. Right pelvic fractures with subcutaneous hematoma and active bleeding in the right groin
13. Intact thoracic and lumbar spine
14. 6x gunshot wounds to the upper left chest, left lower chest, right groin, left groin, left posterior calf, and foot
15. Gunshot wound of left foot with tarsal bone fractures
16. Open traumatic fractures of ribs of left side with pneumothorax
17. Fractures of multiple ribs, both sides
18. Open fracture of right iliac wing
19. Open sacral fracture
20. Injury to the right side of the pelvis
21. Gunshot wound of left knee, status, post foreign body in left knee
22. Open fracture of bone of left foot, fracture of unspecified tarsal bones of left foot
23. Type I or II open fracture of proximal end of left tibia, unspecified fracture morphology
24. Retroperitoneal injury from back through right psoas muscle
25. Right groin hematoma with no femoral vessel injury but hematoma of spermatic cord, status, post ligation of testicular vessel



26. Exploratory laparotomy [02/10/23] multiple enterotomies of proximal jejunum with ~35-cm resection and left in discontinuity, ileocecectomy, right psoas muscle packed with surgical from retroperitoneal injury and ligated testicular vessel after groin exploration
27. Jejunojejunal anastomosis, ileocolic anastomosis (with transverse colon)
28. Resection of remainder of ascending colon with side-to-side ileocolic anastomosis
29. Traumatic hemorrhagic shock
30. Superficial abrasions
31. Swelling over the right hand
32. Ecchymosis to the axilla and medical aspect of the right arm
33. Small circumferential laceration to the anterior, anterior lateral, and posterior medial left thigh
34. Two small wounds to the right anterior tibia, 2 small wounds to the posterior proximal tibia
35. One small circumferential wound on the dorsal and plantar aspects of the left foot
36. Metallic foreign body fragments in the pelvis, left proximal tibia, left knee
37. Fractures of the right sacrum, right iliac, 2 separate left proximal tibia fractures, fractures of the medial intermediate, and lateral cuneiform fractures

**Patient Evaluation and Interaction Visit**

I visited Renato Urena on October 21, 2025, beginning at about 09:43 a.m. We spoke at length while I evaluated him to perform a clinicopathologic correlation as part of my differential diagnosis.

Renato Urena stated that he was in an induced coma and woke up about one week and a half later. A nurse had told him. He said he was in the hospital for one to two months. They kept doing surgeries on him. When he went to the bathroom to pee, his pee was going everywhere, and when he looked down all he saw was a hole, where his penis used to be. There was no penis there. "My mind snapped and I began tripping. All my groin area was swollen. I was told my penis was retracted. A bullet had blown off all my groin area. My mind was computing what happened to me."

Renato Urena suffers from pain everywhere. He said, "My whole body hurts. I have pain everyday, especially in my left leg." He cannot walk without a cane and even with a cane, he hobbles. "I find myself crying. I feel humiliated. One bullet went into my butthole; I have to place ointments regularly into my anus. It gets irritated by stool and it burns."

**Medico-Legal Questions**

1. **What were the characteristics and trajectory of the bullets of the gunshot wounds Renato Urena sustained?**
   a. **What was Renato Urena's body positioning while he was shot?**
   b. **What injuries or damages were caused to Renato Urena by the gunshots?**

Medicine is a life science, which is evidence-based. The practice of medicine is guided by established standards and generally accepted principles, which certified physicians must adhere to. The specialties and the categories of physicians who are most proficiently trained, specialized, and competent in the accurate determination of the cause, mechanism, and manner of death and the mechanisms of sustenance of serious bodily injury and possibly lethal trauma are the forensic pathologists. Renato Urena suffered serious bodily injuries.



It is a generally accepted principle and common knowledge in medicine and forensic pathology that specific traumatic events generate predictable, reproducible, and specific patterns of traumas and injuries. Applying the clinicopathologic method of differential diagnosis, a specific documented pattern of trauma can be evaluated, translated, and applied to the determination of the mechanisms of generation, causation, and sustenance of the specified trauma pattern with a reasonable degree of medical and scientific certainty based on the differential diagnosis of the established common knowledge and generally accepted principles of trauma patterns and their mechanisms of generation, causation, and sustenance. The documentation and translation of patterns of trauma can be done by a variety of methods including, but not limited to, radiological methods, autopsy methods, clinical physical examination methods, applied clinicopathologic methods and real-time audio and videographic methods.

The patterns of injuries generated by gunshots, firearms, and ballistics weapons, and the mechanisms of generation, causation, and sustenance of these patterns of injuries, are very well-established in the medical literature and are common knowledge. Based on the prevailing forensic scenario and on the generally accepted principles and common knowledge of medicine and science, and based on the global constellation, configurations, and anatomic conformations of the gunshot wound sustained by Renato Urena, the mechanisms of generation, causation, and sustenance of his injuries can be determined with a reasonable degree of medical certainty.

The direction of travel of a bullet inside the body can be determined in the three planes of nature (with the body disposed in the universal anatomic position), by the systematic tracking and description of the anatomic pathway of the bullet, tissue disruptions, damages, and injuries correlated with the anatomic topographic locations of the gunshot wound, and recovery of the bullet or where the bullet settled.

Based on these commonly known and generally accepted principles of medicine and science, Renato Urena sustained multiple gunshot wounds of his chest and abdomen, pelvis, and lower extremities. The videographic, radiological, and clinical documentations of his trauma confirm that Renato Urena fell on the ground, and in total two officers shot at him about 36 times. The locations of the gunshot wounds, the anatomic pathways of the bullets, and the trajectories of the tissues and organs destroyed and damaged by the bullets confirm that Renato Urena was struck by some of the shots while he was lying on the ground, at a lower level than the guns firing the bullets. The trajectories of the bullets inside the body were forward and upward. The trajectories were inclined upwards given that he was lying on the ground during at least some of the shots, and the bullets came from guns that were located at levels that were much higher than the body.

Renato Urena was shot at about 36 times, and he was struck by multiple shots. This epidemiological pattern of a multiplicity of gunshot wounds and the mathematical proportions will qualify as overkill shots. This specified pattern of trauma will be consistent with an overkill[2-12]. Epidemiologically speaking, an overkill pattern of trauma is distinct and far removed from the patterns of trauma that are associated with an individual defending himself from an imminent assailant or possible assailant. Rather, an overkill pattern, in this scenario, makes Renato Urena an overpowered and subdued victim of a gunshot assault, which was Renato Urena's clinical diagnosis at the hospital upon receipt in the emergency department: "Assault with Gunshot Wound."



Renato Urena suffered serious bodily injuries of his chest, abdomen and pelvis, and lower extremities, which have been enumerated above. His injuries are permanent injuries, especially the injuries of the pelvis, which destroyed and damaged the intricate milieu and systems of nerve fibers, nerve plexuses, and ganglia of the pelvis. Such nervous injuries will generate permanent neurological sequelae like neuropathic pain, sexual dysfunction, erectile dysfunction, and impotence, as well as the attendant psychiatric sequalae of low self-esteem and depression. He is expected to suffer urinary impairment, anorectal impairment, and mobility and balance impairment. He is at an increased risk of suffering falls from standing heights and suffering all forms of blunt force trauma, especially traumatic brain injury. He is expected to suffer all forms of post-traumatic neuropathic pain for the rest of his life, including multidomain post-traumatic stress disorders from the neuropsychiatric and somatic encounters of the February 10, 2023, shooting[8,18-71].

2. **Did Renato Urena experience pain and suffering as a result of his multiple gunshot wounds on February 10, 2023, and, if so, for how long?**

It is a generally accepted principle and common knowledge in medicine and forensic pathology that specific traumatic events generate predictable, reproducible, and specific patterns of traumas and injuries and outcomes of traumas and injuries. The patterns of injuries generated by blunt force trauma, gunshots, and all types of ballistics, and the mechanisms of sustenance of these patterns of injuries, are very well-established in the medical literature and are common knowledge. A specified, prevailing pattern of trauma can reasonably predict the mechanisms of sustenance of the prevailing trauma.

Renato Urena suffered severe bodily injuries as a result of multiple gunshot wounds of the chest and abdomen, pelvis, and lower extremities. These injuries have been listed above. Based on the prevailing forensic scenario, and on the generally accepted principles and common knowledge of medicine and science, and based on the global constellation, configurations, and anatomic conformations of the traumas sustained by Renato Urena, he experienced pain and suffering beginning from the time he was shot, and will continue to experience pain and suffering for the rest of his life. All forms of regional nerve fiber, nerve plexus, and ganglia injuries are permanent injuries. He suffered major damages to the axial and appendicular skeleton and will continue to suffer mobility and balance impairment from his extensive pelvic bone fractures.

**Pathophysiology of Conscious Pain and Suffering**
Conscious pain and suffering are initiated by widespread free nerve endings situated in the skin, soft tissues, and organs. Pain can be elicited by multiple types of stimuli classified into three broad categories: mechanical, thermal, and chemical pain stimuli. Nerve endings for pain sensations generate electrical action potentials following all forms of tissue damage caused by all types of energies including, but not limited to, kinetic and mechanical energy from gunshots.

Action potentials are the subcellular physiologic basis for noxious conscious sensations and originate from voltage-gated sodium and potassium electrolyte membrane pumps in the cell membranes of nerve cells, fibers, and synapses.

It takes few 10, 000[th's] of a second to generate action potentials. Action potentials are transmitted through nerve fibers to the brain. They are transmitted in peripheral nerves in the Aδ and C fibers for fast and slow pain, respectively, at impulse rates of 5-30 meters per second and 0.5-2 meters per second, respectively. There is, therefore, a double pain sensation: a fast-sharp pain and a slow pain. The sharp pain apprises the person rapidly of imminent danger and



prompts the person to react immediately and remove himself from the painful stimulus or imminent danger. The slow pain becomes greater as time passes, resulting in continued intolerable pain and suffering and prompting the person to continue to try to relieve the cause of the pain and flee from the imminent danger.

As an average human adult, Renato Urena experienced gunshot-, and ballistics-induced pain within milliseconds of contact with an unyielding surface and contact and penetration of each bullet. One millisecond is one second divided into 1000 parts. For the slowest nervous mechanisms of pain sensation and consciousness, an adult male, like Renato Urena, felt pain within 100 milliseconds.

Nerve pathways that transmit pain terminate in the spinal cord. Secondary pathways transmit the pain from the spinal cord to the brainstem and thalamus, especially to the reticular activating system of the brainstem. From the thalamus, tertiary pathways transmit pain to other basal ganglia, limbic cortex, and neocortex of the brain. Pain stimuli are transmitted to the reticular nuclei of the midbrain, pons, and medulla and to the tectal midbrain and the periaqueductal gray matter. These lower regions of the brain, i.e., brainstem, are vital for the appreciation of the suffering types of pain.

Animals with their brains sectioned above the midbrain, to block any impulse reaching the neocortex and cerebral hemispheres, still experience suffering from pain caused by all types of trauma. Complete removal or disconnection of the somatosensory regions of the cerebral hemispheres, like we may have in quadriplegic patients, does not preclude a human or animal's ability to perceive and experience pain.

Pain impulses entering the spinal cord, brainstem, and lower centers of the human brain can cause perception of pain. Pain perception is principally a function of the lower centers of the brain; however, the upper centers and cerebral hemispheres are responsible for the interpretation of the quality of pain and other cognitive aspects of pain, which are not needed to experience pain. Perception of pain is a primitive vegetative reflex, similar to thirst and hunger.

One of the factors we consider in the determination of general and case-specific causation is analogy. Is there another disease or trauma entity that is analogous to the case in question? In this case, an analogy is that of spinal cord injuries and quadriplegia. The quadriplegic patient can still experience pain and suffering below the level of the injury, which may include, but are not limited to[97]:
1.  Nociceptive pain
    a.  Musculoskeletal pain
    b.  Visceral pain
    c.  Other nociceptive pain
2.  Neuropathic pain
    a.  At-level spinal cord injury pain
    b.  Below-level spinal cord injury pain
3.  Other pain
4.  Unknown pain

Gunshot wounds elicit both the fast and slow pain types. Fast pain is felt within milliseconds, while slow pain is felt within about one second. Following mechanical tissue damages, biochemical tissue reactants like bradykinin, serotonin, histamine, prostaglandins, leukotrienes, potassium ions, substance P, acetylcholine, acids, and proteolytic enzymes are expressed to elicit



sustained secondary biochemical pain in addition to the primary fast pain directly caused by tissue damages. The biochemical pain elicited by these biochemical reactants is a slow type of pain. The intensity of pain is closely correlated with the rate of tissue damage.
The brain is responsible for and sustains consciousness in human beings. The sensation of pain induces conscious suffering since pain is a noxious sensation which stimulates the neocortex, limbic cortex, and forebrain to cause mental pain and suffering. All these neural processes occur in 1000th's of a second (milliseconds). The human nervous system is one of the most efficient, effective, and optimal operating systems ever known to mankind. After centuries of empirical research mankind has not been able to fully decipher and reproduce the operating systems of the human brain and nervous system.

The human brain is a postmitotic organ and can only survive on oxygen and glucose, which are supplied by blood that come from the heart, primarily in the internal carotid arteries and the vertebral arteries. While the brain is only about 2-3% of the body weight, it receives approximately 15% of the cardiac output at a rate of 750-900 ml/min of blood. The normal range of perfusion of the brain is about 50 to 65 ml/100 g/min (80-100 ml/100 g/min for the gray matter and 20—25 ml/100 g/min for the white matter, at a rate of oxygen consumption of 3.5 ml/100 g/min). The normal brain tissue partial pressure of oxygen is 35 to 40 mmHg. Brain tissue oxygen levels below 30 mmHg may cause brain tissue injury, and at 20 mmHg, the risk of brain damage becomes exponentially elevated. The threshold for brain infarction is 10-12 ml/100 g/min of blood supply, with neuronal injury and death beginning in 60 to 180 seconds.

Being a postmitotic organ, the human brain does not have any reasonable capacity to regenerate itself. This means that when the human brain suffers any type of irreversible injury, that injury is permanent and cannot be reversed or cured by the brain or by medical therapy. There are many types of brain injuries. For the human brain to suffer irreversible global brain injury and damage, there has to be an impaired supply of oxygen and blood to the brain. The established and generally accepted median or mean reference threshold time for irreversible hypoxic-ischemic brain damage to occur is three to five minutes in cumulative time. This means that irreversible brain damage can occur in less than three minutes or in more than five minutes, but with a mean or median time of close to three to five minutes.

Pain is a basic, vegetative, and primitive human reflex with a primary objective of alerting the person to remove himself from imminent danger. Given that pain is a primitive reflex, patients who are alive but are suffering a disorder of consciousness still experience pain and suffering. There is no rigid demarcation between consciousness and unconsciousness. It is a continuum or spectrum of physiological functioning; however, there are broad, varying degrees of disorders of consciousness with broad, varying degrees of pain and suffering physiology and biochemistry[104-107]. We cannot reasonably differentiate or quantitate the degree of pain and suffering; rather, it is a qualitative question of whether a person experiences pain or not. Therefore, pain and suffering are present in all persons with disorders of consciousness and should be adequately treated[105,108-111]. In the noncommunicative, unconscious patient, the most relevant aspects of response to pain are physiologic (i.e., modification in the vital parameters such as heart rate and respiration) and behavioral (i.e., modification in the facial expression, motor, and visual response)[112-114].


**Renato Urena's Conscious Pain and Suffering**
Immediately prior to and at the time of the gunshots, Renato Urena was fully conscious and aware of his surroundings, with a GCS of 15/15. He was not suffering from any known neurological disease that may have impaired his capacity to process noxious stimuli and



experience the full spectrum of pain and suffering based on his learned behavior and intellect. Pain and suffering, moreover, are primitive autonomic reflexes of humankind. Patients who suffer neurological diseases like delirium, neurosis, psychosis, and dementia and all forms of cognitive impairment, congenital and acquired intellectual disabilities, and autism spectrum disorders still possess the autonomic capacity for primitive reflexes like pain and suffering, thirst and hunger, and fear.

Renato Urena's reticular activating center was completely intact and functional. As a 52-year-old adult male, he had the mental capacity, prior experiences, and learned behavior to identify and classify the presence of the police officers, their guns and weapons, the noises of the police sirens, the visual effects of the police lights, the firing and explosive noises of the gun(s), and the bullets hitting him as imminent dangers and threats to his life.

At this time, the brainstem nuclei, the frontal cortex, prefrontal cortex, basal forebrain, and limbic cortex of Renato Urena's brain initiated, within 10,000th of a second, action potentials, which initiated within milliseconds, the primitive human reflexes of fright, flight, and fight. This mental awareness of imminent danger initiated the noradrenergic and adrenergic biochemical neural responses of fear, fight, and flight, when the locus ceruleus of the brainstem released large amounts of noradrenalin to the cerebral hemispheres. This fear, fight, and flight adrenergic response caused high levels of mental pain and suffering. His heart started pumping faster (chronotropic effect) and stronger (ionotropic effect) due to the noradrenergic/adrenergic response. His respiratory rate and general muscle tonicity increased, as well, due to the noradrenergic/adrenergic response. His gastrointestinal system increased bowel peristalsis and acid secretion in the stomach.

All these pathophysiologic processes culminated in high levels of conscious mental pain and suffering, which resulted in attendant somatic and biochemical pain and suffering as a result of the body's pathophysiological and biochemical responses to mental pain and suffering. The fear, fight, and flight autonomic response prompted him to flee and run from the police.

The officers fired their guns 36 times at him, hitting him multiple times, including while he was on the ground. Firing the guns generated loud blast noises, which instigated mechanical ossicular noxious stimuli and pain from transmission of such loud noises. Falling to the ground caused blunt force impacts of his body on the ground, which excited numerous naked nerve endings in his body, which generated action potentials that further caused somatic and biochemical pain as he continued to experience mental pain and suffering, fright, and flight. The various domains of his brain and cerebral functioning were intact and identified the imminent danger within 1000ths of a second. His limbic system instigated high levels of primitive adrenergic fright-flight-fight response, which caused high levels of mental, somatic, and biochemical pain and suffering.

