# EXHIBIT C



# PUBLIC RELEASE MEMORANDUM

---

**Subject:**                    **Non-Fatal Officer-Involved Shooting**

**Involved Officers:**          **Officer Andres Estrella**
                                **San Bernardino Police Department**

                                **Officer Jonathan Davalos**
                                **San Bernardino Police Department**

**Involved Subject/DOB:**       **Renato Alfonso Urena, Sr.**

**Subject's Residence:**        **San Bernardino**

**Incident Date/Time:**         **February 10, 2023, 10:16 a.m.**

**Incident Location:**          **Vacant Lot, 1400 Block of North Mount Vernon Avenue**

**Case Agent/Agency:**          **Detective B. Keith**
                                **San Bernardino Police Department**

**Agency Report Number:** 23-15413

**DA STAR Number:**            **2023-00-0010370**

---

**PUBLIC RELEASE MEMORANDUM**
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 2

# TABLE OF CONTENTS

**PREAMBLE**............................................................................................................3

**FACTUAL SUMMARY**...........................................................................................3

**STATEMENTS BY POLICE OFFICERS**................................................................4
   Officer Jonathan Davalos ..................................................................................4
   Officer Andres Estrella.......................................................................................8

**STATEMENTS BY CIVILIAN WITNESSES** .......................................................10
   Witness #1..........................................................................................................10
   Witness #2..........................................................................................................10
   Witness #3..........................................................................................................10

**DISPATCH SUMMARY** .......................................................................................11

**INCIDENT AUDIO AND VIDEO**...........................................................................11
   Surveillance Camera Video ...............................................................................11
   Body-Worn Camera Video .................................................................................12

**INCIDENT SCENE INVESTIGATION** .................................................................17

**WEAPON**.............................................................................................................20

**DE-ESCALATION** ...............................................................................................22

**INJURED PARTY** .................................................................................................22
   Injuries................................................................................................................22
   Criminal History .................................................................................................23

**APPLICABLE LEGAL PRINCIPLES**...................................................................24

**ANALYSIS**...........................................................................................................29

**CONCLUSION**.....................................................................................................31

PUBLIC RELEASE MEMORANDUM
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 3

## PREAMBLE

This was a non-fatal officer-involved shooting by officers from the San Bernardino Police Department. The San Bernardino Police Department investigated the shooting. This factual summary is based on a thorough review of all the investigative reports, photographs, video, and audio recordings submitted by the San Bernardino Police Department.

## FACTUAL SUMMARY

During the morning hours of Friday, February 10, 2023, San Bernardino Police Department Officers Jonathan Davalos and Andres Estrella were on patrol in the western district of San Bernardino. Officer Estrella drove while Officer Davalos rode in the front passenger seat. The officers had received information that a man who was possibly armed with a gun was driving a silver or gray Nissan Versa near the intersections of 14th Street and K Street or 14th Street and Massachusetts Avenue. As western district resource officers, Officers Davalos and Estrella were familiar with the area. The officers knew the location described was in a documented gang area, and a nearby elementary school was open and in session. Officers Davalos and Estrella set out to locate the vehicle with the suspected armed man. At approximately 10:15 a.m., the officers located a silver Nissan Versa turning westbound onto 14th Street from K Street. Officers Davalos and Estrella noticed the Nissan had a broken front windshield, a vehicle code violation. The Nissan continued westbound on 14th Street and proceeded through the intersection of 14th Street and Garner Avenue without stopping at the stop sign.

Officers Davalos and Estrella waited to stop the Nissan until after it passed by a known gang house where residents were lingering outside. As they followed behind the Nissan heading westbound on 14th Street, Officers Davalos and Estrella noticed the driver and sole occupant, Renato Urena, reaching around inside the car. Due to the presence of a nearby school, the officers again waited to initiate a traffic stop. As Urena's Nissan approached the intersection of 14th Street and North Mt Vernon Avenue, the officers activated their overhead lights and front-facing solid red light to conduct a traffic stop. Instead of pulling over for the officers, Urena drove through the intersection, failing to stop at the stop sign, and made an abrupt northbound turn onto North Mt Vernon Avenue. The officers activated the patrol unit's siren, but Urena continued driving north on North Mt Vernon. Urena drove approximately 20 to 30 yards north and then suddenly veered into the southbound traffic lanes, driving on the wrong side of the road. As the Nissan headed north in the southbound lanes of traffic, Urena opened the driver's door and, with the car still in motion, jumped from the vehicle and ran westward toward a vacant field and nearby homes.

Officer Estrella stopped the patrol car. Both officers quickly got out to chase after Urena. Officer Estrella commanded Urena to stop and show his hands, but Urena continued running away, holding onto his waistband. As the officers chased behind Urena, they saw

PUBLIC RELEASE MEMORANDUM
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 4

Urena reach into his waistband with his right hand. Urena continued running westward as the officers repeated their commands, yelling at Urena to stop, to show his hands, and to stop reaching. As the officers continued chasing Urena, Officer Davalos saw Urena pull a dark-colored semi-automatic handgun from his waistband with his right hand; Officer Estrella was only able to see what he believed to be the bottom of a gun's magazine.

Upon seeing Urena pull the gun from his waistband, both officers pulled their handguns from their duty belts and slowed their pace. Urena continued running, heading toward a field of tall brush and a nearby home surrounded by a tall chain-link fence with privacy slats. The officers continued giving Urena multiple commands to stop and to stop reaching. Officer Davalos yelled at Urena and warned Urena that he would be shot. Upon reaching the field of tall brush, Urena suddenly dove face-first down into the tall brush and turned toward the officers with the handgun in his right hand. As Urena pointed the gun toward the officers, Officer Davalos and Estrella fired their duty weapons at Urena, striking him. The officers approached Urena, placed him into handcuffs, and turned him onto his side in a recovery position while they waited for medical aid to arrive. While Officer Davalos tended to Urena, Officer Estrella searched through the tall brush for Urena's handgun without success. As additional officers arrived on scene, Urena's fully loaded .40 caliber handgun was found adjacent to the scene, just on the other side of the tall chain-link fence. Urena was transported to the hospital, where he was treated for his injuries.

## STATEMENTS BY POLICE OFFICERS[1]

On February 10, 2023, San Bernardino Police Department (SBPD) Officers Jonathan Davalos and Andres Estrella were on duty as western district resource officers assigned to patrol the western district of the city of San Bernardino from 7:00 a.m. until 5:00 p.m. Officer Estrella drove a marked black and white SBPD Ford Explorer, unit number 10, with Officer Davalos as the front seat passenger. Officers Davalos and Estrella wore distinctively marked SBPD uniforms consisting of a black polo shirt and pants. A SBPD badge and the officer's name were affixed to the officers' polo shirts. Body-worn cameras were affixed to the officers' shirts at the sternum/upper abdominal level. Officers Davalos' and Estrella's duty belts held their department-issued Glock 17, 9mm handguns, each loaded with 17 rounds in the magazine and one in the chamber. Officers Davalos and Estrella activated their body-worn cameras before the incident under review. Both officers reviewed their body-worn camera video footage prior to their interviews.

On February 10, 2023, at approximately 6:11 p.m., **Officer Jonathan Davalos** was interviewed by Detective B. Keith of the San Bernardino Police Department.

Officers Davalos and Estrella had received information regarding a male subject who was possibly armed inside a gray or silver Nissan Versa near the intersection of 14th Steet

---

[1] Herein is a summary only. All reports submitted were reviewed, but not all are referenced here.

