# EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

RENATO URENA, INDIVIDUALLY,    )
                               )
          PLAINTIFF,           )
                               )
     vs.                       )CASE NO. 5:24-cv-
                               )   00341-JGB-SHK
CITY OF SAN BERNARDINO,        )
JONATHAN DAVALOS, ANDRES       )
ESTRELLA, AND DOES 1-10,       )
INCLUSIVE,                     )
                               )
          DEFENDANT(S).        )
_____)

VIDEOTAPED REMOTE DEPOSITION OF

RENATO URENA

Wednesday, February 11, 2026

Reported by:
Christine C. Gordon
CSR No. 7709

Job No. 1009733

Page 1

RENATO URENA - February 11, 2026

**Page 2**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

RENATO URENA, INDIVIDUALLY,    )
                                )
          PLAINTIFF,       )
                                )
     vs.                )CASE NO. 5:24-cv-
                        )  00341-JGB-SHK
CITY OF SAN BERNARDINO,      )
JONATHAN DAVALOS, ANDRES      )
ESTRELLA, AND DOES 1-10,      )
INCLUSIVE,                )
                                )
          DEFENDANT(S).    )
_____)

          The Remote Videotaped Deposition of
RENATO URENA, was taken pursuant to Notice
of Deposition, via Zoom videoconferencing,
on Wednesday, February 11, 2026, commencing at
9:24 A.M., before Christine C. Gordon, CSR
No. 7709, a Certified Shorthand Reporter, in
and for the State of California.

**Page 3**

(All appearances were by videoconference.)

APPEARANCES:

     FOR PLAINTIFF:
          LAW OFFICES OF JAMES TERRELL
          BY:  JAMES S. TERRELL, ESQ.
          15411 Anacapa Road
          Victorville, California 92392
          (769) 951-5850
          jim@talktoterrell.com


     FOR DEFENDANTS:
          CARPENTER, ROTHANS & DUMONT LLP
          BY:  SCOTT J. CARPENTER, ESQ.
          500 South Grand Avenue, 19th Floor
          Los Angeles, California 90071
          (213) 228-0400
          scarpenter@crdlaw.com




     VIDEOGRAPHER:
          PHILIP CRUZ

**Page 4**

I N D E X

WITNESS:  RENATO URENA

EXAMINATION                    PAGE:
BY MR. CARPENTER                 6


          EXHIBITS
EXHIBITS                    PAGE:
  1   Bodycam footage              101
  2   Still image from bodycam       108
      footage

  3   Still image from bodycam       110
      footage
  4   Still image from bodycam       110
      footage

          INFORMATION REQUESTED
               (None)


     QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
               (NONE)

**Page 5**

          Wednesday, February 11, 2026;
               9:24 A.M.

               ~oOo~

     THE VIDEOGRAPHER:  Good morning.  We are now on the record at 9:24 A.M.

     My name is Philip Cruz, a video technician representing Bayside Reporting Company located in Torrance, California.

     This is the deposition of Mr. Renato Urena on February 11, 2026, in the matter of Urena versus City of San Bernardino, et al.  Case number is 5:24-cv-00341-JGB-SHK.

     All parties are appearing remotely via Zoom internet conferencing.

     Today's deposition is being taken on behalf of the defendants.

     The court reporter today is Ms. Christine Gordon of Bayside Reporting Company.

     Counsel, please introduce yourselves and state your appearances.

     MR. TERRELL:  Jim Terrell on behalf of Mr. Urena. I'm present with him.

     MR. CARPENTER:  Scott Carpenter on behalf of

RENATO URENA - February 11, 2026

defendants.

THE COURT REPORTER:  Good morning.  My name is Christine Gordon.  I am a California Certified Shorthand Reporter and the deposition officer for today's deposition.  My CSR license number is 7709.

I will now swear in the witness.

Please raise your right hand.

Do you solemnly swear that the testimony you are about to give in this matter shall be the truth, the whole truth, and nothing but the truth so help you God?

THE WITNESS:  Yes, ma'am.

THE COURT REPORTER:  Thank you.

RENATO URENA,
having been first duly sworn, testified
as follows:

EXAMINATION
BY MR. CARPENTER:

Q    Good morning, sir.

Could you state and spell your full name for the record?

A    My name is Renato Alfonso Urena, R-E-N-A-T-O, Renato, Alfonso, A-L-F-O-N-S-O, and

Page 6

Urena, U-R-E-N-A.

Q    Thank you, sir.

Are you able to hear me clearly enough?

A    Yes, sir.

Q    Okay.  Good.

