# EXHIBIT 1

**RJF & Associates Inc.**
**Robert Fonzi**
*Training and Consulting*
robert.fonzi@yahoo.com

**P.O. Box 1154**
**Yucaipa, CA  92399**
**951-312-9679**

**February 27, 2026**

Carpenter, Rothans & Dumont LLP
500 South Grand Avenue, 19th Floor
Los Angeles, California 90071

Attention: Scott J. Carpenter | Attorney at Law
Re: ***Urena v. City of San Bernardino et al.***
Case No. 5:24-cv-00341-JGB-SHK

Dear Mr. Carpenter,

In accordance with the Federal Rules of Civil Procedure 26(a)(1)(B), this report sets forth my opinions regarding police procedures, specifically the issues related to the police response, de-escalation efforts, and use of force involving Officers Estrella and Davalos with the San Bernardino Police Department.

It is my understanding that additional discovery materials may still be pending. I reserve the right to obtain additional discovery that may assist in further evaluating this matter. Additionally, I reserve the right to add, change, or delete any of my opinions based on further discovery, should a supplemental report be submitted. I will be available for deposition upon reasonable request before the discovery cut-off date at a mutually agreeable date and time.

## I.    Summary of Qualifications:

Specifically, my responsibilities included directing and supervising subordinate executive and command staff; coordinating and commanding subordinate personnel in the management of administrative support services and criminal operations; interpreting and anticipating implications of proposed legislative/regulatory changes regarding correctional facilities; and developing, directing, and implementing policy and procedural changes resulting from legislative changes, procedures, or departmental philosophy.

Before my position as Undersheriff, I was an Assistant Sheriff with the San Bernardino County Sheriff's Department.  As the Assistant Sheriff, I was responsible for all support operations within the organization.  My administrative duties included directing, planning, coordinating, and managing all functions within a major area of the Sheriff's Department's assigned responsibility.

1

Before I was appointed Assistant Sheriff, I served as a Deputy Chief with the San Bernardino County Sheriff's Department. I was responsible for several bureaus: Administrative Services, Court Security, Training Division, Detentions, and Corrections.

Before my promotion to Deputy Chief, I served as the commanding officer of the Sheriff's Employee Resources Division, which provides a wide range of services to the Sheriff's Department. Under my command, this division conducted background investigations, participated in state-wide recruiting, was responsible for the department's payroll and benefits, coordinated hiring through County Human Resources, and provided services for department personnel through the Sheriff's Employee Assistance Team (SEAT).

Before I was appointed Deputy Chief, I served as the commanding officer of the West Valley Detention Center, where I was responsible for various personnel matters, disciplinary actions, and policies and procedures that adhered to applicable state and federal laws.

I served as the Chief of Police for the City of Yucaipa (a contract city with the San Bernardino County Sheriff's Department). My responsibilities included station operations, personnel management, conducting criminal investigations, providing use-of-force training, and overseeing support staff. I also served on multiple community projects and committees and participated in city events.

I am a 32-year veteran with the San Bernardino County Sheriff's Department and the San Diego Police Department. I have several years of experience in patrol work in San Bernardino and San Diego counties. My expertise includes patrol operations, criminal investigations, internal affairs, civil liabilities, training, canine coordinator, and corrections.

I am best known in the field of peace officer training. With over 19 years of experience, I have trained approximately 10,000 law enforcement officers nationwide. My expertise is extensive in the use of force and police procedures. I have testified as an expert witness in numerous civil and criminal trials in state and federal courts.

II.    **Curriculum Vitae and Court Testimony:**  I have attached my curriculum vitae, which outlines my training, knowledge, and experience. Additionally, I have attached a list of court testimony within the past five years.

III.    **Compensation:** A copy of my fee schedule, which outlines my compensation for professional services, is attached:

IV.    **Charts / Exhibits**: I have attached charts/exhibits that I may use for testimony and/or trial proceedings pursuant to the Federal Rules of Civil Procedure.

2

V.    **Materials Reviewed:**  As of the date of this report, I have reviewed the following reports, materials, and documents.

1.    Complaint for damages
2.    12.16.2024 - P's Response to City of San Bernardino's RFP, Set 1
3.    12.16.24 - P's Response to City of San Bernardino's ROGS, Set 1
4.    File folder with BWC SB 00122 – 00153
5.    Deposition - Davalos
6.    Deposition - Estrella
7.    Deposition - Renato Alfonso Urena
8.    Urena-Public-Release
9.    Policies and procedures
10.   Photos
11.   Investigative reports
12.   Applicable P.O.S.T. training
13.   Applicable policies and procedures

Note: I am informed and believe that I have received all Disclosures and Discovery Responses produced in this case, as well as all deposition transcripts completed before the date of this report. The foregoing list underscores those records to which I devoted substantial consideration. If any items were inadvertently omitted from the foregoing list, this expert will gladly supplement it upon questioning under oath and reserve the right to supplement the list in a supplemental report.

VI.   **Summary of Opinions:** The following opinions are based on my review of the materials listed as well as my training, knowledge, and experience.  I am prepared to testify and/or explain my opinions regarding the police procedures giving rise to this litigation.  I do not intend to offer my opinions on the ultimate issues in this action. However, I reserve the right to offer opinions based on my areas of expertise, even if such opinions embrace the ultimate issues in the incident.  Additionally, I reserve the right to amend these opinions based on additional testimony and/or discovery documents.

*Police practices and procedures* encompass training that covers a range of topics, including police response, communication, resources, use of force, and tactics, all based on the totality of the circumstances.  The application of police practices and procedures may vary depending on the information known or unknown by the officer(s) at the time of the incident.

Note: None of my opinions is intended to usurp the jury's province and is not stated as an ultimate issue. Instead, my opinions involve the consistency of the officers' actions with standard police practices.

**NOTE: The text in this report in italics is taken verbatim from the discovery materials and has not been edited for spelling, grammar, content, and/or context.**

3

1. Based on my review of the listed materials, a police officer acting consistently with standard police practices and training would conclude that there was *reasonable suspicion[1]* for Officers Davalos and Estrella to initiate contact and *detain (detention)[2]* Renato Urena (hereinafter referred to as Urena). The initial information included, but was not limited to, the following:

- February 10, 2023, during the morning hours, Officers Davalos and Estrella were on patrol in the western district of the City of San Bernardino.
- Officer Estrella and Davalos were working as partners as Officer Estrella drove while Officer Davalos rode as the passenger.
- The officers received information that there was a man who was possibly armed with a gun who was driving a silver or gray Nissan Versa near the intersections of 14th Street and K Street and Massachusetts Avenue.
- Officers Davalos and Estrella were familiar with the area and knew that the location described was a known gang area, located near an open and in-session elementary school.
- Officers Davalos and Estrella responded to the area in an attempt to locate the suspect vehicle.
- At approximately 1015 hours, Officers Davalos and Estrella located a silver Nissan Versa turning westbound onto 14th Street from K Street. Officers Davalos and Estrella noticed the Nissan had a broken front windshield, in violation of *California Vehicle Code section 26710[3]*.
- The Nissan continued westbound on 14th Street and drove through the intersection of 14th Street and Garner Avenue without stopping at the stop sign, in violation of *California Vehicle Code section 22450[4]*.

---

[1] **Reasonable Suspicion:** The suspicion necessary to make an investigative stop or detention. For it to be valid an officer must articulate certain facts justifying a stop for investigative purposes. First, the officer must be able to identify the criminal activity and/or the suspicious circumstances. Secondly, the person to be detained is reasonably suspected by the officer to be connected to the criminal activity. Finally, articulate those specific facts that exist under the totality of the circumstances at the time.

[2] **Detain or detention** is an act that empowers a police officer to stop a person for the limited purpose of investigating if, a crime/violation of the law is about to take place, is in progress, or has taken place.

[3] **California Vehicle Code section 26710:** It is unlawful to operate any motor vehicle upon a highway when the windshield or rear window is in such a defective condition as to impair the driver's vision either to the front or rear.

[4] **California Vehicle Code section 22450:** The driver of any vehicle approaching a stop sign at the entrance to, or within, an intersection shall stop at a limit line, if marked, otherwise before entering the crosswalk on the near side of the intersection.

2.  Based on my review of the listed materials, it is my opinion that a police officer acting consistently with standard police practices and training would conclude that Officers Davalos and Estrella had ***probable cause***[5] to place Urena under arrest for interfering, delaying, and obstructing a police officer in violation of ***California Penal Code section 148(a)***[6], brandishing a firearm in a threatening manner in violation of ***California Penal Code section 417***[7], and shortly thereafter, for drawing and exhibiting a firearm in a rude manner in the presence of a police officer, in violation of ***California Penal Code section 417(c)***[8]. The officers had a reasonable belief that Urena had the intent, ability, and placed others in jeopardy of serious injury and/or death, while displaying a firearm. Thus, the applicable criminal acts would apply when Urena presented a serious threat under the circumstances.

The information, observations, and actions of Urena, which contributed to the officer's perception and ***threat assessment***[9], including but not limited to the following:

- As the Nissan approached the intersection of 14th Street and North Mt Vernon Avenue, the officers activated their emergency lights and a forward-facing red light to initiate a traffic stop.
- Instead of pulling over as required, Urena drove through the intersection, failing to stop at the stop sign, and made an abrupt northbound turn onto North Mt Vernon Avenue.
- In response to Urena's failure to stop, the officers activated the patrol unit's siren. Once again, Urena failed to stop as he continued driving north on North Mt Vernon.

---

[5] **Probable cause:** This exists when the totality of the circumstances causes an officer to believe that the person is guilty of a crime reasonably. The totality of the circumstances and the person (s) involved have acted unusually or suspiciously in relation to some criminal act (s), and the person being detained is directly involved.

[6] **California Penal Code section 148(a)**(1): Every person who willfully resists, delays, or obstructs any public officer, peace officer, in the discharge or attempt to discharge any duty of his or her office or employment, shall be punished by a fine or imprisonment.

[7] **California Penal Code section 417 (a) (1):** Every person who, except in self-defense, in the presence of any other person, draws or exhibits any deadly weapon whatsoever, other than a firearm, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a deadly weapon other than a firearm in any fight or quarrel is guilty of a misdemeanor, punishable by imprisonment. Every person who, except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a firearm in any fight or quarrel, is punishable.