He experienced mental, somatic, and biochemical pain and suffering from every tissue destruction he suffered as a result of his blunt force trauma and ballistics injuries. He suffered severe bodily injuries. Transfer of forensically significant kinetic energy constituted noxious stimuli, which generated novel action potentials, which traveled to the spinal cord and brain to cause novel mental, somatic, and biochemical pain and suffering. Renato Urena suffered severe polytrauma of his chest, abdomen, and extremities. Such severe polytrauma of different regions of his body will generate even more severe physiological responses like pain and suffering.



The biochemical secondary responses of his body to the primary tissue injuries and damages precipitated biochemical, anatomic, and pathophysiological noxious stimuli, which generated action potentials within 10,000ths of a second, which were transmitted to the spinal cord and to the brain to precipitate cumulative mental, somatic, and biochemical pain and suffering. The multimodal nature of the noxious stimuli resulted in synergistic and cumulative conscious experience of very high levels of mental, somatic, and biochemical pain and suffering.

Action potentials from physical or thermal noxious stimuli eventually reach the limbic system to generate mental and psychological aspects of somatic pain and suffering. The primary injuries initiated secondary tissue injuries, systemic and tissue reactive responses, which elicited novel biochemical pain and accentuated the conscious mental and somatic pain and suffering.

Following sustenance of his trauma and serious bodily injury, Renato Urena began to develop biophysiologic deficits and sequelae of his injuries. More nerve endings in his body, soft tissues, and viscera were recruited, and many more action potentials were elicited and caused increasingly higher levels of mental, somatic, and biochemical pain and suffering.

Many more types of ions, peptides, proteins, and enzymes were expressed and activated, which enhanced his biochemical pain and suffering, which synergized with his pre-existing pain and suffering to cause higher, progressive mental, somatic, and biochemical pain and suffering.

The brain is responsible for and sustains consciousness in human beings. The region of the brain responsible for consciousness is the brainstem. The center in the brainstem, which is responsible for consciousness, is the reticular activating system, which is located deep in the central regions of the brainstem. As long as the reticular activating system remains anatomically and electrochemically intact, an individual like Renato Urena will remain conscious and will experience pain and suffering. Following his sustenance of serious bodily injuries, Renato Urena's reticular activating system did not suffer any catastrophic trauma; therefore, it remained intact.

As time progressed, Renato Urena continued to experience increasingly higher levels of mental, somatic, and chemical pain and suffering due to his secondary tissue injury cascades induced by the primary traumatic injuries. His pain and suffering persisted as he received emergency medical care and was transferred to the hospital. He continued to groan and moan in excruciating agony and distress at the scene, asking for help and for water.

At the hospital, he received both medical and surgical treatments and was eventually discharged after a long-term hospital stay. Medical and surgical intervention initiated novel cascades of mental, somatic, and chemical pain and suffering, which contributed to the pre-existing mental, somatic, and chemical pain and suffering. His severe bodily injuries were permanent, and they persisted and metamorphosed into chronic post-traumatic sequelae and impairments. Each and every pharmacologic, medical, and surgical therapy he received generated novel iatrogenic pain and suffering, which synergized with the pain and suffering caused by his primary and secondary injuries.

Renato Urena manifested and suffered from, and continues to manifest and suffer from, the established impairments, symptoms, and signs of the types of serious bodily injuries he suffered. He continues to experience pain and suffering. He continues to experience the sequalae and impairments of his serious bodily injuries, which, by themselves, cause independent pain and suffering. Over time, his pain and suffering may become less in intensity, but they are not



expected to completely disappear during his lifetime. Mental, psychological, and mood disorders and somatic, behavioral, social, and occupational disorders and impairments and PTSD caused by his serious bodily injuries are all expected to continue to cause him the full spectrum of mental, somatic, and biochemical pain and suffering. The underlying sequelae of his bodily injuries shall continue to generate neurological, pathophysiological, and biochemical cascades of mental, somatic, and chemical pain and suffering for the rest of his life.

Renato Urena has suffered and experienced conscious pain and suffering from his multiple gunshot wounds for three years since the time of the shooting.[4,5]. He will continue to suffer and experience conscious pain and suffering from his serious bodily injuries, sequelae, and impairments for the rest of his life[6].

As long as the spinal and cranial reflexes are intact, the human body continues to experience debilitating trauma-induced and physiologic biochemical pain and suffering until there is a complete cessation of all bodily functions and death.

I have provided my opinions and conclusions with a reasonable degree of medical and scientific certainty.

I reserve the right to amend, supplement, revise and/or modify my opinions and report, up to the time of trial, should additional information become available

Thank you.

Very truly yours,

Bennet I. Omalu, MD, MBA, MPH, CPE, DABP-AP,CP,FP,NP
Clinical Pathologist, Anatomic Pathologist, Forensic Pathologist, Neuropathologist, Epidemiologist
President and Medical Director, Bennet Omalu Pathology

---

[4] Medicine is not an absolute science, and these estimated ranges should not be interpreted as absolute quantitative estimations of time. Quantitative ranges of any measurable index are common practice and are the standard of practice in pathology and medicine.

[5] Human events like loss of consciousness and death involve a continuum of pathophysiological events on the cellular and gross functional levels without any identifiable rigid transitions or demarcations. Therefore, the determination of the time of occurrence of these events are guided by the time the events have been reproducibly and quantifiably confirmed. For example, the time of death of any individual is determined by the time the individual was pronounced dead by a designated medical professional who has clinically assessed the patient and confirmed the patient to be dead based on prevailing, reproducible and quantifiable clinical evidence that the patient was dead.

[6] Medicine is not an absolute science, and these estimated ranges should not be interpreted as absolute quantitative estimations of time. Quantitative ranges of any measurable index are common practice and are the standard of practice in pathology and medicine.

**Bennet Omalu**
PATHOLOGY

<u>EndNote References</u>

1. Hill AB. The Environment and Disease: Association or Causation? Proc R Soc Med. May 1965;58(5):295–300.
2. Washington PM, Villapol S, Burns MP. Polypathology and dementia after brain trauma: Does brain injury trigger distinct neurodegenerative diseases, or should they be classified together as traumatic encephalopathy? Exp Neurol. Jan 2016;275 Pt 3:381–388. doi:10.1016/j.expneurol.2015.06.015
3. Symonds C. CONCUSSION AND ITS SEQUELÆ. The Lancet. 1962/01/06/ 1962;279(7219):1–5. doi:https://doi.org/10.1016/S0140-6736(62)92635-1
4. Nowinski CJ, Bureau SC, Buckland ME, et al. Applying the Bradford Hill Criteria for Causation to Repetitive Head Impacts and Chronic Traumatic Encephalopathy. Front Neurol. 2022;13:938163. doi:10.3389/fneur.2022.938163
5. Proceedings of the Congress of Neurological Surgeons in 1964: Report of the Ad Hoc Committee to Study Head Injury Nomenclature. Clinical Neurosurgery. 1966;12:386–394.
6. Miller G. Cerebral Concussion. Archives of Surgery. 1927;14(4):891–916.
7. Omalu B. The Historical Foundation of CTE in Football Players: Before the NFL, there was CTE. Bennet Omalu; 2014.
8. Omalu B. Chronic traumatic encephalopathy. Prog Neurol Surg. 2014;28:38–49. doi:10.1159/000358761
9. Saxena S, Zutrauen S, McFaull SR. Assault-related traumatic brain injury hospitalizations in Canada from 2010 to 2021: rates, trends and comorbidity. Inj Epidemiol. Feb 7 2024;11(1):4. doi:10.1186/s40621-024-00486-5
10. Report to Congress on Traumatic Brain Injury in the United States: Epidemiology and Rehabilitation (2015).
11. Oehmichen M, Meissner C, König HG. Brain injury after gunshot wounding: morphometric analysis of cell destruction caused by temporary cavitation. J Neurotrauma. Feb 2000;17(2):155–62. doi:10.1089/neu.2000.17.155
12. Alvis-Miranda HR, A MR, Agrawal A, et al. Craniocerebral Gunshot Injuries; A Review of the Current Literature. Bull Emerg Trauma. Apr 2016;4(2):65–74.
13. Turco L, Cornell DL, Phillips B. Penetrating Bihemispheric Traumatic Brain Injury: A Collective Review of Gunshot Wounds to the Head. World Neurosurg. Aug 2017;104:653–659. doi:10.1016/j.wneu.2017.05.068
14. Reyes G, Gadot R, Ouellette L, Nouri SH, Gopinath SP, Patel AJ. Firearm-Related Traumatic Brain Injuries in Adults: A Scoping Review. Neurosurgery. Feb 1 2024;94(2):229–239. doi:10.1227/neu.0000000000002734
15. Saiki RL. Current and evolving management of traumatic brain injury. Crit Care Nurs Clin North Am. Dec 2009;21(4):549–59. doi:10.1016/j.ccell.2009.07.009
16. Yoganandan N, Li J, Zhang J, Pintar FA, Gennarelli TA. Influence of angular acceleration-deceleration pulse shapes on regional brain strains. J Biomech. Jul 19 2008;41(10):2253–62. doi:10.1016/j.jbiomech.2008.04.019
17. Su E, Bell M. Diffuse Axonal Injury. In: Laskowitz D, Grant G, eds. Translational Research in Traumatic Brain Injury. CRC Press/ Taylor and Francis Group; 2016:chap Chapter 3.
18. Frey LC. Epidemiology of posttraumatic epilepsy: a critical review. Epilepsia. 2003;44(s10):11–7. doi:10.1046/j.1528-1157.44.s10.4.x
19. Keret A, Bennett-Back O, Rosenthal G, et al. Posttraumatic epilepsy: long-term follow-up of children with mild traumatic brain injury. J Neurosurg Pediatr. Jul 2017;20(1):64–70. doi:10.3171/2017.2.PEDS16585
20. Keret A, Shweiki M, Bennett-Back O, et al. The clinical characteristics of posttraumatic epilepsy following moderate-to-severe traumatic brain injury in children. Seizure. May 2018;58:29–34. doi:10.1016/j.seizure.2018.03.018
21. Ritter AC, Wagner AK, Fabio A, et al. Incidence and risk factors of posttraumatic seizures following traumatic brain injury: A Traumatic Brain Injury Model Systems Study. Epilepsia. 12 2016;57(12):1968–1977. doi:10.1111/epi.13582
22. Semple BD, Zamani A, Rayner G, Shultz SR, Jones NC. Affective, neurocognitive and psychosocial disorders associated with traumatic brain injury and post-traumatic epilepsy. Neurobiol Dis. 03 2019;123:27–41. doi:10.1016/j.nbd.2018.07.018
23. Xu T, Yu X, Ou S, et al. Risk factors for posttraumatic epilepsy: A systematic review and meta-analysis. Epilepsy Behav. 02 2017;67:1–6. doi:10.1016/j.yebeh.2016.10.026
24. Fann JR, Ribe AR, Pedersen HS, et al. Long-term risk of dementia among people with traumatic brain injury in Denmark: a population-based observational cohort study. Lancet Psychiatry. 05 2018;5(5):424–431. doi:10.1016/S2215-0366(18)30065-8
25. Gardner RC, Byers AL, Barnes DE, Li Y, Boscardin J, Yaffe K. Mild TBI and risk of Parkinson disease: A Chronic Effects of Neurotrauma Consortium Study. Neurology. May 15 2018;90(20):e1771–e1779. doi:10.1212/WNL.0000000000005522
26. LoBue C, Wilmoth K, Cullum CM, et al. Traumatic brain injury history is associated with earlier age of onset of frontotemporal dementia. J Neurol Neurosurg Psychiatry. 08 2016;87(8):817–20. doi:10.1136/jnnp-2015-311438
27. LoBue C, Wadsworth H, Wilmoth K, et al. Traumatic brain injury history is associated with earlier age of onset of Alzheimer disease. Clin Neuropsychol. 01 2017;31(1):85–98. doi:10.1080/13854046.2016.1257069
28. LoBue C, Cullum CM, Didehbani N, et al. Neurodegenerative Dementias After Traumatic Brain Injury. J Neuropsychiatry Clin Neurosci. 2018;30(1):7–13. doi:10.1176/appi.neuropsych.17070145
29. Nguyen TP, Schaffert J, LoBue C, Womack KB, Hart J, Cullum CM. Traumatic Brain Injury and Age of Onset of Dementia with Lewy Bodies. J Alzheimers Dis. 2018;66(2):717–723. doi:10.3233/JAD-180586



Renato Urena
Medico-Legal Report

Page 17 of 20

30. Schaffert J, LoBue C, White CL, et al. Traumatic brain injury history is associated with an earlier age of dementia onset in autopsy-confirmed Alzheimer's disease. Neuropsychology. 05 2018;32(4):410–416. doi:10.1037/neu0000423

31. Mortimer JA, van Duijn CM, Chandra V, et al. Head trauma as a risk factor for Alzheimer's disease: a collaborative re-analysis of case-control studies. EURODEM Risk Factors Research Group. Int J Epidemiol. 1991;20 Suppl 2:S28–35. doi:10.1093/ije/20.supplement_2.s28

32. Wang HK, Lin SH, Sung PS, et al. Population based study on patients with traumatic brain injury suggests increased risk of dementia. J Neurol Neurosurg Psychiatry. Nov 2012;83(11):1080–5. doi:10.1136/jnnp-2012-302633

33. Wang HK, Lee YC, Huang CY, et al. Traumatic brain injury causes frontotemporal dementia and TDP-43 proteolysis. Neuroscience. Aug 2015;300:94–103. doi:10.1016/j.neuroscience.2015.05.013

34. Yang JR, Kuo CF, Chung TT, Liao HT. Increased Risk of Dementia in Patients with Craniofacial Trauma: A Nationwide Population-Based Cohort Study. World Neurosurg. May 2019;125:e563–e574. doi:10.1016/j.wneu.2019.01.133

35. Strickland D, Smith SA, Dolliff G, Goldman L, Roelofs RI. Physical activity, trauma, and ALS: a case-control study. Acta Neurol Scand. Jul 1996;94(1):45–50. doi:10.1111/j.1600-0404.1996.tb00038.x

36. Seals RM, Hansen J, Gredal O, Weisskopf MG. Physical Trauma and Amyotrophic Lateral Sclerosis: A Population-Based Study Using Danish National Registries. Am J Epidemiol. Feb 2016;183(4):294–301. doi:10.1093/aje/kwv169

37. Stern RA, Daneshvar DH, Baugh CM, et al. Clinical presentation of chronic traumatic encephalopathy. Neurology. Sep 24 2013;81(13):1122–9. doi:10.1212/WNL.0b013e3182a55f7f

38. Fazel S, Wolf A, Pillas D, Lichtenstein P, Långström N. Suicide, fatal injuries, and other causes of premature mortality in patients with traumatic brain injury: a 41-year Swedish population study. JAMA Psychiatry. Mar 2014;71(3):326–33. doi:10.1001/jamapsychiatry.2013.3935

39. Sariaslan A, Sharp DJ, D'Onofrio BM, Larsson H, Fazel S. Long-Term Outcomes Associated with Traumatic Brain Injury in Childhood and Adolescence: A Nationwide Swedish Cohort Study of a Wide Range of Medical and Social Outcomes. PLoS Med. 08 2016;13(8):e1002103. doi:10.1371/journal.pmed.1002103

40. Madsen T, Erlangsen A, Orlovska S, Mofaddy R, Nordentoft M, Benros ME. Association Between Traumatic Brain Injury and Risk of Suicide. JAMA. 08 2018;320(6):580–588. doi:10.1001/jama.2018.10211

41. Richard YF, Swaine BR, Sylvestre MP, Lesage A, Zhang X, Feldman DE. The association between traumatic brain injury and suicide: are kids at risk? Am J Epidemiol. Jul 2015;182(2):177–84. doi:10.1093/aje/kwv014

42. Burke JF, Stulc JL, Skolarus LE, Sears ED, Zahuranec DB, Morgenstern LB. Traumatic brain injury may be an independent risk factor for stroke. Neurology. Jul 2013;81(1):33–9. doi:10.1212/WNL.0b013e318297eecf

43. Chen YH, Kang JH, Lin HC. Patients with traumatic brain injury: population-based study suggests increased risk of stroke. Stroke. Oct 2011;42(10):2733–9. doi:10.1161/STROKEAHA.111.620112

44. Liu SW, Huang LC, Chung WF, et al. Increased Risk of Stroke in Patients of Concussion: A Nationwide Cohort Study. Int J Environ Res Public Health. 02 2017;14(3)doi:10.3390/ijerph14030230

45. Liao CC, Chou YC, Yeh CC, Hu CJ, Chiu WT, Chen TL. Stroke risk and outcomes in patients with traumatic brain injury: 2 nationwide studies. Mayo Clin Proc. Feb 2014;89(2):163–72. doi:10.1016/j.mayocp.2013.09.019

46. Barlow KM. Postconcussion Syndrome: A Review. J Child Neurol. Jan 2016;31(1):57–67. doi:10.1177/0883073814543305

47. Dwyer B, Katz DI. Postconcussion syndrome. Handb Clin Neurol. 2018;158:163–178. doi:10.1016/B978-0-444-63954-7.00017-3

48. Montenigro PH, Alosco ML, Martin BM, et al. Cumulative Head Impact Exposure Predicts Later-Life Depression, Apathy, Executive Dysfunction, and Cognitive Impairment in Former High School and College Football Players. J Neurotrauma. 01 15 2017;34(2):328–340. doi:10.1089/neu.2016.4413

49. Balabandian M, Noori M, Lak B, Karimizadeh Z, Nabizadeh F. Traumatic brain injury and risk of Parkinson's disease: a meta-analysis. Acta Neurol Belg. Aug 2023;123(4):1225–1239. doi:10.1007/s13760-023-02209-x

50. McKee AC, Mez J, Abdolmohammadi B, et al. Neuropathologic and Clinical Findings in Young Contact Sport Athletes Exposed to Repetitive Head Impacts. JAMA Neurol. Oct 1 2023;80(10):1037–1050. doi:10.1001/jamaneurol.2023.2907