PUBLIC RELEASE MEMORANDUM
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 5

and K Street or 14th and Massachusetts Avenue in the city of San Bernardino.[2] No description of the male subject was given. Officers Davalos and Estrella were driving in the area looking for a vehicle matching the description when Officer Davalos saw a silver Nissan Versa make a westbound turn onto 14th Street from K Street. Officer Estrella positioned their patrol unit behind the silver Nissan Versa. Officers Davalos and Estrella saw the Nissan had a broken front windshield, a vehicle code violation. The Nissan proceeded westbound on 14th Street toward Massachusetts Avenue, stopping at the stop sign before proceeding through the intersection. The Nissan then approached the intersection of 14th Street and Garner Avenue and proceeded through the intersection without stopping at the stop sign. Officers Davalos and Estrella decided not to stop the vehicle there because the area was known to be gang territory of the Westside Verdugo criminal street gang, and recent shootings and stabbings had occurred there. Officer Davalos had recently been involved in foot pursuits and retrieved guns from suspects in the neighborhood. The officers did not want to stop the car in an area where gang members might attempt to intervene during the traffic stop. Additionally, there was an elementary school nearby that was in session, so they did not want to attempt a traffic stop near the school in case the subject inside the car was armed. The officers did not want the subject to have the opportunity to flee into the elementary school and possibly create a hostage situation. Officer Davalos was familiar with the school grounds and knew there were typically two open gates, allowing access into the school from the street. For these reasons, Officers Davalos and Estrella waited to initiate the traffic stop until the Nissan got closer to 14th and Mt Vernon.

As Officers Davalos and Estrella approached the intersection of 14th and Mt Vernon, they activated the overhead lights and front-facing solid red light on their patrol unit to initiate the traffic stop on the Nissan. Officer Davalos saw the driver (later identified as Renato Urena) was the sole occupant in the Nissan. After initiating the traffic stop, Urena failed to stop at the stop sign at the intersection of 14th and Mt Vernon and made an abrupt northbound turn onto Mt Vernon Avenue. Urena traveled northbound approximately 20 to 30 yards on Mt Vernon before making a sudden northwest diagonal turn into the southbound lanes of traffic, another vehicle code violation that presented a danger to vehicle traffic on Mt Vernon. At this point, Officer Davalos believed Urena would attempt to flee, resulting in a vehicle pursuit. Officer Davalos noticed that Urena appeared to be reaching around inside the vehicle. Based on the information they had at the time, Officer Davalos thought this behavior was consistent with Urena having a gun in his possession. Officer Davalos considered the possibility that Urena would shoot the officers.

As the Nissan approached the west curb line of Mt Vernon near a driveway to a vacant lot, Urena exited from the driver's side of the Nissan while grabbing his waistband with both of his hands. Officer Davalos exited the front passenger side of the patrol unit while Officer Estrella exited from the driver's side. Officer Davalos radioed that there was a subject running westbound. Officer Davalos noticed that as Urena ran westbound, he held his waistband with his left hand while "tugging on something with his right hand." Officer

---

[2] Officer Estrella did not say, nor was he asked, from where this information originated.

**PUBLIC RELEASE MEMORANDUM**
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 6

Davalos had chased multiple subjects who had firearms in their waistbands, and based on his training and experience, it was common practice for subjects to hold their waistbands in place as they tried to pull the firearm out of their waistband.

Officer Davalos chased Urena westbound while giving him multiple commands to stop running. Urena continued running away and looked back at the pursuing officers. While chasing Urena, Officer Davalos saw Urena pull a dark-colored semi-automatic handgun from his waistband with his right hand. Officer Davalos saw the gun over Urena's right shoulder. The weapon appeared to have an extended magazine in it. Officer Davalos was scared because he knew Urena had a gun and could turn around and shoot him or his partner. Officer Davalos pulled his handgun from his duty belt and slowed down to give himself some space from Urena in case he turned around and shot at them. Officer Davalos' immediate thought was that Urena's backdrop was the school, so if Urena shot at the officers, students at the school would be in danger.

Urena was running toward a residential neighborhood, and Officer Davalos considered that Urena might jump a fence and enter a house to take someone hostage. Officer Davalos gave Urena multiple commands to drop the firearm. Urena did not drop the firearm and continued running westbound with the gun in his right hand. Officer Davalos then warned Urena that he would shoot him if he didn't drop the gun. Urena ran toward the southeast corner of a fence surrounding a property.[3] The fence was just north of an empty field with waist-tall brush. Officer Davalos thought Urena would either go into the house (surrounded by the fence) or ambush the officers by concealing himself with the waist-tall brush or the fence when he rounded the fence. By contrast, Officers Davalos and Estrella had no cover or concealment from Urena, meaning Urena would have a position of advantage over the officers.

---

[3] Officer Davalos did not describe the property or the fence that surrounded it; however, his body-worn camera footage and the crime scene investigation revealed it was a residential property with a single-family residence surrounded by an approximate six-foot tall chain link fence lined with privacy slats.

PUBLIC RELEASE MEMORANDUM
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 7



Still image from Officer Davalos' body-worn camera video footage, during his foot-pursuit of Urena.

Officer Davalos repeated commands to Urena to stop and warned him again that he would shoot him. Urena reached the fence line, still holding the gun, and Officer Davalos yelled, "Gun, gun, gun!" As Officer Davalos yelled, "Gun, gun, gun," Urena laid down on the ground, without being ordered to do so by the officers, and took a "tactical prone-shooting position, allowing him to be covered by the brush." This provided Urena a visual on the officers as they ran toward him and made it harder for the officers to see him. Urena turned to look back over his left shoulder at Officer Davalos with the gun in his right hand and pointed the gun at Officer Davalos. Believing Urena was going to kill him or his partner, Officer Davalos fired at Urena, aiming for his torso area. In addition to his fear for his own life and that of his partner, Officer Davalos feared for the safety of students at the school and any nearby residents. Officer Davalos fired 18 rounds until he stopped the threat presented by Urena. While shooting at Urena, Officer Davalos heard his and Officer Estrella's gunfire. Officer Davalos estimated he was 10 yards away from Urena when he fired. Officer Davalos conducted a tactical reload and reassessed the situation. Officer Davalos heard Urena moaning and saw him reaching around. Fearing Urena would grab the gun, Officer Davalos yelled at Urena to stop reaching. Officer Davalos told Urena to put his hands behind his head, and Urena complied.

The officers approached Urena together, and Officer Davalos maintained lethal coverage on Urena as Officer Estrella holstered his handgun and handcuffed Urena. Officer Estrella gave dispatch their location, and Officer Davalos requested medical aid. Officer Davalos turned Urena onto his right side in the recovery position, asked him where he was hit, and began looking for bullet holes to assist with medical aid. Officer Davalos stayed with Urena until medics arrived.

PUBLIC RELEASE MEMORANDUM
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 8

Officer Davalos estimated only 30 seconds had elapsed from the time Urena abandoned his vehicle until the shooting occurred.

On February 10, 2023, at approximately 3:11 p.m., **Officer Andres Estrella** was interviewed by Detective B. Keith of the San Bernardino Police Department.