So my name is Scott Carpenter.  I represent the City of San Bernardino and San Bernardino Police Officers Estrella and Davalos in this lawsuit that you brought against them that relates to a February 10, 2023, incident in which you were shot by the police.

Do you understand that?

A    Yes.

Q    Okay.  Have you ever had your deposition taken before?

A    This is the first time I have ever seen you gentlemen or ladies.

Q    Okay.  Have you ever sat for a deposition like this in a civil lawsuit?

A    Never.

Q    Have you ever testified in court before?

A    Never.

Q    Okay.  So I'm going to go over some ground rules.  Essentially I'm going to be asking you some questions about that incident that we talked about.

Page 7

Now, if I refer to the incident from February 10, 2023, as "the incident" or "the shooting," you understand what I'm referring to?

A    Yes, sir.

Q    Okay.  So I'm going to be asking you some questions about the shooting, about the incident.

The court reporter just administered the oath to you, so you're here to give the truth.  It has the same force and effect as if you were in court in front of a jury and a judge.

Do you understand that?

A    Yes, sir.

Q    Okay.  So your testimony here today is under penalty of perjury, and even though you're in a conference room and I'm over Zoom, it still has that legal effect that you're here to testify truthfully.

Do you understand?

A    Yes, sir.

Q    Okay.  The court reporter is going to be taking everything we say down into a written transcript, so it's really important that we not talk over one another, and that especially since I'm over Zoom you please wait for me to finish my questions before you respond.

Page 8

Is that okay?

A    Yes, sir.

Q    Thank you.

And you're doing a good job so far, but the court reporter, because she's going to take everything down into a written transcript, is going to need audible, verbal responses such as a "yes" or "no" rather than shaking your head, shrugging your shoulders, that sort of thing.

Does that make sense?

A    Is this bothering you?

Yes, I got you.  I got you.

Q    That's okay.  Yeah.  No.

And if I ask you -- because we're over Zoom and you're in a room, it might get a little difficult to hear you.  If I ask you to speak up or to repeat something, I'm not trying to bother you.  I'm just trying to get a clear record for the court reporter.

Okay?

A    Yes, sir.  Thank you.

Q    If you don't understand any of my questions, just let me know.  I'll try to rephrase to the best of my ability.

If you need to take a break to use the

Page 9

RENATO URENA - February 11, 2026

Q   And could you give me an estimate as to what you currently weigh?
A   215 pounds.
Q   And then could you give me an estimate as to how much you weighed back in February of 2023?
A   Like 201.
Q   Are you left handed or right handed?
A   Right handed.
Q   And you were right handed back as of February 10, 2023?
A   Yes, sir.
Q   And did you have a Driver's License back in February, 2023?
A   No, sir.
Q   And when was the last time you had a Driver's License, if ever?
A   I think 2001.
Q   Were you on any disability as of February, 2023?
A   No.
Q   Did you graduate from high school, sir?
A   GED.
Q   And when did you obtain that?
A   March, 2007.
Q   Did you say "March"?

Page 22

A   Yes, sir.
Q   And was that at -- where was that?
A   Chino State Prison.
Q   Have you ever attended high school?
A   No, sir.
Q   Other than your GED have you done any other schooling?
A   Electrician.
Q   You went to school to be an electrician?
A   I'm in the process of electronics at Centinela State Prison.
Q   And were you taking any courses when you were in Centinela?
A   That's where I was taking, yeah, electric -- what do they call it?  They just call it "electronics."  I was barely getting into it.  I had barely started when I paroled, before I paroled.
Q   Okay.  Do you recall approximately how long had you been taking any courses to be an electrician when you were in Centinela before you were paroled?
A   Well, that's when Covid hit, so that stopped everything pretty much, but like I'd say I had at least four months before -- before Covid hit.

Page 23

Q   Did you obtain any certificates or licenses as a result of those courses?
A   Yes, I had -- I had quite a few certificates.
Q   Sorry.  Could you repeat that?  I didn't catch that.
A   Yes.  I acquired like three certificates.
Q   Okay.  And do you have an understanding of what those certificates entailed?
A   One was for like environment, had to do with environment and like the equipment that I was going to be using in electrical field, how it affected the environment.  They call it "rebook," and there's a booklet that everybody takes.
It's almost pretty much the same for all trades.  I forgot the name of the book, but like I said, I barely started, so like I didn't get a chance to really put into memory what certificates that I did receive though.
Q   Okay.  But you didn't receive any licenses to be able to practice as an electrician; correct?
A   No.  I received -- well, the certs I received, the way my teacher explained it to me, like I say, once you start the electrical field of work that you get an I.D. number, I guess you can