[8] **California Penal Code section 417(c):** Every person who, in the immediate presence of a peace officer, draws or exhibits any firearm, whether loaded or unloaded, in a rude, angry, or threatening manner, and who knows, or reasonably should know, by the officer's uniformed appearance or other action of identification by the officer, that he or she is a peace officer engaged in the performance of his or her duties, and that peace officer is engaged in the performance of his or her duties, shall be punished by imprisonment.

[9] **Threat assessment:** involves an officer processing the totality of the circumstances by identifying a threat, a suspect's ability to carry out a threat, and the officer's ability to formulate a response to the threat.

- Urena drove approximately 20 to 30 yards north and then suddenly veered into the southbound traffic lanes, driving on the wrong side of the road.
- As the Nissan headed north in the southbound lanes of traffic, Urena opened the driver's door and, with the vehicle still moving, he jumped from the vehicle and ran westward toward a vacant field.
- Officer Estrella stopped the patrol car, and both officers quickly jumped out, chasing after Urena.
- Officer Estrella issued repeated commands for Urena to stop and show his hands. In response, Urena refused to comply, continuing to run away while holding onto his waistband.
- As Officers Davalos and Estrella pursued Urena on foot, they saw him (Urena) reach into his waistband with his right hand.
- Officers Davalos and Estrella continued to issue repeated commands for Urena to stop, show his hands, and stop reaching into his waistband.
- In response, Urena refused to comply as he continued running westward.
- As the officers continued chasing Urena, Officer Davalos saw Urena pull a dark-colored semi-automatic handgun from his waistband with his right hand.
- In that moment, Officer Estrella was able to see what he believed to be the bottom of a gun's magazine.

3. Based on my review of the listed materials, it is my opinion that a police officer acting consistently with standard police practices and training would conclude that Officers Davalos and Estrella used reasonable force in self-defense and defense of others to stop the threat presented by Urena, who they believed was armed with a handgun. In response to the perceived threat, Officers Davalos and Estrella had only a split second to address the deadly threat posed by Urena, with little to no time to de-escalate the situation. Both Officer Davalos and Estrella repeatedly gave multiple commands and warnings to Urena.

Instead of complying with the officer's repeated commands, Urena ran a stop sign and drove into oncoming traffic. Without stopping his vehicle, Urena opened the vehicle door, got out, and ran from the officers. The officers were in a marked police vehicle and wore uniforms clearly identifying them as police officers as they chased Urena. Both officers repeatedly ordered Urena to show his hands and to stop reaching; however, Urena refused to comply.

At no time during the incident did Urena indicate that he would surrender or comply with the officers. Every attempt made by Officers Davalos and Estrella to de-escalate the situation and to gain cooperation from Urena was met with active resistance.

When Officers Davalos and Estrella both saw Urena's gun pointed in their direction, they feared for their own lives, each other's lives, and for the lives of others at the nearby elementary school.

6

Officers Davalos' and Estreall's fear was objectively reasonable under the circumstances. Urena had refused repeated commands and demonstrated his willingness to use force to evade arrest. Urena dove into the tall bushes into what Officer Davalos described as a tactical-prone shooting position and pointed the gun at the officers. A reasonable officer in a similar situation with similar knowledge would also have believed their lives and those nearby were in imminent danger.

Additionally, the officers' use of force included the following applications, all of which were consistent with standard police practices and de-escalation tactics, and were reasonable given the ***totality of the circumstances or TOC[10]***.

- Uniform presence (show of force)
- Repeated verbal commands
- Presented a firearm in preparation for self-defense and defense of others
- Use of deadly force

The information, observations, and actions of Urena, which contributed to the officer's perception, included but were not limited to the following:

- In response to the perceived threat, seeing Urena pull the gun from his waistband, both Officers Davalos and Estrella pulled their handguns as Urena continued running, heading toward a field of tall brush and a nearby home surrounded by a tall fence.
- Officers Davalos and Estrella continued giving Urena multiple commands to stop and to stop reaching. Officer Davalos yelled at Urena and warned him that he would be shot.
- As Urena reached the field of tall brush, he suddenly dove face down into the tall brush as he turned toward the officers with the handgun in his right hand.
- In response to Urena pointing the gun toward the officers, Officer Davalos and Estrella fired their weapons at Urena, striking him.

4. Based on my review of the listed materials, it is my opinion that an officer conforming to standard police practices and training would conclude that it was reasonable to believe that Urena posed a serious threat of injury or death to Officers Davalos and Estrealla.  An officer conforming to standard police practices and training would conclude that Urena presented an ***imminent threat[11]*** of death and/or serious bodily injury based on the totality of the circumstances.

---

[10] **Totality of the circumstances or TOC** in law enforcement refers to a standard for evaluating police actions, requiring consideration of  all surrounding facts and events, not just isolated ones, to determine if a situation was objectively reasonable, particularly regarding probable cause for searches and the excessive use of force. This comprehensive, flexible approach, established by Supreme Court cases like Illinois v. Gates and Graham v. Connor, examines the entire event's timeline to assess the legal justification for an officer's actions, even if the most critical events unfold rapidly.

[11] **Imminent threat** means a significant threat that police officers reasonably believe will result in death or serious bodily injury to themselves or to other persons. An imminent threat is not limited to "immediate" or "instantaneous."

Furthermore, Urena's deliberate actions included refusing to comply with repeated commands, acts consistent with an attempt to assault a police officer with a deadly weapon (firearm), and placing others in imminent danger. These undertakings enhanced the officer's perceived threat assessment. The totality of the circumstances that contributed to the officer's perception included, but was not limited to:

- Based on information and observations, Officer Davalos and Estrella regarding a man who was potentially armed with a gun, they attempted to perform a traffic enforcement stop.
- The information they received indicated that a man was possibly armed with a gun, driving in a known gang area, and near an elementary school, which demanded an immediate response to investigate.
- Officers Davalos and Estrella both demonstrated commitment to public safety when they responded to the information broadcast by dispatch and when they attempted to conduct a traffic enforcement / investigatory stop on the Nissan Versa driven by Urena.
- Having information that the driver (Urena) may be carrying a gun and seeing Urena reaching around inside the vehicle as he drove, enhanced the officers' concern for the public and officers' safety by waiting until they were in a safer location before initiating the traffic stop.
- Urena demonstrated his unwillingness to comply with repeated commands from the officers who attempted to stop him.
- The officers activated their vehicle's overhead emergency lights, forward-facing red light, and siren to stop Urena's vehicle.
- Instead of yielding for the traffic stop, Urena ran from his moving vehicle, forcing the officers to chase him on foot.
- Officers Davalos and Estrella repeatedly ordered Urena to show his hands and stop reaching.
- Urena refused to comply with the officers' repeated commands.
- Officers Davalos and Estreall saw Urena pull a dark colored handgun from his waistband as they chased him.
- Both officers slowed their pace in an effort to give themselves more distance from Urena.
- Urena was armed and running toward homes, so Officer Davalos and Estrealla had a duty to continue their foot pursuit in spite of the risk to themselves. of him.
- As Urena approached the occupied homes, a tall chain-link fence, and a vacant field, both officers were concerned for their own safety as well as the safety of the public.

---

A person may pose an imminent danger even if they are not, at the moment, pointing a weapon at another person. Reasonable belief that if the actions of an individual/suspect(s) continue to occur, there is a strong probability and likelihood that it would cause serious injury and/or death.

- Both officers were concerned they would lose sight of Urena when he reached the fence line and the field, so while they kept some distance, they couldn't stay too far behind Urena.
- As soon as Urena reached the fence line and the field, Officer Davalos yelled, "Gun, gun, gun," warning Officer Estrella of the danger.
- As both officers were moving forward towards Urena, he suddenly dove into the tall brush, making it harder for the officers to see him.
- In that split second, Officers Davalos and Estreall were forced to react to a situation that was rapidly unfolding
- While Officer Davalos and Estrella came to a sudden stop, they each saw Urena with the gun in his right hand, pointing it at the officers.
- When Urena pointed the gun at Officers Davalos and Estrella, both officers feared that Urena was about to shoot them.
- Officers Davalos and Estrella were forced to make a split-second decision and react to the imminent threat posed by Urena when he pointed the gun at them.

5. Based on my review of the listed materials, it is my opinion, as determined by standard police practices and training, that under the circumstances, the use of deadly force by Officers Davalos and Estreall was consistent with standard police practices. Therefore, an officer conforming to standard police practices and training would conclude that, in a split-second moment, it was objectively reasonable, based on their perception and **_fear for their own lives and/or that of others_**[12], to use deadly force to stop the life-threatening actions that Urena created.

   The actions of Urena would cause a reasonable officer acting consistently with standard police practices under the same circumstances to believe that he was attempting to assault Officers Davalos and Estrella with a deadly weapon (handgun) and threaten the safety of others in the immediate area; thus, creating a situation that appeared to be life-threatening. Furthermore, the use of deadly force to stop Urena's life-threatening actions, under the totality of the circumstances, comports with both national and statewide training standards.

6. Based on my review of the incident and the material provided thus far, "action vs. reaction time" is a factor that must be considered when evaluating the dynamics of this incident and Officers Davalos' and Estrella's decision to use deadly force.

   "Action vs. Reaction Time" training addresses what's "reasonable" in a use-of-force encounter with a suspect and an officer's split-second response to a suspect's attack and/or assault. An officer's split-second response to a suspect's actions (action vs. reaction time) is the difference in time between an action and a reaction.

---

[12] **Fear for his own life and/or that of others.** An officer may use deadly force to protect oneself or others when (from the perspective of a reasonable law enforcement officer) the officer has the objective and reasonable belief that his/her life, or the life of another, is in imminent danger of death or serious physical injury based upon the totality of the facts known to the officer at the time.

In law enforcement, it refers to a police officer's response to a suspect's actions. The delayed response is because the suspect will have the advantage of lag time, which is the brief period it takes for a police officer to 1) perceive a threat, 2) formulate a response, and 3) execute a reaction.