51. Suter CM, Affleck AJ, Pearce AJ, Junckerstorff R, Lee M, Buckland ME. Chronic traumatic encephalopathy in a female ex-professional Australian rules footballer. Acta Neuropathol. Sep 2023;146(3):547–549. doi:10.1007/s00401-023-02610-z

52. Bruce HJ, Tripodis Y, McClean M, et al. American Football Play and Parkinson Disease Among Men. JAMA Netw Open. Aug 1 2023;6(8):e2328644. doi:10.1001/jamanetworkopen.2023.28644

53. Delic V, Beck KD, Pang KCH, Citron BA. Biological links between traumatic brain injury and Parkinson's disease. Acta Neuropathol Commun. Apr 7 2020;8(1):45. doi:10.1186/s40478-020-00924-7

54. Ascherio A, Schwarzschild MA. The epidemiology of Parkinson's disease: risk factors and prevention. Lancet Neurol. Nov 2016;15(12):1257–1272. doi:10.1016/S1474-4422(16)30230-7

55. Lillian A, Zuo W, Laham L, Hilfiker S, Ye JH. Pathophysiology and Neuroimmune Interactions Underlying Parkinson's Disease and Traumatic Brain Injury. Int J Mol Sci. Apr 13 2023;24(8)doi:10.3390/ijms24087186

56. Gardner RC, Yaffe K. Epidemiology of mild traumatic brain injury and neurodegenerative disease. Mol Cell Neurosci. May 2015;66(Pt B):75–80. doi:10.1016/j.mcn.2015.03.001



57.  Gardner RC, Burke JF, Nettiksimmons J, Goldman S, Tanner CM, Yaffe K. Traumatic brain injury in later life increases risk for Parkinson disease. Ann Neurol. Jun 2015;77(6):987–95. doi:10.1002/ana.24396

58.  Sartor-Glittenberg C, Brickner L. A multidimensional physical therapy program for individuals with cerebellar ataxia secondary to traumatic brain injury: a case series. Physiother Theory Pract. Feb 2014;30(2):138–48. doi:10.3109/09593985.2013.819952

59.  Takao M, Aoyama M, Ishikawa K, et al. Spinocerebellar ataxia type 2 is associated with Parkinsonism and Lewy body pathology. BMJ Case Rep. Apr 1 2011;2011doi:10.1136/bcr.01.2011.3685

60.  Hong JH, Kim OL, Kim SH, Lee MY, Jang SH. Cerebellar peduncle injury in patients with ataxia following diffuse axonal injury. Brain Res Bull. Aug 28 2009;80(1-2):30–5. doi:10.1016/j.brainresbull.2009.05.021

61.  Jang SH, Lee HD. Ataxia due to injury of the cortico-ponto-cerebellar tract in patients with mild traumatic brain injury. Medicine (Baltimore). Dec 3 2021;100(48):e28024. doi:10.1097/MD.0000000000028024

62.  Chester CS, Reznick BR. Ataxia after severe head injury: the pathological substrate. Ann Neurol. Jul 1987;22(1):77–9. doi:10.1002/ana.410220117

63.  Freund JE, Stetts DM. Continued recovery in an adult with cerebellar ataxia. Physiother Theory Pract. Feb 2013;29(2):150–8. doi:10.3109/09593985.2012.699605

64.  Vasudevan EV, Glass RN, Packel AT. Effects of traumatic brain injury on locomotor adaptation. J Neurol Phys Ther. Jul 2014;38(3):172–82. doi:10.1097/NPT.0000000000000049

65.  Potts MB, Adwanikar H, Noble-Haeusslein LJ. Models of traumatic cerebellar injury. Cerebellum. Sep 2009;8(3):211–21. doi:10.1007/s12311-009-0114-8

66.  Calzolari E, Chepisheva M, Smith RM, et al. Vestibular agnosia in traumatic brain injury and its link to imbalance. Brain. Feb 12 2021;144(1):128–143. doi:10.1093/brain/awaa386

67.  Marcus HJ, Paine H, Sargeant M, et al. Vestibular dysfunction in acute traumatic brain injury. J Neurol. Oct 2019;266(10):2430–2433. doi:10.1007/s00415-019-09403-z

68.  Keleher F, Lindsey HM, Kerestes R, et al. Multimodal Analysis of Secondary Cerebellar Alterations After Pediatric Traumatic Brain Injury. JAMA Netw Open. Nov 1 2023;6(11):e2343410. doi:10.1001/jamanetworkopen.2023.43410

69.  Woodrow RE, Winzeck S, Luppi AI, et al. Acute thalamic connectivity precedes chronic post-concussive symptoms in mild traumatic brain injury. Brain. Aug 1 2023;146(8):3484–3499. doi:10.1093/brain/awad056

70.  Vella MA, Warshauer A, Tortorello G, et al. Long-term Functional, Psychological, Emotional, and Social Outcomes in Survivors of Firearm Injuries. JAMA Surgery. 2020;155(1):51–59. doi:10.1001/jamasurg.2019.4533

71.  Harris KA, Yonclas P. Acute and Long-Term Complications of Gunshot Wounds to the Head. Current Physical Medicine and Rehabilitation Reports. 2020/12/01 2020;8(4):436–442. doi:10.1007/s40141-020-00301-4

72.  Majdan M, Plancikova D, Maas A, et al. Years of life lost due to traumatic brain injury in Europe: A cross-sectional analysis of 16 countries. PLoS Med. Jul 2017;14(7):e1002331. doi:10.1371/journal.pmed.1002331

73.  Majdan M, Melichova J, Plancikova D, et al. Burden of Traumatic Brain Injuries in Children and Adolescents in Europe: Hospital Discharges, Deaths and Years of Life Lost. Children (Basel). Jan 13 2022;9(1)doi:10.3390/children9010105

74.  Mavroudis I, Kazis D, Petridis FE, Balmus IM, Papaliagkas V, Ciobica A. The Association Between Traumatic Brain Injury and the Risk of Cognitive Decline: An Umbrella Systematic Review and Meta-Analysis. Brain Sci. Nov 26 2024;14(12)doi:10.3390/brainsci14121188

75.  Li W, Risacher SL, McAllister TW, Saykin AJ. Traumatic brain injury and age at onset of cognitive impairment in older adults. J Neurol. Jul 2016;263(7):1280–5. doi:10.1007/s00415-016-8093-4

76.  El-Menyar A, Al-Thani H, Mansour MF. Dementia and traumatic brain injuries: underestimated bidirectional disorder. Front Neurol. 2023;14:1340709. doi:10.3389/fneur.2023.1340709

77.  Gardner RC, Burke JF, Nettiksimmons J, Kaup A, Barnes DE, Yaffe K. Dementia risk after traumatic brain injury vs nonbrain trauma: the role of age and severity. JAMA Neurol. Dec 2014;71(12):1490–7. doi:10.1001/jamaneurol.2014.2668

78.  Zhang L, Yang W, Li X, et al. Association of life-course traumatic brain injury with dementia risk: A nationwide twin study. Alzheimers Dement. Jan 2023;19(1):217–225. doi:10.1002/alz.12671

79.  Nordstrom A, Nordstrom P. Traumatic brain injury and the risk of dementia diagnosis: A nationwide cohort study. PLoS Med. Jan 2018;15(1):e1002496. doi:10.1371/journal.pmed.1002496

80.  Ling H, Holton JL, Shaw K, Davey K, Lashley T, Revesz T. Histological evidence of chronic traumatic encephalopathy in a large series of neurodegenerative diseases. Acta Neuropathol. Dec 2015;130(6):891–3. doi:10.1007/s00401-015-1496-y

81.  Nordström P, Michaëlsson K, Gustafson Y, Nordström A. Traumatic brain injury and young onset dementia: a nationwide cohort study. Ann Neurol. Mar 2014;75(3):374–81. doi:10.1002/ana.24101

82.  Plassman BL, Havlik RJ, Steffens DC, et al. Documented head injury in early adulthood and risk of Alzheimer's disease and other dementias. Neurology. Oct 24 2000;55(8):1158–66. doi:10.1212/wnl.55.8.1158

83.  Simmonds E, Han J, Kirov G, Sharp DJ, Massey TH, Escott-Price V. Dementia Risk Due to Traumatic Brain Injury in Subtypes of Dementia in the Welsh Population. Neurology. Aug 12 2025;105(3):e213866. doi:10.1212/wnl.0000000000213866



Bennet Omalu
PATHOLOGY

84.   Iacono D, Raiciulescu S, Olsen C, Perl DP. Traumatic Brain Injury Exposure Lowers Age of Cognitive Decline in AD and Non-AD Conditions. Front Neurol. 2021;12:573401. doi:10.3389/fneur.2021.573401

85.   Stubbs JL, Thornton AE, Sevick JM, et al. Traumatic brain injury in homeless and marginally housed individuals: a systematic review and meta-analysis. Lancet Public Health. Jan 2020;5(1):e19–e32. doi:10.1016/S2468-2667(19)30188-4

86.   Chassman S, Calhoun K, Bacon B, et al. Correlates of Acquiring a Traumatic Brain Injury before Experiencing Homelessness: An Exploratory Study. Social Sciences. 2022;11(8):376.

87.   Hwang SW, Colantonio A, Chiu S, et al. The effect of traumatic brain injury on the health of homeless people. CMAJ. Oct 7 2008;179(8):779–84. doi:10.1503/cmaj.080341

88.   McKee AC, Cantu RC, Nowinski CJ, et al. Chronic traumatic encephalopathy in athletes: progressive tauopathy after repetitive head injury. J Neuropathol Exp Neurol. Jul 2009;68(7):709–35. doi:10.1097/NEN.0b013e3181a9d503

89.   McKee AC, Stern RA, Nowinski CJ, et al. The spectrum of disease in chronic traumatic encephalopathy. Brain. Jan 2013;136(Pt 1):43–64. doi:10.1093/brain/aws307

90.   Mez J, Daneshvar DH, Kiernan PT, et al. Clinicopathological Evaluation of Chronic Traumatic Encephalopathy in Players of American Football. JAMA. 07 2017;318(4):360–370. doi:10.1001/jama.2017.8334

91.   Stein TD, Alvarez VE, McKee AC. Chronic traumatic encephalopathy: a spectrum of neuropathological changes following repetitive brain trauma in athletes and military personnel. Alzheimers Res Ther. 2014;6(1):4. doi:10.1186/alzrt234

92.   Roberts A. Brain damage in boxers. A study of the prevalence of traumatic encephalopathy among ex-professional boxers. Pitman Medical and Scientific Publishing Co; 1969.

93.   Burke DC. Pain in paraplegia. Paraplegia. Feb 1973;10(4):297–313. doi:10.1038/sc.1973.54

94.   de Oliveira RC, de Freitas LB, Gomes RR, Cliquet A. Orthopedic Related Comorbidities in Spinal Cord-Injured Individuals. Acta Ortop Bras. Jul–Aug 2020;28(4):199–203. doi:10.1590/1413-785220202804224403

95.   Cragg JJ, Haefeli J, Jutzeler CR, et al. Effects of Pain and Pain Management on Motor Recovery of Spinal Cord-Injured Patients: A Longitudinal Study. Neurorehabil Neural Repair. Sep 2016;30(8):753–61. doi:10.1177/1545968315624777

96.   D'Angelo R, Morreale A, Donadio V, et al. Neuropathic pain following spinal cord injury: what we know about mechanisms, assessment and management. Eur Rev Med Pharmacol Sci. Dec 2013;17(23):3257–61.

97.   Finnerup NB, Baastrup C. Spinal cord injury pain: mechanisms and management. Curr Pain Headache Rep. Jun 2012;16(3):207–16. doi:10.1007/s11916-012-0259-x

98.   Hagen EM. Acute complications of spinal cord injuries. World J Orthop. Jan 18 2015;6(1):17–23. doi:10.5312/wjo.v6.i1.17

99.   Masri R, Keller A. Chronic pain following spinal cord injury. Adv Exp Med Biol. 2012;760:74–88. doi:10.1007/978-1-4614-4090-1_5

100.  Yasko JR, Mains RE. Chronic pain following spinal cord injury: Current approaches to cellular and molecular mechanisms. Trends Cell Mol Biol. 2018;13:67–84.

101.  Rosner J, Negraeff M, Belanger LM, et al. Characterization of Hyperacute Neuropathic Pain after Spinal Cord Injury: A Prospective Study. J Pain. Jan 2022;23(1):89–97. doi:10.1016/j.jpain.2021.06.013

102.  Vierck C. Mechanisms of Below-Level Pain Following Spinal Cord Injury (SCI). J Pain. Mar–Apr 2020;21(3-4):262–280. doi:10.1016/j.jpain.2019.08.007

103.  Waring WP, Maynard FM. Shoulder pain in acute traumatic quadriplegia. Paraplegia. Jan 1991;29(1):37–42. doi:10.1038/sc.1991.5

104.  Zasler ND, Formisano R, Aloisi M. Pain in Persons with Disorders of Consciousness. Brain Sci. Feb 23 2022;12(3)doi:10.3390/brainsci12030300

105.  Chatelle C, Thibaut A, Whyte J, De Val MD, Laureys S, Schnakers C. Pain issues in disorders of consciousness. Brain Inj. 2014;28(9):1202–8. doi:10.3109/02699052.2014.920518

106.  Di Perri C, Thibaut A, Heine L, Soddu A, Demertzi A, Laureys S. Measuring consciousness in coma and related states. World J Radiol. Aug 28 2014;6(8):589–97. doi:10.4329/wjr.v6.i8.589

107.  Calabro RS, Pignolo L, Muller-Eising C, Naro A. Pain Perception in Disorder of Consciousness: A Scoping Review on Current Knowledge, Clinical Applications, and Future Perspective. Brain Sci. May 20 2021;11(5)doi:10.3390/brainsci11050665

108.  Schnakers C, Zasler ND. Pain assessment and management in disorders of consciousness. Curr Opin Neurol. Dec 2007;20(6):620–6. doi:10.1097/WCO.0b013e3282f169d9

109.  Schnakers C, Chatelle C, Demertzi A, Majerus S, Laureys S. What about pain in disorders of consciousness? AAPS J. Sep 2012;14(3):437–44. doi:10.1208/s12248-012-9346-5

110.  Pistoia F, Sacco S, Stewart J, Sara M, Carolei A. Disorders of Consciousness: Painless or Painful Conditions?-Evidence from Neuroimaging Studies. Brain Sci. Oct 8 2016;6(4)doi:10.3390/brainsci6040047

111.  Fins JJ, Shapiro ZE. Pain Management, Disorders of Consciousness, and Tort Law: An Emergency Tort to Fix a Longstanding Injustice. Indiana Law Journal. 2023;98(3)(1):693–720.

112.  Riganello F, Soddu A, Tonin P. Addressing Pain for a Proper Rehabilitation Process in Patients With Severe Disorders of Consciousness. Front Pharmacol. 2021;12:628980. doi:10.3389/fphar.2021.628980



113. Bodien YG, Allanson J, Cardone P, et al. Cognitive Motor Dissociation in Disorders of Consciousness. N Engl J Med. Aug 15 2024;391(7):598–608. doi:10.1056/NEJMoa2400645

114. Naro A, Bramanti P, Bramanti A, Calabro RS. Assessing pain in patients with chronic disorders of consciousness: Are we heading in the right direction? Conscious Cogn. Oct 2017;55:148–155. doi:10.1016/j.concog.2017.08.009



# EXHIBIT "B"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

RENATO URENA, individually, )
                            )
            Plaintiff,      )
                            )
     vs.                    ) Case No.
                            ) 5:24-cv-00341-JGB-SHK
                            )
CITY OF SAN BERNARDINO,     )
JONATHAN DAVALOS, ANDRES    )
ESTRELLA, and DOES 1-10,    )
inclusive,                  )
                            )
            Defendants.     )
_____)

DEPOSITION OF EXPERT WITNESS

BENNET OMALU, MD, MPH, MBA

Friday, April 24, 2026

Reported by:
Annette Shaver
CSR No. 6169

Page 1

BENNET OMALU, MD - April 24, 2026

Deposition of Expert Witness, BENNET OMALU, MD, MPH, MBA, taken remotely via Zoom Meetings on behalf of Defendants, beginning at 10:08 a.m., on Friday, April 24, 2026, before Annette Shaver, Certified Shorthand Reporter No. 6169.

APPEARANCES:

For Plaintiff:
    LAW OFFICES OF DALE K GALIPO
    BY:  RENEE V. MASONGSONG, ESQ.
    21800 Burbank Boulevard, Suite 310
    Woodland Hills, California 91367
    (310) 698-0990
    rvalentine@galipolaw.com

    LAW OFFICE OF JAMES TERRELL
    BY:  JAMES S. TERRELL, ESQ.
    15411 Anacapa Road
    Victorville, California 92392
    (760) 951-5850
    jim@talktoterrell.com

    LAW OFFICE OF SHARON J. BRUNNER
    BY:  SHARON J. BRUNNER, ESQ.
    14393 Park Avenue, Suite 100
    Victorville, California 92392
    (760) 243-9997   (Not present)
    sharonjbrunner@yahoo.com

For Defendants:
    CARPENTER, ROTHANS & DUMONT, LLP
    BY:  SCOTT J. CARPENTER, ESQ.
    500 South Grand Avenue, 19the Floor
    Los Angeles, California 90071
    (213) 228-0400
    scarpenter@crdlaw.com

Page 2

INDEX

WITNESS              EXAMINATION         PAGE
BENNET OMALU         BY MR. CARPENTER       4


EXHIBITS
(None offered)

Page 3

FRIDAY, APRIL 24, 2026
10:08 A.M.
-- o0o --
BENNET OMALU, MD, MPH, MBA, called as a witness, having been first duly sworn in remotely, was examined and testified remotely via Zoom Meetings as follows:

EXAMINATION
BY MR. CARPENTER:

Q.  Good morning, Doctor.  Could you please state and spell your full name for the record.

A.  My full name is Bennet Omalu, B-e-n-n-e-t, O-m-a-l-u.

Q.  And Doctor, my name is Scott Carpenter, and I represent the City of San Bernardino and Officers Davalos and Estrella in this matter, and in connection with this matter you are here today because you have been retained as a medical expert witness hired by one or more of Mr. Urena's attorneys in this civil case, is that correct?