Officer Estrella and his partner, Officer Davalos, were on patrol in the western district of San Bernardino. Officer Estrella was familiar with the area because he had conducted multiple proactive arrests and responded to numerous calls for service, including shootings in the area. As a western district resource officer, Officer Estrella's duties included gaining a familiarity with the neighborhood in which he patrolled, listening to the concerns of residents, and addressing issues affecting the quality of life of citizens, including specific community issues such as homelessness, robberies, prostitution, traffic collisions, enforcement of laws related to school zones, narcotics activities, and gang violence. Officer Estrella explained that open dialogue is facilitated with neighborhood members through regularly scheduled community meetings and regular interactions with the public and local schools. Through his experience, Officer Estrella was aware that gang violence was a significant concern of the residents within the western district.

The officers had received information that a subject, possibly armed with a firearm, was driving a silver Nissan Versa in the neighborhood.[4]  The neighborhood was a high-crime area where known gang members resided. Officers Estrella and Davalos were driving near 14th Street and Massachusetts Avenue when they spotted a silver Nissan Versa that matched the description of the one reportedly being driven by a subject armed with a firearm. The silver Nissan Versa was heading northbound on K Street and then turned westbound onto 14th Street. Officer Estrella noticed the Nissan had a cracked windshield. Officers Estrella and Davalos decided not to conduct a traffic stop near 14th Street and Massachusetts Avenue because there was a known gang house at the intersection with multiple subjects lingering. The Nissan proceeded westbound passing the intersection of Garner Avenue and 14th Street. The officers again allowed the car to continue further west due to the presence of a school near this intersection.

As the Nissan neared the intersection of Mt Vernon Avenue and 14th Street, the officers activated the patrol unit's forward-facing red light to initiate a traffic stop. Officer Estrella saw the driver of the Nissan (later identified as Renato Urena) reaching around inside the vehicle. The Nissan continued driving through the intersection, failing to stop at the stop sign, so they activated the patrol unit's siren. The Nissan immediately proceeded northbound and then west across opposing lanes of traffic on Mt Vernon Avenue toward a vacant field. Urena jumped out of the Nissan while the car was still in motion and ran westbound toward the vacant field. The vehicle continued northbound, leading Officer Estrella to believe Urena had left the car in drive. When Urena abandoned the Nissan, it

---

[4] Officer Estrella did not say, nor was he asked, from where this information originated or whether the subject's description was provided.

**PUBLIC RELEASE MEMORANDUM**
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 9

made Officer Estrella nervous because, based on his training and experience, people only do this when fleeing from arrest or hiding something. Officer Estrella stopped the patrol unit, got out, and ran after Urena. Officer Estrella estimated he was 10 to 15 feet behind Urena. Officer Estrella commanded Urena to "stop" and "let me see your hands." Officer Estrella also heard his partner yell commands at Urena. Urena did not respond to their commands.

Officer Estrella immediately noticed Urena's "right hand dig into the front of his right waistband." Seeing Urena reaching into his waistband was concerning because people typically run with their hands out and visible. Based on his training and experience, Officer Estrella believed Urena was trying to hide or conceal something in his pants. Officer Estrella yelled commands at Urena, telling him, "Don't reach!" Urena did not respond to the commands. Urena continued running and pulled an object out of his waistband. The object appeared to be the bottom of a magazine "consistent with what would be inside a pistol." Officer Estrella saw a cell phone fall from Urena's rear pocket. Officer Estrella unholstered his gun and "flared out" to the right of Urena to get a better view of Urena's right hand. Officer Estrella could "see the bottom of what appeared to be the magazine of the firearm." Urena ran in a southwest direction toward the vacant field and a residence directly in front of Urena. There was a fence around the rear of the residence, and Officer Estrella knew he might not be able to see Urena when Urena passed by the fence.

Urena turned the corner around the residential property's rear fence line. As Officer Estrella neared the fence line, he saw Urena holding the firearm and pointing it in Officer Estrella's direction. Officer Estrella heard Officer Davalos yell, "Gun, gun, gun!" Behind Officer Estrella was a school that was in session. Officer Estrella knew students and staff were present at the school. Officer Davalos was to the left of Officer Estrella. Officer Estrella feared Urena was about to shoot him or Officer Davalos. Officer Estrella "punched out" with both hands around his duty weapon and fired at Urena, who was in the brush in the field. Officer Estrella's intent when he shot at Urena was "to not get shot, myself or my partner, or the people, the residents surrounding us, and the school that was directly behind me, the students, and staff." While firing, Officer Estrella briefly paused to reassess the threat presented by Urena. Urena continued reaching with his right arm to the front of his body, so Officer Estrella fired two additional rounds. Officer Estrella believed he fired approximately 18 rounds total at Urena. Officer Estrella estimated that from the time Urena abandoned his vehicle until the officer-involved shooting, only 10 seconds had elapsed.

Officer Estrella ejected his magazine to reload his handgun and reassess Urena, who was down on the ground in the prone position. Urena was not moving very much. Officer Davalos maintained lethal coverage on Urena while Officer Estrella called out to dispatch to request medical aid and to get officers to set up a perimeter around the scene. Officer Estrella approached Urena and placed him in handcuffs. Officer Estrella saw Urena had a needle in his right front pocket and did a quick pat-down search for additional firearms.

**PUBLIC RELEASE MEMORANDUM**
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 10

Officer Estrella did not find any guns on Urena's person. Officer Estrella searched the immediate area around Urena for the gun he had seen Urena pointing in his direction, but a large amount of brush in the field hampered his search. Officer Estrella saw Officer Davalos place Urena onto his side. Officer Estrella gave directions to the responding officers on the scene regarding the fastest way for paramedics and the fire department to access the field to begin treating Urena.

## STATEMENTS BY CIVILIAN WITNESSES[5]

On February 10, 2023, at approximately 11:37 a.m., **Witness #1** was interviewed by Officer G. Rodriguez of the San Bernardino Police Department.

Witness #1 lived at the 1300 block of Magnolia Avenue West in San Bernardino. On this day, at an unknown time in the morning, Witness #1 heard someone yelling but could not tell what was being yelled. Witness #1 heard approximately "three rounds." Witness #1 looked outside from her front window and saw multiple police officers in the area. Witness #1's residence had video cameras affixed to the front that point in the direction of where the incident occurred. Witness #1 advised that she would be able to access the video footage that was captured 24 hours after it was recorded, and said she would be able to provide it to the officers on Saturday, February 11, 2023, at 10:15 a.m.

On February 10, 2023, at approximately 11:51 a.m., **Witness #2 and Witness #3** were interviewed by Officer G. Rodriguez of the San Bernardino Police Department.

Witness #2 and Witness #3 lived at the 1300 block of Magnolia Avenue West in San Bernardino. Witness #2 advised she was inside her home when she heard approximately 10 pops, which, which she believed were fireworks. Witness #2's dogs began to bark. Witness #2 went outside to her backyard, where she contacted her father, Witness #3. Just west of their residence, Witness #2 saw a subject on the ground moaning with uniformed officers around him. Witness #2 could not get a clear view of the subject or the officers.

Witness #3 was in the rear garage of his residence when he heard 10 pops, which he believed were firecrackers. Witness #3 heard a male screaming, but from the rear of his residence, he did not have a clear view of the subject. Witness #3 saw officers enter the rear yard of the neighboring residence located at [redacted] Magnolia Avenue West. The officers located a firearm on the southern portion of the property. Witness #3 described the firearm as huge and believed it was a .38 caliber gun.

---

[5] All reports of civilian statements made were reviewed, though not all are summarized here.

**PUBLIC RELEASE MEMORANDUM**
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 11

## DISPATCH SUMMARY

According to the call for service detail report, the traffic stop was initiated at 10:15:45 a.m.
The foot pursuit was called out at 10:16:13 a.m. At 10:16:40 a.m., shots were reported
fired with the suspect down and the officers okay.