Page 24

say.  And like if I were to go to an employer, I would give them that number, and he would know like where I'm at in training and all that --
Q   Okay.
A   -- or whatnot.
Q   Okay.  Had you ever done any electrical work at all?
A   Yeah, I've done some.  Yes, sir.
Q   Outside of the courses you were taking?
A   Yes, sir.
Q   Okay.  Have you ever received any income from any electrical work that you have done?
A   Yes.
Q   About how much income have you received for electrical work?
A   It's just piecework.  I really couldn't say, but it was like a day or two like 300 bucks, you know.
Q   Are you currently enrolled in any type of courses or schooling?
A   No.  No, sir.
Q   Any plans of attending any other schooling?
A   I would like to.
Q   What would you like to do?
A   Electric.  Electric -- electrician.

Page 25

RENATO URENA - February 11, 2026

police officers --

A    Yes.

Q    -- you ultimately have been taken into custody?

A    Yes, sir.

Q    Have there been any times prior to February, 2023, where you ran from officers but were able to evade arrest?

A    No.

Q    And those three or four other times you had run from police officers, no force had been used against you when taking you into custody?

A    No, sir.

Q    Had you ever been shot prior to February 10, 2023?

A    Never.

Q    Where were you when you were first contacted by the San Bernardino Police Officers in the morning of February 10, 2023?

A    14th Street and Val Verde.

Q    Did you say "14th Street"?

A    Yes, and Val Verde.

Q    And you were in a vehicle driving; correct?

A    Yes, sir.

Q    And whose vehicle was it?

Page 34

A    Anna Lisa's.

Q    And what type of vehicle was it?

A    Nissan.

Q    And you didn't have a Driver's License at that time; correct?

A    Correct.

Q    Sorry.  I didn't hear you.  Did you say "no"?

A    No, sir.

Q    And you were on parole at that time?

A    Yes, sir.

Q    Okay.  And where were you driving to?

A    To see my kids.  Not all of them, but to see one of my kids.

Q    And which child were you going to go visit with?

A    My son.

Q    And what's their name?

A    Renato.

Q    And where were you going to go meet him?

A    I forgot what street it was.  It was at someone's house, and I was just supposed to pick him up.

Q    Did you have plans to do anything with him after you picked him up?

Page 35

A    No.

Q    And I believe you said you were just supposed to pick him up at someone's house, but you don't know whose house it was?

A    Yeah.  No, my son, he -- yeah.

Q    And you weren't working that day; is that correct?

A    No.

Q    Did Anna Lisa know you were using her car at that time?

A    Yes.

Q    And would she let you borrow that Nissan?

A    Yes.

Q    And do you know what she was doing that day?

A    She was working.

Q    And where did she work at that time?

A    An outpatient up there in Loma Linda.

Q    Sorry.  Could you repeat that?

A    Some outpatient hospital right there in Loma Linda that's connected to the Loma Linda Hospital.

Q    And what did she do for that outpatient hospital?

A    I'm not sure.  I forgot the name, what

Page 36

like her actual position is.

Q    Is she a nurse or a doctor or any type of medical provider to your knowledge?

A    She prepares the rooms and cleans up after surgeries.

Q    Prior to being contacted by the police officers in the morning of February 10, 2023, where had you been coming from?

A    (Inaudible.)

Q    Sorry, I didn't hear you.  Could you please repeat?

A    An associate of mine.  A friend, yeah.

Q    You were visiting with a friend?

A    Yes.

Q    Okay.  And do you recall their name?

A    Monica.

Q    Monica?

A    Yeah.

Q    And do you have a last name for Monica?

A    No.

Q    And where were you with Monica prior to driving to pick up your son?

A    On K.  On K Street.  K Street right there. It's like a -- it's like a little street off of 14th Street.

Page 37

RENATO URENA - February 11, 2026

Q    Okay.  So somewhere near 14th and K?
A    Yeah, somewhere like that.
Q    Would that have been a house or apartment?
A    A house.
Q    Is that Monica's house?
A    I couldn't even tell you.  She had just been -- I guess you could say she's fighting cancer, so like she's not doing too well.  I mean, I just went to see like -- yeah, she's doing bad, you know.  She's got cancer.
Q    Okay.  So she was sick, and you were just going to visit with her that morning?
A    Yeah, just encourage her.  She's sick.  She's got cancer.
Q    Is Monica still alive currently?
A    That I am aware of, yes.
Q    And do you recall approximately what time you left that house on K Street prior to being contacted by the police officers?
A    It was early.  It was early in the morning, you know.  Before 12:00.  Before 10:00.
Q    Would you say you left that house just a few minutes before the police --
A    Yes, sir.
Q    -- contacted you?