Several factors influence lag time, including distractions, divided attention, focused vision, environmental factors, and other related variables. A suspect can act and decide before an officer can perceive the act, recognize it as a danger, and respond accordingly. The issue is further explained later in this report.

7. Based on my review of the listed material, it is my opinion, as determined by standard police practices and training, that police officers have no duty or obligation to perform advanced first aid or medical care beyond their experience and basic law enforcement training. However, the training instructs police officers to secure the scene and summon emergency medical personnel as soon as possible.

**First aid/medical treatment:** The training that police officers receive regarding medical care focuses on basic first aid. In any situation, the priority is to ensure the safety of both officers and the public. If deemed necessary, the second priority is to summon emergency medical services to the scene. Another concern for emergency personnel is air/fluid-borne pathogens to which officers may be exposed when in contact and/or providing first aid to suspect(s).

**Primary responsibilities as a first responder:** Police officers should assume the primary responsibility for:

- ensuring officer safety as well as the safety of ill or injured individuals and the public
- evaluating the emergency situation
- taking necessary enforcement actions related to the incident
- initiating actions regarding the well-being and care of ill or injured persons

**Urgent Enforcement Actions Required:**
- Protection of victim(s) from aggressor(s)
- Control of suspect(s) and/or bystanders
- Immediate protection of a crime scene

Police officers are responsible for protecting their own safety and the safety of other EMS personnel, the ill or injured person, and the public, and for controlling the scene. When determining appropriate safety precautions to take, officers should consider possible dangers from:

- exposure to biological hazards (e.g., body fluids such as blood, saliva, etc.)
- armed suspects, angry bystanders, etc.
- unsafe scene conditions (e.g., unstable buildings, nearby vehicle traffic, etc.)
- environmental hazards (e.g., fire, exposure to dangerous chemicals, chance of explosion, etc.)

- animals (e.g., pets, wild animals)

**Pathogens:** Infection and disease are caused by pathogens that are spread through the air or by contact with another person's blood or body fluids.

**Bloodborne pathogens:** Pathogens are agents that cause disease. Germs that can persist for long periods in human blood and cause disease are called bloodborne pathogens. The most common and dangerous bloodborne germs in hospitals are the Hepatitis B and Hepatitis C viruses. These viruses cause infections and liver damage. HIV (human immunodeficiency virus). This virus causes HIV/AIDS.

**The allegations include criticisms that**, "*After being shot with rounds from a lethal firearm, URENA was immobile, bleeding profusely, and in obvious and critical need of emergency medical care and treatment. Defendants did not timely summon medical care or permit medical personnel to treat URENA. The delay of medical care to URENA caused URENA extreme physical and emotional pain and suffering, and was a contributing cause of URENA'S serious physical injuries,* which, based on the discovery material provided thus far, is unfounded.

- Officers Davalos approached Urena, placed him into handcuffs, and turned him onto his side in a recovery position while they waited for medical aid to arrive.
- While Officer Davalos secured and tended to Urena, Officer Estrella searched through the tall brush for Urena's handgun.
- As additional officers arrived on scene, Urena's fully loaded .40 caliber handgun was found adjacent to the scene, just on the other side of the tall chain-link fence.
- Urena was transported to the hospital, where he was treated for his injuries.

**Officer Davalos**
- *Davalos told me that he did not have any equipment on his person with which he could've stopped the suspects bleeding.*
- *He said that he did place the suspect in the recovery position to ensure that he would not choke on vomit or blood.*
- *Davalos told me that medical aid was called for the suspect and that he had requested medical aid himself, for the suspect.*
- *This request for medical aid for the suspect was made just after the suspect was taken into custody and placed in handcuffs.*
- *Davalos said that he remembered telling dispatch to "start medical aid."*
- *Davalos did not recall if permission had been given to clear medical aid to enter the scene.*
- *Davalos told me that he had only requested medical aid after he determined that the scene was safe.*

11

- *Davalos informed me that he and Estrella both looked for gunshot wounds to the suspects body together.*

### Offcier Estrella

- *Ofc. Estrella told me that he did not recall if there was any medical aid rendered to the suspect.*
- *Estrella said that he was immediately ordered to step away from the scene once paramedics and a supervisor had arrived.*
- *Ofc. Estrella said that someone had authorized medical aid to respond to the scene, but he did not remember who.*
- *Estrella told me he remembered telling responding officers to have AMR respond to the north portion of the vacant lot so that they could easily reach the suspect as soon as possible.*

8. Based on my review of the material listed, it is my opinion, as determined by standard police practices and training, that the officers followed appropriate state law, department policies, tactics, de-escalation/escalation of force principles, and the training guidelines taught statewide by California P.O.S.T.

9. Based on my review of the listed material, it is my opinion that there is no indication that the San Bernardino Police Department's training, policies, procedures, encourages, or condones poor police tactics, procedures, or the use of excessive force (deadly or non-deadly) by any member of the Department.

**NOTE: The text in this report that is in italics is taken verbatim from the discovery materials and has not been edited for spelling, grammar, content, or context.**

VII.    **Basis for Opinions:**

1. **Traffic enforcement stop and incident involving Renato Urena:** On February 10, 2023, during the morning hours, Officers Davalos and Estrella were on patrol in the western district of the City of San Bernardino. Officer Estrella and Davalos were working as partners as Officer Estrella drove while Officer Davalos rode as the passenger. The officers received information that there was a man who was possibly armed with a gun who was driving a silver or gray Nissan Versa near the intersections of 14th Street and K Street and Massachusetts Avenue. Officers Davalos and Estrella were familiar with the area and knew that the location described was a known gang area, located near an open and in-session elementary school. Officers Davalos and Estrella responded to the area in an attempt to locate the suspect vehicle.

At approximately 1015 hours, Officers Davalos and Estrella located a silver Nissan Versa turning westbound onto 14th Street from K Street. Officers Davalos and Estrella noticed the Nissan had a broken front windshield, in violation of *California*

12

*Vehicle Code section 26710*[13]. The Nissan continued westbound on 14th Street and drove through the intersection of 14th Street and Garner Avenue without stopping at the stop sign, in violation of *California Vehicle Code section 22450*[14].

Officers Davalos and Estrella waited to initiate a traffic enforcement stop on the Nissan until after it had passed a known gang-related house where several individuals were lingering outside. As they followed the Nissan westbound on 14th Street, Officers Davalos and Estrella noticed that the vehicle had a single occupant (the driver), later identified as Renato Urena. As the officers followed the Nissan, they saw Renato Urena (hereinafter, Urena) reach into the car. Once again, the officers waited to initiate a traffic enforcement stop because they were near a school. As the Nissan approached the intersection of 14th Street and North Mt Vernon Avenue, the officers activated their emergency lights and a forward-facing red light to initiate a traffic stop.

Instead of pulling over as required, Urena drove through the intersection, failing to stop at the stop sign, and made an abrupt northbound turn onto North Mt Vernon Avenue. In response to Urena's failure to stop, the officers activated the patrol unit's siren. Once again, Urena failed to stop as he continued driving north on North Mt Vernon. Urena drove approximately 20 to 30 yards north, then suddenly veered into the southbound lanes, driving on the wrong side of the road. As the Nissan headed north in the southbound lanes of traffic, Urena opened the driver's door and, with the vehicle still moving, he jumped from the vehicle and ran westward toward a vacant field.

Officer Estrella stopped the patrol car, and both officers quickly jumped out and chased after Urena. Officer Estrella repeatedly commanded Urena to stop and show his hands. In response, Urena refused to comply, continuing to run away while holding onto his waistband. As Officers Davalos and Estrella pursued Urena on foot, they saw him (Urena) reach into his waistband with his right hand. Officers Davalos and Estrella continued to issue repeated commands for Urena to stop, show his hands, and stop reaching into his waistband. In response, Urena refused to comply as he continued running westward. As the officers continued chasing Urena, Officer Davalos saw Urena pull a dark-colored semi-automatic handgun from his waistband with his right hand. In that moment, Officer Estrella was able to see what he believed to be the bottom of a gun's magazine.

In response to the perceived threat, seeing Urena pull the gun from his waistband, both Officers Davalos and Estrella pulled their handguns as Urena continued running, heading toward a field of tall brush and a nearby home surrounded by a tall

---

[13] **California Vehicle Code section 26710 (a):** It is unlawful to operate any motor vehicle upon a highway when the windshield or rear window is in such a defective condition as to impair the driver's vision either to the front or rear.

[14] **California Vehicle Code section 22450 (a):** The driver of any vehicle approaching a stop sign at the entrance to, or within, an intersection shall stop at a limit line, if marked, otherwise before entering the crosswalk on the near side of the intersection.

fence. Officers Davalos and Estrella continued giving Urena multiple commands to stop and to stop reaching. Officer Davalos yelled at Urena and warned him that he would be shot. As Urena reached the field of tall brush, he suddenly dove face down into the tall brush as he turned toward the officers with the handgun in his right hand. In response to Urena pointing the gun toward the officers, Officer Davalos and Estrella fired their weapons at Urena, striking him.

The officers then approached Urena, placed him into handcuffs, and turned him onto his side in a recovery position while they waited for medical aid to arrive. While Officer Davalos secured and tended to Urena, Officer Estrella searched through the tall brush for Urena's handgun without success. As additional officers arrived on scene, Urena's fully loaded .40 caliber handgun was found adjacent to the scene, just on the other side of the tall chain-link fence. Urena was transported to the hospital, where he was treated for his injuries.