A.  Yes, sir.

Q.  And Doctor, you've prepared a Rule 26 report in connection with your work in this civil case, is that correct?

Page 4

A.  Yes, sir.

Q.  And your report appears to be dated February 26, 2026, is that correct, Doctor?

A.  Yes, sir.

Q.  And do you have that Rule 26 report in front of you today?

A.  Yes, sir.

Q.  And if you could, please keep that handy, I will be referring to it throughout our time together this morning, okay?

A.  Yes.

Q.  I was going over your extensive CV, Doctor, and I see that you went to medical school in Nigeria, and then you moved to the United States around 1994, is that correct?

A.  Yes.

Q.  And since moving to the United States you've obtained and hold a total of five board certifications?

A.  Yes.

Q.  And one is in anatomic pathology?

A.  Yes.

Q.  And the others are clinical pathology, forensic pathology and neuropathology, and then the last one in medical management, is that

Page 5

BENNET OMALU, MD - April 24, 2026

A. No, I am sorry.

Q. And you are not aware that Dr. Contreras prepared a life care plan with respect to Mr. Urena in connection with this case?

A. I have not seen such a document, I am sorry.

Q. So I am assuming you haven't spoken with Dr. Contreras about any long term care Mr. Urena might need?

A. No, sir.

Q. Going to your report, and starting on page 8 you have a heading "Medical/Legal Questions," and then there's a heading No. 1 which discusses the characteristics and trajectory of bullets of the gunshot wounds?

A. Yes, sir.

Q. And then in reading this section, looking at page 9, in the second to the last paragraph, it looks like the second to the last sentence addresses the trajectories of the bullets, it says "The trajectories of the bullets inside the body were forward and upward"?

A. Yes.

Q. Do you see that part of the report?

A. Yes.

Page 58

Q. And when you state that the trajectories of the bullets were forward, do you mean front to back?

A. Forward, back to front.

Q. Back to front?

A. Yes, sir.

Q. Meaning that he was shot in the back?

A. Yes, sir.

Q. And what did the medical records -- well, I guess, what is that determination based on?

A. Well, the differential diagnosis matters I reviewed, the body camera clips of the shooting, the body camera clips when the officers got to him, when the officers handcuffed him, when they turned him over, the video -- body camera clips when the Emergency Medical Service were handling him, the indications of the trauma patterns at the scene, review of the medical records and the damages, so the totality of the materials and the video itself that documented the shooting all confirm that he was shot in the back.

I watched all the video clips, they took me hours, but in many of the video clips you can see the ones in the front and the ones in the back, and you can tell entrance wound from exit wound,

Page 59

and all the wounds in his back, if not all of them, were entrance wounds, and the video of the shooting showed he was running away from the officers, he fell, and the shooting began.

Q. And does any of the records -- your description of the records show or note in your report gunshot wounds to the back?

A. No, no, forward and over doesn't mean gunshot wounds to the back, it means he was shot in his back, meaning the posterior surfaces of his back. Many of the wounds were about the trunk, torso, pelvis area; so the entrance wounds indicate that he was not facing the officers when he was shot.

Q. None of the entrance wounds were consistent with his body facing the officers at the time he was shot?

A. No.

Q. And you didn't see any evidence in the videos of entrance wounds to the front of his body?

A. I stay away from absolutes; the word "any," and even in my report I said "Most of the wounds, almost all the wounds," I stay away from never, any absolutes, but based on my examination,

Page 60

the majority of the wounds he suffered he was shot in the back of his body.

Q. Do you note any trajectories of any bullets that were front to back in your report?

A. I did not have sufficient evidence to indicate any that was backward, from front to back; does that make sense?

Q. Well, do you recall in the video Mr. Urena telling the officers after the shooting that he had been shot in the stomach?

A. Yes, being shot in the stomach doesn't mean he was shot from the front. A wound where you are shot in the back and pass it to your stomach and exit in your stomach; so being shot in the stomach does not mean he was shot from the front.

Q. And did your physical examination of Mr. Urena entail any type of investigations to where he sustained any gunshot wounds?

A. You don't examine scars to determine entrance and exit, no. When I spoke with him and discussed the events of the day of the shooting as documented in the medical records he was running away from the officers, he fell, he was shot, and during this interaction there was never a time he turned around to face the officers.

Page 61

BENNET OMALU, MD - April 24, 2026

Like documented in the medical records, he was assaulted, he was the victim, again, the medical records, which I already stated, that this was the case of an assault, meaning he was the victim, and the officers who shot him were the assailants, because there was at no point was he the assailant, he never turned or pointed a gun at the officers, and, in fact, the majority of the shots, as documented by the patterns of trauma and the video was when he was on the car, and even he, himself, stated that when he fell, he still felt them still shooting at him while he was on the ground.

Q. Was the gunshot wound the chest cavity that you have noted in the report a back to front wound?

A. Yes; the majority of the wounds were back to front, he was shot in the back, and so I usually say things like this: There is no justification or evidence to indicate otherwise, like preponderance of the evidence, the videos, the pattern of trauma, the images are consistent with a reasonable degree of medical certainty of a victim who was shot 36 times by two officers who were located in his back.

Q. I guess what I'm specifically saying is this gunshot on wound of the chest cavity, it's your

Page 62

determination this that was a back to front trajectory?

A. No. If you look in my report, sir, I did not itemize the words. You don't itemize words unless there was an autopsy done itemized ones. So the start out of factors in a case like this where the person survived, and there were a multiplicity of wounds, for example, what you are calling a gunshot wound of the chest may have entered from the buttock. But the only way you can identify that is if an autopsy was done after he was shot. In the absence of that, you cannot itemize the individual wounds because it becomes unreasonable, the scientific measure now becomes invalid.

So what you do, the epidemiological mattered, the differential diagnosis mattered, is you make a general itemization of the gunshot wounds, meaning, a preponderance of the wounds, majority if not all he received in the back of his head, of his neck, of his trunk, of his extremities, and this is consistent with what the video shows us.

Q. Okay. Did the medical records note any specific gunshot wounds to his posterior?

A. The medical records do not describe wounds

Page 63

individually, the medical records simply stated he received multiple wounds of his trunk, of his buttock, of his pelvis, and why that is, that is so. The doctor who is trained to characterize gunshot wounds is a forensic pathologist. In my experience, physicians do not typically describe entrance and exit, no, that is not what they do, they simply describe gunshot wound, gunshot wound, perforating wound, they don't demarcate entrance and exit, and at that moment when a patient is being treated it is of no value whether it is entrance or exit.

So that was why my differential diagnosis included examination of all the video clips, and many times, luckily, the officers themselves handled him, they moved him around, the paramedics when they arrived also moved him around, and during the interaction you will see in the videos the wounds in his back, in fact, at some point he actually wears his clothing you will see all the wounds, and when you look at all the wounds in his back, they are the classic gunshot wounds of entrance.

So there is no evidence for us to believe otherwise that he wasn't shot in his back, that is how we categorize it.

Page 64

Q. If he had suffered a gunshot wound to his back, that would have been specifically noted in the medical records, would it not?

A. No. No.

Q. They wouldn't have noted that?

A. No. So in my experience physicians are not trained and do not focus to demarcate wounds of entrance or exit because in terms of medical treatment it is of no value.

Q. Right. I am not asking entrance or exit, I am saying if they had sustained just a gunshot wound to the back, they would have noted the wound regardless if it was entrance or exit, correct?

A. No, they would have rather said "Gunshot wounds of the trunk," some would even just say "There are ten gunshot wounds of the back," and if you notice, what I did, because of how difficult cases like this could be, on page -- let me see --

Q. I'm looking at page 7 you have --

A. -- on page 7 of my report --

Q. -- a list of "Clinical Descriptions," right?

A. On page 7 of my report, it is very good to go to the medical records, and as expected, I reviewed thousands and thousands of medical

Page 65

BAYSIDE REPORTING COMPANY    (888) 229-9897
www.baysidedepo.com

BENNET OMALU, MD - April 24, 2026

records, what you see on medical records are not what you see on autopsy reports because they are two totally different things, okay?

Q. Well --

A. So in the medical records, these are the different times they describe wounds, okay? For example, look on No. 8, No. 8, there were wounds to the left lateral chest and the right thoracic, and the left sternal chest, the right groin, these are all the trunk.

Now what I want you to realize is if a wound may enter the body two at a time, and exit in the chest, I actually did an autopsy two days ago, that was exactly what happened, somebody was shot in the head, and exit was in the chest.

So the location of wounds does not indicate where he was shot, from what angle or not, especially given the multiplicity of wounds; in fact, if I were to do an autopsy on an individual like this who had also multiple gunshot wounds, we do not itemize the wounds, because some of the wounds may have crossed over.

So what we do in a case like this is just identify the entrance wounds, identify the exit wounds, identify any bullets recovered, make sure

Page 66

they match, meaning if there are 30 entrance wounds, there should be the bullets recovered and the exit wounds will equal to 30, okay?

Q. Okay. So as I understand, you are saying that there were some bullets that entered from the posterior, and some that entered from the front of his body?

A. This is not what I am saying, what I am saying is based on the video recording of the shooting, based on the video recording after the shooting of the victim while he was being treated, while he was being handled, while he was being handcuffed, I spent time, I reviewed all the video clips, and I examined each individual wound in his body, and the preponderance of evidence, the great majority of the evidence is consistent with an individual who was shot in the back, most, if not all the time, and that the wounds were traveling in an upward trajectory, indicating that he was either falling, was on the ground or was fleeing, because when people are fleeing they lower their body, they may not realize that, when you are running away you lower your trunk, that is a reflex.

So he was fleeing, falling on the ground when he was shot, and he was shot in the back, that

Page 67

is the conclusion based on the totality of the entire evidence in this case.

Q. And did you make any determinations as to whether any bullets entered the front of his body?

A. Less likely than not that a bullet entered from the front of his body. Now when I mean front, I mean he was not diametrically facing the officers, the bullet could have entered from the side, okay? Because depending on the location of the officer and the individual, but there was no bullet, no wound on his body to show that when he was shot he was diametrically or perpendicularly facing the officer who shot him, no, meaning, based on the patterns of trauma, when he was shot, he was not an assailant, meaning he was not attacking the officers who shot him, because to attack an officer who shoots you, you have to be facing the officer diametrically and perpendicularly face up.

So the patterns of trauma on his body are consistent, and also with the video, that he was never an assailant when he was shot, he was either fleeing, was falling or on the ground when he was shot, that is my conclusion, based on the prevailing evidence.

Q. Was there any documentation noting any

Page 68

wound to the back of his trunk?

A. The video is the documentation, yes, the videos are the documentation plus the medical evidence --

Q. Okay, and --

A. Let me finish, sir. The medical evidence, photographic documents are evidence, they are documentations. So the videographic, the photographic evidence are the documentations, and the medical descriptions are documentations but of less evidentiary value because the majority of physicians do not describe characteristics of wounds, that is not what they do.

Q. Just so I'm clear, is there any documentation in the medical records as to a gunshot wound to the back of Mr. Urena's trunk?

A. To answer that question I may have to go back. When doing my review that wasn't important to me as an expert whether the medical records show the entrance wound, there was no place in the medical records where they were describing entrance and exit, no.

Q. And I'm not asking --

A. That's not what medical records do. So if medical records don't describe exit and entrance,

Page 69

BENNET OMALU, MD - April 24, 2026

your question now becomes immaterial, because the medical records clearly indicate he was shot in his trunk.

Q. But did they indicate that he suffered any wound to the back --

A. To the back of what?

Q. To the back of his --

A. To the back of his trunk --

(Discussion held off the record.)

THE WITNESS: To the back of his trunk. Okay, do you see where it says "the right thoracic"?

BY MR. CARPENTER:

Q. And what number are you looking at?

A. Page 7, No. 8.

Q. Okay.

A. Well, in medicine when you say "right thoracic" that is the back.

Q. Any other --

(Discussion held off the record.)

(Record read.)

THE WITNESS: Thoracic, it means the back. And then I have to go back one page after the other to look for them.

BY MR. CARPENTER:

Q. Any other --

Page 70

A. Excuse me, let me finish, sir. You see where it says "Open fracture of the right iliac wing," the right iliac wing is the back, the back of the buttock, okay?

Q. What number, sir?

A. No. 18. Well, it says the injury to the right side of the pelvis, that's the back, because if that's the front, that's the front. If you know notice, up on No. 8 they describe the right groin, so the right pelvis, that's the back.

We can go on and on and on, because of your question I will find specific areas in the report when the medical terminology indicates the back.

And look at No. 37, you see where it says "the right sacrum," the right sacrum, the right iliac, those are the back. So, but like said --

Q. Any -- yes, go ahead. Sorry.

A. The standards of practice, you do not determine entrance and exit from medical records, because medical records, the objective is not to characterize wounds, that is forensic science or medicine.

So what you do is if you don't have any pictures of the shooting, but in this case we have

Page 71

video, you rely on the photographic documentation, and the videographic documentations, but assuming those do not exist, we use CT scans, because a CT scan, based on display, based on the dust of the bullets, and based on the character of the fractures, you can determine trajectory, but that is what you rely on if you don't have any videographic or photographic documentation of the shooting.

In this instance we have more than we need, there is a lot, and thankfully there are a lot, they did not stop after the shooting, they continued. More and more officers that came were documenting the event.

So we have more than enough evidence to examine the wounds, videographically and photographically, and videography is a form of documentation, and, in fact, it is even more accurate than anything because it shows you in real time the evidence.

Q. Do you, Doctor, have anywhere in your report where you note where in the videos you identified gunshot wounds to Mr. Urena's posterior?

A. So this is generally something we don't do, that's like if I say he was shot at 7 p.m., you ask

Page 72

me "Show me where it is in the report," that is called retail medicine; you look at the totality of the evidence, and like told you, I looked at each video, some of the videos took me hours, and as I am examining the video I am looking. So when you ask me such a question I'll tell you to go look at the entirety of the videos.

Now some lawyers have retained me actually to do what you are asking me, to go through the videos and put the specific time of the video the wound, that is a totally different assignment by itself.

Q. Did you make any determination in your review of any of the materials that any of the bullets that entered Mr. Urena's body were front to back, in terms of trajectory?

A. No, sir, I talked about this, that the standard of practice when you have a multiplicity of wounds, you don't itemize anymore, you look at a preponderance of evidence, and a preponderance of evidence, more likely than not in this case, is that majority, if not all -- I will not say absolute all of them, were from the back, or from the back or the side, but none was diametrically him facing the

Page 73

officers, none, that is my opinion with a reasonable degree of medical certainty. I cannot be more absolute than that.

Q. Were all of the gunshot wounds Mr. Urena sustained inconsistent with him facing the officers at any point during the shooting?

A. I will reword it that the gunshot wounds do not indicate that at any point he was attacking the officers or facing the officers to attack them when he was shot, he was fleeing when he was shot, or fleeing, falling down or on the ground, that is my opinion.

Q. Are all the gunshot wounds Mr. Urena sustained inconsistent with him facing the officers at any point in time during the shooting?

A. None of the -- the totality of the wounds are consistent with my opinion that he got shot while he was fleeing, falling on the ground or on the ground, that is my opinion.

Q. And in your report you mentioned that he was shot at 36 times, correct?

A. That is in my opinion that was with the information I received, the officers totally fired 36 times at him, 18 from each officer, and he was hit 20 times, that is the factual information I

Page 74

got from the materials, I did not determine that myself.

Q. And where in the materials does it mention that he was hit -- did you say 20 times?

A. In the medical records.

Q. Do you recall where specifically?

A. No, no, but I got them from the medical records.

Q. Did you ever make an independent determination as to how many separate bullets actually struck Mr. Urena?

A. No, that wasn't my assignment in this case; an autopsy was not performed, we don't have the appropriate platform to determine to count, so we will rely on information provided to us by any party in this case.

So my understanding is that it is a fact of the case that he was shot at 36 times and was hit 20 times, but in my report I give references for my method, they took the absolute number of times is immaterial, we use a count of ten; if somebody is shot at ten times or stabbed at ten or more times, that qualifies as overkill, that's the epidemiological standard, that qualifies as an overkill.

Page 75

(Discussion held off the record.)

BY MR. CARPENTER:

Q. Yes, I'll get to the overkill aspect in a second.

In terms of the trajectories, or in terms of the bullets, you did not make any determinations as to the sequencing of which shots struck Mr. Urena, correct?

A. No.

Q. And similarly, you did not make any determinations as to which shots that were fired actually caused what wounds?

A. No. No.

So let me ask you, when do you think you'll be done?

Q. That's a great question. I am trying to get through this, but probably another hour or so, sir.

A. So we will be done by like 1:30?

Q. I hope so.

A. Because I have a hard cutoff time, I need to go and do a homicide autopsy.

Q. When is that, sir, when is your hard cutoff?

A. 12:30, I think 2 o'clock will be my hard

Page 76

cutoff.

Q. Okay, we'll try to get through it by then.

A. That will be four hours.

Q. In terms of you mentioning the term "overkill," is that something that's defined in the medical literature?

A. Yes. Yes.

Q. And how does the medical literature define "overkill"?

A. Overkill is when there is a multiplicity of unnecessary shots, unnecessary stab wounds, that are unnecessary to kill the person, that is why I said "overkill," there are just too much to kill the person, and historically the general cutoff multiplicity, but the general cutoff that has been arbitrarily set up is ten, more than ten.

Q. More than ten?

A. Yes, sir.

Q. And can you identify any specific literature that defines "overkill"?

A. It is in my report in the section where I talk about it, I give about 20 or 30 references, not to support my opinion, but to show that my method is generally accepted to overcommit double challenge {sic}.

Page 77

BENNET OMALU, MD - April 24, 2026

Q. Okay.

MR. CARPENTER: Let me take a five-minute break and come back, and I think I'll be finishing up.

THE WITNESS: Thank you, sir.

MS. MASONGSONG: Okay, thank you.

(Recess.)

BY MR. CARPENTER:

Q. Just a quick few follow-up questions. I believe you said you have no plans to prepare any updated reports?

A. No, I did not say that, I just said I do not have any plans to provide an updated report based on the additional materials I reviewed, however, sometimes it happens down the road, the attorneys may ask me to do an addendum report, and if I do that, that will be forwarded to you.