## INCIDENT VIDEO[6]

## SURVEILLANCE VIDEO

### 1400 Block of N Mt Vernon

The surveillance camera at this address was located several yards northeast of the
scene, across Magnolia Avenue West. There is no audio. The camera captured footage
of Urena in the distance as he ran away from Officers Davalos and Estrella. When Urena
reached the field of tall weeds, he dove headfirst down into the weeds and disappeared
from camera view. The officers stopped running at this point; however, due to the distance
from the scene, the footage does not clearly show the officers shooting.

### Dr. Mildred Dalton Henry Elementary School

The surveillance camera at this address was located several yards northeast of the
scene, across N Mt Vernon Avenue. There is no audio. The camera captured footage of
Urena's silver Nissan heading west on 14th Street with Officer Estrella's marked SBPD
patrol unit directly behind it. The patrol unit's overhead emergency lights were activated.
Urena's Nissan approached the intersection of 14th and N Magnolia Avenue. Large trees
briefly blocked the Nissan from camera view as it turned right and headed north on N Mt
Vernon Avenue, followed by the SBPD patrol unit. Trees in the landscape partially
blocked the camera view as Urena's vehicle and the SBPD unit drove north on Mt. Vernon
Avenue. Urena's Nissan slowed as it headed north in the southbound lanes of N Mt
Vernon Avenue. Urena was briefly captured in the camera view as he ran westward, away
from the still-rolling Nissan. Officers Davalos and Estrella were briefly captured in camera
view chasing after Urena. Urena and the officers headed west and out of the camera's
field of view. Urena's car continued rolling northbound onto the west curb of N Mt Vernon
before heading back into the southbound lanes. Several other motorists took evasive
maneuvers to avoid crashing into the Nissan as it continued in motion, circling to the right
across N Mt Vernon Avenue, back up onto the west curb of N Mt Vernon Avenue, and
then back down onto the street, where it came to a rest facing northeast in the southbound
lanes of N Mt Vernon Avenue.

---

[6] All videos submitted were reviewed though not all are summarized herein. The summaries will cover the events
from the beginning through the point immediately after the incident under review.

## OFFICER DAVALOS' BODY-WORN CAMERA[7]

00:00 to 00:30 Officer Davalos was seated in the front passenger seat of the patrol unit when his video recording began. Officer Davalos was holding the police radio microphone in his hand while Officer Estrella drove. The angle and position of Officer Davalos' camera did not capture images of traffic on the street.

00:31 to 00:38 Officer Davalos said, "He's reaching." The patrol unit's engine revved loudly, followed by the sound of the unit's siren, and the unit quickly turned right onto Mt Vernon from W 14th Street. Officer Davalos raised the radio mic toward his face, but no words were audible over the police siren.

00:38 to 00:42 The patrol unit stopped. Officer Davalos quickly opened the passenger door and hurriedly got out of the vehicle. Officer Davalos yelled, "Hey!" Officer Estrella yelled, "Hey, let me see your hands!"

00:42 to 00:44 Officer Davalos ran southwest from the patrol car. As Officer Davalos ran, the images captured by his body-worn camera bounded up and down. Urena's silver Nissan, still in motion, rolled forward onto the west sidewalk of Mt Vernon Avenue before being lost from camera view as Officer Davalos headed west. Urena came into camera view. Urena ran west toward a partially paved asphalt vacant lot. Officer Estrella came into camera view, running ahead of Officer Davalos, chasing after Urena. Officer Davalos raised his radio's mic to his face and said, "Adam 50, foot pursuit."

00:45 to 00:47 Still running behind Officer Estrella and Urena, Officer Davalos continued his radio broadcast, saying, "We're gonna be headed westbound 14th and --." Officer Davalos' continued radio broadcast was unintelligible over Officer Estrella yelling commands at Urena. Officer Estrella yelled, "Let me see your fucking hands!" Officer Estrella drew his handgun from his duty belt with his right hand and continued chasing Urena. Urena ran west through the vacant lot toward residences located several yards to the west. Urena's hands remained at his waist and did not move side to side as he ran.

00:47 to 00:49 Still in pursuit of Urena, Officer Estrella yelled, "Hey, let me see your hands!" Officer Estrella pointed his handgun to the front of his body toward Urena. Urena continued running away from the officers. Still running, Officer Davalos also yelled, "Let me see your hands, let me see your fucking hands!" Officer Davalos pointed his handgun toward Urena Officer Estrella ran ahead of and to the right of Officer Davalos. Officer Estrella pointed his handgun toward Urena. Both officers continued yelling commands at Urena, saying repeatedly, "Let me see your hands." Urena held his hands near his

---

[7] The officers were equipped with Axon body-worn cameras. The camera system turns on when the operator activates the camera. When the camera is activated, the previous 30 seconds of video are included without audio. Body-worn video recordings from both involved officers were reviewed in their entirety. Both officers' body-worn cameras captured the same footage, but from slightly different angles. Officer Davalos' video will be summarized herein. Times noted are from the media player bar.

**PUBLIC RELEASE MEMORANDUM**
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 13

---

waistband as he ran. Urena's right elbow shifted outward and slightly upward as his left arm shifted inward toward the front of his body. It appeared that Urena was reaching into his waistband with one hand while holding onto his waistband with the other as he continued running away from the officers.

00:49 to 00:57 Urena ran west toward the vacant field and a tall chain-link fence. Officer Davalos yelled, "Let me see your hands. Stop reaching! Stop reaching!" Officer Davalos said, "He's reaching!" Both officers slowed their pace, creating distance between themselves and Urena. Officer Davalos caught up to Officer Estrella. As the officers ran side-by-side, Officer Estrella was lost from the camera view, but his shadow was visible on the ground as he ran to the right of Officer Davalos. Urena continued running with his hands hidden from the officers' view officers and turned southwest, running toward a vacant field with tall weeds. Officer Davalos again yelled, "Stop reaching! You're gonna get fucking shot!" Officer Estrella yelled, "Stop reaching!"



00:57 to 00:58 As Urena reached the field, a dark colored gun was visible in his hands.

**PUBLIC RELEASE MEMORANDUM**
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 14



00:58 As soon as Urena ran into the field, he dove down into the weeds, disappearing from camera view.

**PUBLIC RELEASE MEMORANDUM**
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 15



00:58  to 00:59 As Urena dove down into the tall weeds, Officer Davalos yelled, "He has a gun, he has a gun! He has a gun!" Urena was blocked from the camera view by the tall weeds. Officer Estrella came into camera view as he ran in a southwest direction after Urena. Officer Davalos raised his arms to the front of his body, holding his gun in a two-handed grip, and pointed it toward the spot where Urena was last seen in the camera view. Officer Estrella pointed his gun with his right hand toward Urena's last seen location.

**PUBLIC RELEASE MEMORANDUM**
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 16



00:59 to 01:03 Multiple overlapping gunshots rang out as both officers fired their handguns toward the location where Urena was last seen in the camera view. As the officers fired, they moved closer to where Urena was last captured in the camera view. The gunshots briefly stopped and Urena could be heard moaning.

01:03 to 01:04 Officer Estrella fired four rounds in quick succession toward the ground and weeds where Urena had last been visible by the camera. All sounds of gunfire stopped.