Page 38

A    Yes, sir.
Q    It wasn't like hours before the police contacted you; right?
A    It was right after.
Q    And how long had you been at that house on K Street?
A    Maybe half hour.  Yeah, half hour.  Under an hour.  Under half an hour, something like that.
Q    And where had you been prior to that house?
A    A casino.
Q    And do you recall the name of the casino?
A    San Manuel right there in San Bernardino.
Q    Is that the one in Highland?
A    Yes, sir.
Q    And how long had you been at that casino?
A    A couple hours.
Q    Do you recall when you left the casino?
A    Early in the morning.
Q    Would that have been after 4:00 A.M.?
A    Yeah.
Q    Had you been drinking in the 12 hours prior to being contacted by the police?
A    I don't drink.  Water.
Q    Had you been -- had you consumed any recreational drugs before being contacted by the

Page 39

police officers?
A    No.  That morning I was sober.
Q    So you hadn't had any alcohol or drugs in the 24 hours before being contacted by the police officers?
A    Marijuana.  Marijuana, but that was it.
Q    Okay.  When had you consumed any marijuana prior to being contacted by the police officers?
A    Like 15 minutes before that.
Q    I'm sorry?
A    15 minutes before.
Q    15 minutes before the police contacted you?
A    I'd say 15 minutes.
Q    Would that have been at the K Street house?
A    Yeah.
Q    Did you go to the casino with anybody?
A    No.
Q    Were you on any medication at that time?
A    Suboxone.
Q    Could you spell that?
A    Your guess would be as good as mine.  Suboxone.  A spelling for it I couldn't tell you.
Q    And is that medication that was prescribed to you?
A    Yes.

Page 40

Q    And what was your understanding of what that medication was supposed to be for?
A    It's an anti-opiate to keep me from doing opiates.
Q    Like to treat addiction?
A    Yes.
Q    And how long had you been on Suboxone?
A    2021.
Q    And the other drugs or medication that you had taken in the 24 hours prior to being contacted by the police officers, how much marijuana would you say you consumed in those minutes before the police contacted you?
A    Just a hit.  Like half a cigarette.
Q    When was the last time you had slept prior to your encounter with the police on February 10, 2023?
A    That day.  The day before.
Q    When you say "the day before," can you give me an estimate as to what time you last slept?
A    The day before.  I'd go to sleep at 10:00, 11:00, and wake up at 10:00 the next day.
Q    Okay.  Just so I make sure I understand correctly, you believe you woke up around 10:00 A.M. on --

Page 41

BAYSIDE REPORTING COMPANY    (888) 229-9897
www.baysidedepo.com

RENATO URENA - February 11, 2026

A    The day previously.

Q    -- February 9th, 2023?

A    Yes.

Q    Okay.  And do you recall how many hours of sleep you had gotten that night?

A    No.  I don't record or -- no, sir.

Q    Okay.  Do you recall the last time you may have eaten a meal before your encounter with the police on February 10th, 2023?

A    Around at lunch.

Q    Do you recall approximately what time that was?

A    No.

Q    Would it have been before you got to the K Street house?

A    Oh, yes.

Q    And just so I understand, you were living at the Fourth Street apartment at that time; right?

A    Yes, sir.

Q    On February 9th, 2023, do you think you had worked at all?

A    No.  We were in the middle of waiting for another job.

The guy I was working for just started a startup, and it was word of mouth, and a couple

Page 42

days.

Most of the time between jobs would be maybe a week, 10 days, but it was usually just nonstop working, you know.

Q    Do you recall like what if anything you had been doing prior to going to the casino in the evening of February 9th, 2023?

A    Enjoying the day.

Q    Do you recall any specific activities you were doing?

A    Just sitting there enjoying the day outside looking at the sky.  I'm out of prison, out of jail, enjoying freedom.

Q    So at some point you leave the K Street house, and a few minutes later you get contacted by the San Bernardino police officers?

A    Yes, sir.

Q    How did you first become aware of there being police officers driving behind you?

A    Ever since I left the K Street house they were behind me.

Q    When you first noticed the police officers --

A    I was on 14th Street.

Q    And when you first noticed them, had they

Page 43

activated their lights and siren at that point?

A    They were just following me.

Q    Okay.  So you were driving on 14th Street --

A    Yes, sir.

Q    -- and you see the police car behind you; is that correct?

A    Yes, sir.

Q    At some point after driving for a little while did they ultimately activate their lights and siren?

A    Yes, sir.

Q    About how long in terms of time was it between the time you first noticed the car behind you, the police car behind you, to when they activated the lights and siren?