2. **According to Officer Davalos's verbatim summary of his interview:** *Ofc. Davalos told me that he and Ofc. Estrella had received information that a subject in a gray or silver Nissan versa was possibly armed around 14th Street and K Street or 14th and Massachusetts Avenue in the city of San Bernardino. Ofc. Davalos said that he and Ofc. Estrella were in the area looking for a vehicle matching that description. Ofc. Davalos said that he observed the vehicle driving, and the car made a westbound turn onto 14th Street. from K Street. Ofc. Estrella was driving their department patrol unit. Ofc. Davalos explained that he observed the suspects' car had a broken front windshield, and that the driver made a westbound turn onto 14th Street. from K Street. Davalos noted that the broken front windshield was a CVC violation. The vehicle then proceeded westbound on 14th Street towards Massachusetts Avenue. The vehicle then stopped at the stop sign and went through the intersection. The vehicle then approached the intersection of 14th Street and Garner Avenue.*

*As the vehicle approached the intersection of 14th Street and Garner Avenue, it failed to stop completely at the limit line of the intersection. Ofc. Davalos and Ofc. Estrella then made the decision to not stop the vehicle because they knew that the area in which they were in was known to be gang territory. Ofc. Davalos further explained that this was known to be gang territory of the Westside Verdugo criminal street gang. Because of this, Officer Davalos said that they did not want to stop the car in an area where other gang members may attempt to intervene during the traffic stop. In addition, Ofc. Davalos said that the nearby elementary school was in session and that they did not want to stop the car near the school in case the subject inside the car was armed. Ofc. Davalos said that he and Ofc. Estrella did not want the suspect to have an opportunity to flee into the elementary school. Ofc. Davalos said that he was familiar with the school grounds and that there were usually two gates, which were open and allowed access into the school from the street. Because of these considerations Ofc. Davalos told me that he and Ofc. Estrella waited until the subject drove closer to 14th Street and Mount Vernon Ave.*

14

*As Ofc. Estrella and Ofc. Davalos approached the intersection of 14th St. and Mount Vernon Ave. the overhead lights of the patrol unit were turned on, to include a forward-facing red light. Ofc. Davalos told me that he then activated the siren of the vehicle while he noticed that the vehicle was occupied by one person.*

*The suspect vehicle then failed to stop at a stop sign and made an abrupt northbound turn onto Mount Vernon Ave. The suspect vehicle then traveled approximately 20 to 30 yards and made a sudden northwest diagonal turn into the southbound lanes of traffic of Mount Vernon Ave. Ofc. Davalos said that this driving presented a danger to vehicle traffic traveling on Mount Vernon Ave. and was another vehicle code section violation.*

*Officer Davalos told me that at this point, he thought that the driver would either attempt to flee in the vehicle and a pursuit would be initiated, or the driver would flee the vehicle and a foot pursuit would be initiated. Ofc. Davalos added that he and Ofc. Estrealla had noticed that the driver appeared to be reaching around the inside of the vehicle. Based upon the information that Davalos had at the time he thought that this behavior was consistent with the suspect having a gun in his possession. Ofc. Davalos considered the possibility that the suspect would shoot at officers.*

*Ofc. Davalos told me that he then observed the driver exit the vehicle while grabbing his waistband with both of his hands. Ofc. Davalos exits the front passenger seat of the police unit as Ofc. Estrella exits the driver seat of the patrol unit. Ofc. Davalos then put out radio traffic that they had a subject fleeing westbound. Ofc. Davalos told me that he observed that the suspect was holding his waistband with his left hand and tugging on something with his right hand. Ofc. Davalos told me that based upon his training and experience chasing persons holding firearms that this was common. Ofc. Davalos added that this is done because the person is usually attempting to hold their waistband in place while trying to remove the gun from their waistband with the other hand. Ofc. Davalos explained to me that he had witnessed this occur many times.*

*Ofc. Davalos said that he was watching the suspect attempt to remove the gun from his waistband. As they engage in a foot pursuit, they chased the suspect approximately 20 to 30 yards. During the foot pursuit officer Davalos said that the suspect was given multiple commands by officers to stop. Ofc. Davalos told me that at this point he became scared because he believed that the suspect may pull out the gun from his waistband and attempt to shoot at Ofc. Estrella or himself. Ofc. Davalos then observed the suspect use his right hand to pull from his waistband a dark colored firearm. Ofc. Davalos explained that he witnessed this occur over the shoulder of the suspect.*

*Ofc. Davalos then told me that he slowed down his pursuit of the suspect to give some space between the suspect and himself in case the suspect turned and fired at officers. Ofc. Davalos told me that he thought that the next thing that would happen was the suspect firing at officers. Davalos told me that he thought about the backdrop behind*

15

*officers. Davalos said that the suspect backdrop was the elementary school across the street which he thought was in session. Davalos also said that he considered that the suspect had been fleeing towards a residential neighborhood which he may choose to continue to flee into. Davalos thought about the suspects potential knowledge of the residential area and the likelihood that he would attempt to jump fences through yards in the neighborhood. Ofc. Davalos also considered that allowing the suspect to flee into the residential area would afford him potential cover, concealment, and positions of ambush against officers. Ofc. Davalos explained that he wanted to prevent the suspect from being able to flee into the residential neighborhood.*

*Ofc. Davalos clarified that he had previously seen the suspect holding the gun over the suspect's right shoulder. Upon seeing the gun over the suspect's right shoulder, he believed that the suspect was about to shoot at them. Ofc. Davalos gave the suspect multiple commands to drop the firearm and informed him that if he did not drop the firearm, he would shoot him. Ofc. Davalos described the suspect fleeing towards the southeast corner of a residential property alongside which was tall brush approximately waist high. Ofc. Davalos believed that the suspect would either attempt to flee into the backyard of the house or ambush officers at the corner of the property line. Ofc. Davalos then considered that when the suspect arrived at the corner, he would have the potential cover and concealment of the nearby fence line, the concealment of the tall weeds, along with any cover and concealment provided by other objects in the field such as large rocks. Ofc. Davalos believed that the suspect was trying to ambush officers by fleeing to the positional that he did.*

*Ofc. Davalos told me that he continued to give commands to the suspect to stop and informed the suspect that he would shoot him. Ofc. Davalos said that once the suspect passed the corner of the property, he yelled, "gun, gun, gun" because he still saw him with a gun. Ofc. Davalos said that neither he nor Ofc. Estrella told the suspect to get down onto the ground and that he had done so on his own. Ofc. Davalos believed that the suspect did this to obtain a tactical prone shooting position at which to fire at officers. Ofc. Davalos said that as he approached closer to the suspect who was laying in this prone position. He saw the suspect turn towards him with the gun in his right hand. Ofc. Davalos said that the gun was pointing directly at him. In response Davalos opened fire.*

*Ofc. Davalos said that he saw the suspect looking directly at him, while pointing the gun towards him. Ofc. Davalos at this time believed that the suspect was going to kill him and so he fired his weapon at the suspect. Ofc. Davalos said that he believed the suspect would shoot him, or his partner (Ofc. Estrella) and that he was concerned for the safety of the public. Ofc. Davalos told me that due to the school being behind them, He felt concerned for the children there and any children or parents traveling to and from the school. Ofc. Davalos told me that he felt the need to "stop the threat."*

16

*Ofc. Davalos told me that he fired his weapon at the suspect until he felt that the suspect was no longer a threat. Davalos then performed a tactical reload of his weapon and reassessed the situation. At this point Ofc. Davalos heard the suspect moaning and groaning and saw him still reaching around the area where he was laying. Davalos yelled to the suspect to "stop reaching." Davalos gave the suspect multiple commands to stop reaching around. At this time Ofc. Davalos  told me that he feared that the suspect would again attempt to shoot at officers. Ofc. Davalos then ordered the suspect to place his hands behind his head, which he did. Ofc. Davalos said that the suspect finally complied with his order (after multiple orders being given to him to which he did not comply). After seeing the suspect's hands behind his head. Ofc. Davalos and Ofc. Estrella approached the suspect. Ofc. Davalos said that he provided lethal handgun cover for Ofc. Estrella while Ofc. Estrella holstered his weapon and handcuffed the suspect.*

*After the suspect was handcuffed, Officer Estrella provided dispatch with their updated location over the radio. Ofc. Davalos then turned the suspect over into the recovery position on his right side. Ofc. Davalos then asked the suspect where he had been hit and attempted to locate any bullet holes. Ofc. Davalos said that he attempted to locate any bullet holes on the suspect to better assist with the emergency medical response to the suspect. Ofc. Davalos also told me that he turned the suspect onto his side, so that if the suspect had any blood or vomit in his throat. It would not obstruct his airway, causing him to choke. Ofc. Davalos told me that he had the suspect in this position until medical aid arrived and continued speaking with the  suspect during this time. Ofc. Davalos asked the suspect where he had been shot and the suspect was answering. Ofc. Davalos said that he was continuing his assessment of the suspect's injuries so that if he identified an arterial bleed on the suspect's body, he may be able to apply a tourniquet or apply pressure to stop or slow the bleeding. As Ofc. Davalos was performing emergency medical care he was communicating with Estrella . Shortly thereafter, medical aid arrived and transported the suspect by ambulance.*

*Ofc. Davalos told me that there were no communications issues or concerns that affected him during the incident. Ofc. Davalos and Ofc. Estrella communicated constantly during the incident which Davalos told me enhanced his ability to manage the situation.*

*Ofc. Davalos told me that he was familiar with the area, and that he knew it to be a known Westside Verdugo Sur Crazy One's gang territory. Ofc. Davalos told me that the area of 14th, Street and Massachusetts Avenue in the city of San Bernardino is known to be a location where shootings and stabbings frequently occur. Davalos told me that he has personally been engaged in foot pursuits and fights with suspects in the area. Davalos also told me that he has made arrests of persons in possession of firearms in the immediate area. Ofc. Davalos told me that the area that he was in caused him to be stressed during the incident. Ofc. Davalos said that frequently during enforcement actions, suspects attempt to intervene between police and*

17

*suspects, especially in neighborhoods where persons are not supporters of law enforcement. Ofc. Davalos also considered that the area is the territory of a known criminal street gang, which may afford the suspect help in hiding or concealing himself or other items of evidence.*

*Ofc. Davalos told me that he and Ofc. R. Estrella had time to develop a preliminary plan for conducting the enforcement stop and chose to do so at a location that would minimize the risk to Public Safety, and the ability of the suspect to flee and receive assistance from other criminal suspects. Ofc. Davalos told me that Ofc. Estrella was driving the unit and he (Ofc. Davalos) was riding in the front passenger seat. Ofc. Davalos told me that when the suspect failed to stop after the overhead lights and sirens had been activated and the suspect reached around the interior of the vehicle and that these actions taken together, caused Ofc. Davalos concern. Ofc. Davalos told me that this was concerning to him because he thought that the suspect would flee to an area where he could more easily hide from officers or flee on foot to an area where he would be able to ambush officers. Ofc. Davalos told me that he associates the behavior of failing to yield to a police car while reaching around the interior of the vehicle with attempting to hide contraband, including firearms.*