Q. Have you been given any assignment to actually prepare an updated report?

A. As I sit here today, not yet, but other cases, I mean I am asked to prepare updated reports even prior to trial, I don't know, but when I am asked to prepare addendum reports, even after my deposition, so it depends on the lawyers, but as I sit here today, I am not working on any addendum report.

Page 98

Q. After this deposition as you sit here today do you have any plans to review more materials or gather more information to support your opinions in this case?

A. No, not to support my opinions, but as you well know, the lawyers may send me more reports, depositions of experts, reports of experts, they may ask me at any time to write a report or address a question that wasn't addressed in my report but as I sit here today, my opinions as stated in my report will not change.

Q. Okay. And your report contains all the opinions that you tend to offer at trial in this case?

A. At this junction, yes, sir, based on the questions you also asked me at this deposition, yes, sir.

Q. Are there any opinions you intend to offer at trial that are not contained in your request report?

A. No, sir, but you know, you are a lawyer, sometimes even at the time of trial, some issues may come up, and when they come up I may be asked, "Okay, Doctor, do you have any additional opinion on this issue?" So I don't know, but as my report

Page 99

states and opinions said today, they will not change, no, sir.

MR. CARPENTER: Okay. Then that's all I have for today, Doctor. Thank you for your time. I am just going to note on the record before we conclude that we're still awaiting production of Dr. Omalu's file in this matter, so we'll reserve any right to take a second session based on a review of that file, and based off of review of Mr. -- Dr. Omalu's corrected bibliography that was just sent, but with that, we'll conclude --

THE WITNESS: It is updated. Sorry, it's a software glitch. It was updated.

MR. CARPENTER: Yes, thank you, Doctor.

MS. MASONGSONG: Sounds good.

THE REPORTER: And you don't need a copy, Ms. Masongsong?

MS. MASONGSONG: No, thank you. I have your e-mail address from yesterday, so if the case goes to trial, I'll reach out to you shortly before that to get a copy.

(Whereupon, at the hour of 1:14 p.m. the deposition was concluded.)

-- o0o --

Page 100

I declare under penalty of perjury that I have read the foregoing transcript of my deposition testimony, taken on Friday, April 24, 2026, via Zoom Internet Conference, and that, with the following exceptions which I have hand-marked on the transcript, the same is a true record of the testimony given by me at that deposition:

Page/Line      Should read              Reason for change:
_____      _____         _____
_____      _____         _____
_____      _____         _____
_____      _____         _____
_____      _____         _____
_____      _____         _____
_____      _____         _____
_____      _____         _____
_____      _____         _____
_____      _____         _____
_____      _____         _____

_____                    _____
DATE                               BENNET OMALU

Page 101

BENNET OMALU, MD - April 24, 2026

COUNTY OF LOS ANGELES,  )
STATE OF CALIFORNIA,     )
        I, Annette Shaver, Certified Shorthand
Reporter licences in the State of California,
License No 6169, hereby certify that the deponent
was by me first duly sworn and the foregoing
testimony was reported by me and was thereafter
transcribed with Computer-Aided Transcription; that
the foregoing is a full, complete, and true record
of said proceeding.
        I further certify that I am not of counsel or
attorney for either or any of the parties in the
foregoing proceeding and caption named or in any
way interested in the outcome of the cause in said
caption.  The dismantling, unsealing, or unbinding
of the transcript will render the reporter's
certificates null and void.
        In witness whereof, I have hereunto set my
hand this day: 11th of May, 2026.
        _____ Reading and Signing was requested.
        _____ Reading and Signing was waived.
        __X__ Reading and Signing was not requested.

        _____
                ANNETTE SHAVER, CSR NO. 6169

Page 102

# EXHIBIT "C"



*Where Knowledge and Service Matter*

**CLIENT:** Carpenter, Rothans & Dumont LLP
500 S. Grand Avenue, 19th Floor
Los Angeles, CA  90071

**ATTENTION:** Monique Alvarez

**FILE NUMBER:** SBC.1013

**CASE NAME:** Renato Urena, individually
vs
City of San Bernardino, Jonathan Davalos, Andres Estrella, et al.

**PRODUCTION DATE:** February 20, 2026

**RECORDS SUBJECT NAME:** Renato Urena

**FACILITY NAME:** American Medical Response, Inc. c/o CSC Lawyers, Inc.
2710 Gateway Oaks Drive, Suite 150N
Sacramento, CA  95833

☒ **THE ENCLOSED RECORDS COMPLETE YOUR REQUEST FROM THIS CUSTODIAN**

☐ **THIS REQUEST IS INCOMPLETE FOR THE FOLLOWING REASON:**

    ☐ **Billing records were not available at the time of copying and will be fowarded to your office when they become available.**

    ☐ **X-Rays were not available at the time of copying and will be forwarded when available.**

☐ **THERE ARE NO RECORDS AT THE ABOVE LOCATION**

☐ **OTHER:** _____

_____

**Titan Legal Reference No.:  SU438397-03**

**2050 W 190th Street, Suite 200**
**Torrance, CA  90504**

Order: SU438397-03/CPROOF21



AO 88B (Rev. 2/14 ) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# United States District Court
### for the
### Central District of California

Renato Urena, individually
_____
*Plaintiff*
v.
City of San Bernardino, Jonathan Davalos, Andres Estrella,
et al.
_____
*Defendant*

)
)
)
)
)
)

Civil Action No. 5:24-cv-00341-JGB-SHK

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

TO:    **CUSTODIAN OF RECORDS OF: American Medical Response, Inc. c/o CSC Lawyers, Inc., 2710 Gateway Oaks
Drive, Suite 150N, Sacramento, CA 95833   Ph: (800) 913-9106**
*(Name of person to whom this subpoena is directed)*

[x] *Production:* **YOU ARE COMMANDED** to produce at the time, date and place set forth below the
following documents, electronically stored information, or objects, and to permit inspection, copying,
testing, or sampling of the material:
   **See Attachment to Subpoena in a Civil Case.**

| Place:<br>**Titan Legal Services, Inc. c/o William Ross<br>300 Cirby Hills Drive, #131<br>Roseville, CA 95678** | Phone: (800) 441-4107 | Date and Time:<br>**2/20/2026 10:00 AM** |
|---|---|---|

[ ] *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises,
land, or other property possessed or controlled by you at the time, date, and location set forth below, so
that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any
designated object or operation on it.

| Place: | Date and Time: |
|---|---|

   The following provisions of Fed. R. Civ. P. 45 are attached - Rule 45(c), relating to the place of compliance;
Rule 45(d), relating to your protection as a person subject to a subpoena, and Rule 45(e) and (g), relating to your
duty to respond to this subpoena and the potential consequences of not doing so.

**Date: January 29, 2026**

                    *CLERK OF COURT*

_____          /s/ Scott J. Carpenter, Esq.
*Signature of Clerk or Deputy Clerk*    OR    *Attorney's signature*

 The name, address, e-mail, and telephone number of the attorney representing *(name of party)* Defendants, City of San
Bernardino, a public entity, and Officers Jonathan Davalos and Andres Estrella, who issues or requests this
subpoena, are:
Scott J. Carpenter, Esq. (SBN: 253339)
Carpenter, Rothans & Dumont LLP
500 S. Grand Avenue, 19th Floor
Los Angeles, CA 90071
Telephone: (213) 228-0400
E-Mail: scarpenter@crdlaw.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the
inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before
it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

SU438397-03/A088B

Case Number:    5:24-cv-00341-JGB-SHK

Case Name:    **Renato Urena, individually**
                    vs.
            **City of San Bernardino, Jonathan Davalos, Andres Estrella, et al.**


# ATTACHMENT TO SUBPOENA IN A CIVIL CASE


The records to be produced are described as follows:

**All paramedic and/or ambulance records for incident that occured on February 10, 2023 which should also include, but not be limited to, all reports, run reports, notes, charts, dispatch transcripts, invoices and itemized statements of billing charges pertaining to the initial dispatch, examination, care, treatment and transportation pertaining to Renato Urena AKA: Erena Renato Alfonso Urena; DOB: 5/24/1973 ; SS#: XXX-XX-XXXX.**

AO 88B (Rev. 2/14 ) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. **5:24-cv-00341-JGB-SHK**

# PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* **American Medical Response, Inc. c/o CSC Lawyers, Inc.** on *(date)* **01/29/2026**

☒ I served the subpoena by delivering a copy to the named individual as follows: **2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833** *Maddie Bright* on *(date)* 2/3/2026 ; or

☐ I returned the subpoena unexecuted because ;

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ **15.00**

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____

I declare under penalty of perjury that this information is true.

Date: 2/3/2026

_____
Server's signature

*William Ross, Field Agent*
Printed name and title

*2050 W. 190th St. Ste. 200 Torrance, CA 90504*
Server's Address

Additional information regarding attempted service, etc:

AO 88B (Rev. 2/14 ) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c),(d) and (e) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery. A subpoena may command:**

(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction-which may include lost earnings and reasonable attorney's fees-on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises - or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**

(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is requried may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) DUTIES IN RESPONDING TO A SUBPOENA.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) CONTEMPT.** The court for the district where compliance is required-and also, after a motion is transferred, the issuing court-may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

CPROOF29/SU438397

Scott J. Carpenter, Esq. (SBN: 253339)
Carpenter, Rothans & Dumont LLP
500 S. Grand Avenue, 19th Floor
Los Angeles, CA 90071
Phone: (213) 228-0400 Fax: (213) 228-0401
E-Mail: scarpenter@crdlaw.com

Attorney for Defendants, City of San Bernardino, a public entity, and Officers Jonathan Davalos and Andres Estrella

# UNITED STATES DISTRICT COURT
for the
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Renato Urena, individually | **Case No.** 5:24-cv-00341-JGB-SHK |
| Plaintiff(s) | |
| vs. | **NOTICE OF ISSUANCE OF SUBPOENA FOR PRODUCTION OF DOCUMENTS, INFORMATION, OR OBJECTS FOR AMERICAN MEDICAL RESPONSE, INC. C/O CSC LAWYERS, INC.** |
| City of San Bernardino, Jonathan Davalos, Andres Estrella, et al. | |
| Defendant(s) | |
| | Date: February 20, 2026 |
| | Time: 10:00 AM |
| | Production Address: Titan Legal Services, Inc. c/o William Ross 300 Cirby Hills Drive, #131 Roseville, CA 95678 |

TO ALL APPEARING PARTIES AND THEIR ATTORNEYS OF RECORDS WITH RESPECT TO THE FOLLOWING CUSTODIAN / DEPONENT:

American Medical Response, Inc. c/o CSC Lawyers, Inc.
2710 Gateway Oaks Drive, Suite 150N
Sacramento, CA 95833

**PLEASE TAKE NOTICE** that pursuant to Federal Rules of Civil Procedure, Rule 45(a)(4), the Attorney(s)

for the above Defendants, has issued a subpoena to produce documents, information, or objects to the

Custodian or Deponent listed above. A complete copy of the subpoena is attached, hereto.

Dated: January 29, 2026                    Signed: _____ **/s/ Scott J. Carpenter, Esq.** _____

Attorney for Defendants, City of San Bernardino, a public entity, and Officers Jonathan Davalos and Andres Estrella

- 1 -

SU438397-03/A088D

## Proof of Service

I, Trixie Estanislao, and any employee retained by Titan Legal Services, Inc., am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action, my business address is **2050 W. 190th Street, Suite 200, Torrance, CA 90504.**

On  **January 29, 2026** I served the foregoing documents described as:

**NOTICE OF ISSUANCE OF SUBPOENA FOR PRODUCTION OF DOCUMENTS, INFORMATION, OR OBJECTS OF AMERICAN MEDICAL RESPONSE, INC. C/O CSC LAWYERS, INC.;**
**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION (with Attachment);**

[XX]      to interested parties on this action by sending the true copies thereof addressed as follows:

Law Offices of Dale K. Galipo
Dale K. Galipo, Esq.
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367

[XX]      **VIA U.S. MAIL**
As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on the same day with postage thereon fully paid at Torrance, California, in the ordinary course of business.

Executed on  January 29, 2026, at Torrance, CA.

[XX]      (Federal) I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Signed:_____
Trixie Estanislao

## DECLARATION OF CUSTODIAN OF RECORDS

Records pertain to:     **Renato Urena**

Description of Records: All paramedic and/or ambulance records for incident that occured on **February 10, 2023** which should also include, but not be limited to, all reports, run reports, notes, charts, dispatch transcripts, invoices and itemized statements of billing charges pertaining to the initial dispatch, examination, care, treatment and transportation pertaining to Renato Urena AKA: Erena Renato Alfonso Urena; DOB: 5/24/1973 ; SS#: XXX-XX-XXXX.

I, the undersigned, am duly authorized custodian of records for **American Medical Response, Inc. c/o CSC Lawyers, Inc.**, whose business address is 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA, 95833, and have authority to certify records. I am qualified to testify as to the preparation and maintenance of the records sought by the subpoena or authorization attached hereto and, if called as a witness, could testify competently thereto. Further, I hereby certify to the following (check appropriate boxes):

[X] **CERTIFICATION OF RECORDS COPIED**

1.     The accompanying copies are true copies of all records in my custody or control described in the subpoena or authorization.

   [ ] **If applicable, When Only Partial Records are Produced** The following records described in the subpoena or authorization are not in my custody for the following reasons.

   _____

2.     (a) the record was made at or near the time by or from information transmitted by someone with knowledge; (b) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (c) making the record was a regular practice of that activity;

3.     The accompanying records were prepared in the following manner. **(check all applicable boxes)**
   [ ] from microfilm/microfiche; [ ] from computer stored data; [ ] by photocopying the original paper record; [X] by electronic duplication process; [ ] by photographic duplication process; [ ] other (describe):

   _____

[ ] **CERTIFICATION OF NO RECORDS**
[ ] **CERTIFICATION OF NO XRAYS/MRI'S/ RADIOLOGICAL FILMS** [ ] **CERTIFICATION OF NO BILLING RECORDS**
[ ] **CERTIFICATION OF NO COLORED PHOTOS**

1.     A thorough search has been made for the documents, records and things called for in the subpoena or authorization and, based upon the information provided, no such items were found.

2.     No copies or records are transmitted because we do not have said records.

3.     If items 1. and 2. above do not apply please Explain the reason why you have NO RECORDS:

   _____

I **DECLARE** under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ____02-13-2026____ at ____Nashville, TN____ , ~~California~~

Print Name ____Megan Adams____ Signed _Megan Adams_

Phone ____866-587-6274____

**DO NOT WRITE BELOW THIS LINE, FOR TITAN USE ONLY**

### DECLARATION OF PROFESSIONAL PHOTOCOPIER

(California Evidence Codes 1400, 1560; Code of Civil Procedure 1985.3, 2020(e) and Business and Professions Code 22462)

As a representative of "Titan Legal Services, Inc.", I hereby declare that the attached are true and complete copies of all records which were provided to me on this date.

Said records will be delivered only to the party or entity issuing this request.

Executed on _____ at _____ , California

Print Name _____ Signed _____

Titan ref#: SU438397-03/Cproof7us

000001

   

UNDELIVERABLE MAIL ONLY
3867 W. Market St.  PMB 155
Akron, OH  44333-4525

**INVOICE**

- AMERICAN MEDICAL RESPONSE IE

| | | | |
|---|---|---|---|
| **TRIP #** | 883-17033967-01 | **ACCT #** | |
| **PATIENT NAME** | RENATO A. URENA | | |
| **DATE OF SERVICE** | 02/10/2023 | | |
| **AMOUNT DUE** | $0.00 | **DUE DATE** | 02/28/2026 |

RENATO A. URENA
13860 NASON ST
MORENO VALLEY, CA 92555-4620

REMIT PAYMENT TO:

AMERICAN MEDICAL RESPONSE
PO BOX 55418
LOS ANGELES, CA 90074-5418

PLEASE DETACH AND RETURN THIS PORTION WITH YOUR PAYMENT

| PATIENT NAME | ACCOUNT # | TRIP # | INVOICE DATE |
|---|---|---|---|
| RENATO A. URENA | 004499338-0001 | 883-17033967-01 | 02/13/2026 |

| SERVICE DATE | SERVICE FROM | SERVICE TO |
|---|---|---|
| 02/10/2023 | W 14TH ST / N MT VERNON A | ARROWHEAD REGIONAL MED CTRCOUN |

| IMPORTANT MESSAGES |
|---|

| CODE | DESCRIPTION | UNITS | UNIT CHARGE | | TOTAL CHARGE |
|---|---|---|---|---|---|
| A0429 | ALS EMERG MANDATED | 1 | $1,870.61 | | $1,870.61 |
| A0425 | MILEAGE | 6 | $33.01 | | $198.06 |
| | *** PAYMENTS *** | | | $358.91- | |
| | *** ADJUSTMENTS *** | | | $1,709.76- | |

CALL RCVD: 10:17

**TOTAL CHARGES DUE** — $0.00

FED TAX ID: 952223085

Send billing inquiries to:  **AMERICAN MEDICAL RESPONSE**, 50 S. Main St., Suite 401, Akron, OH  44308
or call: **1-800-913-9106**        Keep this portion for your records

**000002**

Patient:  Urena , Renato



Billing Report [v1.5A] - Working

## Patient Information

**Patient Name:** Urena , Renato                    **Social Security #:** 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

---------- DEMOGRAPHICS ------------------------------------            ---------- HOME ADDRESS ------------------------------------

**Gender:** Male                                    **Address:** 13560 Nason St
**Date of Birth:** 05/24/1973                       **City:** City of Moreno Valley
**Age:** 49Years                                    **State:** CA
**Est. Weight:** 81.6 Kilograms                     **ZIP:** 92555
                                                    **County:** Riverside
**Drivers License:** -                              **Country :** United States

**Race:** Hispanic or Latino

| Type | Phone Number |
|---|---|
| Home | (999) 999-9999 |

| External Patient Record ID Number | ID Number Type |
|---|---|
|  | Medical Record Number |