01:04 to 01:13 Officer Davalos quickly reloaded his handgun as Officer Estrella turned to face Officer Davalos and told him, "I got you; I got you." Officer Estrella reached for his lapel mic and spoke into the police radio while Officer Davalos held lethal cover, pointing his gun in the direction of where Urena had last been visible. Officer Estrella walked northeast and out of camera view. Officer Estrella broadcasted their location, pausing his transmission several times to catch his breath. Urena yelled out and briefly extended one arm into the air above the weeds. Officer Davalos told him to "stop reaching." Urena answered, "I'm not reaching," and raised his arm into the air again. Officer Davalos ordered Urena to put his hands up.

01:13 Urena yelled out, "Oh god." Officer Davalos spoke into his radio, "Adam-50, Officers are Code-4, shots fired, suspect down." Officer Davalos' heavy and rapid breathing was clearly audible as he spoke and tried to catch his breath. Officer Davalos moved closer to Urena, who was still hidden from camera view by the tall weeds. Officer Davalos told Urena to stop reaching. Urena replied, "I'm not reaching." Officer Davalos ordered Urena to put his hands behind his head. Officer Estrella came back into camera view to the left

**PUBLIC RELEASE MEMORANDUM**
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 17

of Officer Davalos. Both officers cautiously approached Urena with their guns pointed toward him. Urena came into camera view, lying on the ground. Both officers told Urena, "Don't move." Urena was supine on the ground, crying out in pain. Officer Estrella placed Urena into handcuffs while telling him, "Hey brother, we are here to help you. You need to listen to what we're telling you." Officer Estrella said, "Are you hurt and how can we help you?" Urena said, "You hit me in my stomach." Officer Davalos broadcasted, "Adam-50, suspect's [sic] in custody. Start medics, please." Urena said, "help" and asked for some water. Both officers, still out of breath, asked each other if they were okay. Officer Estrella pulled medical gloves from his pocket. Officer Estrella turned away, speaking into his police radio while Officer Davalos kneeled beside Urena and began tending to him.

Officer Estrella turned back to assist Urena. Both officers told Urena they were there to help him and asked him where he was hit. Urena said he was hit in his stomach and his legs. As the officers tended to Urena, Officer Estrella was lost from camera view. Officer Estrella's body-worn video footage showed that Officer Estrella conducted a pat down search on Urena, locating multiple items, including syringes and a prescription bottle. Officer Estrella's body-worn camera footage showed that Officer Estrella then searched the area surrounding Urena, moving the weeds aside, as he evidently searched for Urena's handgun without success.

## INCIDENT SCENE INVESTIGATION

Detective Sims, assisted by Forensic Specialist Witness #4, of the San Bernardino Police Department conducted the crime scene investigation near the intersection of Magnolia Avenue West and North Mount Vernon Avenue in the city of San Bernardino.



N Mt Vernon Avenue was a major thoroughfare in the city of San Bernardino. It was an asphalt paved roadway with approximately 6-inch raised curbs on the east and west road edge, with north and south traffic, and two travel lanes in both directions. The intersection

PUBLIC RELEASE MEMORANDUM
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 18

of N Mt Vernon Avenue and Magnolia Avenue West was a "T" intersection, north of the scene. The area was a residential area, and there were numerous homes north, south, and west of the location. Dr. Mildred Dalton Henry Elementary School[8] was on the east side of Mt Vernon Avenue, directly across the street from the shooting location.

A SBPD Ford Explorer, unit number 10, faced northbound on Mt Vernon Avenue in the southbound travel lanes. A gray Nissan Versa, four-door sedan, with the engine still running, was north of SBPD unit number 10. The car faced northeast in the southbound lanes of Mt Vernon Avenue. A subsequent search of the Nissan's trunk resulted in the discovery of a gun magazine and multiple rounds of ammunition, including 35- .380 caliber cartridges, 8- 9mm cartridges, 7- .380 caliber cartridges, 20- 357 caliber cartridges, 13- .308 caliber cartridges, 11- 40 caliber cartridges, and 184- 22 caliber cartridges. A SBPD SUV, unit number 50, was parked facing south on the west side of the incident property. SBPD unit number 50 arrived after the incident and was not involved.

The shooting occurred in a field on the southwest corner of Magnolia Avenue and Mt Vernon, near the south side of a home at the 1300 block of Magnolia Avenue West. The field was in a vacant lot at the 1400 block of North Mt Vernon Avenue, which consisted of an asphalt-paved vacant lot, with no erected structures. There was a dilapidated chain-link fence in the center of the property with a green tractor converted into a makeshift transient living quarter. A paved east-west driveway connected the property to North Mt Vernon Avenue. The property was unkempt with various items of debris throughout and the grass and weeds on the property were overgrown and tall.[9]

The south side of [redacted] Magnolia Avenue West consisted of a backyard with an approximate six-foot tall chain-link fence with privacy slats and an open double gate. The backyard had two empty trailers, a car partially concealed with a cover, and a third trailer with miscellaneous metal and scrap items. Officers located a handgun and holster south of the third trailer.

---

[8] The report erroneously listed the school's name as Roosevelt Elementary School.

[9] The report did not specify the height or density of the overgrown weeds and grass, however photographs and video footage from the scene show the weeds and overgrown grass were dense and varied from waist-high to head-high in relation to Urena and the involved officers.

**PUBLIC RELEASE MEMORANDUM**
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 19



Urena's bloodstained clothing was located near the southwest section of the vacant lot. Medical staff cut off the articles of clothing during life-saving measures. (Prior to the crime scene investigation, SBPD officers moved Urena from the grass field to the southwest section of the vacant lot to provide adequate space for medics to render aid to Urena.) A fired bullet was located on the ground beneath the clothing.

Two 17-round Glock 9mm handgun magazines and 36 fired cartridge casings, headstamped "WIN 9mm Luger," were located near the southwest section of the vacant lot at 1446 North Mount Vernon Avenue.

Miscellaneous items, including Urena's brown leather wallet, "a medical container," syringes, tobacco wrappers, and other miscellaneous items were found in the field south of 1335 Magnolia Avenue West. The items were marked with evidence placard 46. SBPD Forensic Specialist Witness #4 listed all items of evidence collected from the incident scene. Among the items listed, Officer Witness #4 listed, "possible marijuana, from inside prescription bottle in field by placard 46" and "possible narcotics, from inside prescription bottle in field by placard 46." Subsequent analysis of the "possible narcotics," conducted by the San Bernardino County Sheriff's Department Scientific Investigation's Division found the white crystalline solid, 0.67-gram net weight, contained methamphetamine.

**PUBLIC RELEASE MEMORANDUM**
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 20



.

## WEAPON

A loaded tan P80 firearm (lower with no serial number) with a black Glock upper (Serial number BVEP472) was located at the scene in the backyard of [redacted] Magnolia Avenue West. The gun was in a black holster and had a black high-capacity .40 caliber Glock magazine loaded into the magazine well (22-round capacity). One round was loaded into the chamber, and the gun was ready to fire. The magazine contained 21 rounds of .40 caliber ammunition. The gun was labeled with evidence placard 48. A dirt impact impression where Urena's gun hit the ground in the backyard was labeled with evidence placard 47.

**PUBLIC RELEASE MEMORANDUM**
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 21





Forensic Specialist Witness #4 collected possible DNA samples from the handgun on February 11, 2023. These samples, along with a buccal swab collected from Urena were submitted to the Riverside/San Bernardino CAL-DNA Laboratory on December 22, 2023. DNA from the samples underwent STR typing using the GlobalFiler amplification kit. The results were compared to the reference buccal swab collected from Urena.