A    A couple minutes.

14th Street is a long street.

Q    Could you estimate how long in terms of distance you drove with the police car behind you before it activated its lights and siren?

A    No, but it seemed like a long time it was behind me.  I noticed it.  I had seen (inaudible.)

Q    Could you say you drove more than a block?

A    Oh, yeah.

Page 44

Q    More than three blocks with the police car behind you before it activated its lights?

A    They were taking a little less than three blocks.

Q    What was your reaction to seeing the police vehicle behind your car?

A    Nothing.  Just like acting normal.

Q    Do you recall what cross street you were near when the police car first activated its lights and siren?

A    Oh, when they activated their siren I was on Mr. Vernon and 14th Street.

Q    Had you already turned onto Mr. Vernon at that point?

A    I was in the process of turning.

Q    And after the lights and siren on the police car were activated what was your reaction?

A    I was running.

Q    Did you say you were "running"?

A    Yep.

Q    Did you understand that the police officers were attempting to pull you over?

A    Yep.  Yes, sir.

Q    So you chose not to immediately pull over to the side of the road; is that correct?

Page 45

RENATO URENA - February 11, 2026

MR. CARPENTER: I'm going to take just a quick five minutes and just look over my notes, but then I think we should be done.

THE WITNESS: Go ahead. Thank you.

THE VIDEOGRAPHER: Off the record at 1:30 P.M.

(Recess.)

THE VIDEOGRAPHER: We're back on the record at 1:34 P.M.

BY MR. CARPENTER:

Q   Okay. Sir, after the shooting had you had any other encounters with San Bernardino Police Officers?

A   Yeah. Well, not San Bernardino. San Bernardino Sheriff.

Q   Okay. But not the City of San Bernardino Police Officers?

A   No, sir.

Q   Have you had any interactions with the officers Officer Davalos or Estrella, since the shooting?

A   No, sir.

Q   Are there any mental health complaints that you attribute to the shooting?

A   I cannot complain. A lot of things are wrong, but I can't bring it up in prison or jail.

Page 122

Q   Do you feel you suffer from any mental health issues as a result of the shooting?

A   Yeah. Yes, sir.

Q   And can you describe what types of mental health issues you feel you suffer from as a result of the shooting?

A   What kind of man -- this is my own thinking. I'm not even a man. Do you understand what I'm saying? Like I'm in a chicken coop with all kinds of chickens but I cannot mate with the chickens. I'd be a liar if I said I don't wish that. A lot of lonely, strenuous nights thinking on that, yeah.

Q   Do you feel you suffer from depression or anxiety or anything as a result of the shooting?

A   A lot of those. I'm scared. I'm scared to say anything, scared. Scared of a lot of things.

Q   Do you ever experience flashbacks or nightmares of the shooting?

A   No, I just -- I try not to think about it.

MR. CARPENTER: That's all I have.

MR. TERRELL: I have no questions.

THE VIDEOGRAPHER: Okay. This concludes the deposition of Mr. Renato Urena. We're off the record

Page 123

at 1:38 P.M.

THE COURT REPORTER: Mr. Terrell, would you like to order a copy of the transcript?

MR. TERRELL: Yes, please.

THE COURT REPORTER: Okay. Thank you.

MR. TERRELL: Thank you.

(Whereupon the deposition proceedings were concluded at 1:38 P.M.)

Page 124

DECLARATION AND ERRATA SHEET

I declare under penalty of perjury that I have read the foregoing transcript of my deposition testimony taken on Wednesday, February 11, 2026, in _____, California, and that, with the following exceptions, the transcript is a true record of the testimony given by me at that deposition:

Page/Line   Should read          Reasons for Change:

_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____

_____  _____
DATE            RENATO URENA

Page 125

RENATO URENA - February 11, 2026

COUNTY OF LOS ANGELES,   )

STATE OF CALIFORNIA.      )

   I, CHRISTINE GORDON, Certified Shorthand Reporter, licensed in the State of California, License No. 7709, hereby certify that the deponent was first duly sworn and the foregoing testimony was reported by me and was thereafter transcribed with computer-aided transcription; that the foregoing is a full, complete, and true record of said proceeding.

   I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceeding and caption named or in any way interested in the outcome of the cause in said caption.  The dismantling, unsealing, or unbinding of the transcript will render the reporter's certificate null and void.

   In witness whereof, I have hereunto set my hand this day:  February 23, 2026.

____ Reading and signing was requested.

____ Reading and signing was waived.

__X_ Reading and signing was not requested.

_____

CHRISTINE GORDON,  CSR NO. 7709

Page 126