*Davalos told me that he did not have a photograph of the suspect. Ofc. Davalos told me he had never seen the suspect before today. Davalos told me that he had information that the suspect was armed. Davalos clarified when I asked him that he had information that a man matching the description of the suspect, driving a vehicle matching the suspect vehicle, was armed with a gun. The information which he had indicated that the suspect was armed with a firearm. Davalos told me that he had never met the suspect or had any contact with them in the past. Ofc. Davalos told me that he did not have any knowledge of the suspects mental health or criminal history past. Davalos also informed me that he had never had any contact with the suspect vehicle and that he did not have any information suggesting the suspect was violent. Davalos also told me that he did not have any knowledge of whether the suspect was on active parole or probation.*

*Davalos confirmed that he had given the suspect repeated verbal commands. Davalos told me that the verbal commands which he gave the suspect were to drop the gun, that he was going to shoot him if he did not drop the gun, and to stop running. Davalos indicated that he told the suspect to drop the gun repeatedly. Davalos also clarified that the commands were not effective because the suspect did not comply with his orders and continued to run and look back at the officers with the handgun in his hand. Davalos told me that he told responding officers where casings were located at the scene and assisted dispatch with setting up a perimeter on surrounding streets.*

*Davalos told me that his stress level during the incident was very high because he thought the suspect was going to kill him or his partner (Ofc. Estrella). Davalos told me that the position where he stood when he shot his gun was the best possible position to gain a view of the suspect and his actions while still maintaining enough*

18

*distance between himself and the suspect to react to the suspects actions. Davalos informed me that he attempted to de-escalate the situation using his uniform presence, the presence of the marked black and white patrol unit with flashing lights and sirens, and multiple verbal commands said loudly and clearly. These multiple verbal commands included the final command that he would shoot the suspect or kill him if he did not drop the gun. The suspect responded to these commands by refusing to comply. The suspect refused to comply through his actions, by pulling a firearm from his waistband, continuing to flee from officers, taking a tactical position behind cover, and pointing the gun at officers.*

*Davalos told me that there was nothing about the lighting conditions which hindered him in any way. Davalos told me that no areas where the incident occurred were covered by darkness and he did not have to use a tactical light in any way. Ofc. Davalos said that the only persons he recalled seeing at the location of the incident were the children across the street at the elementary school. Ofc. Davalos told me that he saw the suspect pointing a gun back at him. Davalos clarified that he said he saw the suspect running with the gun, observed the suspect taking the gun out of his waistband, and then observed the suspect point the gun at him. Davalos told me that the suspect did not give any indication that they were going to comply with his orders. Ofc. Davalos informed me that he did not consider using any other force options other than lethal force. When I asked him why that was Ofc. Davalos told me that other use of force options were not feasible. Davalos informed me that he was addressing deadly force with deadly force.*

*Davalos informed me that he was approximately 10 yards away from the suspect when he fired his weapon at him. Davalos told me that from the time that the traffic stop was initiated to the time the traffic the shooting occurred approximately 30 seconds passed by. Davalos clarified that the total time of the incident from the time that the forward-facing red light of the unit was turned on to the time that the shooting took place was approximately 45 seconds. Davalos told me that he did not use cover because the suspect was the only one with cover. Davalos told me that he remembers aiming his weapon at the suspect's torso. Just prior to the incident. Davalos told me that his weapon was holstered. I then asked the clarifying question of if Ofc. Davalos had his gun holstered or unholstered just prior to the shooting. Davalos informed me that prior to discharging his firearm it was unholstered. Davalos clarified that he drew his weapon during the foot pursuit of the suspect. Davalos told me that he was able to obtain a sight picture of the suspect. Ofc. Davalos told me that he used two hands to shoot with. Davalos said that he was not moving at the time that he was shooting.*

*Davalos told me that the suspect was partially visually obstructed by the weeds in the field; however, Davalos told me that he was able to clearly see the suspect pointing the gun despite the weeds. Davalos clarified that the portion of the suspects body visible to him allowed him to see the gun pointed at him. Davalos told me that the weeds in the field provided the suspect with both cover and concealment.*

19

*Davalos told me that the fence line was also close to the suspect at the time that he fired and that he thought the suspect would have been able to use this as cover as well.*

*Davalos told me that there was a dirt field and a wall in the far distance behind the suspect when he fired his gun at the suspect. Davalos told me that there was no danger to civilians or issues with crossfire with other law enforcement officers. When he fired his weapon. When Davalos fired his gun, he was looking at a barrel of a gun being held by the suspect which was pointing at him.*

*Davalos then demonstrated for me that he moved his left shoulder, backwards, and brought his right hand underneath his left arm and told me that this was the way the suspect had pointed the handgun at him. Davalos described the suspects gun to me as a handgun which he appeared to have an extended magazine attached. Davalos told me that the gun was a semiautomatic firearm. Davalos said that his vision was unobstructed when he fired his weapon by things like sunlight and glare.*

*Just before Davalos fired his weapon, he could hear himself say "gun, gun, gun." While firing his weapon, he could hear the gunshots from both he and Ofc. Estrella firearms. After the shooting. Davalos told me that he heard the suspect moaning, and he heard him giving the suspect orders. Davalos told me that he could not recall anything which distracted his attention during the incident. During the incident.*

*Davalos said that his focus was on the suspect armed with the gun. Davalos said that the incident unfolded "fast" and that it was "all fast". Davalos told me that during the incident. He thought that he was going to die, and his thoughts were focused on his safety and the safety of the schoolchildren behind him. Davalos told me that the suspect took several willful and deliberate actions, which he perceived as forcing him to use lethal force. These actions were running with a handgun, holding a handgun in his hand, which he pulled from his waistband, and then pointing a gun at him. Davalos told me that he recalled the suspect looking back at officers and seeing them in his line of sight as he ran. Davalos told me that he perceived the time passing quickly before the incident. Davalos told me that he could hear his gunshots as he fired his weapon and that he could hear what was being said. After the shooting, Davalos told me that he felt scared prior to the shooting, during the shooting, and during the entire incident.*

*After the incident. Davalos said that he felt lucky to be alive and felt the need to stay composed and slow the pace of the incident down to do his job. Davalos said that if he did not fire his weapon, he thought that the suspect would kill him had he not fired his weapon. Davalos said that he stopped firing his weapon to reassess the situation and to conduct a tactical reload of his firearm. Davalos said that when he reassessed the situation, he saw the suspect continue reaching with his arm. Davalos said that if he had observed the suspect continue reaching for the firearm, he would've continued firing.*

20

*At this point, Davalos told the suspect to place his hands behind his head and he complied. When Davalos fired his weapon, his intent was to "stop the threat." Davalos told me that he did perform a reload of his weapon and that it was a tactical reload.*

*Davalos told me that the suspect did receive medical aid. Davalos told me that he did not have any equipment on his person with which he could've stopped the suspects bleeding. He said that he did place the suspect in the recovery position to ensure that he would not choke on vomit or blood. Davalos told me that medical aid was called for the suspect and that he had requested medical aid himself, for the suspect.*

*Davalos said that he called for medical aid for the suspect over the department radio. This request for medical aid for the suspect was made just after the suspect was taken into custody and placed in handcuffs. Davalos said that he remembered telling dispatch to "start medical aid." Davalos did not recall if permission had been given to clear medical aid to enter the scene. Davalos told me that he had only requested medical aid after he determined that the scene was safe. Davalos informed me that he and Estrella both looked for gunshot wounds to the suspects body together.*

*Ofc. Davalos told me that taking everything into consideration. He believed that the level of force that he used during the incident was necessary. Ofc. Davalos then told me that he normally carries a baton, and pepper spray as less than lethal force options. Ofc. Davalos told me that these tools were department issued tools and approved for carry and use by the San Bernardino Police Department.*

3. **Officer Estrella's verbatim summary of his interview with Detective Keith:**
   *Estrella told me that he and his partner Ofc. Davalos were around 14th Street and Massachusetts Avenue. This was a high crime area and a gang neighborhood. The officers had information that a silver Nissan versa driven by a subject possibly armed with a firearm. Officers observed a matching vehicle traveling northbound on K Street. The vehicle then turned westbound onto 14th Street. Estrella and Davalos noticed that the vehicle had a cracked windshield prior to initiating a traffic stop of the car. Estrella and Davalos decided not to conduct a traffic stop in the area 14th Street and Massachusetts Avenue, due to a house being located on the northwest corner of this intersection which they knew to be associated to a criminal street gang. There were also multiple subjects present at the house at that time.*

   *The suspect vehicle proceeded westbound and after it crossed the intersection with Garner Avenue and 14th Street. The officers again allowed the car to continue further west due to the presence of a school near this intersection. As the vehicle came to the intersection of Mount Vernon Avenue and 14th Street and passed into this intersection the forward-facing red light and siren of the officer's patrol unit was activated after the suspect vehicle failed to stop at the stop sign. The vehicle then immediately proceeded northbound and then west across the opposing lanes of traffic on Mt. Vernon Avenue in a westbound direction towards a vacant field. Before the officer's*

21

*vehicle came to a complete stop behind the suspect car Estrella was able to observe the suspect reaching around inside of the vehicle. Estrella then observed the suspect jump out of the driver's seat of the vehicle while the car was still driving away from him.*

*Estrella exited his patrol unit and began running in a westbound direction towards the vacant lot after the suspect. Estrella immediately noticed the suspect reaching into his front waistband. Estrella told me that at this time he was proximally 10 to 15 feet away from the suspect. Estrella said the suspect continued to pull at an object from his waistband. At this point Estrella observed what he thought was part of a magazine which would be loaded into a handgun. Estrella then observed a cell phone drop from the suspect's rear pocket. Estrella said that he observed the suspect's right hand near what he thought was the magazine of a gun.*