## Insurance Information

| Name | Group ID | Group Name | Policy ID # | Insured First Name | Insured Last Name | Relationship to Insured |
|---|---|---|---|---|---|---|
| Transport Auth: | | | | | | |

## Dispatch Information

---------- EVENT NUMBER ------------------------------------            ---------- MUTUAL AID ------------------------------------
**County Event #:** 17033967
**Agency Event #:** 17033967

---------- UNIT INFO ------------------------------------            ---------- EMD INFORMATION ------------------------------------
**Agency:** AMR - Redlands                          **Complaint at Disp:** Stab/Gunshot Wound/Penetrating Trauma
**Unit Number:** RD135                              **EMD Card #:**
**Unit Call Sign:** RD135
**Primary Role:** ALS Ground Transport              ---------- EVENT TIMES ------------------------------------
**Level of Care:** ALS-Paramedic
**EMS Shift:**                                      **911 Notified:** 02/10/2023 10:17:59
                                                    **Unit Notified:** 02/10/2023 10:18:49
                                                    **Acknowledge:**
---------- INCIDENT ADDRESS ------------------------------------       **En Route:** 02/10/2023 10:18:57
                                                    **On Scene:** 02/10/2023 10:26:57
**Location Name:**                                  **At Patient :** 02/10/2023 10:27:30
**Location Type:** Other                            **To Destination:** 02/10/2023 10:30:24
**Incident Address:** W 14th St / N Mt Vernon Ave   **At Destination:** 02/10/2023 10:40:05
**Address 2:**                                      **ED Transfer:** 02/10/2023 11:42:00
**City:** San Bernardino City                       **Back in Service:** 02/10/2023 11:51:12
**State:** CA                                       **Canceled:**
**Zip:** 92411                                      **Call Completed:**
**Incident County:** SAN BERNARDINO
**Cross Street:** N Mt Vernon Ave

---------- PATIENT TRANSFER ON SCENE ------------------------------            ---------- AIR TRANSPORT ------------------------------------

**Transfer Care:**                                  **Time Called:**
**To Agency:**                                      **Time Arrived:**
**Rig Number:**                                     **Patient at LZ:**

## Event Disposition

**Disposition:** Patient Treated, Transported

**Destination:** Arrowhead Regional Medical Center          **Type:** Hospital-Emergency Department
**Destination Address:** 400 North Pepper Ave
Colton, CA 92324
San Bernardino

**Reason for Choosing:** Protocol                           **Acuity at Dest.:** Lower Acuity (Green)

**Closest Facility:**
**To Distant Reason:**

**Hospital Contacted:** 02/10/2023 10:30:22

**Time of Alert or Activation**                             **Destination Team**

## Unit Response Information

**Service Requested:** 911 Response (Scene)                 **Response Urgency:**
**Dispatch Priority:**                                      **Response Mode:** Emergent (Immediate Response)
                                                            **Descriptors:** Lights and Sirens
**Standby Purpose:**
**Standby Other:**

## Delays and Barriers to Care

| Incident #: 17033967 | Patient: Urena , Renato | Printed: 02/10/2023 18:24 |
|---|---|---|

**Dispatch Delay:** None/No Delay
**Response Delay:** None/No Delay
**Scene Delay:** None/No Delay
**Transport Delay:** None/No Delay
**Turn-Around Delay:** Clean-up
**Barriers to Care:** None Noted

## Transport Information

**Pts In this Unit:**
**Transport Code:**
**Trans Assessment:**
**Transport Descriptors:** No Lights or Sirens

**Transport Mode:** Emergent (Immediate Response)

---------- PATIENT MOVEMENT -------------------------------------
**To Ambulance:**
**Transport Position:**
**From Ambulance:**

---------- ODOMETER INFO -------------------------------------
**On-Scene:** 0
**Patient Destination:** 5.7
**Mileage To Destination:** 5.7
**Mileage Total:**

---------- HOSPITAL DIVERSION -------------------------------
**Diversion Time:**
**Diverted From:**
**Diversion Reason:**

## Crew Members

| Name | Cert Level | Role |
|---|---|---|
| Wood, Zackary | EMT-Paramedic | Primary Patient Caregiver-At Scene ; Primary Patient Caregiver-Transport ; Other Patient Caregiver-Transport ; Other Patient Caregiver-At Scene |
| Casner, River | EMT-Basic | Other Patient Caregiver-At Scene ; Driver/Pilot-Transport ; Driver/Pilot-Response |

## Scene Information

**First on Scene?:** No    **# of Patients:** Single    **# in this EMS Unit:**    **MCI?:**

**Other Agency On Scene**    **Agency ID**    **Type of Service**

**Disaster Related Incident:**    **Type of Disaster:**

## Medical History

**Obtained From:**    **Who called 911?:**

**Advance Directives:**

**Current Medications**    **Comments**

Unable to Complete

**Medication Allergies**    **Comments**

Unable to Complete

**Environmental/Food Allergies**    **Comments**

## Patient's Chief Complaint(s)

| Type | Complaint | Duration | Time Units |
|---|---|---|---|
| Chief (Primary) | Gunshot wound | 10 | Minutes |

**Cardiac Arrest:** No
**Anatomic Location:** General/Global    **Possible Injury:** Yes
**Organ System:** Musculoskeletal/Skin    **Patient Type:**

## Symptoms and Impressions

**Initial Acuity:** Critical (Red)
**Last Seen Normal:**    **Symptom Onset:** 02/10/2023 10:14:17
**ALS Assessment Warranted:** Yes    **ASL Assessment Performed By::** Paramedic - Fire Dept. Unit

**Primary Symptom:** Bleeding

**Other Symptoms:** Bleeding

**Primary Impression:** Traumatic Injury

**Second Impression:** Traumatic Injury

## Report Narrative

RD135 arrived on scene to find a 49 year old male laying supine on concrete being evaluated by fire department paramedics. The pt was alert and oriented with a gcs of 15 and a chief complaint of multiple gunshot wounds. I observed multiple gunshot wounds to the pts torso. Bleeding was controlled prior to our arrival. The pt was immediately moved to gurney via mega mover and was placed supine for treatment. The pt was placed in ambulance. All treatment took place in back of ambulance. Hyfin Chest seals were used to secure wounds to chest. Fire department performed all assessment and direction of all pt treatment. I assisted with pt IV access enroute to arrowhead medical center. Upon arrival FD paramedic gave full report and transferred care to er nurse.

## OB Information

**Incident #:** 17033967    **Patient:** Urena , Renato    **Printed:** 02/10/2023 18:24

**Patient:** Urena, Renato

| Pregnancy: | | Last Period: |
|---|---|---|
| Para: | | Gravida: |
| Estimated Delivery: | | |

## Vital Signs

| Crew ID | Time | Pulse | Pulse Rhythm | BP | Respiratory | Effort | Pulse Ox | Qualifier | Glucose Level | Temp |
|---|---|---|---|---|---|---|---|---|---|---|
| P40103 | 10:38:46 | 110 | Regular | 117 / 72 | 14 | | 93 | At Room Air | | |

| Crew ID | Time | GCS - Eye | GCS - Verbal | GCS - Motor | Total GCS Score | GCS - Qualifier | APGAR |
|---|---|---|---|---|---|---|---|
| P40103 | 10:38:46 | 4 - Opens Eyes spontaneously (All Age Groups) | 5 - Oriented (>2 Years); Smiles, oriented to sounds, follows objects, interacts | 6 - Obeys commands (>2Years); Appropriate response to stimulation | 15 | Initial GCS has legitimate values without interventions such as intubation and sedation | |

| Time | Vitals Crew Members ID | Comments |
|---|---|---|

## Head to Toe Exams

### Assessment Summary

02/10/2023 10:57:41

**Detailed Findings**

| Location | Description | Details |
|---|---|---|

**Normal Findings**

Skin ;  Head ;

**Not Done**

## Procedures

| Time | Crew ID | Procedure | Location | Size | Attempts | Successful | Response |
|---|---|---|---|---|---|---|---|

| Time | Comments |
|---|---|

## Medication Administration

| Time | Crew ID | Medication | Dosage | Units | Route | Response | Complications |
|---|---|---|---|---|---|---|---|

| Time | Comments |
|---|---|

## Monitor Data / EKGs

| Time | Event Type | ECG Lead | Rhythm | EKG Ectopy | Device Interpretation | Type of Shock | Energy | Pacing Rate | Capture | Cause for Change |
|---|---|---|---|---|---|---|---|---|---|---|

## Consumables

| Supply Item | Number Used |
|---|---|

## Controlled Substances

| Broken Seal # | Medication | Administered | Units | Amount Wasted | Amount Returned | Crew #1 | Crew #2 |
|---|---|---|---|---|---|---|---|

## Advanced Airway

| Time | Crew ID | Type | Airway Device | Method | Determined Placement | Tube Depth | Measured At | Complications | Breath Sounds-Left | Breath Sounds-Right | Gastric Sounds |
|---|---|---|---|---|---|---|---|---|---|---|---|

Time of Decision:
Time Abandoned:
Indications:

## Injuries and Trauma

**Work-Related?:** No

**Cause of Injury:** Firearm injury

**Height of Fall (feet):**

**Mechanism of Injury:** Penetrating

| **Incident #:** 17033967 | **Patient:** Urena, Renato | **Printed:** 02/10/2023 18:24 |
|---|---|---|

**000005**

**Mechanisms to Consider:**

**Trauma Criteria:** All penetrating injuries to head, neck, torso, and extremities proximal to elbow or knee

**Risk Factors:** Not Applicable

**OSHA PPE Used:**

| Accident Information | | |
|---|---|---|
| **# of Vehicles:** | **Vehicle Type:** | **Exterior Damage:** |

**Location of Patient:**

**Airbag Deployment:**

**Safety Equipment:**

| Stroke Assessments | | | | |
|---|---|---|---|---|
| Time | Facial Droop | Arm Drift | Speech | Stroke Scale |

**Balance:**                    **Eyes:**

| STEMI Assessment | | |
|---|---|---|
| STEMI Probable? | 12 Lead Interpreted By | Transmitted |

**Exclusion Criteria:**

| Cardiac Arrest | |
|---|---|
| **Arrest Etiology:** | **Time of Arrest:** |
| **First Rhythm:** | **Time of First Defib:** |
| **Patient Outcome:** | **Resus Stopped:** |

**Witnessed By:**

**Resuscitation by this Crew:**

**Reason Discontinued:**

**ROSC:**                    **ROSC Time:**

**Rhythm at Destination:**
**Patient Outcome at End of Call:**

| CPR / AED Use |
|---|

**CPR PTA:**

**Who Provided CPR:**

**Time of First CPR:**

**Type of CPR:**

**AED PTA:**

**Who Used AED :**

| Signatures |
|---|

**Date:**

**Type:** Patient

**Status:** Not Signed - Due to Distress Level

**Reason:** HIPAA acknowledgement/Release; Permission to Transport; Permission to Treat

**Paragraph Text:**
Our Notice of Privacy Practices provides information about how we may use and disclose protected health information about you. You have the right to review our notice before signing this consent. As provided in our notice, the terms of our notice may change. If we change our notice, you may obtain a revised copy. You have the right to request that we restrict how protected health information about you is used or disclosed for treatment, payment or health care operations. We are not required to agree to this restriction, but if we do, we are bound by our agreement. By signing this form, you consent to our use and disclosure of protected health information about you for treatment, payment or health care operations. You have the right to revoke this consent, in writing, except where we have already made disclosures in reliance on your prior consent.

**Signature:**

**Full Name:** Renato  Urena

| Incident #: 17033967 | Patient: Urena , Renato | Printed: 02/10/2023 18:24 |
|---|---|---|

**000006**

**Date/Time Signature Locked:** 02/10/2023 11:15:39

**Date:**

**Type:** EMS Primary Care Provider (for this event)

**Status:** Signed

**Reason:** EMS Provider

**Paragraph Text:** I acknowledge that I have provided or that my partner has provided the above assessments/treatments for this patient.

**Signature:**

**Full Name:** Zackary   Wood

**Date/Time Signature Locked:** 02/10/2023 10:53:30

**Date:**

**Type:** Healthcare Provider

**Status:** Signed

**Reason:** Transfer of Patient Care

**Paragraph Text:** I acknowledge that the above patient was transferred to my care.

**Signature:**

**Full Name:** Victor   RD

**Date/Time Signature Locked:** 02/10/2023 10:51:05

| Employer Information | |
|---|---|
| **Employer:** | |
| **Address:** ,  | |

| Closest Relative | |
|---|---|
| **Closest Relative:** | **Relationship:** |
| **Address:** , | |
| **Phone Number** | **Type** |

| Patient Belongings | |
|---|---|
| **Left With:** | **Left With Other:** |
| **Patient Belongings:** None | |
| **Belongings Other:** | |

### Base Contact

| Time | Procedure Ordered | | | | Comments | |
|---|---|---|---|---|---|---|

| Time | Medication Ordered | Dosage | Units | Route | Comments |
|---|---|---|---|---|---|

### PPE and Exposures

| Crew Member | PPE Used | Suspected Exposure | Type of Exposure | Other |
|---|---|---|---|---|
| Casner, River | Gloves | No | | |
| Wood, Zackary | Gloves | No | | |

### Refusal of Care

| **Incident #:** 17033967 | **Patient:** Urena , Renato | **Printed:** 02/10/2023 18:24 |
|---|---|---|

**Patient:** Urena,Renato

**Refusal Type:** / **Does Patient or Legal Representative have the capacity to refuse care?:**

**Reason for refusal of care:**

**Patient Explanation:**

**Areas refused and/or accepted :**

**Specific Items Refused:**

**Crew Interventions:**

**Patient Alternative Plan:**

**Patient Left With:**

**Risks Discussed?:**

**Instructions Provided by Crew:**

| Attachments |
| --- |

**File Name:** Transfer_133205289846427663
**Modified By:** Zackary Wood
**Modified On:** 02/10/2023 18:04:04

**Patient Name:** Urena , Renato

**EMS Agency Name:** San Bernardino County Fire Department

Division 11 Admin
1824 W St
City of San Bernardino, CA
92415
Work: 909-357-1551
Work: 909-829-4441
Work: 760-947-5289
Work: 760-947-8023

**Complete ePCR w/attachments**

## Patient Information

**Name:** Urena , Renato
**Address:** 13560 Nason St
City of Moreno Valley, CA 92555
**Is Patient Homeless?:** No

**Age:** 49 Years
**Gender:** Male

**D.O.B.:** 05/24/1973
**Race:** Hispanic or Latino

**Weight:** 81.6 kgEstimate

| Patient's Phone Number | Type |
|---|---|
| (999) 999-9999 | Home |

## Call Type/Location/Disposition

**Call Type:** Stab/Gunshot Wound/Penetrating Trauma

**Resp. Mode:** Emergent (Immediate Response)

**Response:** 911 Response (Scene)

**Location:** Other
**Incident Address:** W 14th St
San Bernardino City, CA 92411
**Response Delay:** None/No Delay

**Disposition:** Patient Treated, Transported with this EMS Crew in Another Vehicle
**Primary Role of the Unit:** Fire Apparatus, ALS (non-transport)
**Transport Mode:** Emergent (Immediate Response)
**Destination:** Arrowhead Regional Medical Center
400 North Pepper Ave
Colton, CA 92324
**Dest. Determ.:** Protocol

## Response Times and Mileage

**PSAP:** 02/10/2023 10:16:50
**Disp. Notified:** 02/10/2023 10:16:50
**Unit Disp.:** 02/10/2023 10:17:55
**At Patient:** 02/10/2023 10:24:17
**Destination PT Transfer of Care:** 02/10/2023 10:53:09
**Received From Agency Name:** San Bernardino County Fire Department

**Incident Number:** 23-033823
**Call Sign:** ME222
**Veh. #:** ME222

**EMS Transport Method:** Ground-Ambulance

**Received From Call Sign:** ME222

## Unit Personnel

| Crew Member | Level of Certification | Role |
|---|---|---|
| Bonhus, Andrew | EMT-Paramedic | Primary Patient Caregiver-At Scene |
| Cordova, Anthony | EMT-Paramedic | Primary Patient Caregiver-At Scene |
| Buckner, Nate | EMT-Paramedic | Primary Patient Caregiver-At Scene |

## Provider Impression

**Primary Impression:** Traumatic Injury

**Secondary Impression:** Traumatic Injury

## Patient Condition

| Complaint Type | Complaint | Duration |
|---|---|---|
| Chief (Primary) | Gunshot wound | 10 Minutes |

**Date/Time of Symptom Onset:** 02/10/2023 10:14:17
**Primary Symptom:** Bleeding
**Alcohol/Drug Use:** None Reported
**Chief Complaint Organ System:** Musculoskeletal/Skin

**Mechanism of Injury:** Penetrating

**Cause of Injury:** Firearm injury

**Possible Injury:** Yes
**Other Symptoms:** Bleeding
**Barriers to Patient Care:** None Noted
**Chief Complaint Anatomic Location:** General/Global
**Initial Patient Acuity:** Critical (Red)
**Final Patient Acuity:** Critical (Red)

## Past Medical History

### Patient Medications

| Medication |
|---|
| Unable to Complete |

### Medication Allergies

| Medication Allergies |
|---|
| Unable to Complete |

**Medical History:** Unable to Complete
**Is this patient a suspected PUI?:** No

**Is this patient a confirmed COVID-19? :** No

## Assessment Exam

| Date/Time of Assessment |
|---|
| 10:40:36 |

**Unit Notified:** 02/10/2023 10:17:55
**Incident #:** 23-033823

**Patient Name:** Urena , Renato
**Patient Care Report Number:** 3891be34c2cd467e8ed044e6b68ec79a

**Call #:** 23-033823
**Date Printed:** 02/10/2023 10:56

---

**Patient Name:** Urena, Renato

**EMS Agency Name:** San Bernardino County Fire Department

## Assessment Summary

**02/10/2023 10:40:36**

### Detailed Findings

| Location | Description | Details |
|---|---|---|
| Skin | Pale | |
| Chest/Lungs | Normal | GSW X 3 |
| Extremity Not Specified | Gunshot Wound | Legs, left foot |

### Normal Findings

Head;