**PUBLIC RELEASE MEMORANDUM**
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 22

The results/conclusions for the swabs were as follows: "DNA: Two contributors (male DNA present). The analysis provides very strong support for the proposition that Renato Urena is one of the contributors of the DNA obtained from the swab from the Glock 22, 40 caliber handgun. The DNA results obtained from the swab from the Glock 22, 40 caliber handgun are at least 47 septillion times more likely if Renato Urena and an unrelated, unknown individual are the contributors than if two unrelated, unknown individuals are the contributors."

## DE-ESCALATION

Officers Davalos and Estrella had mere seconds to respond to the deadly threat presented by Urena, leaving them little to no time to attempt to de-escalate. In the seconds before Urena pointed the gun at the officers, both Officers Davalos and Estrella gave multiple commands and warnings to Urena.

It was daylight when the officers, in their marked SBPD unit, initiated the traffic stop using their overhead emergency lights and siren. Instead of yielding to the officers, Urena ran a stop sign and drove into opposing lanes of traffic. Without stopping his vehicle, Urena opened his car door, got out, and ran from the officers. The officers were in distinctively marked SBPD uniforms, clearly identifying them as police officers as they chased after Urena. Both officers commanded Urena to show his hands and to stop reaching multiple times. Urena ignored every command.

At no time did Urena give any indication he would surrender and cooperate with the officers. From the moment Officers Estrella and Davalos attempted their traffic stop on Urena's vehicle until the end, Urena resisted. Every attempt made by the officers to stop Urena and to de-escalate the situation was met with resistance.

## INJURED PARTY

On February 10, 2023, **Dr. Witness #5** was interviewed at [redacted] the hospital by Officer T. Montez of the San Bernardino Police Department.

According to Dr. Witness #5, Urena sustained approximately 20 gunshot wounds. It was unknown which wounds were entry or exit wounds. Urena sustained injuries to his right and left upper and lower lungs, his groin, his right colon, his small bowel, both extremities, and suffered a pelvic fracture. Urena received surgery on February 10, 2023, and would undergo further surgeries in the upcoming weeks. Urena was critical but expected to survive.

Urena's subsequent medical records document gunshot wounds to the following areas: Groin, left foot, left lower leg, left thigh, right thigh, and upper and lower left chest.

## CRIMINAL HISTORY

Renato Urena has a criminal history that includes the following convictions:

1992, 594 of the Penal Code, Malicious Mischief/Vandalism, San Bernardino County case number FSB276784, a misdemeanor.

1992, 459 of the Penal Code, Burglary, San Bernardino County case number FSB278300, a misdemeanor.

1993, 10851 (a) of the Vehicle Code, Unlawful Taking of a Motor Vehicle, San Bernardino County case number FSB00934, a felony.
1993, 664 of the Penal Code, 10851 (a) of the Vehicle Code, Attempted Unlawful Taking of a Motor Vehicle, Riverside County case number CR50602, a felony.

1994, 12021 (a) of the Penal Code, Felon in Possession of a Firearm, San Bernardino County case number FVA003148, a misdemeanor.

1996, 12021 (a) of the Penal Code, Felon in Possession of a Firearm, Riverside County case number RIF71316, a felony.

1996, 24440 of the Vehicle Code, Inoperable Headlamps, an infraction, and 14601.1 (a) of the Vehicle Code, Driving on a Suspended License, and 40508 (a) of the Vehicle Code, Failure to Appear, misdemeanors, Riverside County case number 340448.

1999, 11377 (a) of the Health and Safety Code, Possession of a Controlled Substance, San Bernardino County case number FSB21407, a misdemeanor.

2002, 496 (a) of the Penal Code, Receiving Stolen Property, San Bernardino County case number FSB035522, a felony.

2004, 10851 (a) of the Vehicle Code, Unlawful Taking of a Motor Vehicle, San Bernardino County case number FSB043572, a felony.

2005, 11377 (a) of the Health and Safety Code, Possession of a Controlled Substance, San Bernardino County case number FSB053225, a felony.

2007, 853.7 of the Penal Code, Failure to Appear, San Bernardino County Case number MSB705759, a misdemeanor.

2007, 10851 (a) of the Vehicle Code, Unlawful Taking of a Motor Vehicle, and 186.22(b)(1)(a) of the Penal Code, Criminal Street Gang allegation found true, San Bernardino County case number FVA701943, a felony.

2012, 186.22 (a) of the Penal Code, Participate in Criminal Street Gang, San Bernardino County case number FSB1200751, a felony.

2015, 4573.6 of the Penal Code, Possession of Drugs or Alcohol in Prison, Tuolumne County case number 12F6527, a felony.

## APPLICABLE LEGAL PRINCIPLES

A peace officer may use objectively reasonable force to effect an arrest if he believes the person arrested has committed a public offense. (Calif. Penal Code §835a(b).) [10] Should an arresting officer encounter resistance, actual or threatened, he need not retreat from his effort and maintains his right to self-defense. (Penal Code §835a(d).) An officer may use objectively reasonable force to effect an arrest, prevent escape or overcome resistance. (Penal Code §835a(d).)

An arrestee has a duty to refrain from using force or any weapon to resist arrest if he knows or should know that he is being arrested. (Penal Code §834a.) This duty remains even if the arrest is determined to have been unlawful. (*People v. Coffey* (1967) 67 Cal.2d 204, 221.) In the interest of orderly resolution of disputes between citizens and the government, a *detainee* also has a duty to refrain from using force to resist detention or search. (*Evans v. City of Bakersfield* (1994) 22 Cal.App.4th 321, 332-333.) An arrestee or detainee may be kept in an officer's presence by physical restraint, threat of force, or assertion of the officer's authority. (*In re Gregory S.* (1980) 112 Cal. App. 3d 764, 778, *citing, In re Tony C.* (1978) 21 Cal.3d 888, 895.) The force used by the officer to effectuate the arrest or detention can be justified if it satisfies the Constitutional test in *Graham v. Connor* (1989) 490 U.S. 386, 395. (*People v. Perry* (2019) 36 Cal. App. 5th 444, 469-470.)

An officer-involved shooting may be justified as a matter of self-defense, which is codified in Penal Code sections 196 and 197. Both code sections are pertinent to the analysis of the conduct involved in this review and are discussed below.

**PENAL CODE SECTION 196**. Police officers may use deadly force in the course of their duties, under circumstances not available to members of the general public. Penal Code Section 196 states that homicide by a public officer is justifiable when it results from a use of force that "is in compliance with Section 835a." Section 835a specifies that a ***police officer is justified in using deadly force*** when he reasonably believes, based upon the totality of the circumstances, that it is necessary:

(1)    to defend against an imminent threat of death or serious bodily injury to the officer or another, or

(2)    to apprehend a fleeing felon who threatened or caused death or serious bodily injury, if the officer also reasonably believes

---

[10] All references to code sections here pertain to the California Penal Code.

that the fleeing felon would cause further death or serious
bodily injury unless immediately apprehended.

(Penal Code §835a(c)(1).)

Discharge of a firearm is "deadly force." (Penal Code §835a(e)(1).) The "'[t]otality of the circumstances' means all facts known to the peace officer at the time, including the conduct of the officer and the subject leading up to the use of deadly force." (Penal Code §835a(e)(3).)