*The suspect then continued to run in a southwest direction towards the vacant field and the residence which was nearby at the field. Estrella saw the suspect pull out what appeared to be a firearm. Estrella said that as the suspect turned the corner around the rear fence line of a property and was able to observe the suspect holding a firearm and pointing it in his direction. At this point Estrella was concerned that the suspect was going to shoot in his direction. Estrella feared that the suspect would shoot him or his partner. When the suspect turned the corner around the back fence of the property Estrella "punched out" with both hands around his firearm and began to fire his weapon. Estrella fired approximately 18 rounds at the suspect. As Estrella was firing, he took a short pause to assess the situation as the suspect was in the brush in the field. Estrella could still observe the suspect reaching with his right arm to the area in front of the suspect's body. Estrella said that he then shot two additional times at the suspect. Estrella then ejected his magazine to reload and reassess the suspect.*

*As Ofc. Davalos maintained lethal coverage of the suspect he remembers that he (Ofc. Estrella) called out to dispatch to set up a perimeter and requested medical aid respond to the scene. Estrella said that he told Ofc. Davalos to maintain lethal coverage of the suspect while he approached the suspect and placed him in handcuffs. Estrella said that he immediately noticed that the suspect had a needle in his right front pocket. Estrella then did a quick pat-down search for additional firearms. Estrella did not locate any firearms on the suspect's person. Estrella continued to search the immediate area for the firearm which she had observed. Estrella noted that there was a large amount of brush located in the field and this created some difficulty when searching. Estrella gave direction to responding officers on scene regarding the fastest way for paramedics and the fire department to access the field and begin treating the suspect. Sgt. Compos then arrived at the scene a short time later and relieved Ofc. Davalos and Ofc. Estrella and also took their safety statement.*

*Estrella confirmed that the initial traffic stop had occurred at a location different from the spot where the suspect had abandoned his vehicle. Estrella told me that he and Ofc. Davalos work the west side of the city as their normal beat and that they*

22

*have made multiple gun arrests around 14th Street and Massachusetts Avenue. He and Ofc. Davalos knew that they were registered gang members at the house at the intersection of 14th Street and Massachusetts Avenue. Estrella told me that for officer safety purposes he and Ofc. Davalos wanted to get away from any additional officer safety threats. Ofc. Estrella went on to say that he was aware that there were children at the nearby elementary school. Ofc. Estrella said that he and Ofc. Davalos wanted to mitigate the potential threat to other members of the public like nearby residents and children at the nearby school.*

*Ofc. Estrella told me that the reasonable suspicion for stopping the vehicle included the vehicle code section violations which he and Ofc. Davalos observed in addition to the vehicle matching the description of the one which they had received information about indicating that the driver of said vehicle was armed with a firearm. Ofc. Estrella said that the information they received about this suspect indicated that the suspect was armed with a firearm.*

*Ofc. Estrella told me that there were no communication issues which negatively affected him during the incident. Estrella also indicated that there were no positive aspects of communication which positively impacted him during the incident.*

*I asked Ofc. Estrella if he was familiar with the area, he said that he was. Estrella told me that through making multiple proactive arrests and responding to calls for service, and listening to the concerns of the local residents he familiarized himself with the neighborhood where they conducted the traffic stop and the concerns of the local community members. Estrella told me that the position of district resource Ofc. entails dealing with specific community issues such as homelessness, robberies, prostitution, traffic collisions, enforcement of laws related to school zones, and reports of narcotics activity. Estrella informed me that district resource officers receive this information often directly from community members and it is their job to address said issues affecting the quality of life of citizens. Estrella said that open dialogue is facilitated with members of the community through regularly scheduled community meetings and in regular interactions with community members in the neighborhoods where they are assigned and at local schools. Estrella told me that a major concern of residents within the Western District where they executed the traffic stop was gang violence.*

*Estrella told me that the area that they were in affected his state of mind because he and Ofc. Davalos have made multiple arrests of persons illegally possessing and/or carrying firearms. Estrella told me that he knew that that specific area was "dangerous" and several documented gang members are known to be in the area. Estrella told me that the potential threat to public safety that the suspect presented meant that he and Ofc. Davalos did not want to conduct enforcement action close to the school when the suspect may be armed.*

23

*Estrella told me that he and Davalos did not have time to develop a plan prior to conducting the traffic stop because the incident unfolded very quickly. When the suspect drove into opposing lanes of traffic, he presented a danger to the public and other vehicles traveling on Mount Vernon Avenue. in a southbound direction.*

*Estrella said that he took into consideration that he would have to respond to the suspect's actions as safely as possible. Estrella said that the suspect then ran through the vacant lot towards residences in the neighborhood. When the suspect exited his vehicle, the car did not appear to stop traveling in Mount Vernon Ave. The vehicle continued traveling in a roughly northbound direction, leading Estrella to believe that the suspect had left the vehicle in drive. Estrella said that when the suspect abandoned the vehicle it made him nervous and that based on his training and experience persons only do this when they are either trying to flee from arrest or hiding something. When the suspect ran in a westbound direction Estrella immediately noticed his right hand go to the front right side of his waistband. Estrella said that he attempted to "flare" out to the right of the suspect to get a better view of the suspect and the object which he was reaching for. It was at this point that Estrella told me that he saw a much better view of the object and what appeared to be the bottom of a firearm. Estrella explained that he "flared" out to give himself a better position to observe as much of the right portion of the suspect's body as possible.*

*Estrella a said that he was concerned that someone who runs usually has their hands out and visible. In his experience officer Estrella told me that someone who's running with their hands concealed in their pants was very concerning to him and he believed that it was because the subject was apparently trying to hide or conceal something in his pants. Estrella told me that at the time the suspect abandoned his vehicle it was in the #2 southbound lanes of traffic facing northbound on Mount Vernon Ave. Estrella said that seeing the suspect's gun pointed in his direction heightened his concern. Estrella said that this occurred while he was chasing the suspect and after he abandoned the vehicle.*

*Ofc. Estrella said that there were lawful orders and commands given to the suspect during the contact, some of the commands were "stop" "let me see your hands" "don't reach." Ofc. Estrella said that he gave those verbal commands and his partner (Ofc. Davalos) also gave other verbal commands. Ofc. Estrella did not recall how many times he gave the suspect these verbal commands but that it was several times. At the time that Estrella I gave the suspect verbal commands the suspect was outside of his vehicle. The approximate distance between Ofc. Estrella and the suspect at the time that the commands were given was approximately 10 to 15 feet. Estrella told me that he gave the commands loudly, with command presence while somewhat frightened. The suspect did not respond to these verbal commands. After being issued these verbal commands, the suspect continued to reach into his waistband and continued to run away from officers. Estrella could not recall any communication between other officers or other responding personnel during the incident.*

24

*Estrella told me that his stress level during the incident was "very high." Estrella said that he advised Ofc. Davalos that he would take over radio traffic. Astray I could hear Davalos his stress being very high, and he remembers that before he put out traffic over the radio he took several deep breaths before speaking. Estrella said that his soon as he and Davalos stopped firing he took over radio traffic. Estrella said that he remembered doing this as he reloaded his firearm.*

*I asked Estrella to tell me why he stood where he did at the time that the shooting occurred. Estrella told me that he did so because Ofc. Davalos was to his left. When the subject was running towards the fence around the property next to the field, he did not want to lose sight of the suspect. He said that he knew that after the suspect passed behind the fence, he may not be able to see the suspect. Estrella wanted to position himself where he could maintain visual contact with the suspect which is why he stood where he did.*

*I asked Ofc. Estrella if he made any attempts to de-escalate the situation with the suspect. He responded that he gave the suspect multiple commands, that he had uniform presence as an officer, that the suspect's flight and officers pursued together with the marked patrol unit they were driving, and lights and sirens of the car all represented methods of de-escalation. Estrella said that the lights of the patrol unit had been activated between Mount Vernon and Garner on 14th St. just before approaching Mount Vernon Ave. Estrella said that the suspect responded to their attempts to de-escalation by refusing to comply with all orders given.*

*Estrella said that at the time of the incident the area was brightly lit, and he was able to see what the suspect was holding in his waistband. Estrella also said that there were no visual obstructions between he and the suspect which would've blocked his view from the time that the suspect exited his vehicle to the time of the shooting. Nothing about the lighting concerned officer Estrella. Estrella said that there were no areas of darkness which caused him to use a tactical light. Estrella said that he did not remember seeing anyone else besides the suspect and Ofc. Davalos in the area at the time of the shooting.*

*I asked Ofc. Estrella what occurred or was about to occur that prompted him to react and take the Suspect into custody or use force against him. Ofc. Estrella replied that he thought "that he was about to shoot me." Ofc. Estrella said that the suspect's actions including pointing a gun in his direction indicated to him that he was going to shoot, hurt, or kill he or his partner and did not indicate that he was going to comply with the orders. Based upon Ofc. Estrella is training and experience he did not consider using other force options because the threat of the suspects handgun should be properly addressed with his own handgun. Estrella said that he perceived the suspect to be capable of using the highest level of force and that he could kill Ofc. Davalos or himself.*

25

*I asked Estrella what he saw when the suspect pointed the gun at him. Estrella said that while the suspect was running away from him, he saw the gun go behind the area of his waist which Estrella thought was associated to his running movements. Estrella said that he no longer saw the magazine of the gun, and he saw the other end of the firearm. At this time Estrella told me that he thought "I was going to be shot." Estrella clarified that the portion of the gun which was pointing at him was the bottom of the slide of the firearm and the trigger area of the gun.*

*Estrella told me that the entire incident took place in approximately 10 seconds from the time that the suspect abandoned the vehicle to the times that the shots were fired. Estrella told me that there was no time or opportunity for him to utilize cover or concealment during the incident. Estrella said that the suspect had the opportunity to use the gate near where the incident occurred as cover or concealment. Estrella told me that from his perspective the gate was to his right and in front of him. Ofc. Davalos was positioned to his left. Estrella told me that there were no issues with crossfire between he and Ofc. Davalos.*