### Not Done

## Vitals

### Vitals

| Time | Response PTA (AVPU) | BP | Method of Blood Pressure Measurement | B/Pressure | Patient Position | Airway | Pulse Rate | Method Heart Rate | Pulse Quality | Pulse Rhythm | Resp Rate | Resp Reg | Effort | SpO2 | Qual | CO2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10:38:46 | No Alert | 117/72 | Cuff-Automated | Cuff-Automated | | | 110 | | | Regular | 14 | | | 93 | At Room Air | |

### Vitals

| Date/Time | Mean Arterial Pressure | Temperature | Temperature Method | Pain Scale Score | Pain Scale Type | Blood Glucose Level |
|---|---|---|---|---|---|---|
| 10:38:46 | 87 | | | Unable to Complete | Other | |

### PQRST

| Date/Time Vital Signs Taken | Provoked | Quality | Region | Pain Scale Score | Duration | Duration Units | PQRST Narrative |
|---|---|---|---|---|---|---|---|
| 10:38:46 | | | | Unable to Complete | | | |

### GCS

| Time | Total Glasgow Coma Score | Eye | Motor | Verbal | Score Qualifier |
|---|---|---|---|---|---|
| 10:38:46 | 15 | 4 - Opens Eyes spontaneously (All Age Groups) | 6 - Obeys commands (>2Years); Appropriate response to stimulation | 5 - Oriented (>2 Years); Smiles, oriented to sounds, follows objects, interacts | Initial GCS has legitimate values without interventions such as intubation and sedation |

## Cardiac Arrest

**Cardiac Arrest:** No

## Trauma Detail

**Cause of Injury:** Firearm injury
**Mechanism of Injury:** Penetrating
**Trauma Center Criteria:** All penetrating injuries to head, neck, torso, and extremities proximal to elbow or knee
**Vehicular, Pedestrian, or Other Injury Risk Factor:** Not Applicable
**Work-Related Illness/Injury:** No

## Billing Information

**Work Related?:** No

## Signatures

**Type of Person Signing:** EMS Primary Care Provider (for this event)

**Signature Reason:** EMS Provider

**Paragraph Text:**

**Status:** Signed

**Signature Graphic:**

**Unit Notified:** 02/10/2023 10:17:55
**Incident #:** 23-033823

**Patient Name:** Urena, Renato
**Patient Care Report Number:** 3891be34c2cd467e8ed044e6b68ec79a

**Call #:** 23-033823
**Date Printed:** 02/10/2023 10:56

000011

Patient:  Urena,Renato

Page 2 of 3

Patient: Urena,Renato

**Patient Name:** Urena,Renato                    **EMS Agency Name:** San Bernardino County Fire Department

**Printed Name:** Nate Buckner

**Date/Time Signature Locked:**

**Signature Date:**

| MCI |
|---|

**Number of Patients at Scene:** Single

| Valuables |
|---|

**Patient Belongings:** Clothing

**Unit Notified:** 02/10/2023 10:17:55          **Patient Name:** Urena,Renato          **Call #:** 23-033823
**Incident #:** 23-033823          **Patient Care Report Number:** 3891be34c2cd467e8ed044e6b68ec79a          **Date Printed:** 02/10/2023 10:56

**Incident #:** 17033967                    **Patient:** Urena,Renato                    **Printed:** 02/10/2023 18:24

**000013**

**Incident #:**  17033967                    **Patient:**  Urena,Renato                    **Printed:**  02/10/2023 18:24

000014

Patient Name:  Urena , Renato                                  EMS Agency Name:  San Bernardino County Fire Department



**Complete ePCR w/attachments**

Division 11 Admin
1824 W St.
City of San Bernardino, CA 92415
Work: 909-357-1551
Work: 909-829-4441
Work: 760-947-5289
Work: 760-947-8023

## Patient Information

| | | | | | |
|---|---|---|---|---|---|
| **Name:** | Urena , Renato | **Age:** | 49 Years | **D.O.B.:** | 05/24/1973 |
| **Address:** | 13560 Nason St City of Moreno Valley, CA 92555 | **Gender:** | Male | **Race:** | Hispanic or Latino |
| **Is Patient Homeless?:** | No | **Weight:** | 81.6 kgEstimate | | |

| Patient's Phone Number | Type |
|---|---|
| (999) 999-9999 | Home |

## Call Type/Location/Disposition

| | | | |
|---|---|---|---|
| **Call Type:** | Stab/Gunshot Wound/Penetrating Trauma | **Disposition:** | Patient Treated, Transported with this EMS Crew in Another Vehicle |
| **Resp. Mode:** | Emergent (Immediate Response) | **Primary Role of the Unit:** | Fire Apparatus, ALS (non-transport) |
| **Response:** | 911 Response (Scene) | **Transport Mode:** | Emergent (Immediate Response) |
| | | **Destination:** | Arrowhead Regional Medical Center 400 North Pepper Ave Colton, CA 92324 |
| **Location:** | Other | **Dest. Determ.:** | Protocol |
| **Incident Address:** | W 14th St San Bernardino City, CA 92411 | | |
| **Response Delay:** | None/No Delay | | |

## Response Times and Mileage

| | | | |
|---|---|---|---|
| **PSAP:** | 02/10/2023 10:16:50 | **Incident Number:** | 23-033823 |
| **Disp. Notified:** | 02/10/2023 10:16:50 | **Call Sign:** | ME222 |
| **Unit Disp.:** | 02/10/2023 10:17:55 | **Veh. #:** | ME222 |
| **At Patient:** | 02/10/2023 10:24:17 | | |
| **Destination PT Transfer of Care:** | 02/10/2023 10:53:09 | **EMS Transport Method:** | Ground-Ambulance |
| **Received From Agency Name:** | San Bernardino County Fire Department | **Received From Call Sign:** | ME222 |

## Unit Personnel

| Crew Member | Level of Certification | Role |
|---|---|---|
| Bonhus, Andrew | EMT-Paramedic | Primary Patient Caregiver-At Scene |
| Cordova, Anthony | EMT-Paramedic | Primary Patient Caregiver-At Scene |
| Buckner, Nate | EMT-Paramedic | Primary Patient Caregiver-At Scene |

## Provider Impression

| | | | |
|---|---|---|---|
| **Primary Impression:** | Traumatic Injury | **Secondary Impression:** | Traumatic Injury |

## Patient Condition

| Complaint Type | Complaint | Duration |
|---|---|---|
| Chief (Primary) | Gunshot wound | 10 Minutes |

| | | | |
|---|---|---|---|
| **Date/Time of Symptom Onset:** | 02/10/2023 10:14:17 | | |
| **Primary Symptom:** | Bleeding | **Possible Injury:** | Yes |
| **Alcohol/Drug Use:** | None Reported | **Other Symptoms:** | Bleeding |
| **Chief Complaint Organ System:** | Musculoskeletal/Skin | **Barriers to Patient Care:** | None Noted |
| | | **Chief Complaint Anatomic Location:** | General/Global |
| **Mechanism of Injury:** | Penetrating | **Initial Patient Acuity:** | Critical (Red) |
| **Cause of Injury:** | Firearm injury | **Final Patient Acuity:** | Critical (Red) |

## Past Medical History

### Patient Medications

**Medication**

Unable to Complete

### Medication Allergies

**Medication Allergies**

Unable to Complete

| | |
|---|---|
| **Medical History:** | Unable to Complete |
| **Is this patient a suspected PUI?:** | No |
| **Is this patient a confirmed COVID-19? :** | No |

## Assessment Exam

**Date/Time of Assessment**

10:40:36

| | | | | | |
|---|---|---|---|---|---|
| **Unit Notified:** | 02/10/2023 10:17:55 | **Patient Name:** | Urena , Renato | **Call #:** | 23-033823 |
| **Incident #:** | 23-033823 | **Patient Care Report Number:** | 3891be34c2cd467e8ed044e6b68ec79a | **Date Printed:** | 02/10/2023 10:56 |

Page 1 of 3

**000015**

**Patient Name:** Urena , Renato     **EMS Agency Name:** San Bernardino County Fire Department

## Assessment Summary

### 02/10/2023 10:40:36

#### Detailed Findings

| Location | Description | Details |
|---|---|---|
| **Skin** | Pale | |
| **Chest/Lungs** | Normal | GSW X 3 |
| **Extremity** *Not Specified*: | Gunshot Wound | Legs, left foot |

#### Normal Findings

Head ;

#### Not Done

## Vitals

### Vitals

| Time | PTA | Response (AVPU) | BP | Method of Blood Pressure Measurement | B/Pressure | Patient Position | Airway | Pulse Rate | Method Heart Rate | Pulse Quality | Pulse Rhythm | Resp Rate | Resp Reg | Effort | SpO2 | Qual | CO2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10:38:46 | No | Alert | 117 / 72 | Cuff-Automated | Cuff-Automated | | | 110 | | | Regular | 14 | | | 93 | At Room Air | |

### Vitals

| Date/Time | Mean Arterial Pressure | Temperature | Temperature Method | Pain Scale Score | Pain Scale Type | Blood Glucose Level |
|---|---|---|---|---|---|---|
| 10:38:46 | 87 | | | Unable to Complete | Other | |

### PQRST

| Date/Time Vital Signs Taken | Provoked | Quality | Region | Pain Scale Score | Duration | Duration Units | PQRST Narrative |
|---|---|---|---|---|---|---|---|
| 10:38:46 | | | | Unable to Complete | | | |

### GCS

| Time | Total Glasgow Coma Score | Eye | Motor | Verbal | Score Qualifier |
|---|---|---|---|---|---|
| 10:38:46 | 15 | 4 - Opens Eyes spontaneously (All Age Groups) | 6 - Obeys commands (>2Years); Appropriate response to stimulation | 5 - Oriented (>2 Years); Smiles, oriented to sounds, follows objects, interacts | Initial GCS has legitimate values without interventions such as intubation and sedation |

## Cardiac Arrest

**Cardiac Arrest:** No

## Trauma Detail

**Cause of Injury:** Firearm injury
**Mechanism of Injury:** Penetrating
**Trauma Center Criteria:** All penetrating injuries to head, neck, torso, and extremities proximal to elbow or knee
**Vehicular, Pedestrian, or Other Injury Risk Factor:** Not Applicable
**Work-Related Illness/Injury:** No

## Billing Information

**Work Related?:** No

## Signatures

**Type of Person Signing:** EMS Primary Care Provider (for this event)

**Signature Reason:** EMS Provider

**Paragraph Text:**

**Status:** Signed

**Signature Graphic:**

| | | |
|---|---|---|
| **Unit Notified:** 02/10/2023 10:17:55 | **Patient Name:** Urena , Renato | **Call #:** 23-033823 |
| **Incident #:** 23-033823 | **Patient Care Report Number:** 3891be34c2cd467e8ed044e6b68ec79a | **Date Printed:** 02/10/2023 10:56 |

000016

**Patient Name:** Urena, Renato                                    **EMS Agency Name:** San Bernardino County Fire Department

**Printed Name:** Nate  Buckner

**Date/Time Signature Locked:**

**Signature Date:**

| MCI |
|---|
| **Number of Patients at Scene:** Single |

| Valuables |
|---|

**Patient Belongings:** Clothing

| | | |
|---|---|---|
| **Unit Notified:** 02/10/2023 10:17:55 | **Patient Name:** Urena, Renato | **Call #:** 23-033823 |
| **Incident #:** 23-033823 | **Patient Care Report Number:** 3891be34c2cd467e8ed044e6b68ec79a | **Date Printed:** 02/10/2023 10:56 |

**000017**

# EXHIBIT "D"



# TITAN
## Legal Services
*Where Knowledge and Service Matter*

**CLIENT:**   Carpenter, Rothans & Dumont LLP
500 S. Grand Avenue, 19th Floor
Los Angeles, CA  90071

**ATTENTION:**   Monique Alvarez

**FILE NUMBER:**   SBC.1013

**CASE NAME:**   Renato Urena, individually
vs
City of San Bernardino, Jonathan Davalos, Andres Estrella, et al.

**PRODUCTION DATE:**   December 26, 2024

**RECORDS SUBJECT NAME:**   Renato Urena

**FACILITY NAME:**   San Bernardino County Fire Department Medic Engine #222
1201 W. 9th Street
San Bernardino, CA  92411

☒ **THE ENCLOSED RECORDS COMPLETE YOUR REQUEST FROM THIS CUSTODIAN**

☐ **THIS REQUEST IS INCOMPLETE FOR THE FOLLOWING REASON:**

    ☐ **Billing records were not available at the time of copying and will be fowarded to your office when they become available.**

    ☐ **X-Rays were not available at the time of copying and will be forwarded when available.**

☐ **THERE ARE NO RECORDS AT THE ABOVE LOCATION**

☐ **OTHER:** _____

_____

Titan Legal Reference No.:  **SU417722-05**

**2050 W 190th Street, Suite 200
Torrance, CA  90504**

Order: SU417722-05/CPROOF21



AO 88B (Rev. 2/14 ) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# United States District Court
### for the
### Central District of California

| | |
|---|---|
| **Renato Urena, individually** ) | |
| ) | Civil Action No. 5:24-cv-00341-JGB-SHK |
| *Plaintiff* ) | |
| *v.* ) | |
| **City of San Bernardino, Jonathan Davalos, Andres Estrella, et al.** ) | |
| ) | |
| *Defendant* | |

## AMENDED SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

TO:    **CUSTODIAN OF RECORDS OF: San Bernardino County Fire Department Medic Engine #222, 1201 W. 9th Street, San Bernardino, CA 92411   Ph: (909) 384-5405**

*(Name of person to whom this subpoena is directed)*

☒

*Production:* **YOU ARE COMMANDED** to produce at the time, date and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

**See Attachment to Subpoena in a Civil Case.**

| Place:<br>**Titan Legal Services, Inc.**<br>**2050 W. 190th Street, Suite 200**<br>**Torrance, CA 90504** | **Phone: (310) 464-8655** | Date and Time:<br>**12/26/2024 10:00 AM** |
|---|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached - Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena, and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

**Date: November 14, 2024**

*CLERK OF COURT*

_____       _____
*Signature of Clerk or Deputy Clerk*       OR       /s/ Scott J. Carpenter, Esq.
                                                      *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* Defendants, City of San Bernardino, a public entity, and Officers Jonathan Davalos and Andres Estrella, who issues or requests this subpoena, are:

**Scott J. Carpenter, Esq. SBN:253339**
**Carpenter, Rothans & Dumont LLP**
**500 S. Grand Avenue, 19th Floor**
**Los Angeles, CA 90071**
**Telephone: (213) 228-0400**
**E-Mail: scarpenter@crdlaw.com**

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

SU417722-05/A088B

AO 88B (Rev. 2/14 ) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. **5:24-cv-00341-JGB-SHK**

# PROOF OF SERVICE

(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)* **San Bernardino County Fire Department Medic Engine #222**

on *(date)* **11/14/2024**

☐ I served the subpoena by delivering a copy to the named individual as follows: **1201 W. 9th Street, San Bernardino, CA 92411** *Isabella Hernandez* on *(date)* _____ ; or *11/18/24*

☐ I returned the subpoena unexecuted because ;

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of
$

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____

I declare under penalty of perjury that this information is true.

Date: *11/18/24*

_____
*Server's signature*

*Jun Galit – Field Agent*
*Printed name and title*

*2050 W. 190th St. # 200*
*Torrance, CA 90504*
*Server's Address*

Additional information regarding attempted service, etc:

Case Number:      5:24-cv-00341-JGB-SHK

Case Name:      **Renato Urena, individually**
                                  vs.
                **City of San Bernardino, Jonathan Davalos, Andres Estrella, et al.**

# ATTACHMENT TO SUBPOENA IN A CIVIL CASE

The records to be produced are described as follows:

**All paramedic and/or ambulance records for incident that occured on February 10, 2023 which should also include, but not be limited to, all reports, run reports, notes, charts, dispatch transcripts, invoices and itemized statements of billing charges pertaining to the initial dispatch, examination, care, treatment and transportation pertaining to Renato Urena AKA: Erena Renato Alfonso Urena; DOB: 5/24/1973 ; SS#: XXX-XX-XXXX.**

SU417722-05/genattach

AO 88B (Rev. 2/14 ) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. **5:24-cv-00341-JGB-SHK**

# PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* **San Bernardino County Fire Department Medic Engine #222**

on *(date)* **11/14/2024**

    ☐ I served the subpoena by delivering a copy to the named individual as follows: **1201 W. 9th Street, San Bernardino, CA 92411** ISABELLA HERNANDEZ on *(date)* _____ ; or 12/10/24

    ☐ I returned the subpoena unexecuted because ;

    Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

    **$ 15.00**

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____

    I declare under penalty of perjury that this information is true.

Date: 12/10/24

_____
Server's signature

JUN GALIT - Field Agent
Printed name and title

2050 W. 190th St. # 200
Torrance, CA 90504
Server's Address

Additional information regarding attempted service, etc:

AO 88B (Rev. 2/14 ) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 3)

### Federal Rule of Civil Procedure 45 (c),(d) and (e) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person

**(i)** is a party or a party's officer; or

**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery. A subpoena may command:**

**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction-which may include lost earnings and reasonable attorney's fees-on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises - or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is requried may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) DUTIES IN RESPONDING TO A SUBPOENA.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) CONTEMPT.** The court for the district where compliance is required-and also, after a motion is transferred, the issuing court-may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

**For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).**

Scott J. Carpenter, Esq. (SBN: 253339)
Carpenter, Rothans & Dumont LLP
500 S. Grand Avenue, 19th Floor
Los Angeles, CA 90071
Phone: (213) 228-0400 Fax: (213) 228-0401
E-Mail: scarpenter@crdlaw.com

Attorney for Defendants, City of San Bernardino, a public entity, and Officers Jonathan Davalos and Andres Estrella

## UNITED STATES DISTRICT COURT
for the
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Renato Urena, individually<br><br>Plaintiff(s)<br><br>vs.<br><br>City of San Bernardino, Jonathan Davalos, Andres Estrella, et al.<br><br>Defendant(s) | **Case No.** 5:24-cv-00341-JGB-SHK<br><br>**AMENDED NOTICE OF ISSUANCE OF SUBPOENA FOR PRODUCTION OF DOCUMENTS, INFORMATION, OR OBJECTS FOR SAN BERNARDINO COUNTY FIRE DEPARTMENT MEDIC ENGINE #222**<br><br>Date: December 26, 2024<br>Time: 10:00 AM<br>Production<br>Address: Titan Legal Services, Inc.<br>2050 W. 190th Street, Suite 200<br>Torrance, CA 90504 |

TO ALL APPEARING PARTIES AND THEIR ATTORNEYS OF RECORDS WITH RESPECT TO THE FOLLOWING CUSTODIAN / DEPONENT:

San Bernardino County Fire Department Medic Engine #222
1201 W. 9th Street
San Bernardino, CA 92411

**PLEASE TAKE NOTICE** that pursuant to Federal Rules of Civil Procedure, Rule 45(a)(4), the Attorney(s)

for the above Defendants, has issued a subpoena to produce documents, information, or objects to the

Custodian or Deponent listed above.   A complete copy of the subpoena is attached, hereto.