While the appearance of these principles is new to section 835a in 2020,[11] the courts have been defining the constitutional parameters of use of deadly force for many years. In 1985, the United States Supreme Court held that when a police officer has probable cause to believe that the suspect he is attempting to apprehend "has committed a crime involving the infliction or threatened infliction of serious physical harm" to the officer or others, using deadly force to prevent escape is not constitutionally unreasonable. (*Tennessee v. Garner* (1985) 471 U.S. 1, 11-12.) California courts have held that when a police officer's actions are reasonable under the Fourth Amendment of our national Constitution, the requirements of Penal Code § 196 are also satisfied. (*Martinez v. County of Los Angeles* (1996) 47 Cal.App.4th 334, 349; *Brown v. Grinder* (E.D. Cal., Jan. 22, 2019) 2019 WL 280296, at *25.) There is also a vast body of case law that has demonstrated *how* to undertake the analysis of what is a reasonable use of force under the totality of the circumstances. (See *Reasonableness* discussion, *infra*.) As such, our pre-2020 state caselaw, developed upon the former iteration of section 196, is still instructive.

There are two new factors in section 835a that did not appear in the section previously, nor did they develop in case law pertaining to the use of deadly force. First, a peace officer must make reasonable efforts to identify themselves as a peace officer and warn that deadly force may be used, prior to using deadly force to affect arrest. (Penal Code §835a(c)(1).) This requirement will not apply if an officer has objectively reasonable grounds to believe that the person to be arrested is aware of those facts. (Penal Code §835a(c)(1).) Second, deadly force cannot be used against a person who only poses a danger to themselves. (Penal Code §835a(c)(2).)

While the codified standards for the use of deadly force in the course of arrest are set forth in subsections (b) through (d) of Section 835a, the legislature also included findings and declarations in subsection (a). These findings and declarations lend guidance to our analysis but are distinct from the binding standards that succeed them within the section. In sum, the findings are as follows:

---

[11] Assem. Bill No. 392 (2019-2020 Reg. Sess.) approved by the Governor, August 19, 2019. [Hereinafter "AB-392"]

(1)    that the use of force should be exercised judiciously and with respect for human rights and dignity; that every person has a right to be free from excessive uses of force;

(2)    that use of force should be used only when necessary to defend human life and peace officers shall use de-escalation techniques if it is reasonable, safe and feasible to do so;

(3)    that use of force incidents should be evaluated thoroughly with consideration of gravity and consequence;[12]

(4)    that the evaluation of use of force is based upon a totality of the circumstances, from the perspective of a reasonable officer in the same situation; and

(5)    that those with disabilities may be affected in their ability to understand and comply with peace officer commands and suffer a greater instance of fatal encounters with law enforcement, therefore.

(Penal Code §835a(a).)

**PENAL CODE SECTION 197**.  California law permits *all persons* to use deadly force to protect themselves from the imminent threat of death or great bodily injury.  Penal Code section 197 provides that the use of deadly force by any person is justifiable when used in self-defense or in defense of others.

The pertinent criminal jury instruction to this section is CALCRIM 505 ("Justifiable Homicide: Self-Defense or Defense of Another").  The instruction, rooted in caselaw, states that a person acts in lawful self-defense or defense of another if:

(1)    he reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury;

(2)    he reasonably believed that the immediate use of deadly force was necessary to defend against that danger; and

---

[12] Penal Code §835a (a)(3) conflates a demand for thorough evaluation of a use of force incident with a dictate that it be done "in order to ensure that officers use force consistent with law and agency policies." On its face, the section is clumsily worded. Nothing included in AB-392 plainly requires that a use of force also be in compliance with agency policies. A provision in the companion bill to AB-392—Senate Bill No. 230 [(2019-2020 Reg. Sess.) approved by the Governor, September 12, 2019] (Hereinafter "SB-230"), does explicitly state that "[a law enforcement agency's use of force policies and training] may be considered as a factor in the totality of circumstances in determining whether the officer acted reasonably, but shall not be considered as imposing a legal duty on the officer to act in accordance with such policies and training." (Sen. Bill No. 230 (2019-2020 Reg. Sess.) §1.) It is noteworthy, however, that this portion of SB-230 is uncodified, unlike the aforementioned portion of Penal Code §835a (a)(3).

(3)    he used no more force than was reasonably necessary to defend against that danger.

(CALCRIM 505.)  The showing required under section 197 is principally equivalent to the showing required under section 835a(c)(1), as stated *supra*.

**IMMINENCE.**  "Imminence is a critical component" of self-defense.  (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1094.) A person may resort to the use of deadly force in self-defense, or in defense of another, where there is a reasonable need to protect oneself or someone else from an apparent, *imminent* threat of death or great bodily injury. "An imminent peril is one that, from appearances, must be instantly dealt with." (*In re Christian S.* (1994) 7 Cal.4th 768, 783.) The primary inquiry is whether action was instantly required to avoid death or great bodily injury.  (*Humphrey, supra,* 13 Cal.4th at 1088.) What a person knows, and his actual awareness of the risks posed against him is relevant to determine if a reasonable person would believe in the need to defend. (*Id*. at 1083.) In this regard, there is no duty to wait until an injury has been inflicted to be sure that deadly force is indeed appropriate. (*Scott v. Henrich, supra*, 39 F. 3d at 915.)

Imminence, newly defined in the context of the use of force to effect an arrest, is similar:

> A threat of death or serious bodily injury is "imminent" when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed.

(Penal Code §835a(e)(2).)

**REASONABLENESS**.  Self-defense requires both subjective honesty and objective reasonableness.  (*People v. Aris* (1989) 215 Cal.App.3d 1178, 1186.) The United States Supreme Court has held that an officer's right to use force in the course of an arrest, stop, or seizure, deadly or otherwise, must be analyzed under the Fourth Amendment's "reasonableness" standard. (*Graham v. Connor, supra,* 490 U.S. at 395.)

> The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on scene, rather than with the 20/20 vision of hindsight.... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

PUBLIC RELEASE MEMORANDUM
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 28

(*Id.* at 396-397, citations omitted.)

The "reasonableness" test requires an analysis of "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." (*Id*. at 397, citations omitted.) What constitutes "reasonable" self-defense or defense of others is controlled by the circumstances. A person's right of self-defense is the same whether the danger is real or merely apparent. (*People v. Jackson* (1965) 233 Cal.App.2d 639.) If the person's beliefs were reasonable, the danger does not need to have actually existed. (CALCRIM 505.) Yet, a person may use no more force than is reasonably necessary to defend against the danger they face. (CALCRIM 505.)

When deciding whether a person's beliefs were reasonable, a jury is instructed to consider the circumstances as they were known to and appeared to the person and consider what a reasonable person in a similar situation with similar knowledge would have believed. (CALCRIM 505.) It was previously held that in the context of an officer-involved incident, this standard does not morph into a "reasonable police officer" standard. (*People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1147.)[13] To be clear, the officer's conduct should be evaluated as "the conduct of a reasonable person functioning as a police officer in a stressful situation." (*Id.*)

The *Graham* court plainly stated that digestion of the "totality of the circumstances" is fact-driven and considered on a case-by-case basis. (*Graham v. Connor, supra,* 490 U.S. at 396.) As such, "reasonableness" cannot be precisely defined, nor can the test be mechanically applied. (*Id.*) Still, *Graham* does grant the following factors to be considered in the "reasonableness" calculus: the severity of the crime committed, whether the threat posed is immediate, and whether the person seized is actively resisting arrest or attempting to flee to evade arrest. (*Id.*)

Whether the suspect posed an immediate threat to the safety of the officer or others has been touted as the "most important" *Graham* factor. (*Mattos v. Agarano* (9th Cir. 2011) 661 F.3d 433, 441-442.) The threatened use of a gun or knife, for example, is the sort of immediate threat contemplated by the United States Supreme Court, that justifies an officer's use of deadly force. (*Reynolds v. County of San Diego* (9th Cir. 1994) 858 F.Supp. 1064, 1071-72. "An officer may reasonably use deadly force when he or she confronts an armed suspect in close proximity whose actions indicate an intent to attack.") Again, the specified factors of *Graham* were not meant to be exclusive; other factors are taken into consideration when "necessary to account for the totality of the circumstances in a given case." (*Mattos v. Agarano*, *supra*, 661 F.3d at 441-442.)