*At the time that Estrella a fired he was aiming for the stomach area of the suspect. Estrella motioned to his stomach area as he told me this. Prior to the shooting officer Estrella's handgun was un-holstered because he had seen the suspect running with the firearm. Estrella told me that he drew his firearm in response to the suspects actions which he perceived as potentially dangerous. Estrella told me that he was able to clearly acquire the target of the suspect using the sides of his firearm when he fired. When Ofc. Estrella a fired he used two hands, and he was moving while he fired. Estrella said that he was moving between a running and speed walking pace at the time that he fired. There were no visual obstructions when Ofc. Estrella a fired his weapon. At the time that Ofc. Estrella fired his weapon the distance between him, and the suspect was approximately 10 feet. At the time that Ofc. Estrella a fired he did not remember there being any objects between him and the suspect. In the backdrop of the suspect at the time that Ofc. Estrella fired was several hundred feet of vacant field and beyond that a residence with a cinderblock wall. Ofc. Estrella did not perceive there to be any danger to civilians or crossfire issues with law enforcement because of him firing his weapon. Ofc. Estrella told me that he was looking at the suspects hands at the time that he fired his weapon. At the time that Ofc. Estrella fired his weapon. Ofc. Estrella told me that he fired 18 total rounds during the incident.*

*Ofc. Estrella told me that he did not perform any lifesaving measures on the suspect, but that Ofc. Davalos placed the suspect on his side. Ofc. Estrella did not know why Ofc. Davalos placed the suspect on his side. Ofc. Estrella told me that from his perspective the incident unfolded extremely fast. Ofc. Estrella said that immediately prior to him shooting the suspect he perceived the suspect's actions as determined to harm himself or Ofc. Davalos. Estrella told me that he heard the gunshots as they were being fired and could not recall hearing anything else. Ofc. Estrella said that he heard Ofc. Davalos yell "gun gun gun" at least more than one time. Ofc. Estrella said that he and Ofc. Davalos have worked together as district resource officers since*

26

*September 2022. In the time that they have worked together he is never heard Ofc. Davalos say gun repeatedly as he did during the incident. At the time that Ofc. Davalos said this officer Estrella believed that the suspect would shoot them. Immediately after the shooting occurred Ofc. Estrella said that his adrenaline was high and that he was breathing heavily. Ofc. Estrella told me that he thought about what could've happened when he saw the gun pointed in his direction had he not reacted the way he did. Ofc. Estrella told me that he thought he would die if he did not fire his weapon. Ofc. Estrella, I believed that the suspect would kill him.*

*Ofc. Estrella said that after he reassessed the threat, he observed that the suspect was in the prone position and was not moving very much. Ofc. Estrella interpreted this as indicating that the level of force which they had used was sufficient and that it was appropriate to secure the suspect. Ofc. Estrella described the prone position that the suspect was in as having the pelvic area on the ground. Ofc. Estrella told me that his intent when he fired his weapon was to not be shot. Ofc. Estrella said that he performed a tactical reload right after firing his weapon.*

*Ofc. Estrella told me that he did not recall if there was any medical aid rendered to the suspect. Estrella said that he was immediately ordered to step away from the scene once paramedics and a supervisor had arrived. Estrella explained that he did not remember if he or anyone else had requested medical aid for the suspect. Ofc. Estrella said that someone had authorized medical aid to respond to the scene, but he did not remember who. Estrella told me he remembered telling responding officers to have AMR respond to the north portion of the vacant lot so that they could easily reach the suspect as soon as possible.*

*Ofc. Estrella told me that he perceived the level of force which he used to be necessary after taking the totality of the circumstances into consideration. Ofc. Estrella told me that he normally carries a baton, pepper spray, two pairs of handcuffs, and a radio with him on his belt. I asked Ofc. Estrella if he carried a Taser with him and he responded that he did not.*

4. **Officer Davalos's BWC:** (Times are approx., taken from media player timer and BWC time stamp)

**00:38 / 10:15:50**
- The patrol unit stops, Officer Davalos quickly steps out of the vehicle and yells, "Hey!"
- Officer Estrella also steps out and yells, "Hey, let me see your hands!"

**00:42 / 10:15:53**
- Foot pursuit initiated as Officer Davalos ran southwest. Urena's silver Nissan, still in motion, rolled forward onto the west sidewalk of Mt Vernon Avenue before being lost from the camera view.

27

- As Urena comes into camera view, he runs west toward a vacant lot.
- As Officer Estrella came into camera view, he was running ahead of Officer Davalos, who was chasing Urena.
- Officer Davalos raised his radio's mic to his face and said, "Adam 50, foot pursuit."

**00:45 / 10:15:57**

- Officer Davalos issues several radio broadcasts while still running behind Officer Estrella and Urena.
- Officer Davalos continued his radio broadcast, saying, "We're gonna be headed westbound 14th and …."
- Officer Estrella is heard yelling, "Let me see your fucking hands!"
- Officer Estrella is seen drawing his handgun with his right hand while he continues pursuing Urena.
- Urena ran west through the vacant lot toward residences located several yards to the west.
- Urena's hands remained at his waist while running and did not move side to side in a normal running motion.

**00:47 / 10:15:59**

- Officer Estrella yelled, "Hey, let me see your hands!" while still pursuing Urena.
- While still pursuing Urena, Officer Davalos yelled, "Let me see your hands, let me see your fucking hands!" while pointing his handgun.
- Officer Estrella ran ahead of and to the right of Officer Davalos.
- Officers Davalos and Estrella continued yelling repeated commands at Urena to, "Let me see your hands."
- Urena held his hands near his waistband as he ran.
- Urena's right elbow shifted outward and slightly upward as his left arm shifted inward toward the front of his body.
- It appeared that Urena was reaching into his waistband with one hand while holding onto his waistband with the other as he continued running away from the officers.

**00:49 / 10:16:01**

- Urena ran west toward the vacant field and a chain-link fence.
- Officer Davalos continued with commands, "Let me see your hands. Stop reaching! Stop reaching!"
- Officer Davalos yelled out, "He's reaching!"
- Both officers slowed their pace, while creating distance.
- As Ofcs Davalos and Estrella ran, Ofc. Estrella moved from the camera view; however, his shadow was visible as he ran to the right of Officer Davalos.

28

- Urena continued running with his hands hidden from the officers' view and turned southwest, running toward a vacant field with tall grass and weeds.
- Again Ofc. Davalos yelled, "Stop reaching! You're gonna get fucking shot!"
- Officer Estrella yelled, "Stop reaching!"

**00:57 / 10:16:09**

- As Urena reached the field, a dark colored gun was visible in his hands.





**00:58 / 10:16:10**

- As soon as Urena ran into the field, he dove down into the weeds, disappearing from the camera view.
- As Urena dove down into the tall weeds, Officer Davalos is hear yelling, "He has a gun, he has a gun! He has a gun!"
- Urena was blocked from the camera view by the tall weeds.
- Officer Estrella appears in camera view as he ran in a southwest direction after Urena.
- Officer Davalos raised his arms to the front of his body, holding his gun in a two-handed grip, and pointed it toward the spot where Urena was last seen in the camera view.
- Officer Estrella pointed his gun with his right hand toward Urena's last seen location.

**00:59 / 10:16:11**

- Multiple overlapping gunshots rang out as both officers fired their handguns toward the location where Urena was last seen.
- As the officers fired, they moved closer to where Urena was last seen in the camera view.
- The gunshots briefly stopped, and Urena could be heard moaning.

**01:03 / 10:16:15**

- Officer Estrella fired four rounds in quick succession where Urena had last seen.

**01:04 / 10:16:16**

- Officer Davalos quickly reloads his handgun as Officer Estrella turned to face Officer Davalos and told him, "I got you; I got you."
- Officer Estrella reached for his lapel mic and radio while Officer Davalos held cover, pointing his gun in the direction of Urena.
- Officer Estrella walked northeast and out of camera view.
- Officer Estrella radioed their location, pausing his transmission several times to catch his breath.
- Urena yelled out and briefly extended one arm into the air above the weeds.
- Officer Davalos told him to "stop reaching."
- Urena answered, "I'm not reaching," and raised his arm into the air again.
- Officer Davalos ordered Urena to put his hands up.

**01:13 / 10:16:24**

- Urena heard yelling out, "Oh god."
- Officer Davalos radioed, "Adam-50, Officers are Code-4, shots fired, suspect down."

30

- Officer Davalos heard breathing heavy and with rapid breathing that was clearly audible as he spoke and tried to catch his breath.
- Officer Davalos moved closer to Urena, who was still hidden from camera view by the tall weeds.
- Officer Davalos told Urena to stop reaching, and Urena replied, "I'm not reaching."
- Officer Davalos ordered Urena to put his hands behind his head.
- Officer Estrella came into camera view to the left of Officer Davalos.
- Both officers cautiously approached Urena with their guns pointed towards him.
- Urena came into camera view, lying on the ground.
- Both officers told Urena, "Don't move."
- Urena was on the ground, crying out in pain.
- Officer Estrella placed Urena into handcuffs while telling him, "Hey brother, we are here to help you. You need to listen to what we're telling you."
- Officer Estrella said, "Are you hurt? How can we help you?"
- Urena responded, "You hit me in my stomach."
- Officer Davalos radioed, "Adam-50, suspect's in custody. Start medics, please."
- Urena said, "Help," and asked for some water.
- Both officers, still out of breath, asked each other if they were okay.
- Officer Estrella pulled medical gloves from his pocket.
- Officer Estrella turned away, speaking into his radio while Officer Davalos kneeled beside Urena and began tending to him.
- Officer Estrella turned back to assist Urena.
- Both officers told Urena they were there to help him and asked him where he was hit.
- Urena replied he was hit in his stomach and his legs.

5. **On Feb. 11, 2023, a Forensic Specialist collected DNA samples from the handgun:**
   - DNA results for the swabs were two contributors, male DNA present.
   - Analysis provides firm support that Renato Urena is one of the contributors of the DNA obtained from the swab from the Glock 22, 40 caliber handgun.

6. **Law Enforcement Standard:** Based on my training, knowledge, and experience, I am familiar with the national standards followed by police officers regarding police procedures and the use of force, as well as the specific standards established by the San Bernardino Police Department, which are consistent with standard police practices. Although the wording of the standard may appear to vary somewhat, the standard applied to police officers allows an officer to use reasonable force for self-defense, overcome resistance, prevent an escape, and effect an arrest.