Dated:  December 6, 2024            Signed: _____ **/s/ Scott J. Carpenter, Esq.** _____

Attorney for Defendants, City of San Bernardino, a public entity, and Officers Jonathan Davalos and Andres Estrella

- 1 -

SU417722-05/A088D

## Proof of Service

I, Trixie Estanislao, and any employee retained by Titan Legal Services, Inc., am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action, my business address is **2050 W. 190th Street, Suite 200, Torrance, CA 90504.**

On **December 6, 2024** I served the foregoing documents described as:

**AMENDED NOTICE OF ISSUANCE OF SUBPOENA FOR PRODUCTION OF DOCUMENTS, INFORMATION, OR OBJECTS OF SAN BERNARDINO COUNTY FIRE DEPARTMENT MEDIC ENGINE #222;**
**AMENDED SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION (with Attachment);**

to interested parties on this action

[XX]     by placing the true copies thereof enclosed in a sealed envelope
         addressed as follows:

         Law Offices of Dale K. Galipo
         Dale K. Galipo, Esq.
         21800 Burbank Blvd., Suite 310
         Woodland Hills, CA 91367

**[XX]    VIA U.S. MAIL**
         As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on the same day with postage thereon fully paid at Torrance, California, in the ordinary course of business.

         Executed on  December 6, 2024, at Torrance, CA.

[XX]     (Federal) I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Signed: _____
                     Trixie Estanislao

## DECLARATION OF CUSTODIAN OF RECORDS

Records pertain to:   **Renato Urena**

Description of Records: All paramedic and/or ambulance records for 11/30/22, run reports, notes, charts, dispatch transcripts, invoices and itemized statements of billing charges pertaining to the initial dispatch, examination, care, treatment and transportation pertaining to Renato Urena AKA: Erena Renato Alfonso Urena; DOB: 5/24/1973; SS#: XXX-XX-XXXX.

I, the undersigned, am duly authorized custodian of records for **San Bernardino County Fire Department Medic Engine #222, whose business address is 1201 W. 9th Street, San Bernardino, CA, 92411,** and have authority to certify records. I am qualified to testify as to the preparation and maintenance of the records sought by the subpoena or authorization attached hereto and, if called as a witness, could testify competently thereto. Further, I hereby certify to the following (check appropriate boxes):

[X] CERTIFICATION OF RECORDS COPIED

1.     The accompanying copies are true copies of all records in my custody or control described in the subpoena or authorization.

       [x] **If applicable, When Only Partial Records are Produced** The following records described in the subpoena or authorization are not in my custody for the following reasons.
       We did not transport the patient therefore we have no billing records.

2.     (a) the record was made at or near the time by or from information transmitted by someone with knowledge; (b) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (c) making the record was a regular practice of that activity;

3.     The accompanying records were prepared in the following manner. **(check all applicable boxes)**
       [ ] from microfilm/microfiche; [x] from computer stored data; [ ] by photocopying the original paper record; [ ] by electronic duplication process; [ ] by photographic duplication process; [ ] other (describe):

---

[ ] CERTIFICATION OF NO RECORDS
[x] CERTIFICATION OF NO XRAYS/MRI'S/ RADIOLOGICAL FILMS [x] CERTIFICATION OF NO BILLING RECORDS
[x] CERTIFICATION OF NO COLORED PHOTOS

1.     A thorough search has been made for the documents, records and things called for in the subpoena or authorization and, based upon the information provided, no such items were found.

2.     No copies or records are transmitted because we do not have said records.

3.     If Items 1. and 2. above do not apply please Explain the reason why you have NO RECORDS:
       We do not have these type records.

---

I DECLARE under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | | | |
|---|---|---|---|---|
| Executed on | 12/17/2024 | at | San Bernardino | , California |
| Print Name | Miranda Mulhall, Privacy Officer | Signed | *Miranda Mulhall* | |
| Phone | 909-677-6044 | | | |

**** DO NOT WRITE BELOW THIS LINE, FOR TITAN USE ONLY ****

### DECLARATION OF PROFESSIONAL PHOTOCOPIER

**(California Evidence Codes 1400, 1560; Code of Civil Procedure 1985.3, 2020(e) and Business and Professions Code 22462)**

As a representative of "Titan Legal Services, Inc.", I hereby declare that the attached are true and complete copies of all records which were provided to me on this date.

Said records will be delivered only to the party or entity issuing this request.

| | | | | |
|---|---|---|---|---|
| Executed on | 12/16/24 | at | *Torrance* | , California |
| Print Name | | Signed | | |

Titan ref#: SU417722-05/Cproof7us

**000001**

# SAN BERNARDINO COUNTY FIRE PROTECTION DISTRICT

2824 "W" Street ● San Bernardino, CA 92408 ● (909) 501.0602 ● Fax (909) 501.0605

**EMS, Special Ops & Training Headquarters**
sbcfire.org

**Daniel R. Munsey**
Fire Chief/Fire Warden

**Mike O'Bier**
Interim Division Chief

12/17/2024

Titan Legal Services Inc.

2050 W. 190th St. Ste 200

Torrance, CA. 90504

To Whom It May Concern:

I, the undersigned, being the duly authorized Custodian of Records for the San Bernardino County Fire District, declare that I am qualified to testify as to the preparation and maintenance of the records and having the authority to certify records sought and having the authority to certify records sought by the subpoena declare the following:

All records called for in the attached request are true and correct copies of the original documents.

Miranda Mulhall
Privacy Officer
Emergency Medical Services Division
San Bernardino County Fire

| BOARD OF SUPERVISORS | | | | | |
| --- | --- | --- | --- | --- | --- |
| Col. Paul Cook (Ret.) | Jesse Armendarez | Dawn Rowe<br>Vice Chair | Curt Hagman<br>Chairman | Joe Baca, Jr<br>Vice-Chair | Luther Snoke |
| First District | Second District | Third District | Fourth District | Fifth District | Chief Executive Officer |

000002

Patient Name:  Urena , Renato

EMS Agency Name:  San Bernardino County Fire Department



Complete ePCR w/attachments (Timeline)

Division 11 Admin
158 W. 5th st.
San Bernardino City, CA 92415

## Patient Information

| | | | | | |
|---|---|---|---|---|---|
| **Name:** | Urena , Renato | **Age:** | 49 Years | **D.O.B.:** | 05/24/1973 |
| **Address:** | 13560 Nason St<br>City of Moreno Valley, CA 92555 | **Gender:** | Male | **Race:** | Hispanic or Latino |
| **Is Patient Homeless?:** | No | **Weight:** | 81.6 kgEstimate | | |

| Patient's Phone Number | Type |
|---|---|
| (999) 999-9999 | Home |

## Call Type/Location/Disposition

**Call Type:** Stab/Gunshot Wound/Penetrating Trauma

**Disposition:** Patient Treated, Transported with this EMS Crew in Another Vehicle

**Resp. Mode:** Emergent (Immediate Response)

**Transport Mode:** Emergent (Immediate Response)

**Destination:** Arrowhead Regional Medical Center
400 North Pepper Ave
Colton, CA 92324

**Response:** 911 Response (Scene)

**Dest. Determ.:** Protocol

**Location:** Other

**Incident Address:** W 14th St
San Bernardino City, CA 92411

**Unit Disposition:**

**Patient Evaluation/Care:**

**Crew Disposition:**

**Transport Disposition:**

**Response Delay:** None/No Delay

**Reason for Refusal/Release:**

**Level of Care Provided per Protocol:**

**Transport Delay:** None/No Delay

## Response Times and Mileage

| | | | |
|---|---|---|---|
| **PSAP:** | 02/10/2023 10:16:50 | **Incident Number:** | 23-033823 |
| **Disp. Notified:** | 02/10/2023 10:16:50 | **Call Sign:** | ME222 |
| **Unit Disp.:** | 02/10/2023 10:17:55 | **Veh. #:** | ME222 |
| **Enroute:** | 02/10/2023 10:19:12 | | |
| **At Scene:** | 02/10/2023 10:21:35 | | |
| **At Patient:** | 02/10/2023 10:24:17 | | |
| **Depart:** | 02/10/2023 10:47:38 | | |
| **Arrive Dest.:** | Not Applicable | | |
| **Destination PT Transfer of Care:** | 02/10/2023 10:53:09 | **EMS Transport Method:** | Ground-Ambulance |
| **In Service:** | 02/10/2023 11:17:32 | | |

## Unit Personnel

| Crew Member | Level of Certification | Role |
|---|---|---|
| Bonhus, Andrew | EMT-Paramedic | Primary Patient Caregiver-At Scene |
| Cordova, Anthony | EMT-Paramedic | Primary Patient Caregiver-At Scene |
| Buckner, Nate | EMT-Paramedic | Primary Patient Caregiver-At Scene |

## Provider Impression

**Primary Impression:** Traumatic Injury

**Secondary Impression:** Traumatic Injury

## Patient Condition

| Complaint Type | Complaint | Duration |
|---|---|---|
| Chief (Primary) | Gunshot wound | 10 Minutes |

**Date/Time of Symptom Onset:** 02/10/2023 10:14:17

**Possible Injury:** Yes

**Primary Symptom:** Bleeding

**Other Symptoms:** Bleeding

**Alcohol/Drug Use:** None Reported

**Barriers to Patient Care:** None Noted

**Chief Complaint Organ System:** Musculoskeletal/Skin

**Chief Complaint Anatomic Location:** General/Global

| | | | |
|---|---|---|---|
| **Unit Notified:** 02/10/2023 10:17:55 | **Patient Name:** Urena , Renato | **Call #:** 23-033823 |
| **Incident #:** 23-033823 | **Patient Care Report Number:** 24a1eea0e9b94d02a5b9098cc9a9c63b | **Date Printed:** 12/17/2024 09:27 |

| | |
|---|---|
| **Patient Name:** Urena , Renato | **EMS Agency Name:** San Bernardino County Fire Department |
| **Mechanism of Injury:** Penetrating | **Initial Patient Acuity:** Critical (Red) |
| **Cause of Injury:** Firearm injury | **Final Patient Acuity:** Critical (Red) |

## Narrative

**Narrative:** ME222 arrived on scene to find a 49 year old male, in PD custody, handcuffed and lying on floor, A/O x 4, GCS 15, cc of multiple GSW in chest, left side, bilateral legs, and left foot. Reportedly a pursuit that ended in patient fleeing on foot. Skins pale and moist. Pupils PERL. Clothing cut and removed. Secondary showed listed wounds, negative trauma to head/neck, chest seals applied to thoracic GSWs, lungs CBL. Bleeding moderate with no external bleeding control needed. Patient placed in mega mover and onto gurney, and loaded into ambulance. Patient transported to ARMC with ME222 following up. En route, NRB applied, 18G IV access acquired in left forearm, BHC established. Upon arrival, care transferred to ARMC. ME222 cleared scene and returned to service.

## Past Medical History

### Patient Medications

| Medication |
|---|
| Unable to Complete |

### Medication Allergies

| Medication Allergies |
|---|
| Unable to Complete |

**Medical History:** Unable to Complete

## Assessment Exam

### Date/Time of Assessment

02/10/2023 10:40:36

## Assessment Summary

**02/10/2023 10:40:36**

### Detailed Findings

| Location | Description | Details |
|---|---|---|
| **Skin** | Pale | |
| **Chest/Lungs** | Normal | GSW X 3 |
| **Extremity** *Not Specified*: | Gunshot Wound | Legs, left foot |

### Normal Findings

| |
|---|
| Head ; |

### Not Done

| |
|---|
| |

## Vitals

### Vitals

| Time | PTA | Response (AVPU) | BP | Method of Blood Pressure Measurement | B/Pressure | Patient Position | Airway | Pulse Rate | Method Heart Rate | Pulse Quality | Pulse Rhythm | Resp Rate | Resp Reg | Effort | SpO2 | Qual | CO2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 02/10/2023 10:38:46 | No | Alert | 117 / 72 | Cuff-Automated | Cuff-Automated | | | 110 | | | Regular | 14 | | | 93 | At Room Air | |

### Vitals

| Date/Time | Mean Arterial Pressure | Temperature | Temperature Method | Pain Scale Score | Pain Scale Type | Blood Glucose Level |
|---|---|---|---|---|---|---|
| 02/10/2023 10:38:46 | 87 | | | Unable to Complete | Other | |

### PQRST

| Date/Time Vital Signs Taken | Provoked | Quality | Region | Pain Scale Score | Duration | Duration Units | PQRST Narrative |
|---|---|---|---|---|---|---|---|
| 02/10/2023 10:38:46 | | | | Unable to Complete | | | |

### GCS

| Time | Total Glasgow Coma Score | Eye | Motor | Verbal | Score Qualifier |
|---|---|---|---|---|---|
| 02/10/2023 10:38:46 | 15 | 4 - Opens Eyes spontaneously (All Age Groups) | 6 - Obeys commands (>2Years); Appropriate response to stimulation | 5 - Oriented (>2 Years); Smiles, oriented to sounds, follows objects, interacts | Initial GCS has legitimate values without interventions such as intubation and sedation |

| | | |
|---|---|---|
| **Unit Notified:** 02/10/2023 10:17:55 | **Patient Name:** Urena , Renato | **Call #:** 23-033823 |
| **Incident #:** 23-033823 | **Patient Care Report Number:** 24a1eea0e9b94d02a5b9098cc9a9c63b | **Date Printed:** 12/17/2024 09:27 |

| Patient Name: | Urena , Renato | EMS Agency Name: | San Bernardino County Fire Department |
|---|---|---|---|

## Cardiac Arrest

**Cardiac Arrest:** No

## Trauma Detail

**Cause of Injury:** Firearm injury

**Mechanism of Injury:** Penetrating

**Trauma Center Criteria:** All penetrating injuries to head, neck, torso, and extremities proximal to elbow or knee

**Vehicular, Pedestrian, or Other Injury Risk Factor:** Not Applicable

**Work-Related Illness/Injury:** No

## Billing Information

**Work Related?:** No

**Reason for Interfacility Transfer/Medical Transport:**

## Timeline

| Timeline: | Time | Type | Details | Crew Member |
|---|---|---|---|---|
| | 02/10/2023 10:14:17 | Symptom onset | | |
| | 02/10/2023 10:16:50 | PSAP Call | | |
| | 02/10/2023 10:16:50 | Dispatch Notified | | |
| | 02/10/2023 10:17:55 | Unit Notified by Dispatch | | |
| | 02/10/2023 10:19:12 | Unit En Route | | |
| | 02/10/2023 10:21:35 | Initial responder on scene | | |
| | 02/10/2023 10:21:35 | Unit Arrived on Scene | | |
| | 02/10/2023 10:24:17 | Arrived at Patient | | |
| | 02/10/2023 10:38:46 | Vitals | **BP:** 117/72 **Method of BP:** *Cuff-Automated* **Pulse:** 110 **Rhythm:** *Regular* **Resp:** 14 **SPO2:** 93 **SPO2 Qual:** *At Room Air* **GCS Eye:** *4 - Opens Eyes spontaneously (All Age Groups)* **GCS Verbal:** *5 - Oriented (>2 Years); Smiles, oriented to sounds, follows objects, interacts* **GCS Motor:** *6 - Obeys commands (>2Years); Appropriate response to stimulation* **GCS Qualifier:** *Initial GCS has legitimate values without interventions such as intubation and sedation* **GCS Total:** 15 **Pain:** *Unable to Complete* **PTA:** *No* **Mean Arterial Pressure:** 87 **Pain Scale Type:** *Other* **RTS:** 12 **LOC:** *Alert* | Buckner, Nate |
| | 02/10/2023 10:40:36 | Exam | | |
| | 02/10/2023 10:47:38 | Unit Left Scene | | |
| | 02/10/2023 10:53:09 | Destination Patient Transfer of Care | | |
| | 02/10/2023 11:17:32 | Unit Back in Service | | |
| | --:-- | Signature | **Type:** *EMS Primary Care Provider (for this event)* **Reason:** *EMS Provider* **Status:** *Signed* **Name:** *Buckner, Nate* | Buckner, Nate |

## Signatures

**Type of Person Signing:** EMS Primary Care Provider (for this event)

**Signature Reason:** EMS Provider

**Paragraph Text:**

**Status:** Signed

**Signature Graphic:**

**Printed Name:** Nate  Buckner

**Date/Time Signature Locked:**

**Signature Date:**

## MCI

**Number of Patients at Scene:** Single

| | | | |
|---|---|---|---|
| **Unit Notified:** 02/10/2023 10:17:55 | **Patient Name:** Urena , Renato | | **Call #:** 23-033823 |
| **Incident #:** 23-033823 | **Patient Care Report Number:** 24a1eea0e9b94d02a5b9098cc9a9c63b | | **Date Printed:** 12/17/2024 09:27 |

Patient Name:  Urena , Renato                                    EMS Agency Name:  San Bernardino County Fire Department

**Valuables**

**Patient Belongings:**  Clothing

**Unit Notified:**  02/10/2023 10:17:55          **Patient Name:**  Urena , Renato                    **Call #:**  23-033823

**Incident #:**  23-033823          **Patient Care Report Number:**  24a1eea0e9b94d02a5b9098cc9a9c63b          **Date Printed:**  12/17/2024 09:27

**000006**