---

[13] The legislative findings included in Penal Code section 835a(a)(4) suggest to the contrary that "the decision by a peace officer to use force shall be evaluated from the perspective of a reasonable officer in the same situation". As such, if the officer using force was acting in an effort to *effect arrest*, as is governed by section 835a, then it appears the more generous standard included there would apply.

**PUBLIC RELEASE MEMORANDUM**
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 29

---

The use of force policies and training of an involved officer's agency *may* also be considered as a factor to determine whether the officer acted reasonably. (Sen. Bill No. 230 (2019-2020 Reg. Sess.) §1. See fn. 3, *infra.*)

When undertaking this analysis, courts do not engage in *Monday Morning Quarterbacking,* and nor shall we. Our state appellate court explains,

> Under *Graham* we must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

(*Martinez v. County of Los Angeles, supra*, 47 Cal.App.4th at 343, citing *Smith v. Freland* (6th Cir. 1992) 954 F.2d 343, 347.) Specifically, when a police officer reasonably believes a suspect may be armed *or arming himself*, it does not change the analysis, even if subsequent investigation reveals the suspect was unarmed. (*Baldridge v. City of Santa Rosa* (9th Cir. 1999) 1999 U.S. Dist. LEXIS 1414 *1, 27-28 Emphasis added.)

The Supreme Court's definition of reasonableness is, therefore, "comparatively generous to the police in cases where potential danger, emergency conditions or other exigent circumstances are present." (*Martinez v. County of Los Angeles, supra,* 47 Cal.App.4th at 343-344, citing *Roy v. Inhabitants of City of Lewiston* (1st Cir. 1994) 42 F.3d 691, 695.) In close cases, therefore, the Supreme Court will surround the police with a fairly wide "zone of protection" when the aggrieved conduct pertains to on-the-spot choices made in dangerous situations. (*Id.* at 343-344.) One court explained that the deference given to police officers (versus a private citizen) as follows:

> Unlike private citizens, police officers act under color of law to protect the public interest. They are charged with acting affirmatively and using force as part of their duties, because 'the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'

(*Munoz v. City of Union City* (2004) 120 Cal.App.4th 1077, 1109, citing *Graham v. Connor,* [*supra*] 490 U.S. 386, 396.)

## ANALYSIS

Law enforcement officers have a responsibility to investigate suspicious and often perilous situations. Acting on information they had received regarding a man who was potentially carrying a gun, Officers Estrella and Davalos attempted to perform an investigatory stop. The information they received indicated that a man was possibly

armed with a gun, driving in a known gang area, and near an elementary school, which demanded an investigation. This is the type of information that cannot be disregarded.

Officers Davalos and Estrella demonstrated their commitment to public safety when they attempted to conduct an investigatory stop on the silver Nissan Versa driven by Urena. Having information that the driver may have been carrying a gun and seeing Urena reaching around in his car as he drove in front of them, the officers prioritized their safety and that of the public by waiting until they were in a safer location before initiating the traffic stop. However, Urena showed his unwillingness to comply with lawful orders from the moment the officers attempted to stop him. The officers' cautious approach highlights their dedication to ensuring that all members of the public were kept safe and secure, even in a potentially dangerous situation. Despite Officer Davalos' and Estrella's cautious approach, the officers were ultimately faced with a life-or-death situation that required them to act quickly and decisively.

Officers Davalos and Estrella were dressed in police uniforms and were driving a distinctively marked SBPD police unit, making it easily recognizable that they were law enforcement. The officers activated their police unit's overhead emergency lights, forward-facing red light, and siren to stop Urena's vehicle. Instead of yielding for the traffic stop, Urena ran from his moving vehicle, forcing the officers to chase him on foot. Officers Davalos and Estrella repeatedly ordered Urena to show his hands and stop reaching. Urena ignored every command. The officers saw Urena pull a semi-automatic handgun from his waistband as they chased behind him. Both officers slowed their pace behind Urena to give themselves more distance, but Urena was armed and running toward homes, so the officers had a duty to continue their pursuit of him. As Urena neared occupied homes, a tall chain-link fence with privacy slats, and a vacant field, both officers were justifiably concerned for their own safety as well as the safety of the public. Both officers were worried they would lose sight of Urena when he reached the fence line and the field, so while they kept some distance, they couldn't stay too far behind Urena.

As soon as Urena reached the fence line and the field, Officer Davalos yelled, "Gun, gun, gun," warning Officer Estrella of the danger. Suddenly, and without being ordered to get down onto the ground, Urena dove into the tall brush, making it harder for the officers to see him. Both officers were still in motion, not far behind Urena, when he suddenly and unexpectedly dove head-first into the tall weeds. Both officers were forced to react, to quickly stop, essentially slamming on their brakes, to avoid running straight into a man who was armed with a lethal weapon. The element of surprise gave Urena an advantage over the officers. Being partially obscured in the tall brush provided an additional advantage to Urena. While Officer Davalos and Estrella came to a sudden stop, they each saw Urena with the gun in his right hand, pointing the gun at them. Both officers were only feet away from each other as they abruptly stopped only 10 yards from Urena. When Urena pointed the gun at the officers, Officers Davalos and Estrella each feared Urena was about to shoot them. Both officers were forced to make a split-second judgment and react to the imminent threat Urena posed when he pointed the gun at them.

**PUBLIC RELEASE MEMORANDUM**
[Fatal][Non-Fatal] Officer-Involved Incident
DA STAR #
March 26, 2024
Page 31

Seeing Urena's gun pointed in their direction, Officers Davalos and Estrella feared for their own lives, each other's lives, and for the lives of students and staff behind them at the elementary school. Their fear was honest and objectively reasonable. Urena had defied every lawful order and had demonstrated his willingness to use force to evade arrest. Urena refused to pull over to yield for the traffic stop. Urena ran from a moving vehicle and ignored multiple commands to show his hands and to stop reaching. Urena pulled a gun from his waistband while the officers chased him on foot. Then Urena dove into the tall bushes into what Officer Davalos aptly described as a tactical-prone shooting position and pointed the gun at the officers. A reasonable person in a similar situation with similar knowledge would also have believed their lives and those nearby were in imminent danger. Accordingly, Officers Davalos' and Estrella's use of lethal force in self-defense or defense of others was objectively reasonable and, therefore, justifiable, and lawful.

## CONCLUSION

Based on the facts presented in the reports and the applicable law, Officer Estrella's use of deadly force was a proper exercise of Officer Estrella's right of self-defense and defense of others, and therefore, his actions were legally justified.

Based on the facts presented in the reports and the applicable law, Officer Davalos' use of deadly force was a proper exercise of Officer Davalos' right of self-defense and defense of others, and therefore, his actions were legally justified.

**Submitted By:**
**San Bernardino County District Attorney's Office**
**303 West Third Street**
**San Bernardino, CA 92415**
**Dated:**