31

Police officers are vested with an affirmative duty to investigate circumstances and situations that may compromise public safety.  Therefore, the use of force in self-defense and defense of others to stop the perceived assault by Urena was reasonable and in conformance with polices, practices, and training statewide and nationally. Based on my review of the incident, the following law enforcement principles would apply to the use of reasonable force:

- Police officers are entitled to protect themselves against a reasonably perceived threat.  Both California State law and POST (Peace Officer Standards and Training) training authorize the use of reasonable force in self-defense, to overcome resistance, to prevent an escape, and to effect an arrest. Because the incident was tense, uncertain, and rapidly evolving, it was appropriate and reasonable to use measures to stop the attack posed by Valdivia under the totality of the circumstances.

- There is a duty for a person to refrain from using force to resist detention, arrest, or acts of a threatening manner.  Whether an officer is detaining someone to investigate, dealing with a disturbance, trespassing, or performing other required procedures, the person has an obligation to comply.

- A person has no right to resist lawful detention, arrest, or the legal process that is required.  If the suspect does not comply, they have violated Penal Code section 148 (obstructing or delaying an officer in the performance of their duties). An officer may use reasonable force for self-protection and to overcome resistance.

- If a person has knowledge, or by the exercise of reasonable care, should have knowledge, that he is being detained, arrested, or confronting a police officer, it is the duty of such person to refrain from using force to resist such or engage in acts of a threatening manner. ***(California Penal Code Section 834a: Duty to Refrain from Resisting Arrest).***

- A police officer, who has reasonable cause to believe that the person to be detained or arrested has committed a public offense, may use reasonable force to effect the arrest, to prevent escape or to overcome resistance.  A police officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested; nor shall such officer be deemed an aggressor or lose his right to self-defense using reasonable force to effect the arrest, or to prevent escape, or to overcome resistance.

The incident at hand represents an arrest and use of force.  The following law enforcement principles apply to the police officers:

32

- An officer is vested with an affirmative duty to ensure public safety as well as officer safety.
- An officer is vested with an affirmative duty to investigate circumstances that tend to support criminal activity and/or other violations of the law.
- An officer is vested with an affirmative duty to protect themselves against an attack and overcome a suspect's resistance.

7. **P.O.S.T. Training and basis for opinions offered:** Police officers must use the force option appropriate for the situation as conditions may change rapidly. Officers must continually reevaluate the subject's actions and be prepared to transition, as needed, to the appropriate force options.

Reasonable force is a legal term for how much and what kind of force a police officer may use in a given circumstance. Penal Code Section 835a states, "Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrest, to prevent escape, or to overcome resistance."

Fourth Amendment "objective reasonableness" standard in 1989, the United States Supreme Court applied an objective standard to a force situation and further established how reasonable force must be judged objectively (Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865) (1989). The Court's analysis began by considering the subject's Fourth Amendment right to remain free from any unreasonable seizure against the government's interest in maintaining order through effective law enforcement.

P.O.S.T. Training and Courts have noted that in determining the objective reasonableness for the use of force, fact-specific, and establish the following four components for determining reasonableness:

- Judged from the perspective of a reasonable officer.
- Examined through the eyes of an officer on the scene at the time the force was applied, not the 20/20 vision of hindsight.
- Based on the facts and circumstances confronting the officer without regard to the officer's underlying intent or motivation; and
- Based on the knowledge that the officer acted properly under the established law at the time.

8. **Threat Assessment and Decision to Use Force:** The threat assessment is a crucial factor to consider when an officer decides to use force. The threat assessment escalates under the totality of the circumstances when there is a reasonable risk to the public and officers' safety. The risk factors that an officer will consider include:

- Suspect's actions
- Public safety concerns

33

- Officer's safety concerns
- Suspect's ability to resist
- Suspect's ability to escape
- The inherent risk posed by the suspect(s) if allowed to continue with actions that placed others in danger, e.g., use of an axe/hatchet

9. ***P.O.S.T.[15] Training - Learning Domain 20: Use of Force/De-escalation and Basis for Opinions Offered:*** Police officers must use the appropriate level of force for the situation, as conditions may change rapidly. Officers must continually reevaluate the subject's actions and be prepared to transition to the appropriate force options as needed.

Reasonable force is a legal term that describes the amount and type of force a police officer may use in a given circumstance. Penal Code Section 835a states, "Any peace officer who has reasonable cause to believe that the person to be arrested has

committed a public offense may use reasonable force to effect the arrest, to prevent escape, or to overcome resistance."

Fourth Amendment "objective reasonableness" standard in 1989, the United States Supreme Court applied an objective standard to a force situation and further established how reasonable force must be judged objectively (Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865) (1989). The Court's analysis began by considering the subject's Fourth.

The right to remain free from any unreasonable seizure against the government's interest in maintaining order through effective law enforcement.

P.O.S.T. Training and Courts have noted that determining the objective reasonableness for the use of force must be fact-specific and established the following four components for determining reasonableness:

- Judged from the perspective of a reasonable officer,
- Examined through the eyes of an officer on the scene at the time the force was applied, rather than through the 20/20 vision of hindsight,
- Based on the facts and circumstances confronting the officer without regard to the officer's underlying intent or motivation; and
- Based on the knowledge that the officer acted properly under the established law at the time.

---

[15] **P.O.S.T.** or California Peace Officer Standards and Training is the statewide governmental agency that establishes training guideline, standards, and mandates for all police officers in the state of California.

34

10. **Law Enforcement training instructs what is considered in suspect encounters involving action versus reaction time:** An officer's split-second response to a suspect's actions can be defined as the difference in the amount of time between an action and a reaction. In law enforcement, it refers to a police officer's response to a suspect's actions. This is because the suspect will have the advantage of lag time, the brief period it takes a police officer to perceive a threat, formulate a response, and execute a reaction.

Several factors influence lag time, including distractions, divided attention, focused vision, environmental factors, and other related variables. A suspect has the advantage of knowing and deciding to act before an officer has the opportunity to perceive the act, interpret it as a danger, and decide how to react. The process of perceiving the suspect's movement, interpreting the action, deciding on a response, and executing the response for the officer takes longer than it takes the suspect to attack with a weapon, even though the officer has already aimed his gun at the suspect.

Training and research have concluded that many of the elements that occur in real-life shootings would undoubtedly add significant time to the officer's reaction time. Police officers have the right to use force, including deadly force, when it is reasonable to do so in self-defense and defense of others. An officer may use force, including shooting, when there is an imminent risk of harm to self or others, or to stop someone who poses a danger to others.

According to conclusions reached by researchers in reaction time studies, an officer's decision to use deadly force under circumstances perceived as life-threatening may very well be considered reasonable by the standards established by training, which takes into consideration the Graham vs. Connor decision (P.O.S.T. LD-20).

Suppose a suspect suddenly points a gun in an officer's direction. In that case, the officer is highly unlikely to respond (get a shot off) to defend himself before the suspect shoots the officer. Even under ideal conditions, an officer may only react in self-defense (fire a weapon) no faster than simultaneously with the suspect or attacker.

The findings, which training is based upon, have served to illustrate the extreme danger that an armed suspect presents to police officers. Even in situations where a police officer has their gun aimed at an armed suspect, and the suspect is not aiming a gun at the officer, the officer is still in extreme danger of under-reacting, which has been referred to as the reactionary gap.

The reasonable standard established by the Graham decision is based on what a well-trained, prudent officer would do in a given situation. The results, based on training and research, show that even well-trained officers with their guns aimed at a suspect cannot reasonably be expected to react faster than a suspect can raise his or her weapon and fire.

As determined by standard police practices and training, this study is essential in advancing the understanding of the dynamics of deadly force encounters, which often differ significantly from the perceptions held by the general public and the media.

The process of **(1) perceiving the suspect's movement, (2) interpreting the action, deciding on a response, and (3) executing the response for the officer** takes longer than it takes a suspect to execute the action of shooting, even though the officer already had their gun aimed at the suspect.  The training and research related to this issue have often occurred in near-ideal conditions from the officers' perspective.

The officer(s) involved in establishing baseline action-versus-reaction times were highly experienced and knew they would encounter a suspect armed with a gun.  The confrontations took place in well-lit rooms, with only a single suspect, with both parties (suspect and officer) remaining stationary, with no distractions, with no attempts by the suspects to deceive the officer(s) before shooting, with officers nowhere close to stress levels related to actual life or death situation, and with no reporting confusing sensory and perceptual distortions.

An essential factor to consider is that the majority of the suspect(s) extended their arms to bring the gun in line with their eyes before shooting in almost every exchange, rather than simply rotating the weapon and firing.  Thus, their assault was slower than a spontaneous, realistic street encounter experienced by police officers.

Based on training and research, the conclusion has been that many of the elements that occur in real-life shootings would undoubtedly add significant time to the average officer's reaction time.

**Perception/Cognitive Processing Time:** This refers to the time required for an individual to receive, recognize, and process sensory signals (e.g., auditory, visual) and formulate a response.  Referring to our brain schematic, it's the time required for sensory input to pass through the "Switchboard" and be processed by the "Thinker" (the sensory cortex).  This is commonly referred to as lag time.

**Motor Reaction Time:** This is the time required for an individual to perform a specific movement, such as lifting their foot off the accelerator, applying the brake, or pulling the trigger on a handgun.  In other words, it's the time required to execute the movement and for the muscles to respond.

**Multi-tasking and its effect on reaction time:** Police officer training and research have concluded that the more an officer multi-tasks and the more complex the required movement is, the longer the reaction times will take.  For example, multiple driving studies (compiled by the National Safety Council, or NSC) have concluded that drivers who multitask while operating a vehicle significantly increase (on average, by 0.6 seconds) their response time required for braking.

36

**VIII.   Conclusion:**

The foregoing opinions are based upon my review of the materials and information received to date concerning the incident that gave rise to this litigation.  I understand that depositions may not yet be conducted in the case, and/or any party may produce additional discovery.  Thus, to that extent, this report should be considered a preliminary report.  Should I receive further information that materially affects any of these opinions, I will submit a supplemental report and/or be prepared to discuss it during future proceedings, as appropriate.  I expect to receive any additional materials or information that might affect my opinions in this matter in a timely manner.

This report was signed on February 27, 2026, in the City of Yucaipa, State of California.

**Robert J. Fonzi**

37